Michael R. Johnson, Esq. (7070)
Jeffrey W. Shields, Esq. (2948)
David H. Leigh (9433)
**RAY QUINNEY & NEBEKER P.C.**
36 South State Street, 14th Floor
Salt Lake City, Utah  84111
Telephone: (801) 532-1500
Facsimile: (801) 532-7543
Email: mjohnson@rqn.com
Email: jshields@rqn.com
Email: dleigh@rqn.com

*Attorney for EB5AN Wohali Utah Fund XV, LP*

---

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF UTAH

| In re: | **Bankruptcy No. 25-24610** |
|---|---|
| **WOHALI LAND ESTATES, LLC**, | Chapter 11 |
| Debtor. | Honorable Peggy Hunt |

---

### MOTION TO DESIGNATE DEBTOR AS A SINGLE ASSET REAL ESTATE DEBTOR AND CHAPTER 11 CASE AS A SINGLE ASSET REAL ESTATE CASE

---

EB5AN Wohali Utah Fund XV, LP ("**EB5**"), a secured creditor and party in interest in this case, through counsel, respectfully moves this Court for entry of an Order designating the Debtor as a single asset real estate ("**SARE**") debtor, and this Chapter 11 case as a SARE case.

In support hereof, EB5 shows the Court as follows:

## FACTUAL BACKGROUND

A.      The Bankruptcy Case, Jurisdiction and Venue.

1.      On August 8, 2025 (the "**Petition Date**"), the Debtor commenced this case by filing a voluntary petition under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") with the United States Bankruptcy Court for the District of Utah (the "**Bankruptcy Court**").

2.      The Debtor currently operates its property and manages the Wohali Project as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

3.      To date, no official committee of unsecured creditors has been appointed in the case.

4.      On its Voluntary Petition [Dkt. 1], the Debtor did not check the box describing its business as "single asset real estate (as defined in 11 U.S.C. § 101(51B)."

5.      Notwithstanding the Debtor's statement on its Voluntary Petition, EB5 asks this Court to designate this Chapter 11 case as a SARE case.

6.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334.

7.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

8.      This Motion raises a core proceeding pursuant to 28 U.S.C. § 157.

9.      The predicate for the relief requested herein is the definition of Single Asset Real Estate found in 11 U.S.C. § 101(51B), as that definition is applied to the Debtor's business operations.

B.    <u>Relevant Facts Supporting a SARE Designation</u>.

10.    The Debtor is the owner of the Wohali planned development located in or near Coalville, Utah.  The Wohali development spans over 5,000 acres across several parcels, and is nestled in a private valley at the base of Lewis Peak (hereinafter, the "**Wohali Project**").

11.    The Wohali Project is in various stages of construction.  Among the many amenities of the Wohali Project, the Debtor owns a golf course called the Eagle Course.

12.    The Eagle Course is a private course that may only be used by people who own property in the Wohali Project and who are members of the golf course, and their invited guests. In short, the golf course is not open or available to members of the general public.  Currently, it is estimated that there are less than twenty paying members.

13.    On its Voluntary Petition, the Debtor made the following statements about the Wohali Project and various concerns regarding the project [Dkt. 1, pg. 3 of 5]:

a.    "Golf course is in need of ongoing professional maintenance to protect its value."

b.    "Public roadway under construction, adjacent areas (privately owned) under construction, work has been suspended and site/property must be secured for safety reasons."

c.    "Public infrastructure improvements including public roadway, municipal sewer lift station upgrades and other improvements are immediately necessary, general health and safety risk affecting the public at large."

d.    "Basic services, such as utilities, are not available to (end-user) property owners, structures accessible to the general public (manor) do not have utility services, general health and safety issues require immediate attention."

e.      "Structures on site must be secured and protected from inclement weather, structures are not weather tight, work must proceed to protect improvements from weather elements."

f.      "Golf course construction areas must be stabilized or planted to prevent erosion or other degradation, other matters as necessary to preserve value."

14.      On August 11, 2022, EB5, as lender, and the Debtor, as borrower, entered into a Loan Agreement ("**Loan Agreement**") to evidence a loan to the Debtor in the principal amount of up to $79.2 million (the "**Loan**"), which Loan was funded by the proceeds received from various foreign investors in connection with the EB-5 Immigrant Investor Program administered under the Immigration and Nationality Act, Section 203(b)(5) et seq.

15.      The intended purpose of the Loan was to allow the Debtor to satisfy certain secured debt related to the Wohali Project, and to also pay for certain construction costs and expenses related to the Wohali Project.

16.      The Loan Agreement, in Section 2.1 thereof, expressly defines the Wohali Project as "the development and construction of a single-family home golf community consisting of approximately 428 residences, a golf course and clubhouse, a lodge, and other amenities . . . on 32 parcels of land totaling approximately 5,064 acres located in" Morgan and Summit County, Utah.  A true and correct copy of the Agreement is attached hereto as Exhibit "A."

17.      The entire Wohali Project is governed by a Master Planned Development Agreement ("**Development Agreement**") with Coalville City Corporation, dated May 25, 2021. A true and correct copy of the Development Agreement is attached hereto as Exhibit "B."

18.     Recital B of the Development Agreement provides: "Master Developer owns certain real property consisting of approximately 1,664 acres located in Coalvile City, as legally described in Exhibit 'A' (the '**Property**'), and more particularly depicted in Exhibit 'B.' Master Developer desires to develop the Property as a master planned development in a manner consistent with the MPD Ordinance, to be developed and known as 'Wohali' (the '**Project**')."

19.     Section 2.2 of the Development Agreement, titled "Project Elements," indicates that the Wohali Project will consist of 125 residential dwelling units, 1,172.83 acres of open space and trails, an 18-hole championship golf course, an executive short golf course, private trials, and various support facilities.

20.     The entire Wohali Project is the subject of an Assessment Ordinance enacted by the Board of Trustees of the Wohali Public Infrastructure District No. 1, a governmental agency, pursuant to which bond funds were raised to install various improvements on the Wohali Project. A true and correct copy of the recorded Assessment Ordinance, which references (among other things) the improvements to be made to all phases of the Wohali Project, is attached hereto as Exhibit "C."

21.     On the Petition Date, EB5 filed its *EB5's (I) Notice of Interest in and Refusal to Consent to Use of Cash Collateral, and (II) Demand for Segregation and Accounting of Cash Collateral* with the Bankruptcy Court. [Dkt. 10]

22.     Shortly thereafter, counsel for EB5 had a telephone conference with counsel for the Debtor wherein counsel for the Debtor informed counsel for EB5 that the Debtor was not in possession of any of EB5's cash collateral.

23.      On August 14, 2025, certain "Wohali Concerned Owners" filed their *Emergency Application for Administrative Expense Claim* (the "**Admin Request**").  [Dkt. 12] The purpose of the Admin Request was to seek administrative priority status for funds expended by the "Wohali Concerned Citizens" on payroll and to keep the Debtor's golf course maintained and operating.

24.      The Court held a hearing on the Admin Request on August 15, 2025.  At the hearing on the Admin Request, it was disclosed that the Debtor has no employees.  It was further disclosed that all employees are employed by Wohali Resorts, Inc., and have been employed by that entity since June of 2025.  Prior to June of 2025, the employees were employed by Wohali Builders, LLC, although that entity is apparently no longer operating.

25.      In email communications between the Debtor's counsel and others, including EB5's counsel, the Debtor's counsel indicated that "Wohali Land Estates, LLC (the debtor) has historically been invoiced for Wohali Builders'/Wohali Resorts' payroll expenses pursuant to an agreement between the parties."

26.      At the hearing on the Admin Request, counsel for the "Wohali Concerned Owners" shared some banking information that counsel apparently obtained from the Debtor or affiliates/representatives of the Debtor concerning the bank accounts which would receive the payroll funding.

27.      Based upon that banking information, it appears that the payroll was funded to two Wells Fargo accounts.  The first account is in the name of Wohali Master Owners Association and ends in X127.  The second account is in the name of Wohali Resort Inc. and ends in X176.

28.    The Debtor filed its Schedules of Assets and Liabilities and Statement of Financial Affairs (the "**Schedules and Statements**") on August 22, 2025.  [Dkt. 36]

29.    In the Schedules and Statements, the Debtor reported that cash assets of $5.31, accounts receivable valued at $200,000.00, $10,000.00 in golf inventory, $25,000.00 in furniture, fixtures and equipment, $1,000,000.00 in rolling stock, and real property which it valued at over $107 million.  [*See generally id.*]

30.    On Schedule G, question 2.7, the Debtor reported that it entered into a 25-year lease with affiliate Wohali Resort, Inc. on March 11, 2024.  [*Id.*, pg. 52 of 65] On information and belief, this lease relates to the golf course, and Wohali Resort, Inc. operates the golf course and collects the revenues associated therewith.

31.    In its Statement of Financial Affairs, the Debtor reported revenues of $9,081,775.00 in 2024 and $5,229,000.00 from January 1, 2025 to the Petition Date.  [*Id.*, pg. 54 of 65]

32.    On information, all or substantially all of these revenues were received from real property sales.

## ARGUMENT

33.    By this Motion, EB5 asks this Court to designate the this Case as a SARE case. As the Court is aware, SARE debtors are subject to special provisions of the Bankruptcy Code, including the provisions set forth in Section 362(d)(3) of the Bankruptcy Code.

34.    Section 101(51B) of the Bankruptcy Code defines "single asset real estate" in relevant part as "a single property ***or project*** . . . which generates substantially all of the gross income of a debtor . . . an on which no substantial business is being conducted by a debtor

other than the business of operating the real property and activities incidental thereto." 11

U.S.C. § 101(51B) (emphasis supplied).

35.     Courts in the Tenth Circuit and elsewhere have applied the following three-part

test to determine if a debtor is subject to the SARE requirements: "(1) [t]he property must be a

single parcel or project; (2) [t]he property must generate substantially all of the debtor's

income; and (3) [t]he debtor cannot conduct any substantial business other than operating the

property." *See In re Kachina Vill., LLC*, 538 B.R. 124, 127 (Bankr. D.N.M. 2015) (collecting

cases).

36.     Here, the Wohali Project consists of multiple parcels. The test for determining

whether multiple parcels constitute a single project is whether the properties are "linked

together . . . in a common plan or scheme involving their use." *In re McGreals*, 201 B.R. 736,

742 (Bankr. E.D. Pa. 1996). Of primary consideration is "whether the debtor treats its

property as a single project or property by virtue of a common plan or purpose." *In re JJMM

Int'l Corp.*, 467 B.R. 275, 278 (Bankr. E.D.N.Y. 2012) (citations omitted).

37.     As shown below, the Wohali Project constitutes a single project, and this case

meets the definition of a SARE case under Section 101(51B) of the Bankruptcy Code and the

case law interpreting that section of the Bankruptcy Code.

A.     The Wohali Project is a Single Project.

38.     There can be no doubt that the Wohali Project constitutes a "single" real estate

project. In fact, this case is a textbook SARE case, and the Debtor's failure to check the single

asset real estate box on its voluntary petition is concerning.

39.    First, in the Loan Agreement between the Debtor and EB5, the Wohali Project is expressly defined as "the development and construction of a single-family home golf community consisting of approximately 428 residences, a golf course and clubhouse, a lodge, and other amenities . . . on 32 parcels of land totaling approximately 5,064 acres located in" Morgan and Summit County, Utah."

40.    Second, the entire Wohali Project is the subject of the Development Agreement with Coalville City.  That Development Agreement expressly provides that all of the Debtor's property will be developed "as a master planned development in a manner consistent with the MPD Ordinance, to be developed and known as 'Wohali' (the '**Project**')."

41.    Furthermore, section 2.2 of the Development Agreement, titled "Project Elements," indicates that the Wohali Project will consist of 125 residential dwelling units, 1,172.83 acres of open space and trails, an 18-hole championship golf course, an executive short golf course, private trials, and various support facilities.

42.    Finally, the entire Wohali Project is subject to an Assessment Ordinance enacted by the Board of Trustees of the Wohali Public Infrastructure District No. 1 pursuant to which bond funds were raised to install various improvements throughout the entire Wohali Project area.

43.    Simply put, the Wohali Project is a master-planned development that is governed by the terms of the Development Agreement with Coalville City and the terms of the Assessment Ordinance enacted by a Public Improvement District.  There is no question that the Wohali Project is a "single project" as that phrase is used in Section 101(51B) of the Bankruptcy Code. *See In re McGreals*, 201 B.R. 736, 742 (Bankr. E.D. Pa. 1996) (for multiple parcels to constitue

a single project, "the properties must be linked together in some fashion in a common plan or scheme involving their use").

    B.    <u>All if not Substantially all of the Debtor's Income is Generated from Operating the Wohali Project and Activities Incidental Thereto.</u>

44.    On its Statement of Financial Affairs, the the Debtor reported revenues of $9,081,775.00 in 2024 and $5,229,000.00 from January 1, 2025 to the Petition Date. [Dkt. 36, pg. 54 of 65]

45.    EB5 is informed and believes that all or substantially all of these revenues were received from real property sales.

46.    While the Debtor also own a golf course, it appears that any revenues generated from that golf course (if any) are collected by Wohali Resorts and, based upon the facts known to date Wohali Resorts also apparently captures any income that is generated from the golf course in the form of user fees, dues, etc.  In short, it appears that the Debtor does not generate any income or revenues from the golf course.

47.    Additionally, it is clear that the minimal revenue generated from the golf course in the form of dues, concessions, inventory sales, etc. is grossly inadequate to cover even the maintenance needs of the golf course.  In fact, EB5 is informed and believes that the Debtor, or its affiliates, have used EB5 loan funds to cover ongoing maintenance and operations.

48.    Finally, even if the income and revenues generated from the golf course belong to and are collected by the Debtor, those revenues and income are being generated from "operating the real property and activities related thereto."  In fact, the ongoing viability of the golf course is critical to the overall success of the Wohali Project, and the golf course is merely an amenity that is being used to sell real estate within the Wohali Project.

49.     The Debtor expressly identified the need for "ongoing professional maintenance to protect its value" in its voluntary petition.  Furthermore, at the hearing on the Admin Request all parties, including the Debtor, recognized and acknowledged that ongoing care and maintenance of the golf course was the key to protecting the value of the entire Wohali Project.

50.     Furthermore, the golf course is not open to the general public.  Rather, it is a private course open only to members, and those members must own property in the Wohali Project.  EB5 is informed and believes that the golf course has less than twenty (20) members.  Furthermore, any dues paid by those members are de minimis and do not generate sufficient revenues to even maintain the golf course.  Thus, the fact that the Wohali Project includes a golf course is irrelevant to the determination of whether this is a SARE case, because the golf course is an amenity for property owners and is not an independent business that generates revenue from sales of greens fees, carts and concessions to the general public.  *Compare In re Larry Goodwin Golf, Inc.*, 219 B.R. 391 (Bankr. M.D.N.C. 1997) (finding that debtor's operation of a public golf course with associated golf cart rentals, a pool and concessions meant that the debtor was not a SARE because "all these activities constitute operating a *business* on the property versus simply the hold of real property solely for income").

51.     Moreover, the only other "income producing activities" engaged in by the Debtor is the sale of real estate, such as residential lots.  Selling real property is the very definition of activity that occurs through "operating" real property.

52.     Thus, the second SARE factor—that "the property must generate substantially all of the debtor's income"—is also met in this case.  *See, e.g., In re Bridle Path Partners, LLC*, Case No. 23-23960 (Bankr. D. Utah) [Dkt. 44, pgs. 8-9] (Anderson, J.) (rejecting debtor's

argument that its business "entails several economic enterprises that include the building lots, the Equine Amenities, and other open space that can be used for farming" because "it is the Debtor's clear intent to create a master-planned, recreational development for a mountain-based community with open space, trails, and amenities to facilitate equine and activities for the primary benefit of homeowners int the community"); *In re Webb MTN, LLC*, 2008 WL 6566271, (E.D. Tenn. Mar. 6, 2008) (holding that a planned development for a golf course resort was a SARE even though the development contemplated a variety of services, buildings and businesses).

> C.      The Debtor does not Conduct any Substantial Business Other than Operating the Real Property.

53.      In the *Bridle Path Partners* case, Judge Anderson found that the case was a SARE case because, among other facts, while the Debtor did generate "some income from the operation of the Equine Amenities, along with the possible lease of open space for farming, it is apparent that the only sufficient source of revenue to repay the creditors with liens on the Property will come from selling the Bridle Path Estate lots and not from these ancillary activities."  *In re Bridle Path Partners*, Case No. (Bankr. D. Utah) [Dkt. 44, pg. 9]

54.      The same is true here.  The Debtor's sole asset is the Wohali Project.  It does not engage in any other business, or own any other asset. And, even if it did the only way for the Debtor to repay EB5—which is owed over $85 million and has a blanket lien on all of the Debtor's asserts--is to sell lots to generate income for debt repayment.

55.      Thus, the third SARE factor—that the debtor does not conduct any substantial business other than operating the real property—is also met in this case.

56.      In summary, the facts show that this is a textbook SARE case.  The Court should grant this motion, designate the Debtor as a SARE debtor, and designate this case as a SARE case.

WHEREFORE, for the foregoing reasons, EB5 respectfully asks this Court to grant this Motion and designate the Debtor as a single asset real estate debtor, and this case as a single asset real estate case.

DATED this 25th day of August, 2025.

RAY QUINNEY & NEBEKER P.C.


/s/  *Michael R. Johnson*
Michael R. Johnson
*Attorneys for EB5AN Wohali Utah Fund XV, LP*

## CERTIFICATE OF SERVICE

I hereby certify that on the 25th day of August, 2025, a true and correct copy of the

foregoing **MOTION TO DESIGNATE DEBTOR AS A SINGLE ASSET REAL ESTATE**

**DEBTOR AND CHAPTER 11 CASE AS A SINGLE ASSET REAL ESTATE CASE** was

electronically filed and therefore served via ECF on all electronic filing users in that case.


_/s/ Annette Sanchez_____
Annette Sanchez

# Exhibit A

---

LOAN AGREEMENT

by and between

WOHALI LAND ESTATES LLC
as Borrower

and

EB5AN WOHALI UTAH FUND XV, LP
as Lender

August 11, 2022

---

LOAN AGREEMENT

THIS LOAN AGREEMENT, dated as of August 11, 2022 (as amended, restated, replaced, supplemented, or otherwise modified from time to time, this "Agreement"), between Wohali Land Estates LLC, a Utah limited liability company (together with its successors and/or assigns, "Borrower") and EB5AN Wohali Utah Fund XV, LP, a Delaware limited partnership (together with its successors and/or assigns, "Lender").

RECITALS

WHEREAS, Borrower has requested a loan from Lender in the principal amount of up to $79.2 million (the "Loan") to be funded by proceeds received from up to 99 investors (the "EB-5 Investors") qualified to participate in a securities offering (the "Offering") conducted in connection with the EB-5 Immigrant Investor Program administered under the Immigration and Nationality Act, Section 203(b)(5) et seq., as amended (the "EB-5 Program");

WHEREAS, Borrower is expected to use the Loan proceeds to fund a portion of costs relating to the Project (as defined herein), all as described more fully in Lender's confidential offering memorandum dated on or about the date hereof, as may be revised from time to time by Lender (the "Memorandum");

WHEREAS, as a condition precedent to the obligation of Lender to make the Loan to Borrower, Borrower has entered into various pledge and security agreements, of even date herewith, in favor of Lender (as amended, supplemented, or otherwise modified from time to time, collectively the "Pledge Agreement") pursuant to which each Pledgor (as defined in the applicable Pledge Agreement) has granted Lender a first-priority security interest in the Collateral (as defined herein) as collateral security for the Loan (collectively the "Pledges");

WHEREAS, as a condition precedent to the obligation of Lender to make the Loan to Borrower, Lender will receive from Borrower (the "Job Creation Guarantor") an EB-5 job creation guaranty in favor of Lender (as amended, supplemented, or otherwise modified from time to time, the "Job Creation Guaranty"), which, subject to certain conditions, shall guarantee the creation of at least 10 EB-5 eligible jobs for every $800,000 accepted by Borrower from Lender, and shall be in form and substance reasonably acceptable to Lender;

WHEREAS, as a condition precedent to the obligation of Lender to make the Loan to Borrower, Lender will receive from Borrower (the "I-526E Approval Refund Guarantor") an I-526E approval refund guaranty in favor of Lender (as amended, supplemented, or otherwise modified from time to time, the "I-526E Approval Refund Guaranty"), which, subject to certain conditions, shall guarantee the return of that portion of the Loan directly applicable to the subscription amount of any EB-5 Investor whose I-526E Petition (as defined herein) is denied by United States Citizenship and Immigration Services ("USCIS"), as more fully described therein, and shall be in form and substance reasonably acceptable to Lender;

WHEREAS, such Loan shall be advanced as hereinafter provided and evidenced by a note (the "Note"), which Note will be secured by the Pledges and assignment of the Collateral as set forth in the various Pledge Agreements; and

WHEREAS, Lender is willing to make the Loan to Borrower, subject to and in accordance with the terms and conditions set forth in this Agreement and the other Loan Documents (as defined herein).

NOW, THEREFORE, in consideration of the making of the Loan by Lender and the covenants, agreements, representations, and warranties set forth in this Agreement, the parties hereto hereby covenant, agree, represent, and warrant as follows:

ARTICLE I
DEFINITIONS; PRINCIPLES OF CONSTRUCTION

Section 1.1    <u>Definitions</u>. For all purposes of this Agreement, except as otherwise expressly required or unless the context clearly indicates a contrary intent, the following terms have the provided meanings:

"<u>Affiliate</u>" means, as to any Person (as defined herein), any other Person that directly or indirectly is in Control of, is Controlled by, or is under common Control (as defined herein) with such Person or is a director or officer of such Person or of an Affiliate of such Person.

"<u>Agreement</u>" has the meaning assigned to it in the preamble hereof.

"<u>Anti-Money Laundering Laws</u>" shall mean the USA Patriot Act of 2001, the Bank Secrecy Act, as amended through the date hereof, Executive Order 1 3324−Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism, as amended through the date hereof, and other federal laws and regulations and executive orders administered by OFAC (as defined herein) that prohibit, among other things, the engagement in transactions with, and the provision of services to, certain foreign countries, territories, entities and individuals (such individuals include specially designated nationals, specially designated narcotics traffickers, and other parties subject to OFAC sanction and embargo programs), and such additional laws and programs administered by OFAC that prohibit dealing with individuals or entities in certain countries regardless of whether such individuals or entities appear on any of the OFAC lists.

"<u>Backcountry Parcel</u>" means the collective assemblage of land parcels with corresponding acreage attached hereto as <u>Exhibit C</u>.

"<u>Borrower</u>" has the meaning assigned to it in the preamble hereof.

"<u>Boyden Family Trust</u>" means collectively the Stephen George Boyden Revocable Inter Vivos Trust Established June 29, 1993, and the Patricia Shumway Boyden Revocable Inter Vivos Trust Established June 29, 1993.

"<u>Boyden Family Trust Subordinate Loan</u>" means the loan of up to $2,700,000 made pursuant to the Boyden Family Trust Subordinate Promissory Note (as defined herein), which ranks junior to the Senior Loan (as defined herein) and the Loan in accordance with the terms of the Intercreditor Agreement (as defined herein).

"<u>Boyden Family Trust Subordinate Promissory Note</u>" means that certain promissory note between Borrower (as assignee of Wohali Partners, LLC) and the Boyden Family Trust, entered as of October 5, 2017, with respect to the Project, as amended by that certain first amendment to promissory note between Borrower (as assignee of Wohali Partners, LLC), entered as of November __, 2017, with respect to the Project.

"<u>Boyden Farms</u>" means Boyden Farms, LLC a Utah limited liability company.

"<u>Boyden Farms Subordinate Loan</u>" means the loan of up to $5,950,000 made pursuant to the Boyden Farms Subordinate Promissory Note (as defined herein), which ranks junior to the Senior Loan (as defined herein) and the Loan in accordance with the terms of the Intercreditor Agreement (as defined herein).

"<u>Boyden Farms Subordinate Promissory Note</u>" means that certain promissory note between Borrower (as assignee of Wohali Partners, LLC) and the Boyden Family Trust, entered as of November 21, 2017, with respect to the Project.

"<u>Bridge Financing</u>" means proceeds advanced to Borrower at any time under the Senior Loan or the Equipment Loan to cover Project expenses in anticipation of receiving future proceeds at any time under the Loan.

"<u>Budget</u>" means the budget, which has been reasonably approved by Lender, setting forth a line item breakdown of all hard costs, soft costs, any other costs and expenses incurred or estimated to be incurred with respect to the Construction of the Project (as defined herein), and relevant assumptions, as such budget is modified from time to time as permitted hereunder.

"<u>Business Day</u>" means each day that is not a Saturday, Sunday, or any other day on which banking institutions in West Palm Beach, Florida, are authorized or required by law to close.

"<u>Capital Stock</u>" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation), and any and all warrants, rights, or options to purchase any of the foregoing.

"<u>Collateral</u>" means the Collateral as such term is defined in the applicable Pledge Agreement.

"<u>Condemnation</u>" means a temporary or permanent taking by any Governmental Authority (as defined herein) as the result, in lieu, or in expectation of the exercise of the right of condemnation or eminent domain, of all or any party of any real property, or any interest therein or right accruing thereto, including any right of access thereto or any change of grade affecting such real property or any part thereof.

"<u>Construction Contract</u>" means a contract entered into with any licensed general contractor for the Construction of the Project, together with any and all extensions, renewals, modifications, amendments, supplements, and replacements thereto and therefor.

"<u>Construction of the Project</u>" means the development and construction of the Project on the Property (as defined herein) in substantial accordance with the Plans and Specifications (as defined herein).

"<u>Construction Schedule</u>" means a schedule for the Construction of the Project in form and substance reasonably satisfactory to Lender, as such schedule is modified from time to time as permitted hereunder.

"<u>Contractual Obligation</u>" means as to any Person, any provision of any security issued by such Person or of any agreement, instrument, or undertaking to which such Person is a party or by which it or any of its property is bound, or any provision of the foregoing.

"<u>Control</u>" means the power to direct the management and policies of an entity, directly or indirectly, whether through the ownership of voting securities or other beneficial interest, by contract or otherwise; the terms "<u>Controlled</u>" and "<u>Controlling</u>" shall have correlative meanings.

3

"Creditors Rights Laws" means any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization, conservatorship, arrangement, adjustment, winding-up, liquidation, dissolution, composition, or other relief with respect to debts or debtors.

"Default Rate" means, with respect to the Loan, a rate per annum equal to 3.0% above the applicable Interest Rate (as defined herein).

"Developer Equity" has the meaning assigned to it in the Memorandum.

"Development Parcel" means the collective assemblage of land parcels with corresponding acreage attached hereto as Exhibit D.

"Disbursement" has the meaning assigned to it in Section 2.2(a) hereof.

"EB-5 Documentation" has the meaning assigned to it in Section 4.13.

"EB-5 Investors" has the meaning assigned to it in the recitals hereof.

"EB-5 Program" has the meaning assigned to it in the recitals hereof.

"EB-5 Program Laws" shall mean, collectively, all laws, statutes, rules, regulations, ordinances, codes, licenses, authorizations, decisions, injunctions, interpretations, orders, or decrees of any court or other Governmental Authority (including, without limitation, USCIS) having jurisdiction over any aspect of the EB-5 Program (see (8 U.S.C. 1153 (b)(5)(A)(i)-(iii), (C), as may be in effect from time to time.

"Environmental Laws" means any and all foreign, federal, state, local or municipal laws, rules, orders, regulations, statutes, ordinances, codes, decrees, requirements of any Governmental Authority or other Legal Requirements (as defined herein) regulating, relating to, or imposing liability or standards of conduct concerning protection of human health or the environment, as now or may at any time hereafter be in effect.

"Equipment Loan" means the loan in principal amount of up to $1,678,625 made pursuant to the Equipment Loan Agreement (as defined herein), which ranks junior to the Senior Loan and the Loan in accordance with the terms of the Intercreditor Agreement.

"Equipment Loan Agreement" means that certain loan agreement between Borrower, Wohali Partners, LLC, Wohali Builders, LLC, and Big Shoulders Capital IX, LLC, entered as of December 16, 2021, with respect to the Project, and the loan documents between such parties related thereto.

"Event of Default" has the meaning assigned to it in Article VI hereof.

"Force Majeure" means the failure of Borrower to perform any Obligation hereunder by reason of any act of God (including fire, flood, pandemic (including without limitation COVID-19), earthquake, windstorm, or other natural disaster), enemy or hostile government action, terrorist attacks, civil commotion, insurrection, sabotage, strikes or lockouts, governmental delays in processing or responding to required applications, requests for approval and similar matters, or any other reason primarily due to a cause or causes beyond the reasonable control of Borrower or any Affiliate of Borrower, as the case may be.

"GAAP" means generally accepted accounting principles in the United States set forth in the opinion and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or

such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied.

"Governmental Authority" means any applicable court, board, agency, commission, office, or other authority of any nature whatsoever for any governmental unit (federal, state, county, district, municipal, city, or otherwise), whether now or hereafter in existence.

"I-526E Approval Refund Guarantor" has the meaning assigned to it in the recitals hereof.

"I-526E Approval Refund Guaranty" has the meaning assigned to it in the recitals hereof.

"I-526E Petition" means the Form I-526E, Immigrant Petition by Regional Center Investor, to be filed with USCIS by each EB-5 Investor.

"I-829 Petition" means the Form I-829, Petition by Investor to Remove Conditions on Permanent Resident Status, to be filed with USCIS by each EB-5 Investor within 90 days prior to the second anniversary of an EB-5 Investor obtaining conditional lawful permanent residence in the United States.

"Indebtedness" means of any Person at any date, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person for the deferred purchase price of property or services (other than current trade payables incurred in the ordinary course of such Person's business), (c) all direct obligations of such Person evidenced by notes, bonds, debentures, or other similar instruments, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all capital lease obligations of such Person, (f) all direct obligations of such Person as an account party or applicant under or in respect of acceptances, letters of credit, surety bonds or similar arrangements, (g) the liquidation value of all redeemable preferred Capital Stock of such Person, and (h) all direct guaranty obligations of such Person in respect of obligations of the kind referred to in clauses (a) through (g) above.

"Indemnitee" has the meaning assigned to it in Section 8.10.

"Intercreditor Agreement" means one or more intercreditor agreements entered into or expected to be entered into between Lender, Senior Lender (as defined herein), and the Subordinate Lenders (as defined herein), as the same may be amended or modified in writing, each of which is expected to reflect that payment priority under the Senior Loan shall rank senior to payment priority under the Loan, and that payment priority under the Loan shall rank senior to payment priority under any loans made by the Subordinate Lenders.

"Interest Rate" has the meaning assigned to it in Section 2.8.

"Job Creation Guarantor" has the meaning assigned to it in the recitals hereof.

"Job Creation Guaranty" has the meaning assigned to it in the recitals hereof.

"Legal Requirements" means all federal, state, county, municipal, and other governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees, and injunctions of Governmental Authorities, including common law, directly affecting Borrower, the Collateral, the Project, the Property or any part thereof, or the construction, use, alteration, or operation thereof, or any part thereof, whether now or hereafter enacted and in force, including, without limitation, any and all permits, authorization, and regulations relating thereto, and all covenants, agreements, restrictions, and encumbrances contained in any

instruments, either of record or known to Borrower, at any time in force affecting Borrower, the Collateral, the Project, or the Property in a manner that would result in a Material Adverse Effect (as defined herein).

"Lender" has the meaning assigned to it in the preamble hereof.

"Lien" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or other security interest or any preference, priority, or other security agreement or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement and any capital lease having substantially the same economic effect as any of the foregoing) but not including community development district debt or its equivalent.

"Loan" means the loan made by Lender to Borrower pursuant to this Agreement, as set forth in the recitals hereof and as further described in Section 2.2 hereof.

"Loan Deadline" has the meaning assigned to it in Section 2.2(a) hereof.

"Loan Documents" means, as applicable, collectively, this Agreement, the various Pledge Agreements, the Job Creation Guaranty, the I-526E Approval Refund Guaranty, the Note, and the Recorded Security Interest (as defined herein), as each of the same may be amended, restated, replaced, extended, renewed, supplemented, or otherwise modified from time to time.

"Loan Party" means any Person that is a party to a Loan Document.

"Loan Tranche" has the meaning assigned to it in Section 2.2(b) hereof.

"Loan-to-Value Ratio" has the meaning assigned to it in Section 2.5(c).

"Material Adverse Effect" means, unless further qualified, a material adverse effect on (a) the business, property, operations, or condition (financial or otherwise), of Borrower, taken as a whole (b) the Project, the Property, or the Collateral, taken as a whole (c) the enforceability, validity, perfection, or priority of this Agreement or any of the other Loan Documents or the rights or remedies of Lender hereunder or thereunder, or (d) the ability of Borrower to perform its Obligations (as defined herein) under the Loan Documents.

"Maturity Date" means, with respect to a Loan Tranche, the date on which the final payment of the principal amount of such Loan Tranche becomes due and payable as herein provided, whether at the expiration of the applicable Term (as defined herein) or by declaration of acceleration, extension, or otherwise.

"Memorandum" has the meaning assigned to it in the recitals hereof.

"Mutual Extension" has the meaning assigned to it in Section 2.7.

"Note" has the meaning assigned to it in the recitals hereof.

"Obligations" means any liabilities, obligations, or Indebtedness now existing or hereafter arising, due, or to become due of Borrower to Lender pursuant to this Agreement, the Note, and the other Loan Documents.

"OFAC" shall mean the United States Department of the Treasury, Office of Foreign Assets Control.

6

"OFAC Prohibited Person" shall mean a country, territory, individual, or person (a) listed on, included within, or associated with any of the countries, territories, individuals, or entities referred to on OFAC's List of Specially Designated Nationals and Blocked Persons or any other prohibited person lists maintained by governmental authorities, or otherwise included within or associated with any of the countries, territories, individuals, or entities referred to in or prohibited by OFAC or any other Anti-Money Laundering Laws, or (b) that is obligated or has any interest to pay, donate, transfer, or otherwise assign any property, money, goods, services, or other benefits from the Project directly or indirectly, to any countries, territories, individuals, or entities on or associated with anyone on such list or in such laws.

"Offering" has the meaning assigned to it in the recitals hereof.

"Organizational Documents" shall mean with respect to any Person, the following duly filed, certified, and/or executed documents or instruments evidencing or confirming the lawful formation and existence of such Person: (a) as to any corporation, its articles of incorporation and bylaws, (b) as to any limited partnership, its certificate of limited partnership and partnership agreement, (c) as to any general partnership or joint venture, its statement of partnership and partnership agreement, (d) as to any limited liability company, its articles or certificate of organization, and operating agreement or limited liability company agreement, and (e) as to any trust, its trust agreement and a certification of the current trustees thereof, each of the foregoing together with all supplements, amendments and modifications thereto.

"Origination Fee" has the meaning assigned to it in Section 2.9(a).

"Origination Fee Refund" has the meaning assigned to it in Section 2.9(a).

"Permitted Encumbrances" means, with respect to the Project, (a) the Lien and security interests created by the Senior Debt and/or any Subordinate Debt (as defined herein), (b) the Lien and security interests created by this Agreement and the other Loan Documents, (c) all Liens, encumbrances and other matters related to any debt senior to the Loan that Lender has approved or may approve in writing in Lender's sole discretion, (d) any trade payables or contractor liens created in the ordinary course of business, (e) Liens, if any, for Taxes (as defined herein) imposed by any Governmental Authority not yet due or delinquent, (f) such other title and survey exceptions as may be approved by the Senior Lender or any holder of Indebtedness senior to the Loan that Lender has approved or may approve in writing in Lender's sole discretion, (g) judgment liens in respect of judgments that do not constitute an Event of Default, (h) easements, zoning restrictions, rights-of-way, site plan agreements, development agreements, operating agreements, cross-easement agreements, reciprocal easement agreements and similar encumbrances and exceptions to title on real property that do not materially detract from the value of the affected property or materially interfere with the ordinary course of business of Borrower or the ordinary operation of such real property, (i) carriers', warehousemen's, mechanics', materialmen's, repairmen's and other like Liens imposed by law, arising in the ordinary course of business and securing obligations that are not overdue by more than 30 days or are being contested in good faith, (j) pledges and deposits made (1) in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations and (2) in respect of letters of credit, bank guarantees or similar instruments issued for the account of Borrower in the ordinary course of business supporting obligations of the type set forth in clause (1), (k) pledges and deposits made to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case in the ordinary course of business, and (l) undetermined or inchoate Liens and charges arising or potentially arising under statutory provisions which have not at the time been filed or registered in accordance with applicable Legal Requirements or which, although filed or registered, relate to obligations not due or delinquent.

"<u>Person</u>" means any individual, corporation, partnership, joint venture, limited liability company, estate, trust, unincorporated association, any federal, state, county, or municipal government or any bureau, department, or agency thereof, and any other entity and, in each case, any fiduciary acting in such capacity on behalf of any of the foregoing.

"<u>Plans and Specifications</u>" means the plans and specifications for the Construction of the Project, prepared by an architect approved by Borrower, and all amendments and modifications thereto from time to time.

"<u>Pledge</u>" has the meaning assigned to it in the recitals hereof.

"<u>Pledge Agreement</u>" has the meaning assigned to it in the recitals hereof.

"<u>Policies</u>" has the meaning assigned to it in Section 4.3 hereof.

"<u>Principal</u>" shall mean Samuel B. Silverman or Michael Schoenfeld.

"<u>Project</u>" has the meaning assigned to it in Section 2.1 hereof.

"<u>Property</u>" has the meaning assigned to it in Section 2.1 hereof.

"<u>Recorded Security Interest</u>" has the meaning assigned to it in Section 2.5(b) hereof.

"<u>Qualifying Expenditures</u>" means all hard and soft costs related to the development of the Project. Notwithstanding anything to the contrary, Qualifying Expenditures shall not include any hard and soft costs related to the development or improvement of the Backcountry Parcel.

"<u>Quarterly Debt Service Payment Amount</u>" means for any Quarterly Payment Date (as defined herein) a payment equal to the aggregate amount of unpaid interest accrued for each Disbursement under the Loan computed at the applicable Interest Rate.

"<u>Quarterly Payment Date</u>" means every tenth day of January, April, July, and October occurring during the term of the Loan, or if such date is not a Business Day, then the first Business Day thereafter.

"<u>Responsible Officer</u>" means the chief executive officer, president or chief financial officer or vice president or equivalent of Borrower, but in any event, with respect to financial matters, the chief financial officer or a vice president or equivalent of Borrower.

"<u>Senior Collateral</u>" means any "Collateral" as defined in any Senior Debt Document (as defined herein) or any other asset of Borrower with respect to which a Lien is granted pursuant to any collateral agreement, security agreement, and other instrument and document executed and delivered by Borrower for purpose of providing collateral security for any payment obligation to the Senior Debt Party (as defined herein) under any Senior Debt Document.

"<u>Senior Debt</u>" means Indebtedness with respect to the Senior Loan relating to the Project issued by Borrower and secured by the Senior Collateral (or a portion thereof) on a senior basis to the Obligations.

"<u>Senior Debt Documents</u>" means, with respect to the Senior Debt, the Senior Loan Agreement (as defined herein), promissory note, or other operative agreement evidencing or governing such Indebtedness.

"<u>Senior Debt Party</u>" means, with respect to any Senior Debt, the holder of such Indebtedness, the representative with respect thereto, any trustee or agent therefor under the related Senior Debt Documents,

and the beneficiaries of each indemnification obligation undertaken by Borrower or any guarantor under any related Senior Debt Documents.

"Senior Lender" means Construction Loan Services II, LLC, a Washington limited liability company.

"Senior Loan" means the revolving loan in principal amount of up to $50,000,000 made pursuant to the Senior Loan Agreement, which ranks senior to the Loan and all other Indebtedness in accordance with the terms of the Intercreditor Agreement.

"Senior Loan Agreement" means that certain revolving loan facility agreement between Borrower and Senior Lender, entered into as of May 27, 2022, with respect to the Project, and the loan documents between Borrower and Senior Lender related thereto.

"Single 1-Year Extension" has the meaning assigned to it in Section 2.7.

"Subordinate Debt" means Indebtedness with respect to the Wohali Partners Subordinate Loan 1 (as defined herein), the Wohali Partners Subordinate Loan 2 (as defined herein), the Boyden Family Trust Subordinate Loan, the Boyden Farms Subordinate Loan, and the Equipment Loan relating to the Project issued by Borrower and secured by collateral defined in their respective loan agreements.

"Subordinate Debt Documents" means, with respect to the Subordinate Debt, the promissory note or other operative agreement evidencing or governing such Indebtedness.

"Subordinate Debt Party" means, with respect to any Subordinate Debt, the holder of such Indebtedness, the representative with respect thereto, any trustee or agent therefor under the related Subordinate Debt Documents, and the beneficiaries of each indemnification obligation undertaken by Borrower under any related Subordinate Debt Documents.

"Subordinate Lenders" means collectively Wohali Partners, LLC, a Utah limited liability company, the Boyden Family Trust, Boyden Farms, and Big Shoulders Capital IX, LLC.

"Taxes" means all taxes, assessments, water rates, sewer rents, and other governmental impositions, now or hereafter levied or assessed or imposed against the Project, the Property, or any part thereof.

"Term" has the meaning assigned to it in Section 2.6 hereof.

"USCIS" has the meaning assigned to it in the recitals hereof.

"Wohali Partners Subordinate Loan 1" means the loan in principal amount of up to $15,641,250 made pursuant to the Wohali Partners Subordinate Promissory Note 1 (as defined herein), which ranks junior to the Senior Loan and the Loan in accordance with the terms of the Intercreditor Agreement.

"Wohali Partners Subordinate Loan 2" means the loan in principal amount of up to $216,147,500 made pursuant to the Wohali Partners Subordinate Promissory Note 2 (as defined herein), which ranks junior to the Senior Loan and the Loan in accordance with the terms of the Intercreditor Agreement.

"Wohali Partners Subordinate Promissory Note 1" means that certain loan agreement between Borrower and Wohali Partners, LLC, effective as of July 9, 2021, with respect to the Project.

"Wohali Partners Subordinate Promissory Note 2" means that certain loan agreement between Borrower and Wohali Partners, LLC, effective as of April __, 2022, with respect to the Project.

Section 1.2    Principles of Construction. All references to sections, schedules, and exhibits are to sections, schedules, and exhibits in or to this Agreement unless otherwise specified. All uses of the word "including" shall mean "including, without limitation" unless the context shall indicate otherwise. Unless otherwise specified, the words "hereof," "herein," and "hereunder," and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement. Unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined.

ARTICLE II
LOAN TERMS

Section 2.1    Description of the Project. The project is the development and construction of a single-family home golf community consisting of approximately 428 residences, a golf course and clubhouse, a lodge, and other amenities (the "Project") on 32 parcels of land totaling approximately 5,064 acres located in the state of Utah (the "Property"), all as described in further detail in the Memorandum.

Section 2.2    Loan. Subject to, and upon the terms and conditions set forth herein, Lender hereby agrees to make and Borrower hereby agrees to accept the Loan. Borrower acknowledges and agrees that the Loan shall be funded by Lender solely from actual proceeds received from the Offering and that Lender shall have no obligation to make or fund any amount under this Agreement unless and until it actually receives such proceeds. Subject to the terms of this Agreement:

(a)    Lender shall loan up to $79.2 million as the same is raised pursuant to the Offering; provided that following the two (2) year anniversary of the date hereof ("Loan Deadline"), Lender may not subscribe any additional EB-5 Investors to the Offering without Borrower's prior written consent, but Borrower shall accept any Disbursements made after the Loan Deadline that are associated with any EB-5 Investors who subscribed to the Offering prior to the Loan Deadline. The parties agree that Lender shall promptly make Loan disbursements to Borrower only after such funds have been released from escrow to Lender (or otherwise made available for disbursement), pursuant to that certain escrow agreement entered into between Lender, its general partner, an escrow administrator, and an escrow agent, in the amount of such funds (each such disbursement a "Disbursement"). Subject to the terms of the Senior Debt Documents, Disbursements shall be made to Borrower, and Borrower shall accept such Disbursements as soon as practicable after funds have been released from escrow, in the reasonable discretion of Lender, subject to a minimum Disbursement of $50,000, unless waived by Borrower. All Disbursements under this Agreement shall be evidenced by the Note.

(b)    The Loan shall be divided into tranches of $800,000 (each a "Loan Tranche"), with each Loan Tranche reflecting the subscription amount of an individual EB-5 Investor. Each such EB-5 Investor's name shall be recorded on the Note next to each Disbursement applicable to such Loan Tranche related to such EB-5 Investor.

(c)    Interest shall begin to accrue on the outstanding principal balance of each Loan Tranche on the date of initial Disbursement, and the outstanding principal balance of such Loan Tranche along with any accrued but unpaid interest shall be due and payable in full on the applicable Maturity Date.

Section 2.3    Loan Commitment; Disbursement to Borrower. Except as expressly and specifically set forth herein, Lender has no obligation or other commitment to loan any funds to Borrower or otherwise make Disbursements to Borrower in connection with the Project. Borrower hereby waives any

10

right Borrower may have to make any claim to the contrary.

Section 2.4    Note. The Loan shall be evidenced by this Agreement and a Note in a form and substance satisfactory to Lender and its legal counsel, attached hereto as Exhibit A, and secured by the Loan Documents.

Section 2.5    Collateral and Security Interest.

(a)    The Pledgors shall contemporaneously grant to Lender a security interest in 100% of the equity interest (in the form of limited liability company interests or otherwise) in Borrower as Collateral. The security interest in the Collateral granted herein is to secure the payment and performance of the Obligations. Each Pledgor shall deliver to Lender the equity interest certificate (or its equivalent), UCC financing statement(s), or other related documents of or related to Borrower to perfect the security interest granted herein, as further set forth in the applicable Pledge Agreement.

(b)    In addition to the Collateral, the Pledgors shall contemporaneously grant to Lender (i) a second-lien position deed of trust, mortgage, or deed to secure debt on the assets of Borrower encumbered under the Senior Loan, and (ii) a first-lien position deed of trust, mortgage, or deed to secure debt on the assets of Borrower not encumbered under the Senior Loan (the security interests in both (i) and (ii) of this Section 2.5(b) are collectively the "Recorded Security Interest") encumbering the Property for the benefit of Lender. The Recorded Security Interest shall be recorded in the official records of Summit County, Utah, on or before the first Disbursement to Borrower. Parcel numbers and acreage for the first-lien security described in (ii) of this Section 2.5(b) are attached hereto in Exhibit C and lot numbers and acreage for the second-lien security described in (i) of this Section 2.5(b) are attached hereto in Exhibit D.

(c)    Borrower shall maintain a loan-to-value ratio such that the fair market value of the assets of Borrower, less any Senior Debt or any other debt that ranks senior to the Loan, equals or exceeds 150% of the aggregate outstanding principal funded balance of the Loan (the "Loan-to-Value Ratio"). Borrower shall furnish to Lender a quarterly collateral compliance certification in the form attached hereto as Exhibit B (each a "Collateral Compliance Certificate") confirming the matters set forth therein. The fair market value of Borrower's assets shall be determined by a third-party appraiser (or, at Borrower's option, a similar method of determining fair market value) reasonably satisfactory to Lender, the costs and expenses thereof to be borne solely by Borrower.

By way of illustration but not limitation, if the Loan were fully funded at $79.2 million, the aggregate value of the Collateral and any other collateral described in Section 2.5(b) would need to meet or exceed 150% of that amount, which would be $118.8 million. Suppose that the value of the 1,622 acres of land encumbered under the Senior Loan were $40.0 million, and the value of the 3,442 acres of land not encumbered under the Senior Loan were $10.0 million, and the total value of all unsold residences were $80.0 million, and the total value of all unsold memberships were $9.0 million, and the total undistributed cash held by Borrower were $5.0 million, then, the total value of the Collateral and the other collateral described in Section 2.5(b) would be equal to $144.0 million. Now suppose that the Senior Debt equaled $25.0 million, which would reduce the value of the Collateral to $119.0 million. In this example, the value of the Collateral and the other collateral described in Section 2.5(b), valued at $119.0 million, would exceed the $118.8 million required to maintain a Loan-to-Value Ratio of 150% of the outstanding balance of the Loan.

(d)    Subject to the terms and conditions of this Agreement, Lender shall use commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper, or advisable to assist Borrower or its Affiliates with the arranging, obtaining, or amending of the Senior Debt Documents and Subordinate Debt Documents, including executing the

11

Intercreditor Agreement with the Senior Lender and the Subordinate Lenders, replacing or amending any Loan Document, or providing any needed waivers.

(e)    Notwithstanding anything in the Loan Documents to the contrary, any representations, warranties, covenants or obligations related to Borrower, the Property, or the Project shall terminate without further effect and the security related thereto shall promptly be released, upon payment in full of all then-owing monetary obligations of Borrower under this Loan.

Section 2.6    Term. Unless extended pursuant to Section 2.7, the term of each Loan Tranche (as applicable, the "Term") shall begin on the date of initial Disbursement under such Loan Tranche and shall end on the earlier to occur of (a) the fifth anniversary that such Loan Tranche is fully funded; or (b) the fifth anniversary of the last date of funding for the last Loan Tranche that is fully funded. At the end of the applicable Term, the Loan Tranche plus any accrued but unpaid interest shall be due and payable in full.

Section 2.7    Optional Extensions. Provided that no Event of Default shall have occurred and be continuing, Borrower shall have right to extend the Term and Maturity Date of each Loan Tranche for a period of one year by delivering a written extension request to Lender at least 180 days prior to the then-applicable Maturity Date of such Loan Tranche (the "**Single 1-Year Extension**"). Additionally, Lender and Borrower may by mutual written agreement extend the Term and Maturity Date of a Loan Tranche an unlimited number of times for additional periods of up to one year at a time (each a "**Mutual Extension**"). Subject to USCIS guidelines then in effect, during any Mutual Extension, and upon 180 days written notice from Lender (which notice may only be given on March 31st, June 30th, September 30th, and December 31st of each calendar year), the Borrower shall prepay that portion of the outstanding principal and accrued interest under the Loan with respect to an EB-5 Investor whose I-829 Petition has been filed with USCIS (as evidenced by a receipt notice from USCIS with respect to such filed I-829 Petition); *provided* that any such EB-5 Investor has provided Lender written notice indicating such EB-5 Investor's intention to withdraw such funds and such EB-5 Investor has provided an opinion of counsel or other evidence necessary to indicate such EB-5 Investor is aware of and assumes any risks related to withdrawal of funds prior to final adjudication of such EB-5 Investor's I-829 Petition. For the avoidance of doubt, notwithstanding anything in the Loan Documents or the Memorandum to the contrary, during any Mutual Extension, Borrower may freely repay all or any portion of the Loan without penalty and without notice.

Section 2.8    Interest.

(a)    Interest Rate. Interest on each Disbursement shall accrue at an annual rate of 6.0% (the "Interest Rate") on any unpaid principal balance for such Disbursement until the full amount of principal of such Disbursement has been paid. With respect to each Disbursement, interest shall begin to accrue on the date of Disbursement. Interest shall be computed on a 365-day year and actual days elapsed. All interest accrued for such Disbursement, due and owing shall be paid on the Quarterly Payment Date. If not paid when due, then the outstanding principal for such Disbursement and any accrued but unpaid interest shall accrue interest at the Default Rate.

(b)    Default Rate. In the event that, and for so long as, any Event of Default shall have occurred and be continuing, the outstanding principal balance of each Disbursement of the Loan and, to the extent permitted by law, all accrued and unpaid interest in respect of the Loan and any other amounts due pursuant to the Loan Documents, shall accrue interest at the Default Rate, calculated from the date such payment was due without regard to any grace or cure periods contained herein.

Section 2.9    Origination Fee.

12

(a)     With respect to each Disbursement, Borrower shall pay an origination fee of 0.70% on the amount of such Disbursement, to be paid within five Business Days of such Disbursement (the "Origination Fee"); provided, however, that in the event that Borrower is required to return such Disbursement to Lender pursuant to its obligations under the I-526E Approval Refund Guaranty, Lender shall refund Borrower the corresponding Origination Fee Refund within five Business Days following Borrower's return of the Disbursement to Lender. The "Origination Fee Refund" with respect to a given Disbursement is to be calculated as follows:  (i) the amount of the Origination Fee for such Disbursement *minus* (ii) the amount of (x) the Origination Fee for such Disbursement *multiplied by* (y) a fraction, the numerator of which is the number of days such Disbursement has been made available to Borrower, and the denominator of which is the total days that the Disbursement could be outstanding with Borrower under this Agreement, including the Term, the Single 1-Year Extension and any Mutual Extension(s). For illustrative purposes only, if the paid Origination Fee amount is $5,600, the number of days outstanding of the associated Disbursement is 1095, and there is no exercise of the Single 1-Year Extension or any Mutual Extension, then the resulting Origination Fee Refund will be $2,240 determined as follows: $5,600 – ($5,600*(1,095/1,825)) = $2,240.

(b)     The Origination Fee shall not be paid from EB-5 funds. No proceeds of the Loan or any Disbursement shall be used to pay any portion of the Origination Fee.

Section 2.10     Quarterly Debt Service Payments. With respect to each Loan Tranche, Borrower shall pay to Lender on each Quarterly Payment Date up to and including the applicable Maturity Date, the Quarterly Debt Service Payment Amount. With respect to each Loan Tranche, Borrower shall pay to Lender on the applicable Maturity Date the outstanding principal balance of such Loan Tranche, all accrued and unpaid interest thereon, and all other amounts due hereunder and under the Note. For purposes of making payments hereunder, but not for purposes of calculating the accrual of interest for each Disbursement, if the day on which such payment is due is not a Business Day, then amounts due on such date shall be due on the immediately following Business Day; *provided*, that with respect to payments of principal due on the Maturity Date, interest for such Disbursement shall be payable at the applicable Interest Rate or the Default Rate, as the case may be, through and including the day immediately preceding such Maturity Date. All amounts due under this Agreement and the Note shall be payable without setoff, counterclaim, defense, or any other deduction whatsoever.

Section 2.11     Use of Proceeds.

(a)     The Loan proceeds may only be used to (i) replace Bridge Financing, dollar-for-dollar, until such Bridge Financing has been fully repaid; and thereafter (ii) to directly pay Qualifying Expenditures.

(b)     Borrower agrees and warrants that all money it receives pursuant to this Agreement shall be invested in the Project as set forth in herein and used only for advancement of the Project as set forth in the Plans and Specifications. Said funds shall not be used for any other purpose unless agreed upon in writing by the parties. Said funds shall in no case be used to replace or recapitalize any Developer Equity.

(c)     Borrower agrees to provide all information, financial statements, and any other documents regarding use of proceeds of the Loan or any Disbursement thereof necessary to properly calculate job creation and otherwise comply with the EB-5 Program.

Section 2.12     Non-Revolving Loan. The parties acknowledge that the above Loan is a non-revolving loan and amounts repaid may not be re-borrowed.

Section 2.13     EB-5 Early Warning Reports. Lender shall keep Borrower informed as to the status

of submission and approval of all I-526E Petitions and I-829 Petitions. On the first day of each quarter, Lender shall, at Borrower's request, submit to Borrower a list of all I-526E Petitions and I-829 Petitions that either have been denied or, in the opinion of Lender, have a reasonable likelihood of being denied based upon statements, formal or informal, made by USCIS, together with the proposed action plan to cause such I-526E Petitions and I-829 Petitions to be approved.

Section 2.14    <u>Offering Reports</u>.  Lender shall keep Borrower informed as to the status of the Offering.  Each week, Lender shall, at Borrower's request, submit to Borrower a list of all subscriptions under the Offering, the date upon which the related subscription documentation was properly completed, executed, delivered to and accepted by Lender, and the status of funding by the applicable EB-5 Investors.

ARTICLE III
REPRESENTATIONS AND WARRANTIES

Borrower represents and warrants to Lender that each of the following statements is true, correct, and complete as of the date of this Agreement in all material respects, and will be true, correct, and complete as of the date of any Disbursement in all material respects (except in the case of any such representation and warranty that expressly relates to a prior date, in which case such representation and warranty shall be so true and correct on and as of such prior date). Borrower acknowledges that Lender is relying on each of the representations and warranties set forth this Article III as a material inducement to enter into and perform its obligations under this Agreement. Unless otherwise expressly limited, all of the representations and warranties set forth herein shall survive execution and delivery of the Note and any Disbursement, and shall continue in full force and effect as long as the principal of or any accrued interest on any portion of the Loan is outstanding and unpaid. Accordingly, Borrower hereby represents and warrants as follows:

Section 3.1    <u>Legal Status and Authority</u>. Borrower (a) is duly organized, validly existing and in good standing under the laws of its state of formation; (b) is duly qualified to transact business and is in good standing in each jurisdiction where it is required to be so qualified in connection with its assets, business, and operations; (c) has full power and authority to own any applicable real property, including the Property, and to carry on the business as now conducted or expects to have the ability to carry on the business as proposed to be conducted. Borrower has full right, power, and authority necessary to execute, enter into, and deliver the Loan Documents and to perform the Obligations. The entry into the Loan Documents by Borrower and its performance has been approved by all necessary action in accordance with its Organizational Documents and any applicable laws.

Section 3.2    <u>Validity of Documents</u>. To the best of Borrower's actual knowledge, (a) the execution, delivery, and performance of the Loan Documents by Borrower and the borrowing evidenced therefrom (i) are within the power and authority of such parties, (ii) have been authorized by all requisite organizational action of such parties, (iii) have received or are expected to receive all necessary approvals and consents, corporate, governmental, or otherwise, (iv) will not violate, conflict with, result in a breach of, or constitute (with notice or lapse of time, or both) a material default under any provision of law, any order or judgment of any court or Governmental Authority, any license, certificate, or other approval required in connection with the ownership of the Property, the Collateral, the Construction of the Project, or any applicable Organizational Documents, or any applicable indenture, agreement, or other instrument to which Borrower is a party or to which Borrower may be bound (other than the Senior Debt Documents and Subordinate Debt Documents), (v) will not result in the creation or imposition of any Lien, charge, or encumbrance whatsoever upon any of its assets, except for those Liens contemplate by the Loan Documents, and (vi) will not require any authorization or license from, or any filing with, any Governmental Authority or to the extent so required, Borrower expects to receive the same in the ordinary course of business; (b) the Loan Documents have been duly executed and delivered by Borrower; and (c) the Loan Documents constitute legal, valid, and binding Obligations of Borrower. The Loan Documents are not

14

subject to any right of rescission, setoff, counterclaim, or defense by Borrower, including the defense of usury, nor would the operation of any of the terms of the Loan Documents, or the exercise of any right thereunder, render the Loan Documents unenforceable (except as such enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar Creditors Rights Laws, and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law)). Borrower has not asserted any right of rescission, setoff, counterclaim, or defense with respect to the Loan Documents.

Section 3.3     <u>Financial Information</u>. Borrower has furnished to Lender its balance sheet and statements of income and cash flows for the fiscal year ended December 31, 2021.  Such financial statements present fairly, in all material respects, the financial position and results of operations and cash flows of Borrower as of such date and for such period in accordance with GAAP (or such other accounting basis reasonably acceptable to Lender), except as disclosed therein and except for normal year-end adjustments and the absence of footnotes.

Section 3.4     <u>Full and Accurate Disclosure</u>. No statement of fact made by Borrower in this Agreement or in any of the other Loan Documents, to Borrower's actual knowledge, contains any untrue statement of a material fact or omits to state any material fact necessary to make statements contained herein or therein, in the light of the circumstances under which they were made, not misleading. No material fact presently known to Borrower has been withheld from Lender that materially adversely affects, or as far as Borrower can foresee, might materially adversely affect the Project or Borrower.

Section 3.5     <u>Non-Contravention</u>. The execution, delivery, and performance of this Agreement, the Note, and the Loan Documents will not, with or without notice or the passage of time, violate any provision or any requirement of law or of any Contractual Obligation (other than Contractual Obligations under the Senior Debt Documents and the Subordinate Debt Documents) to which Borrower is bound and will not result in or require the creation or imposition of any Lien on any of the properties or revenues of Borrower pursuant to any provision or requirement of applicable law or any Contractual Obligation to which Borrower or its properties are or may in the future be bound.

Section 3.6     <u>Taxes</u>. Borrower has filed or caused to be filed all federal, state, county, and local tax returns that are required to be filed and have paid or caused to be paid all personal property, real estate, income, or other taxes and all special assessments, withholding, contributions, and governmental charges and levies, as shown on such returns and reports or on any assessment received by Borrower, to the extent that such Taxes have become due, except (i) for current Taxes not delinquent and Taxes being contested as provided by law, in good faith and by appropriate legal proceedings for which adequate reserves have been provided to the extent required by GAAP, and as to which no foreclosure, sale, or similar proceedings have commenced or (ii) to the extent that the failure to do so would not reasonably be expected to result in a Material Adverse Effect.

Section 3.7     <u>Liens</u>. None of Borrower's assets, properties, or real estate is subject to any Liens, other than Liens in connection with the Senior Debt and any Subordinate Debt.

Section 3.8     <u>Adverse Contracts</u>. Neither Borrower nor any of its properties are party to any agreement or instrument (other than the Senior Debt Documents and the Subordinate Debt Documents), or subject to any charter or other restriction, or any judgment, decree, or order of any court or governmental body, which would reasonably be expected to result in a Material Adverse Effect. Borrower does not have knowledge of or notice that it is in default on the performance, observance or fulfillment of any obligation, covenant, or condition contained in any such agreement, instrument, charter, or other restriction, judgment, decree, or order of any court or governmental body, which would reasonably be expected to have a Material Adverse Effect.

Section 3.9    Litigation. No action, suit, proceeding, or governmental investigation, in each case, judicial, administrative, or otherwise (including any Condemnation or similar proceeding), is pending or, to the knowledge of Borrower, threatened or contemplated against Borrower or affecting the Project that would reasonably be expected to have a Material Adverse Effect on the Project.

Section 3.10    Sell, Convey, and Transfer. Except for sales, conveyances, or transfers on commercially reasonable terms for adequate consideration made in the ordinary course of Borrower's business, Borrower has not sold, conveyed, transferred, disposed of, or otherwise further encumbered any of its properties or assets within the last 90 days.

Section 3.11    Lawful Interest. To Borrower's knowledge, the amounts to be received by Lender as interest payments under the Note and/or other Loan Documents are lawful and are neither usurious nor illegal under any applicable law, including state law.

Section 3.12    Condemnation. No Condemnation or other similar proceeding has been commenced or, to Borrower's knowledge, is threatened or contemplated with respect to all or any portion of the Project or Property or for the relocation of roadways providing access to the Project or the Property, which would reasonably be expected to have a Material Adverse Effect on the Project.

Section 3.13    Assessments. No pending or proposed special or other assessments for public improvements or otherwise affect the Property, nor are there any contemplated improvements to the Property that may result in such special or other assessments, which would reasonably be expected to have a Material Adverse Effect on the Project.

Section 3.14    Environmental Compliance. Borrower is in compliance with all environmental protection laws in all material respects in each jurisdiction where it is presently doing business. Borrower has not received any written notice from any Governmental Authority regarding any action or investigation, pending or contemplated, pertaining to any alleged violation of any environmental protection laws with respect to any real or personal property presently or previously owned by Borrower, which would reasonably be expected to have a Material Adverse Effect on the Project.

Section 3.15    Compliance with Laws. Borrower is not in violation of any federal, state, or municipal statute, law, ordinance, code, notice, rule, or regulation, nor has Borrower failed to obtain any license, permit, franchise, or other governmental authorization necessary to the ownership of its properties or the conduct of its businesses in a timely manner to the extent that such license, permit, franchise, or other governmental authorization has become obtainable, in each case, which would reasonably be expected to have a Material Adverse Effect on the Project.

Section 3.16    Defaults. Borrower is not in default of any contract, agreement, or undertaking to which it is a party, nor, to Borrower's knowledge, has any event or circumstance occurred that, but for the passage of time or the giving of notice, or both, would constitute an event of default thereunder or an Event of Default, as defined in Article VI of this Agreement, which would be reasonably expected to have a Material Adverse Effect on the Project.

Section 3.17    Permits. Borrower has obtained or will obtain all necessary local, state, and federal permits and licenses for the Construction of the Project.

Section 3.18    Survival of Representations and Warranties. Borrower agrees that all of the representations and warranties of Borrower set forth in this Article III and elsewhere in this Agreement and in the other Loan Documents shall survive for so long as any amount remains owing to Lender under this Agreement or any of the other Loan Documents by Borrower. All representations, warranties, covenants,

and agreements made in this Agreement or in the other Loan Documents by Borrower shall be deemed to have been relied upon by Lender notwithstanding any investigation heretofore or hereafter made by Lender or on its behalf.

ARTICLE IV
AFFIRMATIVE COVENANTS

Borrower hereby agrees that, so long as the Loan or other amount is owing to Lender, Borrower shall do the following:

Section 4.1      <u>Payment and Performance of Contractual Obligations</u>. Pay, discharge, or otherwise satisfy at or before maturity or before they become delinquent, as the case may be, all of its Contractual Obligations under any and all contracts and agreements related to the Construction of the Project (including, but not limited to, all bills for services or labor performed and materials supplied in connection with the Construction of the Project) that, if not paid, discharged or otherwise satisfied would create a Material Adverse Effect on the Project.

Section 4.2      <u>Existence</u>. (a)(i) Preserve, renew, and keep in full force and effect its organizational existence, and (ii) take all reasonable action to maintain all rights, privileges, and franchises necessary or desirable in the normal conduct of its business, except, in each case, as otherwise permitted by Section 5.3 or as the failure to do so would not reasonably be expected to have a Material Adverse Effect; and (b) comply with all Contractual Obligations and Legal Requirements except to the extent that failure to comply therewith would not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 4.3      <u>Maintenance of Property; Insurance</u>. (a) Keep all property useful and necessary in its business in good working order and condition, ordinary wear and tear excepted, except where the failure to do so, in the aggregate, would not reasonably be expected to have a Material Adverse Effect and (b) maintain with financially sound and reputable insurance companies insurance policies (the "<u>Policies</u>") with respect to its operations and assets in at least such amounts and against at least such risks as Borrower reasonably determines.

Section 4.4      <u>Inspection of Property; Books and Records; Information</u>. (a) Keep proper books of records and account in which full, true, and correct (in all material respects) entries in conformity with GAAP and all Legal Requirements shall be made of all dealings and transactions in relation to its business and activities, (b) permit representatives of Lender, upon reasonable prior notice (but in no event more than once each fiscal quarter of Borrower unless an Event of Default has occurred and is continuing), to visit and inspect any of its properties and examine and make abstracts from any of its books and records and to discuss the business, operations, properties, and financial and other condition of Borrower with its officers and employees and, accompanied by one or more such officers or their designees if requested by Borrower, with Borrower's independent certified public accountants, and (c) furnish to Lender any other information, including without limitation any reports related to the Construction of the Project, Construction Schedules, the Budget, financial statements, or any other related information that Lender reasonably requests to be provided.

Section 4.5      <u>Notices</u>. Promptly give notice to Lender of the following: (a) the occurrence of any Event of Default; (b) any (i) default or event of default under any Contractual Obligation of Borrower with respect to the Project or (ii) litigation, investigation, or proceeding that may exist at any time between Borrower and any Governmental Authority that, in the case of either (i) or (ii), if not cured or if adversely determined, as the case may be, would reasonably be expected to have a Material Adverse Effect; (c) any litigation or proceeding affecting Borrower in which the amount involved is reasonably expected to have a Material Adverse Effect, and (d) any development or event that has had or would reasonably be expected

17

to have a Material Adverse Effect. Each notice pursuant to this section shall be accompanied by a statement of a Responsible Officer setting forth details of the occurrence referred to therein and stating what action Borrower proposes to take with respect thereto.

Section 4.6    Environmental Laws. (a) Comply in all material respects, and ensure compliance in all material respects by all tenants and subtenants, if any, with all applicable Environmental Laws, and obtain and comply in all material respects with and maintain, and ensure that all tenants and subtenants obtain and comply in all material respects with and maintain, any and all licenses, approvals, notifications, registrations, or permits required by applicable Environmental Laws, and (b) conduct and complete all investigations, studies, sampling, and testing, and all remedial, removal, and other actions required under Environmental Laws and promptly challenge or comply in all material respects with all lawful orders and directives of all Governmental Authorities regarding Environmental Laws, except, in the case of (a) or (b), where the failure to do so would not reasonably be expected to have a Material Adverse Effect.

Section 4.7    Cooperate in Legal Proceedings. At Lender's expense, cooperate fully with Lender with respect to any proceedings before any court, board, or other Governmental Authority that may in any way affect the rights of Lender hereunder or any rights obtained by Lender under any of the other Loan Documents and, in connection therewith, permit Lender, at its election, to participate in any such proceedings.

Section 4.8    Estoppel Certificates. Within 10 Business Days after request by Lender, furnish Lender with a written statement, duly acknowledged and certified, as to Borrower's knowledge of (a) the original principal amount of the Loan, (b) the unpaid principal amount of the Loan, (c) the Interest Rate applicable to each Disbursement under the Loan, (d) the date installments of interest and/or principal were last paid, (e) any offsets or defenses to the payment of the Loan, if any, claimed by Borrower, and (f) that this Agreement and the other Loan Documents are valid, legal, and binding obligations and have not been modified or, if modified, giving particulars of such modification.

Section 4.9    Perform Loan Documents. Observe, perform, and satisfy all the terms, provisions, covenants, and conditions of, and pay when due all costs, fees, and expenses to the extent required under, the Loan Documents executed and delivered by, or applicable to, Borrower.

Section 4.10    Loan Proceeds; Construction. (a) Use the proceeds of the Loan received by it only for the purposes set forth in Section 2.11 hereof, to be commenced and prosecuted in a good and workmanlike manner; (b) use commercially reasonable efforts to cause the same to be completed in accordance with the Construction Schedule and substantially in accordance with the Plans and Specifications; and (c) notify Lender of any material deviations from the Construction Schedule or the Plans and Specifications, and if any deviations are made, explain with reasonable specificity the reason for such deviations.

Section 4.11    Litigation. Provide prompt written notice to Lender of any litigation or governmental proceedings pending or threatened against Borrower or the Project that might result in a Material Adverse Effect on Borrower's condition (financial or otherwise) or the Project.

Section 4.12    Further Assurances. At Borrower's sole cost and expense, (a) execute and deliver to Lender such documents, instruments, certificates, assignments, and other writings, and do such other acts (including the filing and recording of financing statements and other documents) that are required under the Loan Documents or this Agreement.  Borrower also agrees to provide Lender, from time to time upon reasonable request, evidence reasonably satisfactory to Lender as to the perfection and priority of Liens created or intended to be created by the Loan Documents.

18

Section 4.13    <u>EB-5 Program Information Requirements</u>. Within 30 days after any written request by Lender, (a) use its commercially reasonable efforts to provide documentation reports in form and content reasonably acceptable to Lender relating to the expenditures made by or on behalf of Borrower or related to or that are applicable to the Project, including a description and date of each expenditure in such detail as reasonably requested by Lender (the "<u>EB-5 Documentation</u>"), (b) state in the EB-5 Documentation the total expenditures on the Project at the time of the delivery of the EB-5 Documentation to Lender, (c) produce such EB-5 Documentation at its sole cost and expense, and (d) maintain, produce, and deliver to Lender any other documents, data, or any other information then-maintained by Borrower that is related to the Project and requested by Lender in connection with the EB-5 Program administered by USCIS, and specifically including, but not limited to, any information in connection with the job creation requirement under the EB-5 Program, in each case subject to the standard of Borrower's commercially reasonable efforts to comply.

Section 4.14    <u>Terrorism and Anti-Money Laundering</u>. As of the date hereof and throughout the term of the Loan, each of (a): (i) Borrower; (ii) any Person controlling or controlled by Borrower; (iii) any Person having a beneficial interest in Borrower; or (iv) any Person for whom Borrower is acting as agent or nominee in connection with this transaction, is not an OFAC Prohibited Person; and (b) shall comply with applicable Anti-Money Laundering Laws and regulations. All payments by Borrower to Lender will only be made in Borrower's or its Affiliates' name, as applicable, and to and from a bank account of a bank based or incorporated in or formed under the laws of the United States or a bank that is not a "foreign shell bank" within the meaning of the U.S. Bank Secrecy Act (31 U.S.C. § 5311 et seq.), as amended, and the regulations promulgated thereunder by the U.S. Department of the Treasury, as such regulations may be amended from time to time. All payments from Lender to Borrower will only be made in Borrower's name and to and from a bank account of a bank based or incorporated in or formed under the laws of the United States or a bank that is not a "foreign shell bank" within the meaning of the U.S. Bank Secrecy Act (31 U.S.C. § 5311 et seq.), as amended, and the regulations promulgated thereunder by the U.S. Department of the Treasury, as such regulations may be amended from time to time. Borrower shall promptly notify Lender in writing should Borrower become aware of any change in the information set forth in these representations.

Section 4.15    <u>Financial Statements</u>. Furnish to Lender as soon as available, but in any event within 120 days after the end of each fiscal year of Borrower, a copy of the unaudited consolidated balance sheet of Borrower as at the end of such year and the related unaudited consolidated statements of income for such year, setting forth in each case in comparative form the figures for the previous year.

ARTICLE V
NEGATIVE COVENANTS

Borrower hereby agrees that, so long as the Loan or other amount is owing to Lender, Borrower shall not do the following:

Section 5.1    <u>Restrictions on Indebtedness</u>. Create, incur, assume, guarantee, or be or remain liable, contingently or otherwise, with respect to any Indebtedness other than as follows: (a) Indebtedness to the Senior Debt Party with respect to the Senior Debt and any refinancings, refundings, renewals, or extensions thereof; (b) Indebtedness to the Subordinate Debt Parties with respect to the Subordinate Debt and any refinancings, refundings, renewals, or extensions thereof; (c) Indebtedness relating to funding Project costs to the extent required to fully fund the Project if the actual maximum principal amount of the Loan is less than $79.2 million; (d) Indebtedness of any Loan Party pursuant to any Loan Document; (e) Indebtedness outstanding or contemplated on the date hereof and any refinancings, refundings, renewals, or extensions thereof; (f) customary accounts payable paid to trade creditors incurred for services or goods purchased in the ordinary course of Borrower's business or in connection with the Construction of the

19

Project in accordance with the Plans and Specifications; (g) surety bonds, performance and completion guarantees, or letters of credit; (h) endorsements for collection, deposit, or negotiation and warranties of products or services, in each case, incurred in the ordinary course of business; (i) guarantees in connection with any of the foregoing; (j) Indebtedness of any Loan Party to any other Loan Party; (k) Indebtedness of any Loan Party incurred in connection with the acquisition of any fixed or capital assets, and any refinancings, refundings, renewals or extensions thereof; (l) Indebtedness in respect of netting services, overdraft protections and otherwise in connection with deposit and checking accounts, in each case, in the ordinary course of business; (m) obligations under any agreement governing the provision of treasury or cash management services, including deposit accounts, overnight draft, credit cards, debit cards, p-cards (including purchasing cards and commercial cards), funds transfer, automated clearinghouse, zero balance accounts, returned check concentration, controlled disbursement, lockbox, account reconciliation and reporting and trade finance services and other cash management services; and (n) Indebtedness of any Loan Party incurred in connection with "Public Infrastructure District" bond issuances pursuant to the State of Utah's Public Infrastructure District Act (Utah Code Title 17D, as the same may be amended from time to time).

Section 5.2    Liens. Create, incur, assume, or suffer to exist any Lien upon any of its property, whether now owned or hereafter acquired, except as follows: (a) Liens in favor of the Senior Debt Party previously incurred with respect to the Senior Debt; (b) Liens in favor of the Subordinate Debt Parties previously incurred with respect to the Subordinate Debt; (c) Liens for Taxes not yet due or that are being contested in good faith by appropriate proceedings; *provided*, that adequate reserves with respect thereto are maintained on the books of Borrower in conformity with GAAP; (d) carriers', warehousemen's, mechanics', materialmen's, repairmen's, or other like Liens arising in the ordinary course of business that are not overdue for a period of more than 30 days or that are being contested in good faith by appropriate proceedings; (e) pledges or deposits in connection with workers' compensation, unemployment insurance, and other social security legislation; (f) deposits to secure the performance of bids, trade contracts (other than for borrowed money), leases, statutory obligations, surety and appeal bonds, performance bonds, and other obligations of a like nature incurred in the ordinary course of business; (g) any interest or title of a lessor under any lease entered into by Borrower in the ordinary course of its business and covering only the assets so leased; (h) Liens securing Indebtedness permitted under Section 5.1 of this Agreement; (i) Liens not otherwise permitted by this Section 5.2 so long as neither (i) the aggregate outstanding principal amount of the obligations secured thereby nor (ii) the aggregate fair market value (determined as of the date such Lien is incurred) of the assets subject thereto exceeds (as to Borrower) an amount that would have a Material Adverse Effect on the Project; and (j) Permitted Encumbrances.

Section 5.3    Fundamental Changes. Merge into, consolidate with, or amalgamate with, or liquidate, wind up, or dissolve itself (or suffer any liquidation or dissolution), or dispose of all or substantially all of its property or business.

Section 5.4    Negative Pledge. Enter into or suffer to exist or become effective any agreement that prohibits or limits the ability of any Loan Party to create, incur, assume, or suffer to exist any Lien upon any of its property or revenues, whether now owned or hereafter acquired, to secure its obligations under the Loan Documents to which it is a party or any refinancings thereof other than (a) this Agreement and the other Loan Documents, (b) the Senior Debt Documents and Subordinate Debt Documents and (c) any agreements governing any purchase money Liens or capital lease obligations otherwise permitted hereby (in which case, any prohibition or limitation shall only be effective against the assets financed thereby).

Section 5.5    Change in Nature of Business; New Line of Business. Engage in any line of business substantially different from the lines of business conducted by Borrower on the date hereof or engage or enter into any new line of business that would have a Material Adverse Effect.

Section 5.6    <u>Insurance Policies and Bonds</u>. Do or permit to be done anything that would affect the coverage or indemnities provided for pursuant to the provisions of any Policies, performance bond, labor and material payment bond, or any other bond given in connection with the Construction of the Project that would have a Material Adverse Effect.

ARTICLE VI
DEFAULT

Each of the following occurrences or events shall constitute an "<u>Event of Default</u>" for purposes of this Agreement:

Section 6.1    <u>Nonpayment</u>. The failure of Borrower to make any payment of principal or interest or any payment of any other amount payable to or for the benefit of Lender by Borrower under this Agreement, the other Loan Documents, or any other document, instrument, or agreement delivered by Borrower to Lender in connection herewith, when and as due.

Section 6.2    <u>Accuracy of Representations</u>. Any representation, warranty, schedule, certificate, financial statement, report, notice, or other writing furnished by or on behalf of Borrower to Lender or any representation or warranty contained in this Agreement, the Loan Documents, or any document, certificate, or agreement furnished by Borrower to Lender in connection herewith or therewith being false or misleading as and when given or becoming false and misleading at any time in the future, in any of the foregoing cases, that would then result in a Material Adverse Effect.

Section 6.3    <u>Litigation</u>. The entry of any financial judgment resulting from judicial or administrative action against Borrower or with respect to its assets, in which the amount of such judgment alone or in combination with any other unsatisfied judgment, which amounts are not otherwise covered by applicable insurance policies, would have a Material Adverse Effect, if such judgment remains undischarged for a period of 60 days or more after the date on which such judgment becomes final without any right of appeal to a higher court, and unless Borrower, as the case may be, shall have taken whatever action is required, including without limitation, posting a bond, to stay proceedings to enforce such judgment.

Section 6.4    <u>Nonperformance on Other Indebtedness</u>. The occurrence of any default or event of default, subject to curative rights, if any, or any event that requires the prepayment of Indebtedness or the acceleration of the maturity or payment thereof, under the terms of any evidence of material Indebtedness issued or assumed or entered into by Borrower on one hand, and with any third-party lender on the other hand, including without limitation the Senior Lender or any Subordinate Lender.

Section 6.5    <u>Bankruptcy</u>. In the event (a) any Loan Party shall commence any case, proceeding, or other action (i) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization, or relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition, or other relief with respect to it or its debts, or (ii) seeking appointment of a receiver, trustee, custodian, conservator, or other similar official for it or for all or any substantial part of its assets, or any Loan Party shall make a general assignment for the benefit of its creditors; or (b) there shall be commenced against any Loan Party any case, proceeding, or other action of a nature referred to in clause (a) above that (i) results in the entry of an order for relief or any such adjudication or appointment or (ii) remains undismissed or undischarged for a period of 60 days; or (c) there shall be commenced against any Loan Party any case, proceeding, or other action seeking issuance of a warrant of attachment, execution, distraint, or similar process against all or any substantial part of its assets that results in the entry of an order for any such relief that shall not have been vacated, discharged,

21

or stayed or bonded pending appeal within 60 days from the entry thereof; or (d) any Loan Party shall take any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clauses (a), (b), or (c), above; or (e) any Loan Party shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due.

Section 6.6    Covenant Default. In the event Borrower shall default in the observance or performance of any agreement contained in clause (i) or (ii) of Section 4.2(a) (with respect to Borrower only) or Article V hereof.

Section 6.7    Environmental Compliance. The issuance or receipt of any notice alleging violation of any environmental statute, law, ordinance, rule, or regulation relating to the present, previously, or subsequently owned or leased real properties relating to the Project, provided that such violation remains uncured 60 days after the receipt of the relevant notice to Borrower and would create a Material Adverse Effect.

Section 6.8    Default of Pledge or Guaranty. The Job Creation Guaranty, the I-526E Approval Refund Guaranty, or any Pledge Agreement shall cease, for any reason, to be in full force and effect or any Loan Party or any Affiliate of any Loan Party shall so assert, unless terminated in accordance with the terms therein.

Section 6.9    Construction Progress. Borrower fails to use commercially reasonable efforts to advance the Construction of the Project substantially in accordance with the Construction Schedule and such failure would result in a Material Adverse Effect, other than for failures or delays caused by Force Majeure.

Section 6.10    Performance Enjoined or Prohibited. Borrower is enjoined or prohibited from performing any of its Obligations under any of the Loan Documents for a period of more than 30 consecutive days, unless caused by Force Majeure.

Section 6.11    Collateral Compliance Certificate. Borrower fails to provide an acceptable Collateral Compliance Certificate to Lender as required under Section 2.5(c).

ARTICLE VII
CONDITIONS OF LENDING

The obligation of Lender to make the Loan or any Disbursement is subject to the following conditions:

Section 7.1    Documentation. In addition to the conditions precedent set forth in the Loan Documents, the obligation of Lender to make the Loan, or any Disbursement, is subject to the condition that Lender shall have received, at the expense of Borrower, each of the following, duly executed and otherwise in form and substance satisfactory to Lender and its counsel in their reasonable discretion, and in such number of signed counterparts as Lender may request (except for the Note, only one of which shall be signed):

(a)    Plans and Specifications. The then current version of the Plans and Specifications with respect to the Project, together with the Budget, a copy of the Construction Schedule, a copy of the Construction Contract, and copies of all permits as needed for the commencement of Construction of the Project.

(b)    Organizational Documents. A copy of the Organizational Documents of Borrower.

(c)  Note. The Note, duly executed by Borrower.

(d)  Pledge Agreement. A Pledge Agreement, duly executed by the applicable Pledgor.

(e)  Job Creation Guaranty. The Job Creation Guaranty, duly executed by the Job Creation Guarantor.

(f)  I-526E Approval Refund Guaranty. The I-526E Approval Refund Guaranty, duly executed by the I-526E Approval Refund Guarantor.

(g)  Pledge. Borrower has complied with any requirements pursuant to Section 2.5 with respect to the Collateral.

(h)  Miscellaneous. Such other documents and certificates, as Lender may reasonably request.

Section 7.2   Additional Conditions Precedent to Lender's Obligations. Each of the following is an express condition precedent to the obligation of Lender to make the Loan or any Disbursement to Borrower pursuant to the terms of this Agreement. In the event any one or more of the following conditions are not satisfied to Lender's reasonable satisfaction, Lender may at its option (a) waive said condition and fund the Loan or the applicable Disbursement or (b) suspend performance and pursue such other remedies as may be otherwise available under this Agreement, at law or in equity.

(a)  Representations and Warranties. At the date of this Agreement and the funding of the Loan and any Disbursement, the representations and warranties set forth in this Agreement, the other Loan Documents, and all other documents, instruments, or agreements delivered to Lender by Borrower in connection herewith or therewith shall be true and correct in all material respects as of such date with the same effect as though those representations and warranties had been made on and as of such date and are continuing to be made, except in the case of any such representation and warranty that expressly relates to a prior date, in which case such representation and warranty shall be so true and correct in all material respects on and as of such prior date.

(b)  No Default. At the time of this Agreement and the funding of the Loan or any Disbursement, and immediately after giving effect to the Loan or such Disbursement, Borrower shall be in compliance with all the terms and provisions set forth herein, the other Loan Documents, and all other documents, instruments, or agreements delivered to Lender by Borrower in connection herewith or therewith, on their part to be observed or performed, and no Event of Default shall have occurred and be continuing at the time the Loan or Disbursement is made or would result from making the Loan or any Disbursement.

(c)  Absence of Material Adverse Effect. There shall not exist any state of facts or circumstances that would reasonably be expected to have a Material Adverse Effect.

(d)  No Injunction. No injunction, stay, or restraining order shall be in effect prohibiting the consummation of the transactions contemplated by this Agreement.

(e)  Absence of Litigation. No action, suit, investigation, or proceeding shall have been commenced or threatened by any governmental agency or any other person, firm, or entity against Borrower and/or any of their Affiliates, members, officers, managers, or directors, with respect to their properties or with respect to the transactions contemplated hereby, challenging the rights of the parties hereto to consummate such transactions of which would reasonably be expected to have a Material Adverse Effect.

23

      (f)      <u>No Budget Changes</u>. There have been no changes to the Budget that would result in a material reduction in the number of jobs estimated to be created from the Project.

      (g)      <u>EB-5 Program</u>. There has been no change to the EB-5 Program that would adversely affect the Loan or the ability of the Project to meet the requirements of the EB-5 Program.

ARTICLE VIII
MISCELLANEOUS

      Section 8.1      <u>Liability of Lender</u>. Lender shall in no event be responsible or liable to any person other than Borrower for any Disbursement or failure to disburse any Disbursement or any part thereof and no dealer, contractor, subcontractor, laborer, draftsman, material supplier, vendor, or service provider shall have any right or claim against Lender under this Agreement or the other Loan Documents. Neither Borrower nor Lender shall be liable to the other for failure of the contractor(s) to prosecute Construction of the Project in strict accordance with the Plans and Specifications, or for the failure of any dealer, contractor, subcontractor, laborer, draftsman, material supplier, vendor, or service provider to deliver the goods or perform the services required to be delivered or to be performed by them. Borrower shall not be the agent of Lender for any purpose.

      Section 8.2      <u>Curing Default</u>. Except as otherwise stated herein, if an Event of Default occurs and is continuing, Borrower shall have 30 days following its receipt of notice of an Event of Default from Lender to cure the same. If, following such 30 day period, such Event of Default is continuing, Lender may, but shall not be obligated to, at its sole option, terminate the Loan together with all obligations to make Disbursements hereunder, by written notice to that effect to Borrower and may declare (among other remedies provided under the Loan Documents) any or all principal and interest owing hereunder to be forthwith due and payable without presentment, demand, protest, or further notice of any kind, all of which are hereby expressly waived.

      Section 8.3      <u>Waiver of Default</u>. Lender may, by written notice to Borrower, at any time and from time to time, waive any default in the performance or observance of any condition, covenant, or other term hereof, which shall be for such period and subject to such conditions as shall be specified in any such notice. In the case of any such waiver, Lender and/or Borrower, as may be appropriate, shall be restored to their former position and rights under this Agreement and the other Loan Documents, and any Event of Default so waived shall be deemed to be cured and not continuing; however, no such waiver shall extend to or impair any right subsequent thereto or to any subsequent or other Event of Default.

      Section 8.4      <u>Notices</u>. Any notice, request, demand, waiver, consent, approval, or other communication that is required or permitted hereunder shall be in writing. All such notices must be delivered either by hand in person, by electronic mail, by U.S. certified mail, return receipt requested, or by nationally recognized overnight delivery service (receipt requested) and shall be deemed given when so delivered by hand (with written confirmation of receipt), transmitted by electronic mail (in a message to the electronic mail address given below), or, if mailed by U.S. certified mail, three days after the date of deposit in the U.S. mail, or, if delivered by overnight delivery service, when received by the addressee, in each case at the appropriate addresses set forth below (or to such other addresses as a party may designate for that purpose upon at least 10 days' written notice to the other party), and shall be deemed given or made upon receipt thereof.

24

(a)     If to Lender:

>       EB5AN Wohali Utah Fund XV, LP
>       c/o EB5AN Wohali GP, LLC
>       954 Avenida Ponce de León, Suite 205
>       San Juan, Puerto Rico 00907
>       Attn:   Michael Schoenfeld
>       E-mail: mike.schoenfeld@eb5an.com

(b)     If to Borrower:

>       Wohali Land Estates LLC
>       2120 S. Highland Drive #209
>       Salt Lake City, Utah 84106
>       Attn:   Thomas Cottone
>       E-mail: tcottone@wohalipartners.com

**Section 8.5**      No Waiver; Cumulative Remedies. Lender shall not by any act be deemed to have waived any right or remedy hereunder. No failure to exercise, nor any delay in exercising, on the part of Lender, any right, power, or privilege hereunder shall operate as a waiver thereof. No single or partial exercise of any right, power, or privilege hereunder shall preclude any other or further exercise thereof, or the exercise of any other right, power, or privilege. A waiver by Lender of any right or remedy hereunder on any one occasion shall not be construed as a bar to any right or remedy that Lender would otherwise have on any future occasion. The rights and remedies herein provided are cumulative, may be exercised singly or concurrently, and are not exclusive of any rights or remedies provided at law or in equity.

**Section 8.6**      Survival of Agreements. All covenants, agreements, undertakings, obligations, and all representations and warranties set forth or made herein shall survive delivery of the Loan Documents and the making of the Loan and shall nevertheless remain in effect and be enforceable as between the parties and in accordance with their terms for the statute of limitations period applicable thereto, except that all such covenants, agreements, undertaking obligations, and all representations and warranties shall expire and become null and void upon payment in full of all then-owing monetary obligations of Borrower under this Loan or otherwise in accordance with the Loan Documents.

**Section 8.7**      Affiliate Contracts. Lender acknowledges and consents to Borrower entering into contracts with its Affiliates, and paying fees to such Affiliates, in connection with the development and operation of the Project and the Property.

**Section 8.8**      Further Documents. Borrower agrees to do such further acts and things, and to execute, acknowledge, and deliver such additional documents or instruments, as Lender may at any time reasonably request in connection with the administration of this Agreement or related to the other Loan Documents or in order to better assure and confirm to Lender its rights and powers hereunder and thereunder.

**Section 8.9**      Binding Agreements; Assignments. This Agreement and the terms, covenants, and conditions hereof, shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, successors, trustees, receivers, administrators, and assigns. Borrower shall not be permitted to assign this Agreement or any interest herein or in the other Loan Documents or the collateral, or any part thereof, as described herein and therein, or otherwise pledge, encumber, or grant any option with respect to the collateral governed by the Loan Documents, or any part thereof, except to the extent specifically permitted under the terms of the Loan Documents. Notwithstanding anything in the Loan Documents to the contrary,

25

Lender shall not be permitted to sell or assign its interest or participation interest in the Loan except to any Person directly controlled by one or more Principals with notice to Borrower. For purposes of this Section 8.9, the term "directly controlled by" shall mean the direct possession of the irrevocable power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. As of the date hereof, Lender represents that it is directly controlled by one or more Principals.

Section 8.10  Indemnification by Borrower. Borrower agrees to indemnify Lender and each of its partners, directors, officers, employees, agents, and advisors (each an "Indemnitee") and to hold each Indemnitee harmless from and against any and all losses, claims, damages, liabilities, and related expenses (excluding special, indirect, consequential, or punitive damages, including, without limitation, damages for loss of profits, loss of revenue, business interruption or any other pecuniary loss, but including the reasonable fees, charges, and disbursements of any counsel for any Indemnitee), except those arising from the negligence or willful misconduct of any Indemnitee, asserted against any Indemnitee by any third party, directly or indirectly arising out of or resulting from (a) the execution or delivery of this Agreement, the other Loan Documents or any agreement or instrument contemplated hereby or thereby, the performance by the parties of their respective obligations hereunder or thereunder, or the consummation of the transactions contemplated hereby or thereby, (b) the Construction of the Project, including any defective workmanship or materials; (c) any failure by Borrower to comply with the requirements of any applicable Legal Requirements (other than Legal Requirements relating to the EB-5 Program or EB-5 Program Laws) or to comply with any agreement that applies or pertains to the Property or the Project; (d) any Event of Default hereunder or under the other Loan Documents; or (e) any assertion or allegation that Lender is liable for any act or omission of Borrower or any Affiliate of Borrower in connection with the ownership, development, financing, leasing, operation, or sale of the Property or the Project. The agreements and indemnifications contained in this Section 8.10 shall apply to claims arising both before and after payment in full of all then-owing monetary obligations of Borrower under this Loan and shall survive satisfaction of all such monetary obligations, any foreclosure or deed, assignment or conveyance in lieu thereof, and any other action by Lender to enforce the rights and remedies of Lender hereunder or under the other Loan Documents.

Section 8.11  Entire Agreement. This Agreement, the other Loan Documents, and any documents, instruments, or agreements given to Lender by Borrower hereunder or thereunder represent the complete and exclusive agreements of the parties with respect to the subject matter hereof and thereof and replace and supersede any and all prior agreements or understandings, whether written or oral, with regard thereto and all negotiations leading up to their execution and delivery.

Section 8.12  Amendment. Neither this Agreement nor any provisions thereof may be amended, modified, waived, discharged, or terminated generally, except by an instrument in writing duly signed by or on behalf of Borrower and Lender.

Section 8.13  Interpretation; Headings. Any uncertainty or ambiguity existing herein shall not be interpreted against any party because such party prepared any portion of this Agreement, but shall be interpreted according to the application of rules of interpretation of contracts generally. The headings used in this Agreement are inserted for convenience and reference only and are not intended to be an integral part of or to affect the meaning or interpretation of this Agreement.

Section 8.14  Severability. Provided the same would not deprive Lender of the benefit of its bargain hereunder or thereunder, if any term or provision of this Agreement, the other Loan Documents or any other document or instrument executed in connection therewith, including amendments and modifications or the application thereof to any person or circumstance, shall to any extent be invalid or enforceable in any jurisdiction in which enforcement is sought, the terms and provisions or the application

26

of such terms or provisions or the application of such terms or provisions to persons or circumstances shall be ineffective to the extent of such invalidity or unenforceability in such jurisdiction without invalidating the remaining provisions hereof, which shall nevertheless remain in force and be enforceable as among the parties hereto, and any such prohibition or unenforceability shall not invalidate or render unenforceable such provisions in any other jurisdiction.

Section 8.15    Time is of the Essence, Computation of Time. Time is of the essence with respect to every covenant, condition to be satisfied, and action to be taken hereunder, and the parties shall proceed accordingly with respect to every action necessary, proper, or advisable to make effective the transactions contemplated by this Agreement. Whenever the last day for the exercise of any privilege or the discharge of any duty hereunder shall fall upon any day that is not a Business Day, the party having such privilege or duty may exercise such privilege or discharge such duty on the next succeeding Business Day.

Section 8.16    Governing Law; Dispute Resolution. This Agreement shall be governed exclusively by, and construed in accordance with, the laws of the State of Utah, and jurisdiction shall lay solely in the courts located in Salt Lake County, Utah. The parties hereto hereby stipulate to the state and federal courts located in Salt Lake County, Utah, being the exclusive, proper, and convenient forum for the litigation of any matter that might arise between them relating to this Agreement. The parties hereto waive, to the fullest extent permitted by law, any objection that any of them may now or hereafter have to the laying of venue in any suit, action or proceeding arising out of or relating to this Agreement or any judgment entered by any court in respect hereof brought in Salt Lake County, Utah, and further hereby irrevocably waive any claim that any suit, action or proceeding brought in Salt Lake County, Utah has been brought in an inconvenient forum. In the event any litigation is brought to enforce or interpret the terms of this Agreement, the prevailing party in such action shall be entitled to recover its attorney's fees and all costs and expenses incurred in connection with the action and any appeal thereof, including attorney's fees and associated costs incurred for determining the actual amount of the attorney's fees and cost award. Litigation costs include, but are not limited to, long distance calls, copy charges, postage, courier service fees, overnight delivery fees, attorney's travel expenses, all depositions, witness fees, expert witness fees, expert witness travel time, and each and every other cost associated with the litigation or effort to collect sums due hereunder, and the parties specifically agree that the award of costs is not limited to those set forth in the State of Utah guidelines for taxation of costs in civil actions.

Section 8.17    Waiver Of Jury Trial. BORROWER AND LENDER WAIVE TRIAL BY JURY IN RESPECT OF ANY DISPUTE AND ANY ACTION ON SUCH DISPUTE. THIS WAIVER IS KNOWINGLY, WILLINGLY, AND VOLUNTARILY MADE BY BORROWER AND LENDER, AND BORROWER AND LENDER HEREBY REPRESENT THAT NO REPRESENTATIONS OF FACT OR OPINION HAVE BEEN MADE BY ANY PERSON OR ENTITY TO INDUCE THIS WAIVER OF TRIAL BY JURY OR TO IN ANY WAY MODIFY OR NULLIFY ITS EFFECT. THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE PARTIES ENTERING INTO THE LOAN DOCUMENTS. BORROWER AND LENDER ARE EACH HEREBY AUTHORIZED TO FILE A COPY OF THIS SECTION IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER OF JURY TRIAL. BORROWER FURTHER REPRESENTS AND WARRANTS THAT IT HAS BEEN REPRESENTED IN THE SIGNING OF THIS AGREEMENT AND IN THE MAKING OF THIS WAIVER BY INDEPENDENT LEGAL COUNSEL, OR HAS HAD THE OPPORTUNITY TO BE REPRESENTED BY INDEPENDENT LEGAL COUNSEL SELECTED OF ITS OWN FREE WILL, AND THAT IT HAS HAD THE OPPORTUNITY TO DISCUSS THIS WAIVER WITH COUNSEL.

Section 8.18    No Warranty by Lender. By accepting or approving anything required to be observed, performed, or fulfilled by Borrower or to be given to Lender pursuant to this Agreement, including any certificate, survey, receipt, appraisal, or Policies, Lender shall not be deemed to have warranted or represented the sufficiency, legality, effectiveness, or legal effect of the same, or of any term,

27

provision, or condition thereof, and any such acceptance or approval thereof shall not be or constitute any warranty or representation with respect thereto by Lender.

Section 8.19    Compliance with EB-5 Program Laws. The terms of this Agreement and the other Loan Documents are meant to comply in all respects with the EB-5 Program (see 8 U.S.C. 1153 (b)(5)(A)(i)-(iii), (C)) and all other applicable EB-5 Program Laws, and with any and all approvals that have been obtained in connection with the EB-5 Program, and, to that effect, the parties shall cooperate and take such action within their respective reasonable control necessary to ensure that this Agreement, the other Loan Document, and the transactions contemplated hereby and thereby comply with the EB-5 Program, all other applicable EB-5 Program Laws, and all approvals obtained in connection therewith.

Section 8.20    Loan Agreement Notice. TO PROTECT BORROWER AND LENDER FROM ANY MISUNDERSTANDING OR DISAGREEMENTS, ANY CONTRACT, PROMISE, UNDERTAKING, OR OFFER TO FOREBEAR REPAYMENT OF MONEY OR TO MAKE ANY OTHER FINANCIAL ACCOMMODATION IN CONNECTION WITH THIS LOAN OF MONEY OR GRANT OR EXTENSION OF CREDIT, OR ANY AMENDMENT OF, CANCELLATION OF, WAIVER OF, OR SUBSTITUTION FOR ANY OR ALL OF THE TERMS OR PROVISIONS OF ANY INSTRUMENT OR DOCUMENT EXECUTED IN CONNECTION WITH THIS LOAN OF MONEY OR GRANT OR EXTENSION OF CREDIT, MUST BE IN WRITING TO BE EFFECTIVE. ALL RIGHTS AND REMEDIES OF LENDER HEREUNDER AND UNDER THE LOAN DOCUMENTS ARE EXPRESSLY CONDITIONED AND SUBORDINATE TO THE RIGHTS AND REMEDIES OF THE SENIOR DEBT PARTY.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

LENDER:

EB5AN WOHALI UTAH FUND XV, LP

By:    EB5AN Wohali GP, LLC
Its:     General Partner

By: _____
Name:  Samuel B. Silverman
Title:  Authorized Signatory

BORROWER:

WOHALI LAND ESTATES LLC

By: _____
Name:  Thomas Cottone
Its:     Manager and CFO

By: _____
Name:  David Boyden
Title:  Manager and President

By: _____
Name:  John Kaiser
Title:  Manager and CEO

[SIGNATURE PAGE TO LOAN AGREEMENT]

<u>Exhibit A</u>

**Form of Note**

[See attached.]



**THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR UNDER THE SECURITIES LAWS OF CERTAIN STATES. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE ACT AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. HOLDERS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME. THE ISSUER OF THESE SECURITIES MAY REQUIRE AN OPINION OF COUNSEL IN FORM AND SUBSTANCE REASONABLY SATISFACTORY TO THE ISSUER TO THE EFFECT THAT ANY PROPOSED TRANSFER OR RESALE IS IN COMPLIANCE WITH THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS.**

**NOTWITHSTANDING ANYTHING TO THE CONTRARY, THE INDEBTEDNESS EVIDENCED BY THIS INSTRUMENT IS SUBORDINATED TO THE PRIOR PAYMENT IN FULL OF THE SENIOR DEBT (AS DEFINED IN THE LOAN AGREEMENT REFERRED TO BELOW), PURSUANT TO, AND TO THE EXTENT PROVIDED IN, THE SENIOR DEBT DOCUMENTS (AS DEFINED IN THE LOAN AGREEMENT REFERRED TO BELOW).**

### NOTE

Up to $79,200,000                                        August 11, 2022
                                                        Coalville, Utah

Subject to the terms and conditions of this note (this "**Note**"), for good and valuable consideration received, Wohali Land Estates LLC, a Utah limited liability company ("**Borrower**"), promises to pay to the order of EB5AN Wohali Utah Fund XV, LP, a Delaware limited partnership (together with its assigns, "**Lender**"), an amount equal to the outstanding principal amount of this Note up to the principal amount of $79,200,000 or the unpaid balance of all principal advanced against this Note, if that amount is less, and interest thereon as provided herein.

This Note is issued pursuant to the Loan Agreement, dated as of August 11, 2022 (as amended, restated, modified, or supplemented from time to time, the "**Loan Agreement**"), between Borrower and Lender and is subject to the terms thereof and Lender is entitled to the benefits and rights therein. This Note evidences Borrower's indebtedness under the Loan Agreement. Unless otherwise indicated, capitalized terms used in this Note shall have the respective meanings ascribed to such terms in the Loan Agreement.

During the period from the date hereof until the Maturity Date, the outstanding principal amount of this Note shall be equal to the sum of all Disbursements made by Lender to Borrower under the terms of the Loan Agreement and as evidenced by the Schedule of Disbursements attached hereto as <u>Schedule A</u> minus any repayments made by Borrower to Lender. The following is a statement of the rights of Lender and the terms and conditions to which this Note is subject, and to which Borrower, by the issuance of this Note, and Lender, by the acceptance of this Note, agrees:

**1.** **Payment Obligation**. Borrower shall pay all interest and principal at the times and in the amounts as required by the Loan Agreement. The indebtedness of each Loan Tranche advanced to Borrower under the Loan Agreement shall be due and payable on its respective Maturity Date. All payments of principal and interest under this Note will be made to an account designated by Lender.

**2.** **Security**. The security for this Note includes the Collateral as secured by the Pledge Agreement dated of even date herewith as amended, restated, modified, or supplemented from time to time.

1

COPY

**3.** **Interest.** Interest (computed on the basis of a 365-day year and for the actual number of days in the respective period) shall accrue on the unpaid principal amount of each Disbursement under this Note then outstanding in accordance with the interest rates set forth in the Loan Agreement. With respect to each Disbursement, interest shall begin to accrue on the date of Disbursement. All interest accrued, due, and owing shall be paid on each Quarterly Payment Date. If not paid when due, then the outstanding principal and any accrued but unpaid interest shall accrue interest at the Default Rate.

**4.** **Extensions.** Provided that no Event of Default shall have occurred and be continuing, Borrower shall have right to extend the Term and Maturity Date of each Loan Tranche for a period of one year by delivering a written extension request to Lender at least 180 days prior to the then-applicable Maturity Date of such Loan Tranche. Lender and Borrower may by mutual written agreement extend the Term and Maturity Date of any Loan Tranche an unlimited number of times for additional periods of up to one year at a time.

**5.** **Expenses; Indemnity.**

**(a)** Borrower shall promptly pay all documented out-of-pocket expenses incurred by Lender in connection with the enforcement of its rights under this Note and the other Loan Documents, including the reasonable fees, costs, and disbursements of any counsel for Lender and all such out-of-pocket expenses incurred during any workout, restructuring, or related negotiations.

**(b)** Borrower agrees to indemnify Lender and each of its partners, directors, officers, employees, agents, and advisors (each an "**Indemnitee**") and to hold each Indemnitee harmless from and against any and all losses, claims, damages, liabilities, and related expenses (excluding special, indirect, consequential, or punitive damages, including, without limitation, damages for loss of profits, loss of revenue, business interruption or any other pecuniary loss, but including the reasonable fees, charges, and disbursements of any counsel for any Indemnitee), except those arising out of or resulting from the negligence or willful misconduct of any Indemnitee, asserted against any Indemnitee by any third party directly or indirectly arising out of or resulting from (i) the execution or delivery of this Note, any other Loan Documents, or any agreement or instrument contemplated hereby or thereby, the performance by the parties of their respective obligations hereunder or thereunder, or the consummation of the transactions contemplated hereby or thereby, (ii) the Construction of the Project, including any defective workmanship or materials; (iii) any failure by Borrower to comply with the requirements of any applicable Legal Requirements (other than Legal Requirements relating to the EB-5 Program or EB-5 Program Laws) or to comply with any agreement that applies or pertains to the Property; (iv) any Event of Default under any of the Loan Documents; or (v) any assertion or allegation that such Indemnitee is liable for any act or omission of Borrower or any Affiliate of Borrower in connection with the ownership, development, financing, leasing, operation, or sale of the Property.

**(c)** None of the Indemnitees shall have any liability (whether direct or indirect, in contract, tort, or otherwise) to Borrower or any of its affiliates or any of their respective officers, directors, employees, agents, and advisors, and Borrower hereby agrees not to assert any claim against any Indemnitee, for special, indirect, consequential, or punitive damages arising out of or otherwise relating to the Loan Documents, the actual or proposed use of the proceeds of the Note, or any of the transactions contemplated by the Loan Documents.

**6.** **Default.** Upon the occurrence of an Event of Default, the unpaid balance of the principal amount of this Note, together with all accrued and unpaid interest thereon, may become, or may be declared to be, due and payable in the manner, upon the conditions, and with the effect provided in the Loan Agreement.

7. **Assignment**. Subject to any legal limitations arising under any applicable securities laws, Lender has the right to transfer all or any portion of this Note to any other entity as provided in the Loan Agreement. The rights and obligations of Borrower and Lender will be binding upon and inure to the benefit of the successors, assigns, heirs, administrators, and transferees of the parties.

8. **Notices**. Any notice, request, demand, waiver, consent, approval, or other communication that is required or permitted hereunder shall be in writing. All such notices must be delivered either by hand in person, by electronic mail, by U.S. certified mail, return receipt requested, or by nationally recognized overnight delivery service (receipt requested), and shall be deemed given when so delivered by hand (with written confirmation of receipt), transmitted by electronic mail (in a message to the electronic mail address given below), or, if mailed by U.S. certified mail, three days after the date of deposit in the U.S. mail, or, if delivered by overnight delivery service, when received by the addressee, in each case at the appropriate address set forth below (or to such other address as Borrower may designate for that purpose upon 15 days written notice to Lender).

    (a)    If to Lender:

        EB5AN Wohali Utah Fund XV, LP
        c/o EB5AN Wohali GP, LLC
        954 Avenida Ponce de León, Suite 205
        San Juan, Puerto Rico 00907
        Attn:   Michael Schoenfeld
        E-mail: mike.schoenfeld@eb5an.com

    (b)    If to Borrower:

        Wohali Land Estates LLC
        2120 S. Highland Drive #209
        Salt Lake City, Utah 84106
        Attn: Thomas Cottone
        E-mail: tcottone@wohalipartners.com

9. **Governing Law; Severability; Waiver of Jury Trial**. This Note shall be governed exclusively by, and construed in accordance with, the laws of Utah, and jurisdiction shall lay solely in the courts located in Salt Lake County, Utah. The parties hereto hereby stipulate to the local, state, and federal courts located in Salt Lake County, Utah being the exclusive, proper, and convenient forum for the litigation of any matter that might arise between them relating to this Note. THE INVALIDITY, ILLEGALITY, OR UNENFORCEABILITY OF ANY PROVISION OF THIS NOTE SHALL NOT AFFECT OR IMPAIR THE VALIDITY, LEGALITY, OR ENFORCEABILITY OF THE REMAINDER OF THIS NOTE, AND TO THIS END, THE PROVISIONS OF THIS NOTE ARE DECLARED TO BE SEVERABLE. THE PARTIES HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS NOTE.

10. **Headings; References**. All headings user herein are used for convenience only and will not be used to construe or interpret this Note. Except where otherwise indicated, all references herein to Sections refer to Sections hereof.

11. **Conflicts**. Notwithstanding anything herein to the contrary, to the extent there is a conflict between this Note and the Loan Agreement, the Loan Agreement shall prevail.

**12.    Modification; Waiver**. Any term of this Note may be amended or waived with the written consent of Borrower and Lender.

**13.    Loss of Note**. Upon receipt by Borrower of evidence satisfactory to it of the loss, theft, destruction, or mutilation of this Note or any Note exchanged for it, and indemnity satisfactory to Borrower (in case of loss, theft, or destruction) or surrender and cancellation of such Note (in the case of mutilation), Borrower will make and deliver in lieu of such Note a new Note of like tenor.

*[Signature Page Follows]*

COPY

**BORROWER:**

WOHALI LAND ESTATES LLC

By: _____

Name:   Thomas Cottone
Title:    Chief Financial Officer

Address:        2120 S. Highland Drive #209
                Salt Lake City, Utah 84106

E-mail:         tcottone@wohalipartners.com

[SIGNATURE PAGE TO NOTE]

COPY

## Schedule A

**Schedule of Disbursements**

| Date | Disbursement Amount | Outstanding Principal | Name of EB-5 Investor for Loan Tranche | Borrower Signature |
|------|---------------------|-----------------------|----------------------------------------|--------------------|
|      |                     |                       |                                        |                    |
|      |                     |                       |                                        |                    |
|      |                     |                       |                                        |                    |
|      |                     |                       |                                        |                    |
|      |                     |                       |                                        |                    |
|      |                     |                       |                                        |                    |
|      |                     |                       |                                        |                    |
|      |                     |                       |                                        |                    |
|      |                     |                       |                                        |                    |
|      |                     |                       |                                        |                    |
|      |                     |                       |                                        |                    |
|      |                     |                       |                                        |                    |
|      |                     |                       |                                        |                    |
|      |                     |                       |                                        |                    |
|      |                     |                       |                                        |                    |
|      |                     |                       |                                        |                    |
|      |                     |                       |                                        |                    |
|      |                     |                       |                                        |                    |
|      |                     |                       |                                        |                    |
|      |                     |                       |                                        |                    |
|      |                     |                       |                                        |                    |
|      |                     |                       |                                        |                    |
|      |                     |                       |                                        |                    |
|      |                     |                       |                                        |                    |
|      |                     |                       |                                        |                    |
|      |                     |                       |                                        |                    |
|      |                     |                       |                                        |                    |
|      |                     |                       |                                        |                    |
|      |                     |                       |                                        |                    |

[SCHEDULE A TO NOTE]

<u>Exhibit B</u>

**Form of Collateral Compliance Certificate**

[See attached.]

To: EB5AN Wohali Utah Fund XV, LP

From: Wohali Land Estates LLC

## QUARTERLY COLLATERAL COMPLIANCE CERTIFICATE

The undersigned authorized officer of Wohali Land Estates LLC, a Utah limited liability company ("**Borrower**"), hereby certifies that in accordance with the terms and conditions of the Loan Agreement (the "**Agreement**") between Borrower and EB5AN Wohali Utah Fund XV, LP ("**Lender**"): (i) Borrower is in complete compliance for the quarterly period ending [DATE] with Section 2.5(c) of the Agreement except as noted below; and (ii) there are no material changes in the project cost, business plan, market conditions, or other events which will materially impact the value of the Collateral as indicated in the most recently provided appraisal(s) of such Collateral except as noted below. Capitalized terms not otherwise defined herein have the same meaning as in the Agreement.

The total Collateral value has been estimated by multiplying the number of each type of asset by the appropriate current, appraised value of each such asset. The value of the Collateral is reduced by any debt ranking senior to the Loan. EB-5 debt reflects the current amount of drawn funds under the Loan.

**Loan-to-Value (LTV) Test for Collateral:**

| | Number of Asset | Asset Value | Aggregate Value |
|---|---|---|---|
| [ASSETS NOT ENCUMBERED BY SENIOR LOAN] | | | |
| [TYPE OF ASSET] | [###] | $[###,###] | $[#,###,###] |
| [TYPE OF ASSET] | [###] | $[###,###] | $[#,###,###] |
| Subtotal – [ASSET CATEGORY] | | | $[##,###,###] |
| | | | |
| [ASSETS ENCUMBERED BY SENIOR LOAN] | | | |
| [TYPE OF ASSET] | [###] | $[###,###] | $[#,###,###] |
| [TYPE OF ASSET] | [###] | $[###,###] | $[#,###,###] |
| Subtotal – [ASSET CATEGORY] | | | $[##,###,###] |
| | | | |
| **Subtotal Collateral Value** | | | **$[##,###,###]** |
| *Senior Debt (subtracted from subtotal)* | | | $[##,###,###] |
| **A. Total Collateral Value less Senior Debt** | | | **$[##,###,###]** |
| | | | **Indebtedness** |
| **B. Total EB-5 Debt** | | | $[##,###,###] |
| **C. 150% of Total EB-5 Debt** | | | $[##,###,###] |

Is line **C** equal to or less than line **A**?

☐ No, not in compliance
☒ Yes, in compliance

**Comments**: See attached.

Sincerely,

_____

*Signature*

_____

*Title*

_____

*Date*

| LENDER USE ONLY |
| --- |
| Verified:_____ |
| *Signature* |
| Date:_____ |
| Compliance Status:          Yes          No |

Exhibit C

**First-Lien Security Lot Numbers and Acreage**

The following lot numbers and corresponding acreage together represent the Backcountry Parcel. Loan proceeds will not be used to finance any Project expenses on the Backcountry Parcel.

| Lot Number | Acres |
|---|---|
| NS294 | 252.58 |
| NS295 | 144.15 |
| NS296 | 28.20 |
| NS298A | 120.00 |
| NS299 | 160.00 |
| NS317 | 285.73 |
| NSBDY20 | 15.20 |
| NSBDY21 | 90.33 |
| NS281A | 79.86 |
| 1002136 | 377.32 |
| 100212503 | 50.87 |
| 1002137 | 624.80 |
| 100213501 | 114.37 |
| 1002138 | 628.16 |
| 1002134 | 470.54 |
| **TOTAL** | **3,442.11** |

<u>Exhibit D</u>

**Second-Lien Security Lot Numbers and Acreage**

The following lot numbers and corresponding acreage together represent the Development Parcel. Loan proceeds will be used to finance Qualifying Expenditures on the Development Parcel.

| Lot Number | Acres |
|------------|-------|
| CT280A | 21.45 |
| CT285A | 501.08 |
| CT287A | 80 |
| CT289A | 303.42 |
| CT301 | 19.93 |
| CT303 | 25.75 |
| CT441 | 68.68 |
| CT446 | 50.52 |
| CT446-448-1 | 72.48 |
| CT446A | 52.22 |
| CT446B | 67.08 |
| CT446C | 80 |
| CT447 | 80.31 |
| CT447B | 80.31 |
| CT448 | 49.2 |
| CT449 | 69.66 |
| CT382A1 | 0.02 |
| **TOTAL** | **1,622.11** |

**FIRST AMENDMENT TO**
**LOAN AGREEMENT**

THIS FIRST AMENDMENT TO LOAN AGREEMENT (this "Amendment") is entered into as of April 27, 2023, by and between Wohali Land Estates LLC, a Utah limited liability company (together with its successors and/or assigns, "Borrower") and EB5AN Wohali Utah Fund XV, LP, a Delaware limited partnership (together with its successors and/or assigns, "Lender").

WHEREAS, Borrower and Lender have entered into financing arrangements as set forth in that certain Loan Agreement, dated August 11, 2022, by and between Borrower and Lender (as amended, restated, renewed, extended, supplemented, substituted, and otherwise modified from time to time, the "Loan Agreement"); and

WHEREAS, Lender and Borrower desire to modify certain provisions of the Loan Agreement, in each case, subject to the terms and conditions of this Amendment.

NOW, THEREFORE, upon the mutual agreements and covenants set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.      Definitions. Capitalized terms used and not defined in this Amendment shall have the respective meanings given them in the Loan Agreement.

2.      Amendment. Section 2.8(a) of the Loan Agreement is hereby amended and restated in its entirety to read as follows:

"(a)      Interest Rate. Interest on each Disbursement shall accrue at the applicable Interest Rate (as hereinafter defined) on any unpaid principal balance for such Disbursement until the full amount of principal of such Disbursement has been repaid. With respect to each Disbursement, interest shall begin to accrue on the date of Disbursement. Interest shall be computed on a 365-day year and actual days elapsed. All interest accrued for such Disbursement, due and owing shall be paid on the Quarterly Payment Date. If not paid when due, then the outstanding principal for such Disbursement and any accrued but unpaid interest shall accrue interest at the Default Rate. As used herein, "Interest Rate" shall mean: (i) with respect to Disbursements under the first 25 Loan Tranches, 6.0% per annum; (ii) with respect to Disbursements under the 26th Loan Tranche through and including the 62nd Loan Tranche, 7.25% per annum; and (iii) with respect to Disbursements under any subsequent Loan Tranche, 7.5% per annum."

3.      Conditions to Effectiveness. The effectiveness of this Amendment shall be subject to the receipt by Lender of an original (or electronic copy) of this Amendment duly authorized, executed and delivered by Borrower.

4.      Effect of this Amendment. Except as modified pursuant hereto, no other changes or modifications to the Loan Agreement are intended or implied and in all other respects the Loan Agreement is hereby specifically ratified, restated and confirmed by all parties hereto as of the date hereof. To the extent of conflict between the terms of this Amendment, on the one hand, and the Loan Agreement, on the other hand, the terms of this Amendment shall control.

5.      Further Assurances. Borrower shall execute and deliver such additional documents and take such additional action as may be reasonably requested by Lender to effectuate the provisions and

purposes of this Amendment.

6.    <u>Binding Effect</u>. This Amendment shall be binding upon and inure to the benefit of each of the parties hereto and their respective successors and assigns.

7.    <u>Governing Law</u>. The rights and obligations hereunder of each of the parties hereto shall be governed exclusively by, and construed in accordance with, the laws of the State of Utah (without giving effect to principles of conflict of laws), and jurisdiction shall lay solely in the courts located in Salt Lake County, Utah.

8.    <u>Counterparts</u>. This Amendment may be signed in counterparts, each of which shall be an original and all of which taken together constitute one agreement. In making proof of this Amendment, it shall not be necessary to produce or account for more than one counterpart signed by the party to be charged. Delivery of an executed counterpart of this Amendment electronically or by facsimile shall be effective as delivery of an original executed counterpart of this Amendment.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed and delivered by their authorized officers as of the day and year first above written.

**LENDER**:

EB5AN WOHALI UTAH FUND XV, LP

By:    EB5AN Wohali GP, LLC
Its:    General Partner

By:_____
Name:  Samuel B. Silverman
Title:    Authorized Signatory

**BORROWER**:

WOHALI LAND ESTATES LLC

By:_____
Name:  Thomas Cottone
Title:    Manager and CFO

By:_____
Name:  David Boyden
Title:    Manager and President

By:_____
Name:  John Kaiser
Title:    Manager and CEO

# Exhibit B

ENTRY NO. 01168499
07/14/2021 03:10:44 PM B: 2679 P: 0287
Agreement PAGE 1/63
RHONDA FRANCIS, SUMMIT COUNTY RECORDER
FEE 48.00 BY WOHALI PARTNERS LLC

# Wohali Master Planned Development
# Development Agreement

# May 25, 2021

# TABLE OF CONTENTS

1.0   DEFINITIONS AND CONSISTENCY....................................................................3

2.0   PROJECT DESCRIPTION ...................................................................................3

3.0   PRIOR AGREEMENTS ........................................................................................4

4.0   LAND USE AND PROJECT ELEMENTS ...........................................................4

5.0   CONSTRUCTION, SITE, LANDSCAPE AND SIGN STANDARDS...............8

6.0   INTERNAL STREET STANDARDS WITHIN THE PROJECT.....................16

7.0   WATER, SEWER AND STORMWATER UTILITY STANDARDS ...............19

8.0   SENSITIVE LAND AREAS STANDARDS .........................................................25

9.0   OPEN SPACE AND TRAIL STANDARDS.........................................................27

10.0  DETERMINATIONS, AMENDMENTS & EXPANSION PARCEL REVIEW
      PROCESS .............................................................................................................28

11.0  PROJECT PHASING...........................................................................................29

12.0  DEVELOPMENT REVIEW PROCESS ..............................................................31

13.0  MISCELLANEOUS ADDITIONAL STANDARDS AND REQUIREMENTS...........36

14.0  DEFINITIONS .....................................................................................................37

15.0  GENERAL PROVISIONS ...................................................................................43

01168499  Page 2 of 63  Summit County

# DEVELOPMENT AGREEMENT

This Development Agreement ("**Agreement**") is entered into this 25th___ day of_May___, 2021, by and between COALVILLE CITY CORPORATION, ("**City**") a municipal corporation of the State of Utah located in Summit County, and WOHALI PARTNERS, LLC., a Utah limited liability corporation ("**Master Developer**"). City and Master Developer may hereinafter be referred to individually as a "**Party**" and collectively as the "**Parties.**"

## RECITALS

A.      The City includes large areas of undeveloped lands within its municipal boundaries, and the City has spent many years evaluating and planning for future coordinated development of those lands.

B.      To strengthen the public planning process, encourage private participation and comprehensive planning, and reduce the economic cost of development, the City has adopted Master Planned Development provisions, *Coalville City Ord* § 8-6-010 *et seq.* (2019) (the "**MPD Ordinance**"), within the Coalville City Development Code (the "**Code**"), which authorizes the City to consider a master planned development proposal of an owner of real property within its jurisdiction.

C.      Under the MPD Ordinance, the City allows the clustering of density and uses required in the underlying zoning district and is required to make certain findings of the development standards and other provisions that apply to, govern and vest the development, use, and mitigation of the development impact of the real property included in the MPD Approval.

D.      Master Developer owns certain real property consisting of approximately 1,664 acres located in Coalville City, as legally described in Exhibit "A" (the "**Property**"), and more particularly depicted in Exhibit "B".  Master developer desires to develop the Property as a master planned development in a manner consistent with the MPD Ordinance, to be developed and known as "Wohali" (the "**Project**").

E.      Master Developer and the City desire to enter into this Agreement in order to implement the MPD Approval and to more fully set forth the covenants and commitments of each Party, while giving effect to applicable State law. The Parties understand and intend that this Agreement is a "development agreement" within the meaning of, and entered into pursuant to the terms of, *Utah Code Ann.* § 10-9a-102 (2020).

## AGREEMENT

NOW THEREFORE, in consideration of the mutual promises set forth herein and other good and valuable consideration, the adequacy, sufficiency, and receipt of which are hereby acknowledged, the Parties hereby voluntarily mutually agree as follows:

**A.      Terms**

## 1.0   DEFINITIONS AND CONSISTENCY

### 1.1   DEFINITIONS

All capitalized terms in this Agreement shall have the meaning set forth in Section 14.0.

### 1.2   CONSISTENCY WITH LAW

The Project is consistent with the Code and the MPD Ordinance. This Agreement is consistent with the terms and conditions of the MPD Approval. The Project has been processed, considered and executed under the existing agricultural zone to facilitate development of the Property, pursuant to the City's administrative authority in accordance with the MPD Ordinance and the Code. The City Council, acting as the land use authority, has issued the MPD Approval as a land use decision in accordance with *Utah Code Ann.* § 10-9a-103(32)(c)(i) (2020), pursuant to Master Developer's land use application.

## 2.0   PROJECT DESCRIPTION

### 2.1   PROJECT ZONING AND DEVELOPMENT ENVELOPES

This Agreement governs and vests the zoning, development, use, and mitigation for the Project, as legally described within Exhibit "A" and graphically shown on Exhibit "B". The Property within the boundaries of the Project shown on Exhibit "B", together with the associated off-site improvements, shall be physically developed pursuant to the terms and conditions of this Agreement.

### 2.2   PROJECT ELEMENTS

The Project includes a mix of the Intended Uses, which include the following elements, except as may be modified pursuant to Section 10.4.2:

Residential Density

Dwelling Units                                       125 units

Open Space and Trails (Recreation)

Primary Open Space                              1,172.83 Acres (70.5%)

18 Hole Championship Golf Course

Executive Short Golf Course

Private Trails

Support Facilities

As described in Section 4.1 and 4.3 below specifically, and this Agreement generally.

### 2.3    MPD SITE PLAN AND PROPERTY BOUNDARIES

The Overall Land Use Plan, attached hereto as Exhibit "C" is derived from a scaled survey, but is at too small a scale to depict surveyed boundaries on the ground. Accordingly, the Development Parcel boundaries and their associated acreages shown on Exhibit "C" are approximate. A large version of the Overall Land Use Plan, with surveyed exterior boundaries, shall be kept on file with the City. Surveys of internal Project Phase boundaries will be submitted with Development Applications. The Development Parcel boundaries shown on the Overall Land Use Plan may be adjusted and/or consolidated pursuant to the processes set forth in Section 4.4 of this Agreement, so long as the general character, Open Space and Density of the Overall Land Use Plan is implemented, and all overall open space minimum requirements are met and is consistent with the Applicable Laws.

## 3.0    PRIOR AGREEMENTS AND FUTURE LAWS

### 3.1    EFFECT OF DEVELOPMENT AGREEMENT

To the extent a general provision of the Future Laws conflicts with a specific provision of this Agreement or an interpretation necessary to give effect to the Agreement, then this Agreement shall control.

### 3.2    DEVELOPMENT AGREEMENT SUBJECT TO APPLICABLE LAWS

This Development Agreement is subject to Applicable Laws.

### 3.3    FUTURE APPLICATIONS SUBJECT TO FUTURE LAWS

All future applications shall be subject to Future Laws, as that term is defined in Section 14, provided that Future Laws shall not apply to the vesting of **USE, DENSITY and CONFIGURATION** or specific provisions of this Agreement that existed and were in effect on January 21, 2020, the date the MPD and Phase I Preliminary Plat Application was determined complete by the City. Future development rights, obligations and responsibilities not described in the preceding sentence, including application processing, fee schedules, procedures, policies, ordinances, resolutions, engineering standards, water quality and quantity requirements, utility standards, sign standards, lighting standards, etc. shall be construed and enforced by the current standards in effect at the relevant time referred to herein as **Future Laws.** The exception to vesting described in Section 15.4, and which shall be considered as included within the definition of Future Laws, shall apply to all future applications, subject to the limitation found in this Section 3.3.

## 4.0    LAND USE AND PROJECT ELEMENTS

### 4.1    MPD OVERALL SITE PLAN

The City Council approved the following components of the Project entitled "Overall Land Use Plan" of the MPD Application: (i) the Overall Land Use Plan; (ii) description of land

4

use categories described in the Overall Land Use plan and the Village Illustrative Master Plan; and (iii) Non-Residential Development and a maximum of 125 Dwelling Units (all described as project elements in Subsection 2.2).

The Overall Land Use Plan shown on Exhibit "C" is not a surveyed map; the scale of each exhibit prevents a high level of detail. The Overall Land Use Plan shown on Exhibit "C" may shift and improve road alignments to further minimize impacts on sensitive area, and to show possible locations of land uses. The layouts shown on Exhibit "C" are only conceptual and may be modified pursuant to Development Applications without an amendment to this Agreement. Land uses in the project may include, but are not limited to, the following (consistent with this Agreement as allowed by the MPD and the Code):

1. Additional uses as described below:
   A. Agricultural/range staging
   B. Maintenance facilities
   C. Accessory Dwellings (ADUs)
   D. Recreational support facilities and resort units - nightly rentals
   E. Non-Residential Development (golf club, spa, chapel, kids club, sales center, outfitters, Welcome Center, amphitheater, practice facility, restaurants, theater)
   F. Golf
   G. Recreational support facilities (yurts, glamping, other recreational uses, and facilities)
   H. Private trails and uses accessory to trails

## 4.2    TOTAL NUMBER OF DWELLING UNITS

The total number of Dwelling Units allowed in the Project is 125 Dwelling Units. The predominant housing type will be Single Family residential.

## 4.3    SUPPORT FACILITIES

The Project includes various support facilities consistent with the Code. The approved configuration and design depicted on the Overall Land Use Plan includes 303 nightly rental resort units located within Project.

The nightly rental resort units shall be on the same parcel with the golf course, or any other recreation parcel as allowed by the MPD and the Code and be owned by the Master Developer and/or association and remain so into the future. Their use must be inextricably linked to the use of the golf course resort facility and any of its recreational amenities. The members and guests of the golf facility may not establish permanent residency in these facilities. Nightly rental resort units cannot be open to public nightly rental not associated with the use of the golf recreation facility or the recreational amenities.

## 4.4    OVERALL LAND USE PLAN AMENDMENTS

The following Overall Land Use Plan amendments described in the Subsections below are allowed pursuant to the process and standards found in Section 12.0 of this Agreement. Overall Land Use Plan amendments shall not allow development of more Dwelling Units than the total amounts permitted under Subsections 4.1 and 4.2.

5

**4.4.1**   The residential Density within any Development Parcel may be adjusted  as long as in no instance may the overall project exceed the allowed Maximum Dwelling Units.

**4.4.2**   Overall Land Use Plan amendments to Open Space areas as shown on Exhibit "G" shall be allowed pursuant to the Minor Amendment process, which may only be processed concurrently with the submittal to the City of a Development Application and shall not modify the overall Open Space requirement set forth in Section 9.1 and may include converting entire Development Parcels to Open Space.

**4.4.3**   Although the Overall Land Use Plan shown in Exhibit "C" is not a specifically surveyed map, approximate acreages were assigned to each Development Parcel to aid in understanding the Overall Land Use Plan. The stated acreage of any Development Parcel may be increased or decreased concurrent with the processing of a Development Application without an amendment to the MPD Approval or this Agreement.

Typical reasons for altering the acreage of a Development Parcel include but are not limited to accommodating on the ground surveying or existing conditions, accommodating detailed engineering designs for necessary infrastructure, improving the location and/or access to active Open Space areas, enhancing protections for a sensitive Open Space area, and providing better clustering, buffers, or trail connections between neighborhoods. The acreage of a Development Parcel may not be increased or decreased if doing so alters the total Maximum Dwelling Units or target Densities for the Project as a whole.

**4.4.4**   The roadway alignments shown on the Roadway Plan (Exhibit "E") may be modified pursuant to and concurrent with a Development Application (e.g., subdivision or binding site plan) without an amendment to the MPD Approval or this Agreement, subject to City approval.

**4.4.5**   Any other Overall Land Use Plan amendment (not listed above) may be processed as a Minor Amendment to the MPD Approval; otherwise, an MPD Land Use Plan amendment constitutes a Major Amendment.

## 4.5    INTERFACE WITH ADJOINING PROPERTIES

When a Development Application for a Development Parcel along the Project Site perimeter is submitted, and the abutting property outside the Project to such Development Parcel is already developed on that submittal date, then the Development Parcel layout and design shall ensure the transition between the development within the Project that abuts development outside the Project Site  is consistent with the Overall Land Use Plan (Exhibit "C").

## 4.6    ADDITIONAL USE STANDARDS

### 4.6.1   Construction/Field Offices

6

Construction/field offices may be located within temporary buildings or modular structures throughout the Project Site and Master Developer shall obtain Building Permits and/or temporary certificates for occupancy of such structures, Model Homes, homes shows, sales offices, construction trailers or similar temporary uses in accordance with *Utah Code Ann.* §10-9a-802(2)(d) (2020).

### 4.6.2   Accessory Dwelling Units (ADUs)

The Project is limited to 125 Accessory Dwelling Units (ADUs) on the Project Site. All ADU's shall comply with the ADU provisions, requirements and standards of the Code. All Accessory Dwelling Unit applications must be reviewed and approved by the DRC prior to submittal to the City for approval.

## 4.7   PROCESS TO TRACK TOTAL DWELLING UNITS AND FLOOR AREA

Master Developer shall develop a process to track Dwelling Unit counts based on approved Building Permits and submit same to the City. Table 4-7-4 below shows the anticipated approximate number of Dwelling Units within each Project Phase. Annually, the City and Master Developer shall confirm the number of Dwelling Units that has been developed within the Project. Master Developer shall include in the report total development of other uses, including floor area totals.

**Table 4-7-4 Target Unit Count by Phase**

| Phase[1] | Target Dwelling Unit Range |
|---|---|
| 1 | 1-102 |
| 2 | 1-10 |
| 3 | 1-20 |
| 4 | 1-20 |
| 5 | 1-51 |
| **Maximum Total Allowed** | **125** |

1. Project Phase, Density and Project Phase intensity or volume may vary depending on numerous factors, such as market orientation and demand, interest rates, competition, infrastructure phasing and similar factors. Accordingly, the timing, sequencing, phasing, and the location of Densities as set forth within this Table 4-7-4 is subject to change as determined by Master Developer, and so long as a Development Application is generally consistent with the MPD Approval and this Agreement, the same may be approved as a Minor Amendment. Phasing is depicted in Exhibit D.

## 4.8   DEVELOPER IMPROVEMENTS

The design and mitigation measures described in this Agreement mitigate potential adverse environmental impacts directly identified as a consequence of development of the Project

7

MPD Approval and this Agreement. Additionally, some elements of the MPD Approval and mitigation measures include provisions relating to improvements required by the City. As designed and with full implementation of all the mitigation measures, the Project build-out will adequately mitigate the potential adverse environmental impacts of the Project and, that through such mitigation measures, provisions will be made for: (i) the Project-Level Facilities needed to serve new growth as a result of the Project within the City and (ii) Master Developer to construct or pay a proportionate share of the cost of completing Regional Facilities.

## 5.0    CONSTRUCTION, SITE, LANDSCAPE AND SIGN STANDARDS

All project construction will follow Applicable Laws. This Section of the Agreement sets additional standards for development of the Project. All Project Phases must comply with these standards and guidelines, as well as the Design Guidelines administered by the DRC.

### 5.1    DRC REVIEW REQUIRED FOR DESIGN GUIDELINES AND STANDARDS

The DRC shall review and approve each Development Application, except for Utility Permits, for compliance with the project specific Design Guidelines prior to submittal for review and approval by the City. The DRC's approval shall be noted in each such Development Application, which shall be submitted for review and processing. In the event that the City determines that a Development Application does not comply with this Agreement, the Code, applicable Future Laws or City Engineering Design and Construction Standards, or Dimensional Standards within Section 5.2, or that the DRC has failed to provide approval, the City may require revisions to the application.

### 5.2    DIMENSIONAL STANDARDS

This subsection outlines the dimensional standards applicable within the Project Site consistent with the MPD Approval to allow or impose restrictions as contemplated by the City's applicable Code provisions and City MPD Ordinance.

#### 5.2.1    Residential Lot Size and Lot Width

**A.**    The City MPD Ordinance imposes a minimum lot size. The minimum lot size for Detached Single Family is 0.10-acre (4,356 sq. ft.) subject to specific conditions being met as described in the MPD Ordinance. The minimum lot size does not apply to alternative lot configurations per Section 5.2.6 of this Agreement. Alternative lot configuration lot sizes are dictated by product type, Setbacks, and other specific lot standards described in Section 5.0 of this Agreement.

**B.**    The minimum width of a Flag Lot is 24 feet for the portion of the lot that serves as access. One driveway may access up to two (2) Flag Lots. Shared driveways serving non-Flag Lots may access up to five (5) lots provided that the driveway width is a minimum of 20 feet and 32 feet of minimum right-of-way.

8

### 5.2.2   Residential Setbacks and Maximum Height
Table 5-2-2

| Area | Required Setbacks[1,10] and Maximum Heights[7,8] | | | | | Maximum Building Height |
|------|-------------------|-------------------|-------------------|-------------------|-------|-------|
| | Front Yard @ Street/Garage | Front Yard @ Common Green | Side Yard[2,3] | Side Yard @ Corner Lot[4] | Rear Yard | |
| AG-MPD | 10 | 10 | 5 | 10 | 12 | 35 |
| ALC[9] | 3 | 0 | 10 Total [10] | 5 | 10 | 35 |

**Notes:**
1. Measured to property or right-of-way line.
2. Note that side yard Setback does not apply to alternative lot configurations as provided in Subsection 5.2.6.
3. Use easements may be utilized for provision of private yards.
4. Setbacks at corner lots with buildings with wrap around porches may be reduced in half.
5. Maximum building height may be exceeded by 8' for distinctive architectural elements such as towers, cupolas and spires or other elements as approved by the City.
6. Table 5-2-2 does not apply to Flag Lots, see Section 5.2.5(F).
7. Access to escape and rescue windows shall be provided for in building design as required by the applicable City building code.
8. All secondary structure setbacks shall meet Code requirements.
9. Standards apply to all "alternate lot configurations" within the AG Zone.
10. Total of both side yard setbacks must total at least 10'.

All residential construction shall be designed and constructed in accordance with the applicable City building code.

### 5.2.3   Allowed Encroachments into Setbacks

A.      When a primary egress window on the second floor of a building is directly above an encroachment on the first floor of the same building, such encroachment in that location within the 5' side yard Setback shall be limited to eighteen inches (18") measured horizontally from the outside wall of the foundation.

B.      Uncovered decks, patios, walkways, window wells and other minor structural elements less than 18-inches in height; and fences six (6) feet in height or less; are exempt from Setback requirements.

C.      Retaining walls and rockeries and other similar landscape features are allowed within Setbacks.

9

D.     Monument signs may be located within Setbacks. However, such signs shall be setback at least three (3) from the edge of the property or right-of-way line.

E.     Encroachments shall only be allowed as long as a minimum thirty-inch-wide (30") access path at the ground level is maintained for emergency purposes. For example, decks may require stairs, or fences may require a gate.

F.     Mechanical equipment shall be allowed within setbacks as long as they are sufficiently screened for visual and noise impacts.

### 5.2.4   Measurement of Setbacks

Setbacks are measured perpendicular from the property line to the outside wall of the foundation or finished exterior surface of a structure.

### 5.2.5   Determining Residential Setbacks on Irregular Lots

Irregular Lots are defined as lots that are non-rectangular, lots with three sides, or more than four sides, and require special measurement techniques in order to achieve the purpose of the specific Setbacks. The City may allow alternate Setbacks on irregular lots, other than those described below, in order to promote unique design opportunities.

A.     Front Setbacks: Front Setbacks shall be measured from the property line that abuts the street from which the lot is addressed or takes primary public access. For an alley loaded lot, the front Setback is measured from the lot line furthest from the alley(refer to Alternative Lot Configuration Exhibit).

B.     Rear Setbacks: In the case of an irregularly shaped lot, a line which is within the lot and parallel to and most distant from the front lot line shall be considered the rear lot line.

C.     Side Setbacks: All lot lines, which are not defined as front or rear lot lines, shall be considered side lot lines.

D.     Pie-Shaped Lots: Setbacks on pie-shaped lots shall be measured at the closest point between the proposed building and the angled lot line, perpendicular to that lot line.

E.     Cul-De-Sac Lots: Setbacks shall be taken from the nearest proposed foundation corner and measured perpendicular to the property lines.

F.     Flag Lots: A Flag Lot is a lot so shaped that the building area is not adjacent to the street or alley on which the lot fronts, and which includes an access strip connecting the building area to the street or alley. Setbacks shall be applied at the enlarged area of the flag, and all Setbacks shall be a minimum of five feet, except that one side of a two-story or taller building shall have a minimum 8' Setback for fire access.

10

### 5.2.6    Alternative Lot Configurations

In order to promote creative and unique site designs, Alternative Lot Configurations are allowed within the Project. Alternative Lot Configurations include, but are not limited to:

1.    Common access easements/tracts configuration

2.    Courtyards

3.    Zero lot line development

4.    "Z" lot configuration

11



Zero lot line development                    "Z" lot configuration

*Illustrative examples of some alternative lot configurations; not to scale*

12

### 5.2.7   Non-Residential Development: Setbacks and Height

**A.**      Setbacks for all Non-Residential Development or Open Space development shall be consistent with the International Building Code (IBC), Design Guidelines and the standards within Table 5-2-7 and subject to review by the DRC as established in Section 12.2.

**B.**      Non-Residential Development Building Height

**Table 5-2-7. Non-Residential Development Building Height**

| Area of Project | Max. Building Height* |
|---|---|
| Uses within Open Space | 30' |
| All Other Uses in Village Center(s) | 45' |

*Design features such as chimneys, flues, vents, and cupolas may exceed the max. building height by no more than eight (8) feet.

## 5.3   PARKING STANDARDS

The standards for parking facilities are intended to promote vehicular and pedestrian safety and efficient land use. The standards in this section match or are in addition to those set by the Code.

### 5.3.1   Minimum Parking Requirements

Parking requirements shall comply with the Code and the additional standards provided below.

**A.      Residential and Non-Residential Recreational Support Uses within the Project and Use Classifications**

Residential and certain support uses within the Project shall provide off-street parking spaces pursuant to the chart below. Guest parking may be satisfied by on street or shared lot parking.

| Use | Required Spaces Per Use |
|---|---|
| Single-Family Dwelling | 2 |
| Accessory Dwelling Unit | 1 |
| Nightly Rental Resort Unit (recreational support facilities) | 1 |

**B.      Other Non-Residential Development within the Village Center**

Non-Residential Development parking spaces shall be provided within the Village Center as required to accommodate potential uses.  Details on the number of spaces,

13

the use of shared parking and valet services shall be described in each subdivision plat or site plan application. It is the intent to provide adequate parking and maximize the efficiency of the parking within the project to the greatest extent possible.

## 5.4    SIGNAGE STANDARDS

### 5.4.1   Sign Standards Applicability

All Project Phases within the Project shall be subject to the definitions, standards, requirements and processes found within the sign ordinance section of the Code as well as the additional standards further detailed herein or Master Developer may opt to provide a comprehensive sign plan for the overall project detailing sign types, dimensions, lighting, etc.

### 5.4.2   Sign Permits Review Process

Sign permits shall be reviewed pursuant to the sign ordinance section of the Code, the Wohali Comprehensive Sign Plan (if provided) and Section 12.0 of this Agreement.

### 5.4.3   Real Estate and Construction Sign Program

The Developer will create a construction and real estate sign program that includes standards for the size, number, location and removal of construction and real estate signs within the Project. This sign program shall at a minimum meet all requirements related to construction and real estate signs within the sign ordinance section of the Code, including the requirement to obtain a sign permit from City and review and approval by the DRC. Master Developer or the Homeowners' Association shall provide enforcement for signage on private property. The City shall enforce the standards within any public right-of-way.

### 5.4.4   DRC Review

Master Developer and/or DRC may require varied sign standards and limits than those contained in the sign ordinance section of the Code thru a comprehensive sign plan.

### A.    Design Standards

i.      Resort identification signs shall be designed with similar materials and architectural character as the buildings within the area to provide a cohesive appearance.

ii.     Signs may be indirectly lit or have internally illuminated copy.

### 5.4.5   Neighborhood Identification Signs

Neighborhood identification signs are allowed within the Project pursuant to the processes and standards set forth within the sign ordinance section of the Code or as approved as part of a comprehensive sign plan.

14

### 5.4.6   Sign Standard Variances

The review procedures and standards for variances from sign standards are pursuant to the process and standards set forth in the Code.

## 5.5   LANDSCAPE STANDARDS

### 5.5.1   Applicability

The provisions of this Section establish the landscape standards and plan for the Project and shall apply to all Project Phases within the Project except for detached Single Family residences, Accessory Dwelling Units, home occupations, Temporary Uses, accessory uses, Minor Utilities, and clearing and grading associated with these uses. All Project Phases, including those excepted above, are still subject to review by the DRC (except for Utility Permits) and to any applicable overall landscape proportion and percentage requirements in this Agreement.

### 5.5.2   Review Process

**A.**   A landscape plan designed or approved by either a landscape architect licensed in the State or approved landscape designer/contractor shall be submitted by an applicant to City for review and approval.

**B.**   The landscape plans shall contain generally accepted industry standards and direction for planting and maintenance such as, but not limited to, tree and shrub planting, staking, irrigation as necessary, weed control measures and soil preparation.

**C.**   Landscaping plans shall be approved by the DRC prior to submittal to the City for review and approval.

### 5.5.3   Parking Lots

The purpose of Parking Lot landscaping is to soften the visual appearance, soften off-site views of parking lots, add shade and reinforce safe pedestrian access routes to buildings and connecting sidewalks. Master Developer shall ensure that all permanent parking lots with 12 or more stalls comply with the following:

**A.**   Provide trees at a ratio of one tree to six stalls. Such trees may be located in planter islands or in landscape beds that intrude into the parking lot from the perimeter or as part of a landscape buffer directly adjacent to the parking lot; and

**B.**   The total of all interior landscaped areas shall be at least 10 percent of the total parking area (including parking, maneuvering and loading areas).

### 5.5.4   Maintenance

**A.**   Consistent with the Code, to the extent necessary to remain healthy and attractive, Master Developer shall ensure that all non-native landscaping shall be watered, weeded, pruned, freed of pests, and replaced as necessary. Shrubs near

15

parking lots or driving lanes shall be pruned to prevent blockage of vision necessary for safe driving. Shrubs shall not be allowed to grow so as to reduce the width of public sidewalks or required pedestrian walkways.

**B.**      Street Side Landscaping Specific Maintenance Requirements: Master Developer or applicable Homeowners' Association shall maintain all public and private street side landscaping, unless otherwise agreed upon by the City and Master Developer or applicable Homeowners' Association.

### 5.5.5   Timing of Landscape Improvements

**A.**      The required parking lot landscaping must be in place within six (6) months of date of issuance of a certificate of occupancy for the building or use for which the parking lot is required.

**B.**      Landscaping within public rights-of-way or associated landscape tracts must be bonded for or in place prior to City acceptance of the right-of-way.

## 6.0   INTERNAL STREET STANDARDS WITHIN THE PROJECT

### 6.1   PURPOSE

This Section describes standards for the design, configuration, maintenance and performance of all public and private streets within the Project. These internal street standards are designed to foster the development of a street system respective of the topography of the site and promote a rural design theme throughout the Project.

### 6.2   APPLICABILITY

This Section 6.0 is applicable to all streets, roadways, alleys, private drives and other vehicular accessways proposed within the Project. Specific land uses, site conditions, visibility limitations and sensitive areas may result in variations to the minimum street standards described in Subsection 6.3 of this Agreement and authorized by the MPD Ordinance. Such variations shall be reviewed and approved pursuant to the Minor Amendment procedure. Standards not defined in this Section shall be governed by the Applicable Laws. Adequate roadway capacity shall be provided by Master Developer within the Project Site to provide reasonable access to all Development Parcels while also minimizing impervious surfaces and roadway impacts.

### 6.3   STREET DESIGN

Street alignment for the Project shall be as shown on the Roadway Plan (Exhibit "E") provided, however, that the City may approve road alignment(s) that differ from that shown on Exhibit "E" where necessary to meet the City Engineering Design and Construction Standards or to respond to project adjustments as required per site specific conditions as allowed.

All private roadway and any public roadway sections for all street types within the Project are set by this Agreement within Exhibit "F".

16

Master Developer will provide each required element on all streets and roadways as indicated within Exhibit "F".

The City engineer may approve alternate roadway sections that vary from Exhibit "F" as part of a Project Phase, to respond to specific site characteristics and design constraints. Examples of variations that may be considered by the City include but are not limited to:

- Design speeds
- Road grades and slopes
- Curb return radius
- Lane geometry (cross-slope, crowns, inverted crowns, etc.)
- Curb types and locations
- Materials and surfacing requirements
- Road section standards
- Provisions for alternate access via private streets when minimum fire access is provided
- Traffic calming measures
- Removal of planter strips – Planter strips may be reduced or eliminated within or adjacent to a critical sensitive land area or buffer or along the side of a street that is adjacent to an Open Space area.
- Avoidance of sensitive area impacts.

## 6.4    STREET CONNECTIVITY

### 6.4.1   Off-Site Connections

The street layout for a proposed Project Phase shall include connections to all existing roadway connections to abutting parcels adjacent to the Project as shown on the Roadway Plan (Exhibit "E"). Connections to the existing public roadway (Coal Hollow Road) to the south provide seasonal emergency service accesses. Coal Hollow Road will continue to allow historic rights, including any rights held by the public. Coal Hollow Road will be redesigned and improved to conform to safety standards, including those required by applicable codes.  No Project Phase shall be approved prior to satisfaction of the requirements of the North Summit Fire District.

### 6.4.2   On-Site Connections

The connection points on the Roadway Plan (Exhibit "E") are approximate. The actual design and location of connection points will be determined at the final engineering stage of Project Phases by Master Developer and City.

### 6.4.3   Primary Project Access

The design of the primary project access (Wohali Way) is to extend from the Weber River Bridge to the Property as shown on the Roadway Plan (Exhibit "E"). The preliminary design and alignment of Wohali Way shall be completed by Master Developer prior to submittal of a residential building permit application to the City for Dwelling Units in the Project. The required Wohali Way improvements shall be

17

constructed by Master Developer and open for traffic prior to the City's approval of a residential Building Permit for the Project.

## 6.5   OWNERSHIP AND MAINTENANCE

### A.   Ownership and Maintenance.

All street rights-of-way will be privately owned and maintained by Master Developer or Homeowners' Association, except for public roads which include portions of Wohali Way and Icy Springs Road. All such private roads will be maintained by Master Developer or Homeowners' Association, and any public road will be maintained by the City except that the Homeowners' Association may enter into a winter maintenance agreement with the City to provide the same level of snow removal service to public roads. Maintenance of landscape tracts, planting strips and snow storage areas associated with streets within the Project will be provided by the Homeowners' Association or subset thereof pursuant to the provisions of Subsection 5.5.4 of this Agreement.

### B.   Maintenance of Private Street(s).

Master Developer agrees to maintain all private streets, roadways, alleys and private driveways serving the project as constructed in accordance with each approved Project Phase. Plats shall clearly identify ownership of private streets and the private obligation for the maintenance of the same. Master Developer, in its sole discretion, may elect to transfer the private street maintenance obligation to a Homeowners' Association or other acceptable entity. If a private street is not maintained in a manner adequate to maintain safe passage, in the reasonable determination of the City within ten (10) days of delivery of the written notice the City may perform the required maintenance with the reasonable costs associated therewith charged to Master Developer. In the event of an emergency, the applicable notice period shall be reduced to twenty-four (24) hours and the City may provide notice via a phone call to Master Developer's designated representative. If Master Developer fails to perform such maintenance as required herein and, as a result, the City performs such required maintenance, the City's total reasonable costs arising from its performance of the maintenance shall be paid by Master Developer or Homeowners' Association, as applicable within thirty (30) days of the date of invoicing by the City. Any costs not paid within thirty (30) days of invoicing by the City shall be delinquent, shall have added to them a penalty of ten (10) percent plus interest accruing at the rate of twelve (12) percent per annum from the date of delinquency until paid. City, utility and other service providers shall have access rights over private streets or private access easements including maintenance and/or repair of public utilities. Should the private roadways/streets be cut or otherwise damaged during the maintenance/repair or due to utility failure or break of City owned utilities, it shall be the responsibility of the City to fully repair the roadways/streets affected.

18

## 7.0   WATER, SEWER AND STORMWATER UTILITY STANDARDS

### 7.1   GENERAL REQUIREMENTS

#### 7.1.1   Regional Facilities

Regional Facilities may be necessary for development to occur on the Project Site. Master Developer shall design and construct any required upgrades to the Regional Facilities that are necessary to serve the Project Phases, consistent with the City's adopted level of service, or as otherwise specified by the MPD Approval and this Agreement. City and Master Developer shall enter into pioneering agreements for any infrastructure, including Regional Facilities, where Master Developer and City have mutually determined that a pioneering agreement will facilitate the reimbursement for costs incurred in developing and improving such infrastructure as set forth in such pioneering agreements.   Such pioneering agreements shall include provisions requiring others connecting to infrastructure built with excess capacity to pay for their share of such capacity, including construction, and other reasonable costs and expenses incurred in developing the excess capacity. Nothing in a pioneering agreement shall preclude expenses from being reimbursed from more than one revenue source so long as Master Developer is only reimbursed once for infrastructure, including Regional Facilities.

#### 7.1.2   Project-Level Facilities

Project-Level Facilities include on-site culinary and secondary water mains, sanitary sewer, irrigation and stormwater facilities. Project-Level Facilities will be Constructed by Master Developer as development progresses across the Project Site consistent with the Coalville City Engineering Standards and Construction Specifications as further detailed in this Section.

#### 7.1.3   Location and Type of Facilities Approximate

The location and type of Regional Facilities shown on the Overall Sewer Utility Plan and Overall Water and Irrigation Utility Plan (attached hereto as Exhibits "I" and "J") are approximate and may change during the final design phase provided that the intent of the plans is met as reasonably determined by the City. Alternate means of achieving utility service to and within the Project Site on a temporary or permanent basis will be considered by the City through a Utility Permit application.

#### 7.1.4   Bonding for Project-Level Facilities and Regional Facilities

Master Developer may defer Project-Level Facilities and Regional Facilities so long as the completion of the work is guaranteed by a performance/payment bond or other financial guarantee allowed under State law and Code. Consistent with *Utah Code Ann.* § 10-9a-604.5 (2020), the bond, or other financial guarantee, must be in a form acceptable to the City in an amount equal to the estimated construction cost of all the uncompleted work plus a 20% contingency. The City Engineer shall review Master Developer's estimate of the cost of the Project-Level Facilities and Regional

19

Facilities, identified in an approved set of civil construction drawings, guaranteeing the actual construction and installation of such Project-Level Facilities and Regional Facilities and payment for such Project-Level Facilities and Regional Facilities within a time frame to be set by the City Engineer consistent with this Section.

### 7.1.5   Inspection and Acceptance of Project-Level Facilities and Regional Facilities

The City, or agreed upon third-party inspector, shall make a reasonable effort to inspect Project-Level Facilities and Regional Facilities within one (1) business day of the inspection request, as long as the Project-Level Facilities and Regional Facilities are complete. The inspector shall determine whether the Project-Level Facilities and Regional Facilities are substantially complete and provide a written list of any corrections or additional work necessary for physical completion of the Project-Level Facilities and Regional Facilities within 7 days of the date of the inspection. The City, or agreed upon third-party inspector, shall make reasonable effort to provide one comprehensive written list upon which all subsequent inspections shall be based. The Project-Level Facilities and Regional Facilities shall be accepted by the City.

### 7.1.6   Release of Bond or Financial Guarantee

The City shall make a reasonable effort to fully release original bond or financial guarantee amounts within fourteen (14) days of City acceptance of the Project-Level Facilities and Regional Facilities according to the Coalville City Engineering Standards and Construction Specifications.

Original bond or financial guarantee amounts may be reduced at the reasonable discretion of the City. Financial guarantees will be fully released only after final acceptance of the subject Project-Level Facilities and Regional Facilities by the City Council.

### 7.1.7   Ownership

All water, sewer, and stormwater facilities within public and private rights-of-way or public and private easements will become part of the City's system upon acceptance by the City Council pursuant to the Coalville City Engineering Standards and Construction Specifications. All such facilities shall be maintained by the City with standard City maintenance protocol and procedures. Facilities within the Project developed to distribute secondary water shall be private facilities maintained by Master Developer or its assigns. The secondary water diversion structure and associated infrastructure shall be dedicated to the City at the City's option. Some facilities within the public right-of-way may be privately owned and operated as long as the entity that owns and operates the facilities has a valid franchise agreement with the City.

### 7.1.8   Deviation Review Criteria

20

Deviations from standards are allowed consistent with the process and standards for Deviations found in the Coalville City Engineering Standards and Construction Specifications.

### 7.1.9   Impact Fees

The purpose of the City's Impact Fees is to collect funds to assure new users pay an equitable share of the City's water and sewer service capacity and facilities. Therefore, the City shall collect any and all applicable Impact Fees for Project Phase and Building Permit approvals sought for the Project at the rate amount when the fee is collected.

## 7.2   WATER SYSTEM STANDARDS

### 7.2.1   Culinary Water

Master Developer will pay to have all Project-Level Facilities for water infrastructure designed, approved, constructed, and connected to existing city systems.  Master Developer will also pay all required connection fees, applicable water right fees, and/or impact fees in lieu of developing new water sources or dedicating water shares to the City as provided for by the City provisions in effect at the time. Culinary water shall not be permitted for use in outdoor water features, ponds, landscape irrigation, or other similar non-essential culinary water use purposes, except for the filling of hot tubs and swimming pools. Master Developer shall also be responsible to pay all pumping costs required to delivery culinary water to the Project.

### 7.2.2   Secondary Water

Master Developer shall locate and cause to be contributed or made available new irrigation water sources appropriate for inclusion in the secondary water system for the Project.  Master Developer shall construct required infrastructure and pay lease costs for water leased from the Weber Basin Water Conservancy District and/or any other provider of water services.  Master Developer shall have the right to use any and all secondary water that it has paid the associated lease costs for until such time as the City requests the use of said water. City shall have the first right of use for any and all secondary water and shall pay for the costs of the water it uses. To the extent the Master Developer has paid for the annual lease costs of the water, the City shall reimburse Master Developer for the costs of the water the City impounds for its purposes. The City shall provide a minimum of 12 months written notice of the City's intent to redirect any river water, or other water source of the City, in use by the Master Developer for other general municipal purposes.  City shall then bear the responsibility to pay for their pro rata share of the annual water bill due to the Weber Basin Water Conservancy District.  Master Developer shall not be assessed any additional fees or issued any other bills or invoices for secondary water beyond the annual payment required by the City's contracts with Weber Basin Water Conservancy District.

21

Master Developer shall be required to source or be made available all secondary water for single-family residential lots, nightly rental resort units, golf course irrigation and all other support recreational facilities described in Section 4.1 and 4.3 specifically, and this Agreement generally. The Master Developer shall install, construct, maintain, and manage the secondary water infrastructure as a private irrigation system. Residents of Wohali will be obligated to pay Coalville City water rates which includes a component for secondary water debt service, even though Wohali has its own private secondary water system. The City shall not have any obligation or responsibility to deliver any secondary water to the Project.

**Culinary Water System Design and Construction**

**A.**     All Project-Level Facilities and Regional Facilities for culinary water system facilities (on and off-site) required for service to the Project shall be designed and Constructed by Master Developer, in accordance with the Overall Water Utility Plan, and the Coalville City Engineering Standards and Construction Specifications and will become part of the City's system upon acceptance by the City Council.  The Project-Level Facilities for water systems serving the Project shall be the responsibility of the City, provided that Master Developer pay to have the connecting infrastructure designed, approved and constructed.  It is the City's responsibility to provide all required culinary water service to the Project based on the available capacity provided that the development meets all zoning requirements appertaining to the property comprising the Project. However, the City has no responsibility or obligation to provide secondary water to the Project.

**B.**     Fire flows, hydrant locations and distribution must comply with the then applicable Uniform Building Code requirements.

**C.**     Pursuant to the Uniform Building Code requirements, sufficient quantity and duration of fire flows shall be available prior to the start of any combustible construction. Such requirements apply to the areas actually under construction; areas under construction but without structures are not required to have fire flows until combustible construction begins.

**D.**     All secondary water for residential use shall be metered at the point of extraction from the Wohali secondary water storage reservoir. All secondary water pumps shall also be metered for electrical power usage. The Master Developer shall pay the pumping costs of transporting water from the Weber River, wells and all other sources to the secondary water storage reservoir(s) used for the storage of secondary water. Master Developer shall also be responsible for the maintenance and upkeep of the water storage reservoir(s) used for secondary water storage.

### 7.2.3   Water Connection and Impact Fee Credits

Project Phases and Building Permit approvals within the Project shall be required to pay the City's applicable connection and Impact Fees as stated in Section 7.1.9. Master Developer shall be granted impact fee credits, or be reimbursed equal to the cost incurred, for construction of those Coalville City public infrastructure facilities

22

that serve residents of Coalville beyond the Project on a proportionate use basis. Master Developer shall not pay any impact fees for a secondary water system that it is building only for the use of the Project.

### 7.2.4   Regional Water Facilities

The Overall Water and Irrigation Utility Plan provides one alternative for the general location of on and off-site water mains, pressure reducing valves, and pump station(s) to be Constructed by Master Developer. Water from existing City facilities will be delivered to the Project Site using gravity flow, pump station(s), or water tank(s) to serve the appropriate pressure zone.

Master Developer may seek alternate means of achieving water service to and within the Project through the Utility Permit application and approval process set forth in the Code and Coalville City Engineering Standards and Construction Specifications.

## 7.3   SANITARY SEWER DESIGN STANDARDS

### 7.3.1   Sewer Availability

This Agreement acknowledges and confirms that there is existing sewer capacity availability to service 125 Dwelling Units and other Non-Residential Development in the Project, including, but not limited to, 303 support facilities operated as resort unit nightly rentals. Future sewer service capacity will be evaluated and confirmed with the review and approval of each phase of the Project (refer to Section 11.3 and 11.4).

### 7.3.2   Sewer Design and Construction Standards

All Project-Level Facilities and Regional Facilities for sewer system facilities (on and off-site, except those existing) required to provide service to the Project shall be designed and Constructed by Master Developer in accordance with the Coalville City Engineering Standards and Construction Specifications and will become part of the City's system upon acceptance by the City Council.

### 7.3.3   Connection to City Sewer

Pursuant to Section 7.1.9 above, Project Phases and Building Permit approvals within the Project shall be required to pay the City's applicable Impact Fees.

### 7.3.4   Regional Sewer Facilities

The Overall Sewer Utility Plan (Exhibit "I") shows the general location of the proposed sewer collection system, force mains and new pump station(s) that will pump wastewater to a City designated discharge location. Approximate facility locations are shown on (Exhibit "I"), final locations are subject to City review and approval.

23

### 7.4    STORMWATER MANAGEMENT STANDARDS

#### 7.4.1   Stormwater Facilities Availability

Stormwater facilities must be provided consistent with the Coalville City Engineering Standards and Construction Specifications and further detailed in Section 7.4. When constructing a Project Phase, Master Developer (and successors-in-interest) must comply with both the stormwater standards applicable to all zones for all Project Phases (see Section 7.4.4.), as well as the specific stormwater standards applicable to the stormwater zone in which the Project Phase is located.

For each proposed Project Phase, a storm drainage report providing for preliminary sizing of facilities must be provided that evaluates the proposal and specifies the facilities necessary to meet the standards in the Coalville City Engineering Standards and Construction Specifications and this Agreement. Construction of temporary or permanent water quality and/or detention ponds, infiltration facilities, storm drains, water quality facilities, wetland recharge or other stormwater facilities may be required by the City to ensure that the facilities necessary to serve a Project Phase are in place or will be provided.

#### 7.4.2   Stormwater Facilities

The components of the stormwater management plan for the Project Site include infiltration of stormwater into the shallow aquifer through infiltration facilities; conventional ponds; wetland recharge; water quality treatment facilities and regional stormwater management facilities.

Facilities to serve the entire Project have been planned and approximate locations determined. Master Developer shall be required to obtain all necessary permits from Coalville City for construction, including any necessary approval or agreement authorizing the City to perform necessary maintenance of storm water ponds or detention basins. Master Developer shall submit engineering plans to the City for approval.

Alternate means of achieving stormwater service within the Project may be authorized through a Utility Permit, including deviations from stormwater facilities listed in the Overall Sewer Utility Plan, when justified by a technical analysis, risk assessment.

#### 7.4.3   Stormwater Management Requirements

Master Developer shall comply with the stormwater management requirements provided below. In the event of a conflict between these requirements and the Stormwater Management Design Standards set forth in Section 7.4.4 of this Agreement, this Agreement shall prevail.

A.    Prevent impacts to the Icy Springs Water Source Protection Zone by assuring no increase in phosphorus or other contaminants occurs associated with the Project development within the protection zone through periodic water sampling of the City's

24

water system at Icy Springs. No net increase can be accomplished by on-site or off-site source or mechanical controls, control of phosphorus from golf courses, or other methods approved by the City.

**B.** Pursuant to the Icy Springs Drinking Water Source Protection Plan Update, dated December 2017, maintain surface water and groundwater quality and quantities.

**C.** Recharge groundwater with stormwater infiltrated using Low Impact Development techniques and infiltration facilities.

**D.** Utilize clean roof run-off to recharge wetlands, streams and groundwater to the greatest extent feasible.

**E.** Provide a menu of stormwater treatment options ranging from ponds to rain gardens.

**F.** Minimize impacts to Echo Reservoir water levels by ensuring that the volume of stormwater infiltrated into the shallow outwash upgradient of Echo Reservoir is approximately the same as that which infiltrates under predeveloped conditions

**G.** Avoid impacts to steep slopes by routing excess stormwater away from slopes to a stormwater management facility.

**H.** Provide a proactive, responsive temporary erosion and sediment control plan to prevent erosion and sediment transport and protect receiving waters during the construction phase.

**I.** Construct a stormwater system that does not burden the City with additional maintenance costs.

**J.** Maintain a stormwater system that allows for adaptive management of detention and discharge rates and allows for redirection of stormwater overflows when environmental advantages become apparent.

### 7.4.4   Stormwater Management Design Standards

Developable area, areas of impervious and pervious surface, area of rooftops, the amount of stormwater that can be infiltrated into the shallow outwash must be determined for ultimate stormwater balance calculations. Water balance calculations will need to be performed based on actual developed conditions to ensure water balance goals are met.

Individual Project Phases shall meet the overall stormwater management requirements and shall provide calculations of the amount of stormwater discharged. Master Developer shall maintain a running tally and will manage the water balance requirements for each stormwater zone to ensure that the water balance goals are met.

Stormwater facilities shall be designed to meet the requirements of the any applicable Stormwater Pollution Prevention Plan (SWPPP) that complies with a National

25

Pollutant Discharge Elimination System (NPDES) permit. In the event that new stormwater standards are adopted by the City prior to the beginning of a new Project Phase, the new Project Phase shall comply with the new standards; provided, however, that Master Developer shall not be required to resize stormwater facilities already constructed except as required by state or federal law.

## 8.0   SENSITIVE LAND AREAS STANDARDS

### 8.1   SENSITIVE LANDS AREAS ORDINANCE APPLICABILITY

All development within the Project shall be subject to the standards, requirements, and processes of the Sensitive Land Area provisions in the Code. The sensitive land areas jurisdictional determination and sensitive land area studies have been completed and verified for the Project. Any Project Phase that does not propose any changes or alterations to sensitive land areas or their buffers as shown in the studies described in Subsection 8.2 has met the jurisdictional determination requirements of the sensitive land areas, such that no additional studies need to be submitted with the Development Application.

### 8.2   SENSITIVE LAND AREAS DETERMINATIONS

Consistent with the Sensitive Land Areas Ordinance, at the time of construction, sensitive areas and their established buffers or boundaries shall be clearly identified and marked in the field or approved limits of disturbance shall be marked or flagged that avoid all areas of sensitive lands.

#### 8.2.1   Wetland/Drainageway Determinations and Delineations Final

The presence and absence of wetlands, drainageways, and delineations, consistent with the Sensitive Lands Areas Ordinance, have been determined for the Project and are deemed final and complete through the term of this Agreement.

#### 8.2.2   Reserved

#### 8.2.3   Steep Slope/Ridgeline Areas

Steep Slope/Ridgeline areas for the Project were evaluated and determined for the Project and are deemed final and complete through the term of this Agreement.

#### 8.2.4   Vegetation Areas

Vegetation areas and types for the Project were evaluated and determined for the Project and are deemed final and complete through the term of this Agreement.

#### 8.2.5   Icy Springs Water Source Protection Zone Boundary

The Icy Springs water source protection zone boundary within the Project was evaluated according to the Coalville Source Protection Plan Update, dated December 2017. The source protection zone boundary for the Project is deemed final and complete through the term of this Agreement.

## 9.0   OPEN SPACE AND TRAIL STANDARDS

### 9.1   OVERALL OPEN SPACE REQUIREMENT

The Project is required to provide at least 1,172.83 acres of total Open Space as shown in the following table:

**Table 9-1 Open Space Calculations**

|  | Gross Acres | Total Percentage of MPD |
|---|---|---|
| The Property | 1,664.04 | 100% |
| *Total Open Space | 1,172.83 | 70.5% |

*Total open space includes golf course areas as "open space, landscaped" under the Code.

### 9.2   TRAILS PLAN

Master Developer shall design and construct private trails throughout the Open Space. The approximate location and type of private trails to be provided by Master Developer shall be on a Project Phase by Project Phase basis and will be defined through Project Phase approvals. Trail segments shall be designed and constructed up to the boundaries of each Project Phase, as applicable. The actual alignment of the trails may vary in the field to avoid hazards or create a better trail experience based on site specific conditions.

#### 9.2.1   Open Space and Sensitive Land Areas

Ownership and maintenance of open space and sensitive land areas shall be held in undivided ownership by all lots within the Project, the Homeowners' Association or Master Developer. Open space may also be protected with conservation easements or conveyed to a non-profit land trust with the underlying fee owned by the lot owner, Homeowner's Association or Master Developer.

#### 9.2.2   Trails

All trails will be owned and maintained by the Homeowners' Association or Master Developer.   Details on trail dimensions, function, surfaces and standards for design shall be submitted and included in the DRC review contemplated by Section 12.2.

# 10.0 DETERMINATIONS, AMENDMENTS & EXPANSION PARCEL REVIEW PROCESS

## 10.1 RESERVED

## 10.2 APPLICABILITY

This Section applies to requests to clarify the requirements or meaning of this Agreement by the City, Master Developer, or the Master Developer Transferee and to proposed changes to the provisions contained within the MPD Approval or this Agreement.

## 10.3 DETERMINATIONS

Any dispute between Master Developer (or the Master Developer Transferee) and the City over the application of this Agreement to a land use application shall be resolved first by the City. The City shall decide in writing within fourteen (14) days of receiving a written request for clarification of this Agreement. The City's written decision may be appealed by Master Developer to the City Council within ten (10) days, or other appeal authority designated. A hearing on the appeal shall be held within thirty (30) days following the date upon which the request for an appeal is filed, and any decision shall be subject to the mediation provisions of Section 12.4.1, or, if mediation would be ineffective, to district court to seek relief under this Agreement.

### 10.3.1 Determination of Use Category

In addition to determinations regarding the terms of this Agreement as provided above in Section 10.3, all questions from Master Developer regarding what use category a particular use falls within shall be determined pursuant to the Code.

## 10.4 AMENDMENTS

### 10.4.1 Amendments to the MPD Approval

An Amendment to the MPD Approval may be requested by Master Developer or Master Developer Transferee pursuant to the standards adopted in the MPD Ordinance pursuant to the process described herein. The processes for reviewing Major and Minor Amendments to the MPD Approval are outlined in Subsection 12.7.9 of this Agreement.

### 10.4.2 Amendments to the Development Agreement

An Amendment to this Agreement may be requested by Master Developer pursuant to the standards outlined herein. Amendments to this Agreement that increase overall Density as set forth in the original MPD Approval shall be considered "Major" and shall be reviewed by the same procedures applicable to a new master planned development request, as set forth in Applicable Laws. Amendments that do not increase overall Density as set forth in the original MPD Approval shall be considered "Minor" and may be approved by the appropriate official within the City. Master Developer may amend

28

this Agreement without obtaining the consent, agreement or approval of Sub-developers or any purchasers of lots or units within the Project.

## 11.0   PROJECT PHASING

### 11.1   PHASING PLAN APPROVED

The Phasing Plan attached hereto as Exhibit "D" is approved as the "preliminary plan" for the Project, as defined in Subsection 8-2-060 of the Code.

As noted on the approved Phasing Plan (Exhibit "D"), the Phasing Plan is "subject to change" and is only "a reasonable and accurate estimate of the development improvements and timing that will be needed for the project. The precise locations and details of the Development Parcels' configuration and design, improvements and any other similar items regarding development of the Development Parcels are not definitively known as of the date of this Agreement. Intended Uses and Densities are generally known, however the Parties acknowledge that the most efficient and economic development of the Project depends on numerous factors, such as market orientation and demand, interest rates, competition, and similar factors. Accordingly, the timing, sequencing, and phasing of development of the various Development Parcels in the Project shall be as determined by Master Developer, and so long as a Development Application is generally consistent with the MPD Approval and does not constitute a Major Amendment, the same may be approved as a Minor Amendment. Additionally, alternative or functionally equivalent roads, water, sewer, and stormwater systems or other infrastructure improvements may be approved by the City based on existing conditions (including market demand and City infrastructure) and current technology. The City and Master Developer have agreed to the infrastructure improvements listed in the tables included in this Section 11.

The Master Developer may propose a sub-phase of any phase noted on the Phasing Plan to accommodate the timing, market demands, development of required improvements or other similar factors associated with the project phase.

### 11.2   PHASING OF IMPROVEMENTS

This Section describes the phasing and timing of infrastructure within and outside of the Project. However, the approved Phasing Plan is not intended to be absolute and represents likely phases based on current market conditions and infrastructure phasing. Project Phases may be started concurrently, and portions of phases may be built without completion of the entire phase.  In general, the infrastructure necessary for each phase of the Project is dependent on the infrastructure built in preceding phases.

Project Phases may ultimately be built simultaneously. Accordingly, infrastructure and timing of development different from the Phasing Plan (Exhibit "D") may be proposed by Master Developer, without an amendment to the MPD Approval or this Agreement, based on the needs and timing of specific Project Phases and technological advancements.

29

### 11.3   PHASING AND CONSTRUCTION OF ON-SITE INFRASTRUCTURE IMPROVEMENTS

**A.   Phasing**. On-Site Facilities are Project-Level Facilities and Regional Facilities located within the Project Site of the Project. The capacity of the roadway, water, sewer, and stormwater systems serving a specific Project Phase proposal shall be evaluated during the development review process for that Project Phase. If, based on a Project Phase specific evaluation, there are insufficient infrastructure facilities or capacity to serve some or all the specific Project Phase, infrastructure improvements necessary to provide adequate capacity shall be required as a condition of issuing a building permit for a structure within that Project Phase. Timing, design, and necessity of such infrastructure improvements must be consistent with provisions of Sections 6.0 and 7.0 of this Agreement.

**B.   Construction and Funding**. Master Developer shall design and Construct (or cause to be Constructed) all required On-Site Facilities. Master Developer may elect to construct certain facilities prior to a demonstrated need to obtain adequate capacity. However, nothing in this Section 11.0 shall be construed to require Master Developer of the Project to Construct any infrastructure facility or pay one hundred percent (100%) of any infrastructure facility cost, which is unnecessary to provide adequate capacity for a Project Phase of the Project.

### 11.4   PHASING AND CONSTRUCTION OF OFF-SITE INFRASTRUCTURE IMPROVEMENTS

**A.   Phasing**. Off-Site Facilities are Project-Level Facilities and Regional Facilities that are located outside the Project Site and the boundaries of the Project.

Since the Off-Site Facilities necessary to serve the Project at the end of the Build-Out Period may be substantially more than will be needed to serve the Project during its initial Project Phases, construction of off-site Facilities is tied to thresholds that trigger construction or upgrade of the infrastructure facilities.

Prior to construction on the first Project Phase, a more detailed implementation schedule for any required construction or upgrades of off-site infrastructure improvements supporting Project Phase one and all other subsequent Project Phases shall be submitted to the City for approval. The purpose of this provision is to ensures that necessary off-site Facilities are provided to serve Project Phases as they occur.

**B.   Construction and Funding**. Master Developer shall design and construct (or cause to be constructed) the Off-Site Facilities necessary to serve the Project. Master Developer may elect to construct or upgrade certain Off-Site Facilities prior to a demonstrated need to obtain adequate capacity. However, nothing in this Section 11.0 shall be construed to require Master Developer to construct or upgrade any Off-Site Facility or pay any infrastructure facility cost, which is unnecessary to provide adequate capacity for a Project Phase of the Project.

### 11.5 PHASING OF DEVELOPMENT TRACKING

**A.** On-Site and Off-Site Facilities. The sequencing of Project Phase approvals, construction completeness, and City acceptance of On-Site Facilities and Off-Site Facilities shall be confirmed by the City, who shall make a finding within each staff report for proposed Final Plats or binding site plans within the Project. The finding shall confirm whether required infrastructure and amenities have been scheduled to meet the demands of the future occupants of that specific Phasing Plan or binding site plan.

**B.** Open Space Protection. The details of Open Space protection shall also be identified with each Project Phase during the Final Plat review and approval process.

**C.** Workforce Housing. The Project shall include workforce housing located on maintenance or another parcel supporting the Recreational Facilities or on parcels outside of the Project Site. Workforce Housing shall be deed restricted and does not count against approved dwelling units or resort units.

## 12.0 DEVELOPMENT REVIEW PROCESS

### 12.1 APPLICABILITY

This Section applies to all Project Phases within the Project.

### 12.2 DRC

A Design Review Committee (DRC) shall be established by Master Developer. The DRC shall ensure that Project Phases within the Project are consistent with the Project specific design standards and guidelines as applicable and shall have sole responsibility for ensuring compliance with the Design Guidelines. Except for Utility Permits, all Development Applications, including any formal modifications to Project Phase approvals and ADU applications, must be reviewed by the DRC before the application or formal modification is submitted to the City. All Development Applications (except for Utility Permits) must be accompanied by written documentation of DRC approval at the time of submittal to the City. In the event of a conflict, City review requirements supersede those of the DRC. A Development Application submitted without written documentation of DRC approval is not complete and will be rejected by the City.

### 12.3 BUILDING ENVELOPE REVIEW PROCESS

The DRC will provide individual lot feature maps for single-family lots within the Project. These lot feature maps will identify building setbacks as required for each Lot for the area within which the Lot is located and as detailed on Table 5.2.2 of this agreement. In addition, each Lot feature map may identify a more restricted and defined Building Pad for each lot that all vertical construction must be kept within. This building pad will help ensure that the areas outside of the defined building pad will remain unbuilt and be undisturbed providing for additional open spaces for the project beyond the required total open space provided. The building pads shown on the lot feature maps are not part of a recorded plat and may be

31

adjusted as allowed by the DRC. Driveway access shall comply with the requirements of the Code.

## 12.4    APPLICATION REVIEW PROCEDURES

### 12.4.1  Procedures Applicable to All Project Phases

#### A.    Informal Feasibility Consultation

Potential Project Phase applicants are required to hold a project feasibility meeting with Master Developer and City prior to detailed work being performed by an engineer, architect, landscape architect or planner.

The purpose of this meeting is to work collaboratively with the City and to eliminate as many potential issues as possible in order for the Development Application to be processed without delay and undue expense. The City will make available all pertinent information that may relate to the proposal and take a collaborative approach to addressing any issues.

#### B.    Processing Under Applicable Laws

Approval processes for Development Applications shall be as provided in the Applicable Laws except as otherwise provided in this Agreement. Development Applications shall be approved by the City if they comply with the Applicable Laws and conform to this Agreement. The City shall cooperate reasonably in promptly and fairly processing Development Applications.

Any Development Application requiring the signature, endorsement, or certification and/or stamping by a person holding a license or professional certification required by the State in a particular discipline shall be so signed, endorsed, certified or stamped signifying that the contents of the Development Application comply with the applicable regulatory standards of the City. The Development Application shall thus generally be deemed to meet the specific standards which are the subject of the opinion or certification without further objection or required review by an agency of the City. It is not the intent of this Section to preclude the normal process of the City's "redlining", commenting on or suggesting alternatives to the proposed designs or specifications in the Development Application. Generally, the City should endeavor to make all of its redlines, comments or suggestions at the time of the first review of the Development Application unless and changes to the Development Application raise new issues that need to be addressed.

#### C.    Outsourcing of Processing of Development Applications

Within fifteen (15) days after receipt of a Development Application upon the request of either Party, the Parties will confer and determine whether the City and/or the Applicant wishes the City to Outsource the review of any aspect of the Development Application to ensure that it is processed on a timely basis. If either Party determines that Outsourcing is appropriate, the Applicant shall pay the actual

32

hourly review cost incurred by the City for such services (either overtime to City employees or the hiring of a City Consultant). Upon completion of the Outsourcing services and the provision by the City of an invoice (with such reasonable supporting documentation as may be requested by Applicant) for the actual differential cost of the application fees and the cost of paying the hourly review of the City Consultant and City Staff support for review the application Applicant shall, within ten (10) business days pay or receive credit (as the case may be) for any difference between the differential cost for the additional Outsourcing and the actual application fee

### D.    Non-City Agency Reviews

If any aspect or a portion of a Development Application is governed exclusively by a Non-City Agency an approval for these aspects does not need to be submitted by Applicant for review by any body or agency of the City. The Applicant shall timely notify the City of any such submittals and promptly provide the City with a copy of the requested submissions. The City may only grant final approval for any Development Application subject to compliance by Applicant with any conditions required for such Non-City Agency's approval.

### E.    City Denial of a Development Application

If the City denies a Development Application the City shall provide a written determination advising the Applicant of the reasons for denial including specifying the reasons the City believes that the Development Application is not consistent with this Agreement, the MPD Approval and/or the Applicable Laws (or, if applicable, the Future Laws).

### F.    Meet and Confer regarding Development Application Denials; Mediation

The City and Applicant shall meet within fifteen (15) business days of any Denial to resolve the issues specified in the Denial of a Development Application. If the City and Applicant are unable to resolve a disagreement, the Parties shall attempt within ten (10) business days to appoint a mutually acceptable mediator with knowledge of the issue in dispute. If the Parties are unable to agree on a single acceptable mediator they shall each, within ten (10) business days, appoint their own representative. These two representatives shall, between them, choose the single mediator. Applicant shall pay the fees of the chosen mediator. The chosen mediator shall within fifteen (15) business days, review the positions of the Parties regarding the mediation issue and promptly attempt to mediate the issue between the Parties. If the Parties are unable to reach agreement, the mediator shall notify the Parties in writing of the resolution that the mediator deems appropriate. The mediator's opinion shall not be binding on the Parties. The mediation provision in this Section does not preclude Applicant from filing appeals under Utah law.

## 12.5   PUBLIC NOTICE REQUIREMENTS

Public notice shall be provided in accordance with the Land Use Act.

33

## 12.6   AMENDMENTS TO DEVELOPMENT APPLICATIONS

Amendments to Development Applications may be allowed as a Minor or Major Amendments and shall be processed pursuant to this Agreement.

## 12.7   APPLICABILITY, DECISION CRITERIA AND APPROVAL SPECIFIC REQUIREMENTS

### 12.7.1 Construction Permits

#### A.   Building Permits

The International Residential Code, International Building Code, International Fire Code and other construction codes in effect in the City, or amendments thereto, on the date of filing a complete Building Permit application shall apply to such application.

#### B.   Utility Permits

All improvements within public or private right-of-way and/or public easements, and all improvements intended for ownership, operations or maintenance by the City shall be consistent with the City Engineering Standards and Construction Specifications.

#### C.   Clearing and Grading

All clearing and grading activities shall be consistent with the clearing and grading standards of the Code and City Engineering Standards and Construction Specifications. The City shall be responsible for administration of clearing and grading permits.

### 12.7.2 Lot Line Adjustments and Plat Amendments

All lot line adjustments and plat amendments shall be processed consistent with the requirements of the Code and the Land Use Act.

### 12.7.3 Overall Land Use Plan Amendments

Overall Land Use Plan amendments described in Subsection 4.4 of this Agreement shall be allowed upon the following findings by the City:

**A.**   Roadway, stormwater, water, secondary water and sewer system improvements necessary to support the change are in place or will be provided at the time of occupancy; and

**B.**   The Overall Land Use Plan amendment will not result in the Maximum Dwelling Units to be exceeded or the total area of designated Open Space to be reduced unless a Major Amendment to the MPD Approval is approved pursuant to the Code.

### 12.7.4  Site Plan Review

Site plan review and approval for Non-Residential Development buildings or improvements shall be processed pursuant to the Code.

### 12.7.5  Home Occupation

Home Occupations shall be consistent with the requirements of the Code.

### 12.7.6  Conditional Use Permit

Conditional Use Permits shall be consistent with the requirements of the Code.

### 12.7.7  Accessory Dwelling Unit (ADU)

ADUs shall be consistent with process and requirements of the Code.

### 12.7.8  Variance

Variances shall be consistent with the Code.

### 12.7.9  Amendments to MPD Approval

**A.**   Minor Amendments: Applications for Minor Amendments to the MPD Approval shall be processed as set forth in this Agreement.

**B.**   Major Amendments: Applications for Major Amendments to the MPD Approval shall be processed as a Master Planned Development pursuant to the requirements of the Code.

### 12.7.10  Consolidation of Major Amendments

If a proposal by Master Developer requires a Major Amendment to both the MPD Approval and this Agreement, the applications shall be processed concurrently unless the City determines that separate processing will result in a more efficient or effective review process.

## 12.8   BONDING FOR IMPROVEMENTS

Financial surety for improvements required within Section 7.0 shall be subject to the Coalville City Engineering Standards and Construction Specifications and *Utah Code Ann.* § 10-9a-604.5 (2020). All other permits shall provide bonding surety or other financial guarantee as required by the Code and *Utah Code Ann.* § 10-9a-604.5 (2020). Coalville City may require additional bonding and/or extended guarantee periods due to the complexity, significance and perpetuity of the infrastructure and water protection assurances in accordance with *Utah Code Ann.* § 10-9a-604.5 (2020).

35

### 12.8.1 Bonding for Improvements

At the discretion of Coalville City, Master Developer may defer any required improvement so long as the completion of the work is guaranteed by a performance bond or other financial guarantee. The bond, or other financial guarantee, must be in a form acceptable to the City in an amount allowed by *Utah Code Ann.* § 10-9a-604.5 (2020). The actual construction and installation of such improvements shall be completed within the required time frame set by the Code.

### 12.8.2 Inspection and Acceptance of Improvements

The City shall exercise its best efforts to inspect improvements within three (3) business days of the inspection request. The inspector shall determine whether the improvements are substantially complete and provide a written list of any corrections or additional work necessary for physical completion of the improvements within seven (7) business days of the date of the inspection. The City shall make every effort to provide one comprehensive written list upon which all subsequent inspections shall be based. The improvements shall be presented to the City Council for final action accepting or rejecting the improvements after final inspection and determination of complete construction.

A.     A qualified third-party inspector may be retained to assist the City with inspections if needed to facilitate construction timeframes. The cost of the third-party inspector shall be borne by Master Developer according to a mutual agreement with the City.

### 12.8.3 Release of Bond or Financial Guarantee

Original bond or financial guarantee amounts will be fully released within fourteen (14) days of acceptance of the improvements by the City Council.

## 13.0   MISCELLANEOUS ADDITIONAL STANDARDS AND REQUIREMENTS

### 13.1   CONSTRUCTION WASTE MANAGEMENT PLAN

Master Developer shall comply with the construction waste management plan as required in the Code or Coalville City Engineering Standards and Construction Specifications.

### 13.2   FIRE PROTECTION

Impacts to fire protection services throughout the Project shall be mitigated through the payment of generally applicable fire district fees and construction of improvements in accordance with all applicable codes.

### 13.3   FISCAL IMPACT ANALYSIS.

Master Developer has provided fiscal impact analyses in terms of projected taxes to be generated from the Project and other costs and financial benefits associated therewith. Master Developer shall update and include a fiscal impact component to its periodic

updates to City with each Project Phase.

## 13.4   ON-SITE PROCESSING OF NATURAL MATERIALS

Master Developer may use the natural materials located on the Property such as sand, gravel, and rock, and may process such natural materials into construction materials such as aggregate or topsoil for use in the construction of infrastructure, homes or other buildings or improvements located in the Project and other locations outside the Project. Master Developer shall make an application for all such uses pursuant to the processes provided in the Applicable Laws. In connection with the foregoing, City hereby approves the temporary grading and exporting of excess dirt material for development of the Project, as necessary to effectuate, and in accordance with, the MPD Approval.  Master Developer or its grading contractor may export and engage in incidental sales of the excess dirt materials resulting from such activities. Master Developer may not apply for approval for the production of concrete and asphalt within the Project.

## 14.0   DEFINITIONS

- **Accessory Dwelling Unit (ADU)** – See Code definition.

- **Agreement** – This Agreement including all of its exhibits.

- **Applicable Laws** – The ordinances, policies, standards, and procedures of the City related to zoning, subdivisions, development, public improvements and other similar or related matters that were in effect on January 21, 2020, a digital copy of which is attached as Exhibit "K".

- **Applicant** – A person or entity submitting a Development Application or a request for a Minor or Major Amendment.

- **Build-Out Period** – A "Build-Out" Period of twenty (20) years execution of this Agreement is established for all the development and construction of uses in the Project, as may be extended. The Build-Out Period may be extended up to an additional five years for any Project Phase.

- **Building Permit** – A permit issued by the City to allow construction, erection or structural alteration of any building, structure, private or public infrastructure on any portion of the Project, and any modifications thereto.

- **City** - Coalville City, a political subdivision of the state of Utah.  When a provision of this Agreement contemplates Master Developer seeking consent or approval by the City, the request for approval or consent shall be considered and decided by the appropriate administrative or executive official within the City, and not other decision-making bodies unless required under Applicable Law.

- **City Consultants** – Those outside consultants employed by the City in various specialized disciplines such as land planning, engineering, traffic, hydrology,

37

drainage or other specialized disciplines for reviewing certain aspects of the development of the Project.

- **City Council** – The elected City Council of the City.

- **Code** – The Coalville City Development Code as set forth in the Applicable Laws, incorporated herein by this reference.

- **Coalville City Engineering Standards and Construction Standards** – The Coalville City Engineering Standards and Construction Specifications, incorporated herein by this reference.

- **Constructed** – Bonded for or substantially completed.

- **Construction Permits** – Building Permits, Utility Permits (utilities and streets), clearing, grading, sign and landscaping approvals or similar approvals issued by the City, and any modifications thereto.

- **Covenants, Conditions, Restrictions and Easements (CC&R's)** – The master declaration of covenants, conditions, restrictions, and easements adopted and enforced by the Homeowners' Association or subset thereto.

- **Denial** – A written denial issued by the final decision-making body of the City for a particular type of Development Application but does not include review comments or "redlines" by City staff provided to allow updates or revisions to a Development Application.

- **Densit[y][ies]** – The number of Dwelling Units allowed.

- **Design Guidelines** – The design guidelines adopted and enforced by the Homeowners' Association or subset thereof.

- **Development Applications** – An application to the City for development of a portion of the Project including a Preliminary or Final Plat, Site Plan, Conditional Use Permit, a Building Permit or any other permit, certificate or other authorization from the City required for development of the Project.

- **Development Parcel** – A parcel shown generally as an individual parcel on the Overall Land Use Plan, Exhibit "C".

- **DRC** – The design review committee established pursuant to Section 12.2.

- **Dwelling Unit** – A "dwelling" as set forth in the Code.

- **Final Plat** – The recordable map or other graphical representation of land prepared in accordance with *Utah Code Ann.* § 10-9a-603 (2020), and approved in accordance with the Code, effectuating a Subdivision of any portion of the Project.

38

- **Flag Lot** – A lot with a narrow lot frontage that serves as private road or driveway access to a serving roadway, with the buildable area located to the rear of the lot.

- **Future Laws** – The ordinances, policies, standards, procedures and processing fee schedules of the City which may be in effect as of a particular time in the future when a Development Application is submitted for a part of the Project and which may or may not be applicable to the Development Application depending upon the provisions of this Agreement.

- **Homeowners' Association** – One or more associations formed pursuant to State law to perform the functions of an association of property owners.

- **Impact Fees** – Those fees, assessments, exactions, or payments of money imposed by the City as a condition on development activity as specified in *Utah Code Ann.* § 11-36a-101, *et seq.* (2020).

- **Intended Uses** – The use of all or portions of the Project for Single-Family homes, townhomes, and condominiums, private facilities, nightly rentals, Recreational Support Facilities, Non-Residential Development, Recreational Facilities, Open Space, Temporary Use, accessory and supporting uses, Parks, trails, recreation courts and other uses as generally depicted in the MPD Application and allowed in the AG zone.

- **Land Use Act** – *Utah Code Ann.* § 10-9a-101, *et seq.* (2020).

- **Low Impact Development** – A planning and engineering approach to site and stormwater design that emphasizes conservation and the use of on-site natural features to protect water quality.

- **Major Amendment** – Any amendment to this Agreement or the MPD Approval that increases overall Project Density as set forth in the original MPD Approval.

- **Master Developer** – Wohali Partners, LLC, so long as Wohali Partners, LLC, owns the majority of any then-undeveloped Development Parcel in the Project, or any Master Developer Transferee. Upon a transfer from Wohali Partners to a Master Developer Transferee, all references in this Agreement to Wohali Partners shall be deemed to be references to such Master Developer Transferee, or its successors as the Master Developer transferee.

- **Master Developer Transferee** – A person or entity other than Wohali Partners, LLC, acquiring an interest or estate (except for security purposes only) in the majority of the Property, including the then-undeveloped portion thereof, and including transfer of all interests through foreclosure (judicial or non-judicial) or by deed in lieu of foreclosure. "Master Developer Transferee" also means any successive person or entity similarly acquiring such an interest or estate from a previous Master Developer Transferee.

39

- **Maximum Dwelling Units** – The development on the Property of One Hundred Twenty-Five (125) Dwelling Units.

- **Minor Amendment** – Any and every amendment to this Agreement or the MPD Approval that does not increase overall Density or decrease the overall Open Space as set forth in the original MPD Approval, that may be approved by the City as provided in Section 12.7.

- **Model Home** – Display home or unit and related real estate sales and display offices/activities.

- **MPD Application**– The "land use application" Wohali Master Planned Development Application submitted to the City on January 17, 2020 and determined complete by the City on January 21, 2020.

- **MPD Approval** – The master planned development entitled "Wohali" approved by the City Council adopting findings, conclusions and conditions in the form attached hereto as Exhibit "L".

- **MPD Ordinance** – Title 8, Chapter 6 of the Coalville City Development Code, as existing in the Applicable Laws.

- **Non-City Agency** – A governmental or quasi-governmental entity, other than those of the City, which has jurisdiction over the approval of any aspect of the Project.

- **Non-Residential Development** – A development project consisting of Recreational Support Facilities, support commercial uses, buildings or other improvements including resort unit/support facility nightly rentals, golf courses, golf club house, maintenance buildings, spa, tennis and pickleball courts, swimming pool/hot tubs, splash pad, welcome center, trails, yurts, shooting range, and other similar uses.

- **Open Space** – Open Space means all areas shown as sensitive areas, Open Space, trails, Parks and golf course areas on the Overall Land Use Plan (Exhibit "C") and the Open Space Plan (Exhibit "G"), and any land subsequently designated as Park, Open Space, or aesthetic stormwater or water storage pond through a Development Application.

- **Open Space Plan** – The Open Space Plan attached to this Agreement as Exhibit "G".

- **Outsourc[e][ed][ling]** – The process of the City contracting with City Consultants or paying overtime to City employees to provide technical support in the review and approval of the various aspects of a Development Application as is more fully set out in this Agreement.

- **Overall Land Use Plan** – The Overall Land Use Plan attached to this Agreement as Exhibit "C".

40

- **Overall Sewer Utility Plan** – The Overall Sewer Utility Plan attached to this Agreement as Exhibit "I".

- **Overall Water and Irrigation Utility Plan** – The Overall Water and Irrigation Utility Plan attached to this Agreement as Exhibit "J".

- **Park** – A piece of land, privately owned and maintained, intended for passive or active recreation, gathering space or Open Space. Parks may include a wide range of uses and designs, including but not limited to plazas, playfields, playgrounds, trails, gardens, natural areas, interpretive centers, camping, picnic areas, restrooms, utilities, and Open Space.

- **Phasing Plan** – The Phasing Plan attached to this Agreement as Exhibit "D".

- **Planning Commission** – The City's Planning Commission established by the Code.

- **Project** – The development to be constructed on the Property pursuant to this Agreement with the associated Intended Uses, Densities, and all of the other aspects approved as part of this Agreement.

- **Project-Level Facility** – A element of infrastructure that is necessary to serve only those land uses located within the Project Site, regardless of the location of the street or utility facility, which fall within the meaning of "project improvements" as defined in *Utah Code Ann.* § 11-36a-102(14) (2020). If Project-Level Facilities for several Development Parcels are combined or shared, they are still considered Project-Level Facilities.

- **Project Phase[Sub Phase]** – A development of a portion of the Project subsequent to the execution of this Agreement, which implements or is otherwise consistent with this Agreement and the MPD Approval.

- **Project Site** – The entire area contained within the Project boundaries as described and visually depicted in Exhibit "B".

- **Property** – The real property legally described in Exhibit "A" and to which the MPD Approval applies.

- **Recreational Facilities** – Recreational Facilities include, but are not limited to: Parks, clubhouse, open space, trails, golf courses, sports and play fields, swimming pools, campgrounds, cross country skiing, and other indoor and outdoor recreation facilities.

- **Recreational Support Facilities** – Facilities and uses supporting or associated with the Recreational Facilities.

- **Regional Facility** – An on- or off-site element of infrastructure that serves land uses located within and outside the Project Site, regardless of the location of the street or utility facility and may fall within the meaning of "system improvements" as defined in *Utah Code Ann.* § 11-36a-102(21) (2020).

41

- **Roadway Plan** – The Roadway Plan attached to this Agreement as Exhibit "E".

- **Roadway Sections** – The Roadway Sections attached to this Agreement as Exhibit "F".

- **Sensitive Lands Ordinance** –Title 10 Chapter 10 of the Code and incorporated herein by this reference.

- **Setback** – A space, measured from the property or right-of-way line, unoccupied by structures except where encroachments are specifically allowed by this Agreement.

- **Single-Family** – Any residential building that contains no more than one (1) residence.

- **State** –the State of Utah.

- **Subdeveloper** – An entity not "related" (as defined by Internal Revenue Service regulations) to Master Developer which purchases a Development Parcel for development.

- **Subdivision** – The division of any portion of the Project into a subdivision pursuant to State law and/or the Code.

- **Temporary Use** – Uses of a non-permanent nature including but not limited to: outdoor art and craft shows and exhibits, Christmas trees sales, agricultural or horticultural products, firewood, seafood, and other items typically marketed seasonally; mobile services such as veterinary services; group sales such as parking lot sales, farmers' markets, auctions etc.; carnivals, fairs, or similar transient amusement or recreational activities; sales offices; construction offices; contractor staging areas and other similar activities.

- **Transfer Deed** – Any deed as provided for in Section 15.7.

- **Utility Permit** – The plans, profiles, cross sections, elevations, details, and supplementary specifications signed by a licensed professional engineer and approved by the City that shows the location, character, dimensions, and details of the work to be performed.

- **Village Center** – The Villages Center consists of the mixed-use Development Parcels shown on the Overall Land Use Plan (attached hereto as Exhibit "C") and the Village Illustrative Master Plan (attached hereto as Exhibit "H"). The Village Center is the focal point of the Project and includes a plaza area and recreational support uses and facilities for gatherings, personal services, and recreation.

- **Village Illustrative Master Plan** – The Village Illustrative Master Plan attached to this Agreement as Exhibit "H".

- **Welcome Center** – A building located at the Wohali Way entry into the Project for welcoming owners and guests. The welcome center facility may include a gate for project security.

## 15.0   GENERAL PROVISIONS

### 15.1   BINDING EFFECT

This Agreement constitutes and shall be recorded as a covenant running with the land, benefiting and burdening the Property. This Agreement shall be binding upon and inure to the benefit of Master Developer and the City and to the successors and assigns of Master Developer and the City. Master Developer, Subdevelopers or successors in title may elect to propose and enter into separate agreements with City to govern the construction or development of a particular Development Parcel within the Project. Nothing in any separate agreement may conflict with the entitlements obtained by Master Developer in this Agreement without the express written consent of City and Master Developer.

### 15.2   RECORDING

No later than 10 days after this Agreement has been executed by the City and Master Developer, it shall be recorded in its entirety at Master Developer's expense in the Official Records of Summit County, Utah.

### 15.3   VESTING

To the maximum extent permissible under the laws of the State and the United States and at equity, the City and Master Developer intend that this Agreement grants Master Developer all rights to develop the Property in fulfillment of this Agreement, the Applicable Laws and the MPD Approval except as specifically provided herein. The Parties intend that the rights granted to Master Developer under this Agreement are contractual, unless specifically described as rights that exist under statute, common law and at equity.   The Parties specifically intend that this Agreement and the MPD Approval grant to Master Developer "vested rights" as that term is construed in the State's common law and pursuant to *Utah Code Ann.* § 10-9a-509 (2020).

### 15.4   EXCEPTIONS TO VESTING

The restrictions on the applicability of the Future Laws to the Project as specified in Section 15.3 are subject to only the following exceptions:

**15.4.1** Development Agreement.   Future Laws that Master Developer agrees in writing to the application thereof to the Project.

**15.4.2** Compliance with State and Federal Laws.   Future Laws which are generally applicable to all properties in the City and which are required to comply with State and federal laws and regulations affecting the Project, but not affecting the Maximum Dwelling Units or the entitlement to construct support facilities and resort unit nightly rentals.

43

**15.4.3** <u>Safety Code Updates</u>. Future Laws that are updates or amendments to existing building, plumbing, mechanical, electrical, dangerous buildings, drainage, or similar construction or safety related codes, such as the International Building Code, the APWA Specifications, AAHSTO Standards, the Manual of Uniform Traffic Control Devices or similar standards that are generated by a nationally or statewide recognized construction/safety organization, or by the State or federal governments and are required to meet legitimate concerns related to public health, safety or welfare.

**15.4.4** <u>Taxes</u>. Taxes, or modifications thereto, so long as such taxes are lawfully imposed and charged uniformly by the City to all properties, applications, persons and entities similarly situated.

**15.4.5** <u>Fees</u>. Changes to the amounts of fees for the processing of Development Applications that are generally applicable to all development within the City (or a portion of the City as specified in the lawfully adopted fee schedule) and which are adopted pursuant to State law.

**15.4.6** <u>Countervailing, Compelling Public Interest</u>. Laws, rules or regulations that the City Council finds, on the record, are necessary to avoid jeopardizing a compelling, countervailing public interest pursuant to *Utah Code Ann.* § 10-9a-509(1)(a)(ii) (2020) and which meet the exceptions to the vested rights doctrine as set forth in <u>Western Land Equities, Inc. v. City of Logan</u>, 617 P.2d 388 (Utah, 1988), and its progeny.

**15.4.7** <u>Impact Fees</u>.   Impact Fees or modifications thereto which are lawfully adopted, imposed and collected.

## 15.5   DUTIES OF MASTER DEVELOPER

A single Master Developer (or Master Developer Transferee) shall be maintained throughout the life of this Agreement. Master Developer shall function as a single point of contact for City billing purposes, shall function as a single authority for Agreement revisions and modifications, shall provide to the City proof of Master Developer approval of all Development Applications (except Building Permits) filed by other parties prior to or with submittal to the City, and shall be responsible for distributing Development Agreement entitlements and obligations and administering such.

## 15.6   ASSIGNMENT

City may not assign its rights and obligations under this Agreement.  Master Developer may not assign this Agreement without the prior written consent of City, which consent shall not be unreasonably withheld, conditioned or delayed.  If City fails to provide a response to a request for consent hereunder within fourteen (14) days of receipt of a written request, then City shall be deemed to have consented to the assignment as described in the written request. Each written request shall include the name of proposed assignee and experience with development.    Notwithstanding the foregoing, Master Developer may: (i) assign this Agreement to any affiliate of Master Developer without obtaining City's consent, provided, however, Master Developer shall provide written notice of any such affiliate transfer within

01168499  Page 45 of 63  Summit County

ten (10) business days of the same; and (ii) sell or otherwise transfer a portion of the Project Site to a Subdeveloper, without obtaining City's consent, so long as Master Developer obligates such Subdeveloper, in writing, to comply with all provisions of this Agreement that relate to the portion of the Project Site transferred.    If an assignee assumes the obligations herein pertaining to the property transferred or assigned as described in this Section, then the assignee shall be entitled to all interests and rights and be subject to all obligations under this Agreement, and Master Developer shall thereupon be deemed released of liability under this Agreement for the portion of the property transferred or assigned, whether or not such release is expressly stated in such assignment; provided, however, that Wohali Partners, LLC shall remain obligated for any outstanding mitigation measures set forth in this Agreement or in the MPD Approval as of the date of the assignment that are not assigned with an assignment contemplated by this Section.  Wohali Partners, LLC shall also remain liable for any breach that occurred prior to the transfer or assignment of rights to another party and for those portions of the Wohali Property still owned by Wohali Partners, LLC. Wohali Partners, LLC shall advise prospective transferees or assignees that obligations of this Agreement may apply to the property upon transfer or assignment.

### 15.7   GOVERNING LAW

This Agreement shall be governed by and interpreted in accordance with the laws of the State of Utah subject to venue in the Third Judicial District Court in Summit County.

### 15.8   SEVERABILITY AND WAIVER

If any portion of this Agreement is determined by a court of law to be unenforceable or invalid, then the remaining portions of this Agreement shall remain in effect.

### 15.9   AUTHORITY

Each Party represents and warrants to the others that the individuals signing below have full power, authority and legal right to execute and deliver this Agreement and thereby to legally bind the Party on whose behalf such person signed.

### 15.10  EXHIBITS

The exhibits to this Agreement are hereby incorporated herein as though fully set forth as terms of this agreement. The exhibits are:

Exhibit "A"    Project Legal Description

Exhibit "B"    Project Site Depiction

Exhibit "C"    Overall Land Use Plan

Exhibit "D"    Phasing Plan

Exhibit "E"    Roadway Plan

Exhibit "F"    Roadway Sections

45

| Exhibit "G" | Open Space Plan |
| Exhibit "H" | Village Illustrative Master Plan |
| Exhibit "I" | Overall Sewer Utility Plan |
| Exhibit "J" | Overall Water and Irrigation Utility Plan |
| Exhibit "K" | Digital Copy of Applicable Laws |
| Exhibit "L" | MPD Approval (Land Use Decision, including findings) |

Many of the exhibits to this Agreement are in color or include other features that provide clear illustration; however, this format is not yet acceptable by the Summit County Recorder's Office for permanent recording. Accordingly, the Parties agree that a full-color copy of this Agreement will be kept on file with the City and will be available for public review at City Hall during business hours.

## 15.11   TIME IS OF THE ESSENCE

Time is of the essence of this Agreement. If either Party is delayed or hindered in or prevented from the performance of any act required hereunder by reason or inability to procure materials, acts of God, failure of power, pandemic, riots, insurrection, war or other reason of a like nature not the fault of the Party delayed in performing work or doing acts required under this Agreement, the performance of such acts will be extended for a period equivalent to the period of such delay.

## 15.12   INTERPRETATION

This Agreement has been reached as a result of arm's length negotiations with each Party represented by counsel, and thus no presumption of draftsmanship shall be used in interpreting this Agreement. This Agreement shall be construed according to its fair and plain meaning and as if prepared by all Parties hereto and shall be interpreted in accordance with State law. The descriptive heading of the sections of this Agreement are inserted for convenience only and shall not control the meaning or construction of any of the provisions hereof. As used in this Agreement, masculine, feminine or neuter gender and the singular or plural number shall each be deemed to include the others wherever and whenever the context so dictates. Furthermore, this Agreement shall be construed so as to effectuate the public purposes, objectives and benefits set forth herein. As used in this Agreement, the words "include" and "including" shall mean "including, but not limited to" and shall not be interpreted to limit the generality of the terms preceding such word.

## 15.13   INTEGRATION

This Agreement is the complete expression of the terms hereto and any oral representations or understandings not incorporated herein are excluded. Waiver of any default will not be deemed to be a waiver of any subsequent default. Waiver or breach of any provision of the Agreement will not be deemed to be a waiver of any other provision or subsequent breach and will not be construed to be a modification of the terms of the Agreement unless stated to

46

be such through written approval by the Party charged with so waiving or modifying the terms of the Agreement, which written approval will be attached to the original Agreement.

## 15.14   NO THIRD-PARTY BENEFICIARY

This Agreement is made and entered into for the sole protection and benefit of the Parties hereto and their successors and assigns. No other person shall have any right of action based upon any provision of this Agreement.

## 15.15   OTHER NECESSARY ACTS

The Parties shall execute and deliver to each other all other further instruments and documents that are reasonably necessary to carry out and implement the Agreement.

## 15.16   DEFAULT

Failure by a Party to perform any such Party's obligation under this Agreement for a period of 30 days (the "**Cure Period**") after written notice thereof from the other Party shall constitute a default by such failing Party under this Agreement; provided however, that if the failure cannot reasonably be cured within 30 days, the Cure Period shall be extended for the time period to reasonably required to cure such failure, so long as the failing Party commences its efforts to cure within the  initial 30 days period and thereafter diligently proceeds to complete the cure. Said notice shall specify the nature of the alleged default and the manner in which said default may be satisfactorily cured, if possible.

## 15.17   REMEDIES

Following an uncured default, the Parties may, in addition to any other rights or remedies, take action to cure, correct, or remedy any default; enforce any covenant or agreement herein; enjoin any threatened or attempted violation thereof; enforce by specific performance the obligations and rights of the Parties hereto; or obtain any remedies consistent with the foregoing and the purposes of this Agreement. In addition to any other relief, the prevailing Party in any action, whether at law, in equity or by arbitration, to enforce any provision of this Agreement shall be entitled to its costs of action including a reasonable attorneys' fee.

## 15.18   NOTICE

Any demand, request or notice which either Party hereto desires or may be required to make or deliver to the other shall be in writing and shall be deemed given when personally delivered, or successfully transmitted by email transmission, or when actually received after being deposited in the United States Mail in registered or certified form, return receipt requested, addressed as follows, or to such other addresses as either Party hereto may from time to time designate in writing and deliver in a like manner:

To the City:

Mayor
Coalville City
PO Box 188

47

Coalville, UT 84018
Email: cityhall@coalvillecity.org

With a copy to:

City Attorney
PO Box 188
Coalville, UT 84017
Email: attorney@coalvillecity.org

To Master Developer:

Wohali Partners, LLC: David Boyden, Managing Partner
5533 Lillehammer Lane
Park City, UT 84098
Email: dboyden@wohalipartners.com

Wohali Partners, LLC: John Robert Kaiser, Managing Partner
PO Box 438
Coalville, UT 84017
Email: jkaiser@wohalipartners.com

With a copy to:

Wade Budge
Snell and Wilmer
Gateway Tower West
15 West South Temple, Suite 1200
Salt Lake City, UT  84101-1547

### 15.19  WAIVER

No delay in exercising any right or remedy shall constitute a waiver thereof, and no waiver by the City or Master Developer of the breach of any covenant of this Agreement shall be construed as a waiver of any preceding or succeeding breach of the same or any other covenant or condition of this Agreement.

### 15.20  COUNTERPARTS

This Development Agreement may be executed in counterparts, each of which shall be deemed an original.

### 15.21  ESTOPPEL CERTIFICATE.

Upon twenty (20) days prior written request by Master Developer, City will execute an estoppel certificate to any third-party certifying that Master Developer at that time is not in default of the terms of this Agreement.

48

### 15.22   TERM

The Build-Out Period shall be twenty (20) years following the execution of this Agreement for all the development and construction in Project. The Build-Out Period may be extended up to an additional five years for any Project Phase. The Term of this Agreement shall be from the date written in the first paragraph of this Agreement till the expiration of the Build-Out Period, as may be extended. The Build-Out Period may be further extended upon mutual agreement in writing by the Parties.

### 15.23   TERMINATION ON SALE TO THE PUBLIC.

In order to alleviate any concern as to the effect of this Agreement on the status of title to any of the Property, this Agreement shall terminate without the execution or recordation of any further document or instrument as to any lot which has been finally subdivided and individually leased (for a period longer than one year) or sold to the purchaser or user thereof (a **"Developed Lot"**) and thereupon such Developed Lot shall be released from and no longer be to or burdened by the provisions of this Agreement.

[Signatures appear on the following page]

**COALVILLE CITY MUNICPAL CORPORATION**

By: _____
Trevor Johnson, Mayor

Attest:

By: _____
Nachele Sargent, City Recorder


Approved as to Form:

By: _____
Sheldon Smith, City Attorney


**WOHALI PARTNERS, LLC**

By: _____
David Boyden, Managing Partner


By: _____
John Robert Kaiser, Managing Partner


50

STATE OF UTAH      )

) ss.

COUNTY OF SUMMIT         )

On this day personally appeared before me _Carrie Andree Rukavina_ , to me known to be _Trevor Johnson_ of the Coalville City Municipal Corporation, a Utah Subdivision that executed the within and foregoing instrument and acknowledged the said instrument to be the free and voluntary act and deed of said corporation, for the uses and purposes therein mentioned, and on oath stated that _Trevor Johnson_ is authorized to execute said instrument.

GIVEN under my hand and official seal this _18_ day of _June_ , 2021.

_Carrie Andree Rukavina_

(Print name of notary)

NOTARY PUBLIC in and for the State of Utah, residing at _Oakley, UT_

_Carrie Andree Rukavina_

My commission expires _11/26/23_

Notary Public - State of Utah
**Carrie Andree Rukavina**
Comm. #709426
My Commission Expires
November 26, 2023

51

STATE OF UTAH    )
) ss.
COUNTY OF SUMMIT        )

On this 18 day of June , 2021, before me, the undersigned, a Notary Public in and for the State of Utah, duly commissioned and sworn personally appeared John Robert Kaiser and David Boyden, known to me to be the Managing Partners of Wohali Partners, LLC, the limited liability corporation that executed the foregoing instrument, and acknowledged the said instrument to be the free and voluntary act and deed of said limited liability corporation, for the purposes therein mentioned, and on oath stated the he was authorized to execute said instrument.

I certify that I know or have satisfactory evidence that the person appearing before me and making this acknowledgment is the person whose true signature appears on this document.

WITNESS my hand and official seal hereto affixed the day and year in the certificate above written.

Carrie Andree Rukavina

(Print name of notary)

NOTARY PUBLIC in and for the State of Utah, residing at Ookley, UT

My commission expires 11/26/23



Notary Public - State of Utah
**Carrie Andree Rukavina**
Comm. #709426
My Commission Expires
November 26, 2023

52



# AS SURVEYED PROPERTY BOUNDARIES:

PARCELS CT--289-A, CT-285-A, CT-287-A, CT-310, CT-303, CT-446-C, CT-446, CT-448, CT-446-A, CT-446-B, CT-447-B AND CT-447

BEGINNING AT THE NORTHWEST CORNER OF SECTION 18, TOWNSHIP 2 NORTH, RANGE 5 EAST, SALT LAKE BASE & MERIDIAN AND RUNNING THENCE NORTH 89°11'21" EAST 3743.70 FEET; THENCE SOUTH 56°22'29" EAST 406.43 FEET; THENCE SOUTH 17°05'28" EAST 369.20 FEET; THENCE SOUTH 48°07'57" EAST 780.00 FEET; THENCE SOUTH 12°44'02" WEST 123.14 FEET; THENCE SOUTH 19°38'38" WEST 291.90 FEET; THENCE SOUTH 19°38'38" WEST 1180.02 FEET; THENCE SOUTH 19°38'38" WEST 160.08 FEET; THENCE SOUTH 23°08'38" WEST 700.00 FEET; THENCE SOUTH 0°42'14" EAST 201.86 FEET; THENCE SOUTH 0°42'14" EAST 387.14 FEET; THENCE SOUTH 89°59'49" EAST 387.39 FEET; THENCE SOUTH 21°37'45" WEST 483.72 FEET; THENCE SOUTH 21°37'45" WEST 960.50 FEET; THENCE SOUTH 88°26'37" WEST 1148.59 FEET; THENCE NORTH 89°17'17" WEST 2616.35 FEET; THENCE NORTH 0°11'51" WEST 746.45 FEET; THENCE SOUTH 89°14'02" WEST 245.57 FEET; THENCE SOUTH 89°14'02" WEST 1732.04 FEET; THENCE NORTH 24°14'35" EAST 114.04 FEET; THENCE SOUTH 61°22'24" WEST 4028.44 FEET; THENCE NORTH 57°24'30" WEST 5260.39 FEET; THENCE NORTH 69°41'17" EAST 935.37 FEET; THENCE NORTH 43°11'17" EAST 1900.00 FEET; THENCE NORTH 28°56'17" EAST 1025.00 FEET; THENCE NORTH 28°01'17" EAST 2293.08 FEET; THENCE NORTH 83°49'36" EAST 682.00 FEET; THENCE SOUTH 0°05'27" EAST 1048.23 FEET; THENCE SOUTH 88°52'20" EAST 5453.59 FEET; TO THE POINT OF BEGINNING.

CONTAINS: 66,460,626 sq.ft or 1,525.70 ac

## PARCEL CT-441

BEGINNING AT THE NORTHWEST CORNER OF SECTION 17, TOWNSHIP 2 NORTH, RANGE 5 EAST, SALT LAKE BASE AND MERIDIAN AND RUNNING THENCE SOUTH 88°36'14" EAST 1,803.94 FEET ALONG THE SECTION LINE, MORE OR LESS, TO THE USA PROPERTY; THENCE SOUTH 06°59'54" EAST 237.06 FEET; THENCE SOUTH 18°53'54" EAST 502.00 FEET; THENCE SOUTH 28°19'54" EAST 190.60 FEET; THENCE SOUTH 01°08'06" WEST 182.65 FEET TO PARCEL NS-440; THE NEXT (3) COURSES ARE ALONG THE EXISTING FENCE LINE COMMON TO PARCEL NS-440; THENCE NORTH 88°40'16" WEST 1,902.33 FEET; THENCE SOUTH 00°58'29" EAST 992.30 FEET; THENCE SOUTH 88°37'54" EAST 1,039.76 FEET TO A 3 WAY FENCE CORNER; THENCE SOUTH 15°31'34" EAST 636.72 FEET ALONG AN EXISTING LINE OF FENCE COMMON TO PARCEL NS- 437; THENCE NORTH 89°06'43" WEST 1,363.89 FEET ALONG THE PROJECTION OF AN EXISTING LINE OF FENCE TO THE WEST QUARTER CORNER OF SAID SECTION 17, SAID QUARTER CORNER BEING MARKED WITH AN ORIGINAL STONE; THENCE NORTH 00°55'18" WEST 2,670.12 FEET ALONG THE SECTION LINE TO THE POINT OF BEGINNING.

CONTAINS 68.68 AC

## PARCEL CT-449

BEGINNING AT THE NORTHEAST CORNER OF SECTION 18, TOWNSHIP 2 NORTH, RANGE 5 EAST, SALT LAKE BASE AND MERIDIAN AND RUNNING THENCE SOUTH 89°10'22" WEST 138.00 FEET ALONG THE SECTION LINE; THENCE SOUTH 08°20'22" WEST 168.00 FEET; THENCE SOUTH 03°10'22" WEST 128.00 FEET; THENCE SOUTH 16°55'22" WEST 788.00 FEET; THENCE SOUTH 13°28'41" WEST 71.32 FEET; THE NEXT (5) COURSES ARE ALONG THE ADJACENT WOHALI PARTNERS BOUNDARY AS DELINEATED BY AN EXISTING RECORD OF SURVEY; THENCE SOUTH 12°43'34" WEST 123.14 FEET; THENCE SOUTH 19°38'10" WEST 1,632.00 FEET; THENCE SOUTH 23°08'10" WEST 700.00 FEET; THENCE SOUTH 00°42'42" EAST 589.00 FEET; THENCE NORTH 89°59'43" EAST 1,313.27 FEET, MORE OR LESS, TO THE SECTION LINE; THENCE NORTH 00°29'49" WEST 1,339.27 FEET ALONG SAID LINE TO THE EAST QUARTER CORNER OF SECTION 18, SAID QUARTER CORNER BEING MARKED WITH AN ORIGINAL STONE; THENCE NORTH 00°55'18" WEST 2,670.12 FEET ALONG THE SECTION LINE TO THE POINT OF BEGINNING.

CONTAINS 69.66 AC



WOHALI
DEVELOPMENT AGREEMENT

PROJECT
LEGAL DESCRIPTION

A



WOHALI
DEVELOPMENT AGREEMENT

PROJECT
SITE DESCRIPTION

B



01168499 Page 56 of 63 Summit County



# WOHALI
## DEVELOPMENT AGREEMENT

OVERALL
LAND USE PLAN

C





PHASING
PLAN

D

WOHALI
DEVELOPMENT AGREEMENT



01168499 Page 58 of 63 Summit County

E | ROADWAY PLAN

# WOHALI
## DEVELOPMENT AGREEMENT





**WOHALI ROADWAY SECTION**



**WOHALI VILLAGE STREET SECTION**



# WOHALI
## DEVELOPMENT AGREEMENT

ROADWAY SECTIONS





OPEN SPACE >30%

OPEN SPACE
PARCEL 6
18.81 AC

OPEN SPACE PARCEL 7
2.59 AC

OPEN SPACE
PARCEL 8
16.42 AC

OPEN SPACE PARCEL 1
3.00 AC

OPEN SPACE PARCEL 3
3.13 AC

SLOPES >30%

SLOPES >30%

OPEN SPACE LEGEND

| PARCEL | | OPEN SPACE | % TOTAL |
|---|---|---|---|
| 1 | OPEN SPACE | 3.89 | 0.33% |
| 2 | OPEN SPACE | 60.07 | 5.11% |
| 3 | OPEN SPACE | 3.13 | 0.16% |
| 4 | OPEN SPACE | 227.89 | 55.67% |
| 5 | OPEN SPACE | 21.84 | 1.30% |
| 6 | OPEN SPACE | 18.81 | 1.13% |
| 7 | OPEN SPACE | 2.59 | 0.16% |
| 8 | OPEN SPACE | 16.42 | 0.96% |
| 9 | OPEN SPACE | 660.69 | 39.47% |
| 10 | OPEN SPACE | 138.54 | 8.31% |
| SUB-TOTAL | | 1,172.63 | 70.48% |

OPEN SPACE  NOTES
1.   TOTAL PROJECT AREA = 1,664.04 ACRES
2.   TOTAL REQUIRED OPEN SPACE = 332.81 ACRES (20%)
3.   TOTAL OPEN SPACE = 1,172.63 ACRES (70.48%)
4.   TOTAL ALLOWED OPEN SPACE SENSITIVE LANDS = 588.42 ACRES (50%)
5.   TOTAL OPEN SPACE SENSITIVE LANDS = 499.39 (42.5%)





WOHALI
DEVELOPMENT AGREEMENT

OPEN SPACE
PLAN

G

01168499   Page 61 of 63   Summit County



## DEVELOPMENT LEGEND

- ENTRY CABIN
- PEDESTRIAN BRIDGE
- AMPHITHEATER LAWN
- VILLAGE PLAZA
- GOLF HOUSE
- VILLAGE INN
- THE INN ON THE PLAZA
- CLUBPUB
- ALL FAITHS CHAPEL
- WOHALI HALL
- MOB CLUB

- PRACTICE FACILITY
- TEACHING CABIN
- EVENT LAWN
- SHORE COURSE
- LAKE WOHALI
- BOATHOUSE
- PLATFORM TENNIS
- TENNIS
- PICKLEBALL
- 18 HOLE CHAMPIONSHIP GOLF COURSE
- PUTTING COURSE



# WOHALI
## DEVELOPMENT AGREEMENT

VILLAGE ILLUSTRATIVE PLAN

H

01168499  Page 62 of 63  Summit County





# WOHALI
## DEVELOPMENT AGREEMENT

OVERALL SEWER
UTILITY PLAN

01168499 Page 63 of 63 Summit County



# WOHALI
## DEVELOPMENT AGREEMENT

OVERALL WATER &
IRRIGATION PLAN

# Exhibit C

**01203071   B: 2777 P: 1736**
Page 1 of 24
Rhonda Francis Summit County Recorder
04/13/2023 03:28:48 PM Fee $40.00
By YORK HOWELL
Electronically Recorded

WHEN RECORDED, RETURN TO:

Randall M. Larsen
Gilmore & Bell, P.C.
15 West South Temple, Suite 1450
Salt Lake City, Utah  84101

Parcel Nos. WOH-1-1, WOH-1-3, WOH-1-8, WOH-1-13, WOH-1-68, CT-WOH-COMB

NOTICE OF ASSESSMENT INTEREST

WOHALI PUBLIC INFRASTRUCTURE DISTRICT NO. 1
WOHALI ASSESSMENT AREA #1

DATED AS OF MARCH 29, 2023

WHEN RECORDED, RETURN TO:

Randall M. Larsen
Gilmore & Bell, P.C.
15 West South Temple, Suite 1450
Salt Lake City, Utah  84101

WOHALI PUBLIC INFRASTRUCTURE DISTRICT NO. 1
WOHALI ASSESSMENT AREA #1

ASSESSMENT ORDINANCE

DATED AS OF MARCH 29, 2023

ASSESSMENT ORDINANCE

WHEREAS, the Board of Trustees (the "Board") of the Wohali Public Infrastructure District No. 1 (the "District"), previously adopted Resolution No. 2023-06 on March 21, 2023 (the "Authorizing Resolution"), pursuant to which the Board authorized and approved the form of this Assessment Ordinance (this "Ordinance") and the form of the related designation resolution (the "Designation Resolution"); and

WHEREAS, the District, pursuant to the Assessment Area Act, Title 11, Chapter 42, Utah Code Annotated 1953, as amended (the "Act"), and pursuant to the Authorizing Resolution and the Designation Resolution, designated the Wohali Assessment Area #1 (the "Assessment Area") after having obtained from the fee simple owners of all the property to be assessed within the Assessment Area (the "Owners") an executed Acknowledgement, Waiver and Consent Agreement or an executed Acknowledgement, Waiver, Consent and Petition Agreement (collectively, the "Waiver and Consent") attached to the Designation Resolution; and

WHEREAS, the Board desires to assess and finance the Improvements (plus related overhead, administration, capitalized interest, reserves, permits fees, and closing costs) benefitting the Assessment Area as described in the following table:

| | |
|---|---|
| Wohali Phase 1A | Earthwork, Roadway, Storm Drainage, Culinary Water, Sanitary Sewer |
| Wohali Phase 1B | Earthwork, Roadway, Storm Drainage, Culinary Water, Irrigation, Sanitary Sewer |
| Wohali Phase 1C | Earthwork, Roadway, Storm Drainage, Culinary Water, Irrigation, Sanitary Sewer |
| Wohali Phase 1D | Earthwork, Roadway, Storm Drainage |
| Wohali Phase 1E | Earthwork, Roadway, Strom Drainage, Culinary Water, Sanitary Sewer |
| Wohali Phase 1F | Earthwork, Roadway, Storm Drainage, Culinary Water, Sanitary Sewer |
| Offsite | Storm Drainage |

WHEREAS, the Board has (i) determined the total estimated cost of the Improvements, (ii) received an appraisal of the property to be assessed (from an appraiser who is a member of the Appraisal Institute) and addressed to the District verifying that the market value of the property, after completion of the proposed improvements, is at least three times the amount of the assessments proposed to be levied against the property to be assessed, and (iii) desires to assess the properties within the Assessment Area, and has prepared an assessment list of the assessments to be levied to finance the cost of the Improvements (the "Assessments"); and

WHEREAS, the Board hereby finds that pursuant to the Act, the Improvements constitute a publicly owned infrastructure, facility, or system that (i) the District is authorized to provide or (ii) is necessary or convenient to enable the District to provide a service that the District is authorized to provide; and

WHEREAS, the Board hereby declares the effective date of this Ordinance to be the date this Ordinance is posted on the Utah Public Notice Website as noted herein; and

WHEREAS, the District now desires to confirm the assessment list and to levy said Assessments in accordance with this Ordinance:

NOW THEREFORE, BE IT ORDAINED BY THE BOARD OF TRUSTEES OF THE WOHALI PUBLIC INFRASTRUCTURE DISTRICT NO. 1:

Section 1.   Determination of Estimated Costs of the Improvements and Right of District to Levy Additional Assessments for Completion. Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to such terms in the Designation Resolution. The Board has determined that the estimated acquisition, construction, and installation costs of the Improvements within the Assessment Area, including estimated overhead costs, administrative costs, costs of funding reserves, capitalized interest, and debt issuance costs, is estimated at $51,800,000. Such amount to be levied is an estimate, as permitted under Section 11-42-401 of the Act. If the Assessments are not sufficient in amount to complete the Improvements and pay related costs as described above, the Owners shall be responsible to pay the remaining amount in order to complete the Improvements. However, the District does not guaranty such payments from the Owners. Therefore, if for any reason the Owners do not pay such remaining amount to complete the Improvements, any and all property owners within the Assessment Area shall be responsible for paying any pro-rata share of additional costs required to complete the Improvements, including, but not limited to, an additional assessment on their property without any ability to contest such assessment. Furthermore, each parcel of property (including subdivided parcels) within the Assessment Area shall have an allocated number of ERUs (as defined herein). However, as permitted by law, property Owners in the Assessment Area may be subject to additional development impact costs related to the services provided by the Improvements based upon the requested development of their property if such impact costs exceed the capacity of what the allocated ERUs provide.

Section 2.   Approval of Assessment List; Findings. The Board confirms and adopts the assessment list for the Assessment Area, a copy of which is attached hereto as Exhibit A and incorporated herein by reference (the "Assessment List"). The Board has determined that the Assessments are levied according to the benefits to be derived by each property within the Assessment Area and, in any case, the Owners have consented to such methodology as provided in Section 11-42-409(5) of the Act.

Section 3.   Levy of Assessments. The Board does hereby levy an Assessment against each parcel of property identified in the Assessment List. Said Assessments levied upon each parcel of property therein described shall be in the amount set forth in the Assessment List. The amount of Assessments levied upon each parcel of property in the Assessment Area reflects an equitable portion of the benefit each parcel of property will receive from the Improvements and,

in any case, the Owners have consented to such methodology as provided in Section 11-42-409(5) of the Act.

Section 4.    <u>Amount of Total Assessments</u>.  The Assessments do not exceed in the aggregate the sum of: (a) the estimated contract price of the Improvements (plus related capitalized soft costs); (b) the estimated acquisition price of the Improvements; (c) the reasonable cost of (i) utility services, maintenance, and operation to the extent permitted by the Act and (ii) labor, materials, or equipment supplied by the District, if any; (d) the price or estimated price of purchasing property; (e) overhead costs not to exceed fifteen percent (15%) of the sum of (a), (b), and (c); (f) an amount for contingencies of not more than ten percent (10%) of the sum of (a) and (c); (g) estimated interest on interim warrants and bond anticipation notes issued to finance the Improvements, if any; and (h) an amount sufficient to fund a reserve fund.

Section 5.    <u>Method and Rate</u>.  Each of the benefited properties will be assessed within the Assessment Area initially pursuant to an equivalent residential unit ("ERU") method of assessment as follows:

|  |  | Total Assessment |  | $48,533,368 |
|  |  | Total ERUs |  | 104 |
| Subdivided Parcel | Parcel ID Number | ERUs | Assessment per ERUs | Total Assessment Amount |
| 1 | WOH-1-1 | 1 | $466,667 | $466,667 |
| 3 | WOH-1-3 | 1 | $466,667 | $466,667 |
| 8 | WOH-1-8 | 1 | $466,667 | $466,667 |
| 13 | WOH-1-13 | 1 | $466,667 | $466,667 |
| 68 | WOH-1-68 | 1 | $466,667 | $466,667 |
| <u>Wohali Master Parcel</u> |  |  |  |  |
|  | CT-WOH-COMB | 99 | $466,667 | $46,200,033 |

For the purposes of this Ordinance, an "ERU" means the equivalent residential unit assigned to each Subdivision Parcel (as defined herein).  For each Subdivision Parcel, the number of ERUs shall be as set forth on <u>Exhibit A</u> hereto.

Notwithstanding the levy of the assessments by ERUs, in order to provide additional security for the payment of assessments, the District shall require that all assessments of all properties owned by the same Owner within the Assessment Area (or an affiliate of the same Owner) be aggregated as a single unified assessment against all properties owned by the same Owner within the Assessment Area (or an affiliate of the same Owner). As used in this Ordinance, the term "affiliate" means with respect to any Owner, any person that controls, is controlled by or is under common control with such Owner, and the term "control" or "controlled" means the ownership of more than twenty percent (20%) of the outstanding voting ownership interests of the Owner in question or the power to direct the management of the Owner in question (subject to any required approvals for major decisions by anyone holding equity interests in the Owner in question).

Section 6.    <u>Payment of Assessments</u>.

(a) The Board hereby determines that the Improvements have a weighted average useful life of not less than twenty (20) years, and has elected to have the Assessments paid over a period of not more than twenty (20) years from the effective date of this Ordinance. As required by the District's Governing Document, the Assessments are required to be prepaid at or before conveyance of a Subdivision Parcel to an End User. For purposes of this Ordinance, an "End User" means any owner, or tenant of any owner, of any taxable improvement within the District, who is intended to be the long-term owner or tenant of taxable improvement. By way of illustration, a resident homeowner, renter, commercial property owner, or commercial tenant is an End User and the business entity that constructs homes or commercial structures is not an End User. Notwithstanding the foregoing, a Subdivision Parcel will be deemed to be owned by an End User, and prepayment of the Assessments shall be required, upon application or request of a building permit for such Subdivision Parcel. The aggregate annual Assessment payments shall be in substantially equal amounts, subject, however, to adjustment as described herein. Interest on the unpaid balance of the Assessments shall accrue at the same rate or rates as shall be borne by the assessment bonds anticipated to be issued by the District for the Assessment Area (or any bonds which refund the same) (the "Assessment Bonds"), plus an annual administration cost incurred by the District in an amount not to exceed $100,000 per year plus any direct out of pocket costs of the District related to the administration and collection of the Assessments. The District may outsource all or a portion of the administration services, including legal costs or consulting costs as an additional out of pocket cost, including, but not limited to, all costs related to foreclosure (and other remedies) and amendments to this Ordinance.

(b)    The District will collect the Assessments by directly billing each property owner. The bill for each Assessment payment shall be due December 1 of each year (approximately 30 days after sending such bill, which shall be sent on or prior to November 1 of each year, commencing November 1, 2024, due to estimated capitalized interest). However, failure to send any such bill by the scheduled date shall not impact the requirement of the property owners to timely pay their Assessments on the due date thereof.

(c)    All unpaid installments of an Assessment levied against any parcel of property may be paid prior to the dates on which they become due, but any such

prepayment must include an additional amount equal to the interest which would accrue on the Assessment to the next succeeding date on which interest is payable on the Assessment Bonds, plus such additional amount as, in the opinion of the District Chair or designee as approved by the District (the "Chair") (with assistance from the administrator of the Assessments, if any), is necessary to assure the availability of money to pay interest on the Assessment Bonds as interest becomes due and payable, plus any premiums required to redeem the Assessment Bonds on their first available call date pursuant to the Indenture (defined herein), plus any reasonable administrative costs.

(d) In the event that the property assessed has yet to be fully subdivided as anticipated for development, the property identified on the Assessment List ( individually a "Subdivision Parcel" and collectively, the "Subdivision Parcels") may hereafter be subdivided and re-subdivided, as evidenced by a subdivision plat approved by Coalville City, Utah (the "City") pursuant to the City's development standards and recorded in the official records of the Summit County Recorder (the "Official Records") and with the consent of the District, which consent shall not be unreasonably withheld, conditioned or delayed; but such consent shall be limited solely to the allocation of ERUs or other assessment method to Subdivided Parcels within a classification and withheld only where the information, assumptions and/or formula described in this section create less security for the repayment of the Assessments for the District or holders of Assessment Bonds than the security contemplated in this Section 6(d). The Title Owner(s) (as defined herein) of a Subdivision Parcel may make changes to such Subdivision Parcel including, without limitation, reducing or increasing the size of such Subdivision Parcel, modifying the boundary description of such Subdivision Parcel, modifying the assessment area classification of such Subdivision Parcel, and otherwise make changes necessary or appropriate to plat such Subdivision Parcel; provided that (i) the ERU of that Subdivision Parcel shall not be reduced and (ii) the fair market value of that Subdivision Parcel after the applicable plat is greater than three times the sum of (A) the remaining unpaid Assessment on that Subdivision Parcel, plus (B) any other unpaid assessment liens or property tax liens on such Subdivision Parcel (such fair market value to be determined using either taxable value as maintained on the tax records of Summit County (the "County") or by appraised value presented by the owner of the Subdivision Parcel and determined by a certified appraiser acceptable to the District, including any appraisal requirements of the District related to the Assessment Bonds). In the event that the total ERUs for any subdivided parcels do not at least equal the amount of ERUs allocated to the previously undivided property, the Title Owner shall be required to prepay the amount of the Assessment for all of the eliminated ERUs prior to subdivision. Provided, however, any adjustment of a parcel outside the boundaries of the Assessment Area would require an amendment to this Ordinance to that effect, in accordance with the Act. Once a Subdivision Parcel is subdivided, the lien of the Assessment Area will be re-allocated to or released from, as appropriate, any property located outside the subdivided portion of that Subdivision Parcel by either the Board adopting an amendment to this Ordinance or by the District Chair or other authorized officer of the District authorized to make such changes and record the applicable notices (within the provisions of this Ordinance) and provided the fair market value of such subdivided portion (after release of the property), is greater than three times the sum of (A) the remaining unpaid Assessment on that Subdivision Parcel, plus (B) any other unpaid assessment liens or property tax liens on that Subdivision

Parcel (such fair market value to be determined using either taxable value as maintained on the tax records of the County or by appraised value presented by the owner of the Subdivision Parcel and determined by a certified appraiser acceptable to the District, including any appraisal requirements of the District related to the Assessment Bonds).

(e) Subject to the requirement that Assessments be prepaid at or before conveyance of a Subdivision Parcel to an End User, an interest in a Subdivision Parcel may be sold, transferred or exchanged to any person or entity (the "Title Owner") so long as such interest is recognized by the County and charged a distinct property tax bill by the County. A Title Owner may further subdivide or create a new Title Owner on the Subdivision Parcel and such new Subdivision Parcels are reallocated Assessments in compliance with this Ordinance. When a Title Owner of any Subdivision Parcel in the Assessment Area subdivides, re-subdivides or creates a new Title Owner, it shall allocate the responsibility to pay Assessments tied to that Subdivision Parcel among Title Owners in accordance with (i) or (ii) below. Such reallocation of Assessments must be approved by all Title Owners subject to the reallocation by execution of a form reasonably satisfactory to the District Chair or other authorized officer of the District and similar in form to the Waiver and Consent, and with the consent of the District Chair, which consent shall not be unreasonably withheld, conditioned or delayed, but such consent shall be limited solely to the allocation of ERUs or other assessment method to Subdivided Parcels and withheld only where the information, assumptions and/or formula described in this section create less security for the repayment of the Assessments for the District or holders of Assessment Bonds than the security contemplated in this Section 6(e). The final plat for any Subdivision Parcel recorded after the effective date of this Ordinance must include a plat note that provides the exact allocation of the Assessments among Title Owners and the Assessment List attached as Exhibit A to this Ordinance must be accordingly amended, and the District Chair or other authorized officer of the District is hereby authorized to make such amendments, but may also seek the approval of the Board at his/her discretion. For any reallocation of Assessments tied to a Subdivision Parcel among Title Owners, the Title Owners may either:

(i)    Reallocate in full the total ERUs ascribed to that Subdivision Parcel(s) as contemplated in this Section 6(e); or

(ii)    As long as the aggregate Assessments tied to a Subdivision Parcel in the Assessment Area are allocated in full among Title Owners of that Subdivision Parcel, a Title Owner of that Subdivision Parcel may reallocate the Assessments to the interest(s) of Title Owners in such Subdivision Parcel based on either:

(A)    a saleable square foot method or a then current fair market value method (such fair market value to be determined by such Title Owners using either taxable value as maintained on the tax records of the County or by appraised value presented by the Title Owner and determined by a certified appraiser acceptable to the District, including any appraisal requirements of the District related to the Assessment Bonds), or

(B)     if the District Chair reasonably determines that such reallocated assessment method selected by the Title Owners will not reasonably allocate benefit among the Title Owners in such Subdivision Parcel, any other assessment method reasonably allocating benefit as determined in the reasonable discretion of the District Chair or other authorized officer of the District,

so long as, following a reallocation as described in this paragraph, the then current fair market value of each remaining interest in such Subdivision Parcel and all other affected parcels must be greater than or equal to three times the sum of (Y) the remaining unpaid Assessment applicable to that interest, plus (Z) any other unpaid assessment liens or property tax liens on that interest (fair market value to be determined by such Title Owners using either taxable value as maintained on the tax records of the County or by appraised value presented by the Title Owner and determined by a certified appraiser acceptable to the District, including any appraisal requirements of the District related to the Assessment Bonds).

(f)     A release of the Assessment lien for any Subdivision Parcel will be delivered by the District for recordation in the Official Records as soon as practicable after the Assessment balance for such subdivided parcel is paid in full. If prepayment of an Assessment prior to the Assessment payment date, or any part thereof, arises out of a need of the property owner to clear the Assessment lien from a portion (a "Release Parcel") but not all of a Subdivision Parcel, the Assessment lien on the Release Parcel shall be released by the District, as follows:

(i)     The Title Owner(s) shall submit the legal description of the Release Parcel which shall include the total ERUs allocated to the Release Parcel pursuant to the procedure set forth in this Ordinance. If an assessment allocation method other than ERUs has been applied to a parcel, the release procedures in this subsection (f) shall apply using the new assessment method in lieu of ERUs.

(ii)     The Title Owner(s) shall prepay an Assessment applicable to the Release Parcel calculated by the District Chair (with assistance from the administrator of the Assessments, if any), which Assessment shall be the product of the following: (A) the amount of the prepayment calculated pursuant to Section 6(c) herein for the entire Subdivision Parcel less any previously paid regularly scheduled Assessment payments, (B) multiplied by the percentage calculated by dividing the ERUs of the Release Parcel by the total ERUs of the entire Subdivision Parcel.

(iii)     The partial release of lien upon payment of the prepayment amount determined under subsection (ii) above shall not be permitted, except as otherwise provided in this paragraph, if the fair market value of the Subdivision Parcel, after release of the Release Parcel (the "Remaining Subdivision Parcel"), is less than three times the sum of (A) the remaining unpaid Assessment on such Remaining Subdivision Parcel, plus (B) any other unpaid Assessment liens or property tax liens on the Remaining Subdivision Parcel. In determining the value of the Remaining

Subdivision Parcel, the District Chair (with assistance from the administrator of the Assessments, if any) is entitled to, but need not rely on, credible evidence or documentation presented by the Title Owner(s) of said parcel. If the District Chair (with assistance from the administrator of the Assessments, if any) determines that the proposed partial release does not comply with the requirements of this paragraph, such partial release may still be permitted if the Title Owner(s) prepays a larger portion of the Assessment in order to clear the Assessment lien from the Release Parcel, all as determined by said District Chair (with assistance from the administrator of the Assessments, if any).

(iv)     Prepayments of Assessments shall be applied as provided in the indenture of trust and pledge under which the Assessment Bonds are issued (the "Indenture"). As prepayments are paid and applied against the payment of the Assessment applicable to the Release Parcel, the Release Parcel shall be released from the lien of the Assessment in accordance with this subsection (f), and the remaining unpaid Assessments levied against the Remaining Subdivision Parcel shall remain unaffected.

Section 7.     <u>Default in Payment</u>.

(a)     If a default occurs in the payment of any Assessment on a Subdivision Parcel when due, and such default is not cured within the period provided for in Section 7(b) herein, the District Chair, on behalf of the Board, may declare the unpaid amount of such Assessment on such Subdivision Parcel to be immediately due and payable and subject to collection as provided herein. In addition, the District Chair, on behalf of the Board, may accelerate payment of the total unpaid balance of the Assessment on such Subdivision Parcel and declare the whole of the unpaid principal and interest then due to be immediately due and payable. Interest shall accrue and be paid on all amounts declared to be delinquent or accelerated and immediately due and payable at a rate of 10% per annum plus the same rate or rates as shall be borne by the Assessment Bonds (the "Delinquent Rate"). In addition to interest charges at the Delinquent Rate, costs of collection, as approved by the District Chair on behalf of the Board, including, without limitation, attorneys' fees, trustee's fees, and court costs, incurred by the District or required by law shall be charged and paid on all amounts declared to be delinquent or accelerated and immediately due and payable. Until such costs of collection are recovered by the District, the District may charge such costs as an additional overhead cost against all Assessments, with a credit later upon any recovery of such costs.

(b)     Upon any default, the District Chair shall give notice in writing of the default to the Title Owner(s) of the Subdivision Parcel in default as shown by the last available completed real property assessment rolls of the County. Notice shall be effective upon deposit of the notice in the U.S. Mail, postage prepaid, and addressed to the Title Owner(s) as shown on the last completed real property assessment rolls of the County. The notice shall provide for a period of thirty (30) days in which the Title Owner(s) shall pay the installments then due and owing, after which the District Chair or Foreclosure Trustee (as defined herein), as applicable, on behalf of the District, may immediately (i) initiate a sale of the Subdivision Parcel as provided in Title 59, Chapter 2, Part 13, Utah Code

Annotated 1953, as amended; (ii) sell the Subdivision Parcel pursuant to Section 11-42-502.1(2)(a)(ii)(B) and related pertinent provisions of the Act, in the manner provided for judicial foreclosures; or (iii) sell the Subdivision Parcel pursuant to Section 11-42-502.1(2)(a)(ii)(C) and related pertinent provisions of the Act, in the manner provided for non-judicial foreclosures (such sale having been consented to in accordance with the Act in the Waiver and Consent). If at the sale no person or entity shall bid and pay the District the amount due on the Assessment plus interest and costs, the Subdivision Parcel shall be deemed sold to the District for these amounts. The District shall be permitted to bid at the sale. So long as the District affirmatively elects to retain ownership of the Subdivision Parcel, it shall pay all delinquent Assessment installments and all Assessment installments that become due, including the interest on them and shall be entitled to use amounts on deposit in the Reserve Fund (as defined herein) for such purpose. The District notes it has no available funds or current intention of owning the Subdivision Parcel and will surrender the Subdivision Parcel "as is" and without guaranty or warranty to owner(s) of the Assessment Bonds in full satisfaction of all obligations to such owner(s) of the Assessment Bonds irrespective of the owner(s) of the Assessment Bonds accepting the same.

(c)     The remedies provided herein for the collection of Assessments and the enforcement of liens shall be deemed and construed to be cumulative and the use of any one method or means or remedy of collection or enforcement available at law or in equity shall not deprive the District of the use of any other method or means. The amounts of accrued interest and all costs of collection, trustee's fees, attorneys' fees, and other reasonable and related costs shall be added to the amount of the Assessment against such Subdivision Parcel up to, and including, the date of foreclosure sale.

Section 8.     Remedy of Default.

(a) Prior to the final sale date, payment may be legally made under a final sale or foreclosure of property to collect delinquent Assessments if the Title Owner(s) pays the full amount of all unpaid installments of principal and interest which are past due and delinquent with interest on such installments at the rate or rates set forth in Section 7 herein to the payment date, plus all attorneys' fees, and other costs of collection. Upon receipt of the foregoing payments, the Assessment of said Title Owner(s) shall be restored and the default removed, and thereafter the Title Owner(s) shall have the right to make the payments in installments as if the default had not occurred. Any payment made to cure a default shall be applied first, to the payment of attorneys' fees and other costs incurred as a result of such default; second, to interest charged on past due installments, as set forth above; third, to the interest portion of all past due Assessments; and last, to the payment of outstanding principal.

(b) Prior to the final sale date, payment may be legally made under a final sale or foreclosure of property to collect delinquent Assessments if the Title Owner(s) pays the following amounts on any individual Subdivision Parcel: (i) the full amount of all unpaid previous installments of principal and interest which are past due and delinquent on such Subdivision Parcel with interest on such installments at the rate or rates set forth in Section 7 herein to the payment date, plus (ii) the pro rata share as determined by the Foreclosure Trustee (based on the amount of ERUs assigned to such individual Subdivision Parcel) of

all attorneys' fees, and other costs of collection, plus (iii) the prepayment of the remaining Assessment balance on the individual Subdivision Parcel in full. Upon receipt of the foregoing payments, the Assessment of said Title Owner(s) on such individual Subdivision Parcel shall be released from the lien of the Assessment in accordance with Section 6(f).

Section 9.    Lien of Assessment. An Assessment or any part or installment of it, any interest accruing thereon, and the penalties, trustee's fees, attorneys' fees, and other costs of collection therewith shall constitute a lien against the Subdivision Parcel upon which the Assessment is levied on the effective date of this Ordinance. Said lien shall be superior to the lien of any trust deed, mortgage, mechanic's, or materialman's lien, or other encumbrance and shall be equal to and on a parity with the lien for general property taxes. The lien shall apply without interruption, change in priority, or alteration in any manner to any reduced payment obligations and shall continue until the Assessment, reduced payment obligations, and any interest, penalties, and costs on it are paid, notwithstanding any sale of the property for or on account of a delinquent general property tax, special tax, or other Assessment or the issuance of a tax deed, an assignment of interest by the District or a sheriff's certificate of sale or deed.

Section 10.    Reserve Fund.

(a) The District does hereby establish a reserve fund (the "Reserve Fund") in lieu of funding a special improvement guaranty fund, as additional security for the Assessment Bonds.

(b) The Reserve Fund shall be initially funded from proceeds of the Assessment Bonds in an amount not to exceed the least of (i) ten percent (10%) of the proceeds of the Assessment Bonds determined on the basis of its initial purchase price to the public, (ii) the maximum aggregate annual debt service requirement during any bond fund year for the Assessment Bonds, and (iii) 125% of the average aggregate annual debt service requirement for the Assessment Bonds (the "Reserve Requirement"). The cost of initially funding the Reserve Fund is included in the Assessments of the property in the Assessment Area. The Reserve Requirement shall be adjusted as property owners prepay their Assessments in full as provided in the Indenture. The moneys on deposit in the Reserve Fund, if any, shall be applied to the final Assessment payment obligation of the assessed properties and used to make the final payment on the Assessment Bonds. If the amounts on deposit in the Reserve Fund exceed the final Assessment obligation, any excess amounts shall be paid by the District to the owners whose properties were subject to the final Assessment payment obligation on a pro rata basis, as an excess Assessment payment.

(c)    In the event insufficient Assessments are collected by the District to make the debt service payments on the Assessment Bonds, the District shall draw on the Reserve Fund to make up such deficiency, but shall have no obligation to replenish the Reserve Fund with its own funds.

(d)    Amounts recovered by exercise of any of the remedies provided herein or otherwise from delinquent Assessments (and not needed to pay amounts coming due on the Assessment Bonds) shall be used to replenish amounts drawn from the Reserve Fund.

(e)    In the event the Assessment Bonds are refunded, the Reserve Requirement may be adjusted by the District and amounts in the Reserve Fund may be applied to assist in such refunding.  Any refunding of the Assessment Bonds is hereby permitted so long as the structure thereof shall not increase the total cost of the Assessments in any one year.

Section 11.    Foreclosure Trustee.  The Board hereby appoints M. Thomas Jolley, Esq. as the initial foreclosure trustee (the "Foreclosure Trustee") pursuant to Section 11-42-202(1)(l)(iv) of the Act and the consents received in the Waiver and Consent.  The Foreclosure Trustee shall act under the direction of the Board as the "trustee" required by the Act to carry out non-judicial foreclosures under this Ordinance and the Act on the lien of the assessment area over Subdivision Parcels in default pursuant to the terms hereof.  The Foreclosure Trustee shall have the powers assigned in the Act, including the power of sale of delinquent Subdivision Parcels.  The Foreclosure Trustee may be replaced at the discretion of the Board so long as such replacement Foreclosure Trustee meets the requirements of Section 57-1-21, Utah Code Annotated 1953, as amended.

Section 12.    Investment Earnings.  Except as otherwise provided in the Indenture, all investment earnings on the Reserve Fund shall be maintained in said Fund and applied in the same manner as the other moneys on deposit therein as provided in the Indenture.

Section 13.    Contestability.  No Assessment shall be declared invalid or set aside, in whole or in part, in consequence of any error or irregularity which does not go to the equity or justice of the Assessment or proceeding.  The Owners and any succeeding property owners (whether by sale, foreclosure, or any other property transfer of title) have waived any rights to contest this Ordinance.  Any party who has not waived his or her objections to the same as provided by statute may commence a civil action in the district court with jurisdiction in the District against the District to enjoin the levy or collection of the Assessment or to set aside and declare unlawful this Ordinance.

Such action must be commenced and summons must be served on the District not later than sixty (60) days after the effective date of this Ordinance.  This action shall be the exclusive remedy of any aggrieved party.  No court shall entertain any complaint which the party was authorized to make by statute but did not timely make or any complaint that does not go to the equity or justice of the Assessment or proceeding.

After the expiration of the sixty (60) day period provided in this Section:

(a) The Assessment Bonds and any refunding bonds to be issued with respect to the Assessment Area and the Assessments levied in the Assessment Area shall become incontestable as to all persons who have not commenced the action and served a summons as provided for in this Section; and

(b) No suit to enjoin the issuance or payment of the Assessment Bonds or refunding assessment bonds, the levy, collection, or enforcement of the Assessments, or in any other manner attacking or questioning the legality of the Assessment Bonds or refunding assessment bonds or Assessments may be commenced, and no court shall have authority to inquire into these matters.

Section 14.   Notice to Property Owners.   The Owners are hereby deemed to have received notice of assessment and have waived any notice and hearing requirements under the Act.

Section 15.   All Necessary Action Approved.   The officials of the District are hereby authorized and directed to take all action necessary and appropriate to effectuate the provisions of this Ordinance, including the filing of a notice of assessment interest with the Summit County Recorder.

Section 16.   Repeal of Conflicting Provisions; Amendment.   All ordinances or parts thereof in conflict with this Ordinance are hereby repealed.   The District Chair (or any assigned designee of the District Chair) may make any alterations, changes or additions to this Ordinance which may be necessary to conform the same to the final terms of the Assessment Bonds, to correct errors or omissions herein, to complete the same, to remove ambiguities herefrom, or to conform the same to other provisions of this Ordinance or any resolution adopted by the Board or the provisions of the laws of the State of Utah or the United States, including technical changes to the description of the boundary of the Assessment Area, so long as those changes do not change the boundaries from those depicted on the maps attached to the Designation Resolution and do not materially adversely affect the rights of the Owners hereunder without the consent of such Owners affected.

Section 17.   Posting of Ordinance.   This Ordinance shall be signed by the District Chair and District Secretary/Clerk and shall be recorded in the ordinance book kept for that purpose upon final confirmation of the property description and terms of the Assessment Area.   The officials of the District are hereby authorized to make technical corrections to the legal description of the Assessment Area.   Upon finalization of the legal description, copies of this Ordinance shall be posted in at least three public places within the District's boundaries for at least 21 days and a copy of this Ordinance shall be posted on the Utah Public Notice Website (http://pmn.utah.gov) for at least 21 days.   This Ordinance shall take effect immediately upon its passage and approval and posting/publication as required by law.

Dated as of the date set forth above.

By: _____
District Chair

ATTEST:

By: _____
District Secretary/Clerk

APPROVED AS TO FORM:

By: _____
Attorney for the District

01203071  Page 15 of 24  Summit County

STATE OF UTAH          )
                       : ss.
COUNTY OF ~~SUMMIT~~   )
         Salt Lake

The foregoing instrument was acknowledged before me this ___March 21___, 2023, by
___Dave Boyden___, the District Chair of the Wohali Public Infrastructure District No. 1 (the "District"),
who represented and acknowledged that he signed the same for and on behalf of the District.

_Ashley Tedesco_
NOTARY PUBLIC



STATE OF UTAH          )
                       : ss.
COUNTY OF ~~SUMMIT~~   )
         Salt Lake

The foregoing instrument was acknowledged before me this ___March 21___, 2023, by
___Philip Dunn___, the District Secretary/Clerk of the Wohali Public Infrastructure District No. 1, who
represented and acknowledged that she signed the same for and on behalf of the Wohali Public
Infrastructure District No. 1.

_Ashley Tedesco_
NOTARY PUBLIC



EXHIBIT A

ASSESSMENT LIST

The Assessment is levied by Equivalent Residential Unit ("ERU") and against all of the Assessment Area as follows:

| | Total Assessment | | | $48,533,368 |
| | Total ERUs | | | 104 |

| Subdivided Parcel | Parcel ID Number | ERUs | Assessment per ERUs | Total Assessment Amount |
|---|---|---|---|---|
| 1 | WOH-1-1 | 1 | $466,667 | $466,667 |
| 3 | WOH-1-3 | 1 | $466,667 | $466,667 |
| 8 | WOH-1-8 | 1 | $466,667 | $466,667 |
| 13 | WOH-1-13 | 1 | $466,667 | $466,667 |
| 68 | WOH-1-68 | 1 | $466,667 | $466,667 |

| Wohali Master Parcel | | | | |
|---|---|---|---|---|
| | CT-WOH-COMB | 99 | $466,667 | $46,200,033 |

LEGAL DESCRIPTION

The Assessment Area is more particularly described as follows:

WEST SIDE LEGAL

BEGINNING AT A POINT THAT IS S89°10'43"W 5187.22 FEET FROM THE NORTHWEST CORNER OF SECTION 17, T2N, R5E, SLB&M; THENCE S.12°23'17"W., A DISTANCE OF 442.75 FEET; THENCE S.21°36'11"W., A DISTANCE OF 1,095.35 FEET; THENCE N.85°01'17"W., A DISTANCE OF 194.33 FEET TO THE POINT OF CURVE OF A NON TANGENT CURVE TO THE RIGHT, OF WHICH THE RADIUS POINT LIES N.85°01'14"W., A RADIAL DISTANCE OF 324.97 FEET; THENCE SOUTHERLY ALONG THE ARC, THROUGH A CENTRAL ANGLE OF 19°50'07", A DISTANCE OF 112.50 FEET; THENCE ALONG A LINE NON-TANGENT TO SAID CURVE, S.24°49'38"W., A DISTANCE OF 61.76 FEET TO THE POINT OF CURVE OF A NON TANGENT CURVE TO THE RIGHT, OF WHICH THE RADIUS POINT LIES N.65°12'53"W., A RADIAL DISTANCE OF 274.34 FEET; THENCE SOUTHWESTERLY ALONG THE ARC, THROUGH A CENTRAL ANGLE OF 23°33'35", A DISTANCE OF 112.81 FEET; THENCE ALONG A LINE NON-TANGENT TO SAID CURVE, S.41°41'00"E., A DISTANCE OF 39.03 FEET; THENCE S.07°47'42"E., A DISTANCE OF 250.72 FEET; THENCE S.28°12'50"W., A DISTANCE OF 290.60 FEET; THENCE N.61°44'17"W., A DISTANCE OF 220.98 FEET; THENCE N.09°13'06"W., A DISTANCE OF 252.52 FEET TO THE POINT OF CURVE OF A NON TANGENT CURVE TO THE RIGHT, OF WHICH THE RADIUS POINT LIES N.12°05'35"W., A RADIAL DISTANCE OF 274.03 FEET; THENCE WESTERLY ALONG THE ARC, THROUGH A CENTRAL ANGLE OF 10°28'31", A DISTANCE OF 50.10 FEET; THENCE ALONG A LINE NON-TANGENT TO SAID CURVE, S.09°13'06"E., A DISTANCE OF 117.79 FEET; THENCE S.67°19'52"W., A DISTANCE OF 143.79 FEET; THENCE S.05°27'35"W., A DISTANCE OF 303.49 FEET; THENCE S.20°45'43"W., A DISTANCE OF 626.16 FEET; THENCE S.85°50'31"W., A DISTANCE OF 142.35 FEET; THENCE N.30°53'01"W., A DISTANCE OF 185.87 FEET; THENCE S.48°47'59"W., A DISTANCE OF 101.64 FEET; THENCE S.30°53'01"E., A DISTANCE OF 179.27 FEET; THENCE S.45°10'17"W., A DISTANCE OF 232.14 FEET; THENCE S.10°07'00"E., A DISTANCE OF 700.05 FEET; THENCE

A-1

S.43°05'23"E., A DISTANCE OF 210.03 FEET; THENCE S.24°02'58"W., A DISTANCE OF 425.35 FEET; THENCE S.87°15'40"W., A DISTANCE OF 331.81 FEET; THENCE N.15°25'12"W., A DISTANCE OF 371.44 FEET; THENCE N.06°10'47"W., A DISTANCE OF 463.69 FEET; THENCE N.35°43'37"W., A DISTANCE OF 226.33 FEET; THENCE N.63°46'31"E., A DISTANCE OF 159.49 FEET; THENCE N.19°26'28"W., A DISTANCE OF 133.77 FEET TO THE POINT OF CURVE OF A NON TANGENT CURVE TO THE LEFT, OF WHICH THE RADIUS POINT LIES S.71°22'34"W., A RADIAL DISTANCE OF 15.01 FEET; THENCE NORTHWESTERLY ALONG THE ARC, THROUGH A CENTRAL ANGLE OF 93°49'58", A DISTANCE OF 24.58 FEET TO THE POINT OF CURVE OF A NON TANGENT CURVE TO THE LEFT, OF WHICH THE RADIUS POINT LIES S.22°29'44"E., A RADIAL DISTANCE OF 325.00 FEET; THENCE SOUTHWESTERLY ALONG THE ARC, THROUGH A CENTRAL ANGLE OF 42°09'07", A DISTANCE OF 239.10 FEET; THENCE ALONG A LINE NON-TANGENT TO SAID CURVE, S.25°22'09"W., A DISTANCE OF 55.24 FEET; THENCE S.64°37'51"E., A DISTANCE OF 108.58 FEET; THENCE S.13°26'06"W., A DISTANCE OF 468.38 FEET; THENCE S.15°43'37"E., A DISTANCE OF 725.09 FEET; THENCE S.61°22'32"W., A DISTANCE OF 191.90 FEET; THENCE N.59°33'55"W., A DISTANCE OF 494.93 FEET; THENCE S.33°35'59"W., A DISTANCE OF 375.21 FEET; THENCE N.56°24'01"W., A DISTANCE OF 161.97 FEET; THENCE N.11°58'48"E., A DISTANCE OF 585.73 FEET; THENCE N.60°39'31"E., A DISTANCE OF 176.92 FEET; THENCE N.19°42'11"W., A DISTANCE OF 55.27 FEET; THENCE N.10°03'27"W., A DISTANCE OF 245.11 FEET TO THE POINT OF CURVE OF A NON TANGENT CURVE TO THE LEFT, OF WHICH THE RADIUS POINT LIES S.79°56'00"W., A RADIAL DISTANCE OF 125.01 FEET; THENCE NORTHWESTERLY ALONG THE ARC, THROUGH A CENTRAL ANGLE OF 111°10'24", A DISTANCE OF 242.56 FEET; THENCE ALONG A LINE NON-TANGENT TO SAID CURVE, S.25°18'36"E., A DISTANCE OF 180.68 FEET; THENCE S.06°32'20"W., A DISTANCE OF 143.23 FEET; THENCE S.33°32'43"W., A DISTANCE OF 611.81 FEET; THENCE N.80°43'20"W., A DISTANCE OF 300.48 FEET; THENCE S.09°17'07"W., A DISTANCE OF 135.60 FEET; THENCE N.80°42'53"W., A DISTANCE OF 195.87 FEET; THENCE S.41°38'16"W., A DISTANCE OF 2,041.82 FEET; THENCE N.57°24'30"W., A DISTANCE OF 1,367.90 FEET; THENCE N.32°35'30"E., A DISTANCE OF 1,306.81 FEET; THENCE N.59°12'49"E., A DISTANCE OF 1,714.16 FEET; THENCE N.28°57'10"W., A DISTANCE OF 425.10 FEET; THENCE N.59°49'02"E., A DISTANCE OF 845.19 FEET; THENCE N.28°02'13"E., A DISTANCE OF 677.50 FEET; THENCE S.81°48'55"E., A DISTANCE OF 416.59 FEET; THENCE S.33°21'41"E., A DISTANCE OF 479.16 FEET; THENCE S.60°56'44"E., A DISTANCE OF 535.50 FEET; THENCE S.52°33'22"E., A DISTANCE OF 484.50 FEET; THENCE N.48°47'42"E., A DISTANCE OF 298.78 FEET TO THE POINT OF CURVE OF A NON TANGENT CURVE TO THE LEFT, OF WHICH THE RADIUS POINT LIES N.41°11'55"W., A RADIAL DISTANCE OF 572.87 FEET; THENCE NORTHEASTERLY ALONG THE ARC, THROUGH A CENTRAL ANGLE OF 09°20'33", A DISTANCE OF 93.41 FEET; THENCE ALONG A LINE NON-TANGENT TO SAID CURVE, N.50°30'54"W., A DISTANCE OF 442.31 FEET; THENCE N.33°59'24"W., A DISTANCE OF 416.70 FEET; THENCE N.31°54'03"E., A DISTANCE OF 843.75 FEET; THENCE S.67°42'20"E., A DISTANCE OF 394.29 FEET; THENCE N.88°18'04"E., A DISTANCE OF 461.16 FEET; THENCE S.67°43'01"E., A DISTANCE OF 276.89 FEET; THENCE N.24°48'50"E., A DISTANCE OF 61.76 FEET TO THE POINT OF CURVE OF A NON TANGENT CURVE TO THE LEFT, OF WHICH THE RADIUS POINT LIES N.65°11'27"W., A RADIAL DISTANCE OF 275.15 FEET; THENCE NORTHERLY ALONG THE ARC, THROUGH A CENTRAL ANGLE OF 32°24'24", A DISTANCE OF 155.63 FEET; THENCE ALONG A LINE NON-TANGENT TO SAID CURVE, N.07°36'45"W., A DISTANCE OF 263.22 FEET; THENCE N.84°43'35"W., A DISTANCE OF 398.52 FEET; THENCE N.66°58'34"W., A DISTANCE OF 459.63 FEET; THENCE N.20°28'03"W., A DISTANCE OF 650.53 FEET; THENCE N.01°07'40"E., A DISTANCE OF 218.46 FEET; THENCE S.88°52'20"E., A DISTANCE OF 759.48 FEET; THENCE S.36°23'56"E., A DISTANCE OF 204.62 FEET; THENCE N.53°36'17"E., A DISTANCE OF 161.11 FEET TO THE POINT OF CURVE OF A NON TANGENT CURVE TO THE RIGHT, OF WHICH THE RADIUS POINT LIES S.36°25'17"E., A RADIAL DISTANCE OF 822.18 FEET; THENCE NORTHEASTERLY ALONG THE ARC, THROUGH A CENTRAL ANGLE OF 08°21'22", A DISTANCE OF 119.91 FEET; THENCE ALONG A LINE NON-TANGENT TO SAID CURVE, N.61°56'01"E., A DISTANCE OF 135.81 FEET TO THE POINT OF CURVE OF A NON TANGENT CURVE TO THE RIGHT, OF WHICH THE RADIUS POINT LIES S.27°49'39"E., A RADIAL DISTANCE OF 129.69 FEET; THENCE EASTERLY ALONG THE ARC, THROUGH A CENTRAL ANGLE OF 25°59'31", A DISTANCE OF 58.83 FEET TO THE POINT OF CURVE OF A NON TANGENT CURVE TO THE LEFT, OF WHICH THE RADIUS POINT LIES N.04°43'40"W., A RADIAL DISTANCE OF 15.00 FEET; THENCE NORTHEASTERLY ALONG THE ARC,

A-2

THROUGH A CENTRAL ANGLE OF 84°09'24", A DISTANCE OF 22.03 FEET; THENCE ALONG A LINE NON-TANGENT TO SAID CURVE, N.01°03'28"E., A DISTANCE OF 0.97 FEET; THENCE S.88°52'50"E., A DISTANCE OF 519.28 FEET TO THE POINT OF BEGINNING.

LESS AND EXCEPTING THE LOTS CONTAINED WITH IN THE FUTURE PHASES OF WOHALI SUBDIVISION PHASES 1D-1F

127-132

TOGETHER WITH THE FOLLOWING

LEGAL DESCRIPTION PARCEL 1B

EAST SIDE LEGAL

BEGINNING AT A POINT WHICH IS S89°10'10"W 2761.58 FEET FROM THE NORTHWEST CORNER OF SECTION 17, TOWNSHIP 2 NORTH, RANGE 5 EAST, SALT LAKE BASE AND MERIDIAN; THENCE S.10°28'25"E., A DISTANCE OF 134.39 FEET TO A POINT OF CURVE TO THE RIGHT HAVING A RADIUS OF 100.00 FEET AND A CENTRAL ANGLE OF 13°30'27"; THENCE SOUTHERLY ALONG THE ARC A DISTANCE OF 23.58 FEET TO A POINT OF COMPOUND CURVE TO THE RIGHT HAVING A RADIUS OF 443.00 FEET AND A CENTRAL ANGLE OF 22°14'21"; THENCE SOUTHERLY ALONG THE ARC, A DISTANCE OF 171.95 FEET TO A POINT OF COMPOUND CURVE TO THE RIGHT HAVING A RADIUS OF 133.00 FEET AND A CENTRAL ANGLE OF 20°32'56"; THENCE SOUTHWESTERLY ALONG THE ARC, A DISTANCE OF 47.70 FEET; THENCE CONTINUE SOUTHWESTERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 09°48'17", A DISTANCE OF 22.76 FEET TO A POINT OF REVERSE CURVE TO THE LEFT HAVING A RADIUS OF 87.00 FEET AND A CENTRAL ANGLE OF 18°40'16"; THENCE SOUTHWESTERLY ALONG THE ARC, A DISTANCE OF 28.35 FEET; THENCE S.36°57'21"W., A DISTANCE OF 96.91 FEET TO THE POINT OF CURVE OF A NON TANGENT CURVE TO THE LEFT, OF WHICH THE RADIUS POINT LIES S.58°06'48"E., A RADIAL DISTANCE OF 14.99 FEET; THENCE SOUTHERLY ALONG THE ARC, THROUGH A CENTRAL ANGLE OF 81°07'23", A DISTANCE OF 21.22 FEET; THENCE ALONG A LINE NON-TANGENT TO SAID CURVE, S.49°09'15"E., A DISTANCE OF 35.06 FEET TO THE POINT OF CURVE OF A NON TANGENT CURVE TO THE LEFT, OF WHICH THE RADIUS POINT LIES N.40°50'57"E., A RADIAL DISTANCE OF 99.98 FEET; THENCE EASTERLY ALONG THE ARC, THROUGH A CENTRAL ANGLE OF 90°52'25", A DISTANCE OF 158.58 FEET; THENCE ALONG A LINE NON-TANGENT TO SAID CURVE, N.39°59'10"E., A DISTANCE OF 116.77 FEET TO THE POINT OF CURVE OF A NON TANGENT CURVE TO THE RIGHT, OF WHICH THE RADIUS POINT LIES S.50°01'07"E., A RADIAL DISTANCE OF 275.00 FEET; THENCE NORTHEASTERLY ALONG THE ARC, THROUGH A CENTRAL ANGLE OF 16°46'06", A DISTANCE OF 80.48 FEET; THENCE ALONG A LINE NON-TANGENT TO SAID CURVE, N.57°02'31"E., A DISTANCE OF 202.28 FEET TO THE POINT OF CURVE OF A NON TANGENT CURVE TO THE RIGHT, OF WHICH THE RADIUS POINT LIES S.32°57'26"E., A RADIAL DISTANCE OF 125.00 FEET; THENCE EASTERLY ALONG THE ARC, THROUGH A CENTRAL ANGLE OF 88°53'57", A DISTANCE OF 193.95 FEET; THENCE S.34°03'29"E., A DISTANCE OF 29.90 FEET TO A POINT OF CURVE TO THE LEFT HAVING A RADIUS OF 125.00 FEET AND A CENTRAL ANGLE OF 39°11'40"; THENCE SOUTHEASTERLY ALONG THE ARC A DISTANCE OF 85.51 FEET; THENCE S.73°15'09"E., A DISTANCE OF 93.68 FEET TO A POINT OF CURVE TO THE RIGHT HAVING A RADIUS OF 175.00 FEET AND A CENTRAL ANGLE OF 17°33'48"; THENCE SOUTHEASTERLY ALONG THE ARC A DISTANCE OF 53.64 FEET; THENCE S.55°41'20"E., A DISTANCE OF 26.36 FEET TO A POINT OF CURVE TO THE LEFT HAVING A RADIUS OF 125.00 FEET AND A CENTRAL ANGLE OF 64°33'10"; THENCE EASTERLY ALONG THE ARC A DISTANCE OF 140.83 FEET; THENCE ALONG A LINE NON-TANGENT TO SAID CURVE, N.58°29'53"E., A DISTANCE OF 52.06 FEET TO THE POINT OF CURVE OF A NON TANGENT CURVE TO THE RIGHT, OF WHICH THE RADIUS POINT LIES S.31°32'13"E., A RADIAL DISTANCE OF 125.00 FEET; THENCE EASTERLY ALONG THE ARC, THROUGH A CENTRAL ANGLE OF 72°09'00", A DISTANCE OF 157.41 FEET TO THE POINT OF CURVE OF A NON TANGENT CURVE TO THE RIGHT, OF WHICH THE RADIUS POINT LIES S.40°37'19"W., A RADIAL DISTANCE OF 125.01 FEET; THENCE SOUTHERLY

ALONG THE ARC, THROUGH A CENTRAL ANGLE OF 93°23'41", A DISTANCE OF 203.77 FEET; THENCE ALONG A LINE NON-TANGENT TO SAID CURVE, S.44°01'06"W., A DISTANCE OF 81.36 FEET TO A POINT OF CURVE TO THE LEFT HAVING A RADIUS OF 125.00 FEET AND A CENTRAL ANGLE OF 21°58'52"; THENCE SOUTHWESTERLY ALONG THE ARC A DISTANCE OF 47.96 FEET; THENCE S.22°02'14"W., A DISTANCE OF 173.54 FEET TO A POINT OF CURVE TO THE LEFT HAVING A RADIUS OF 575.00 FEET AND A CENTRAL ANGLE OF 09°39'59"; THENCE SOUTHERLY ALONG THE ARC A DISTANCE OF 97.01 FEET; THENCE S.12°22'16"W., A DISTANCE OF 271.15 FEET TO A POINT OF CURVE TO THE LEFT HAVING A RADIUS OF 775.00 FEET AND A CENTRAL ANGLE OF 11°23'58"; THENCE SOUTHERLY ALONG THE ARC A DISTANCE OF 154.19 FEET; THENCE ALONG A LINE NON-TANGENT TO SAID CURVE, S.00°52'02"W., A DISTANCE OF 103.01 FEET TO THE POINT OF CURVE OF A NON TANGENT CURVE TO THE LEFT, OF WHICH THE RADIUS POINT LIES S.89°41'48"E., A RADIAL DISTANCE OF 758.82 FEET; THENCE SOUTHERLY ALONG THE ARC, THROUGH A CENTRAL ANGLE OF 09°49'38", A DISTANCE OF 130.15 FEET; THENCE ALONG A LINE NON-TANGENT TO SAID CURVE, S.09°28'08"E., A DISTANCE OF 51.56 FEET TO A POINT OF CURVE TO THE RIGHT HAVING A RADIUS OF 425.00 FEET AND A CENTRAL ANGLE OF 40°57'14"; THENCE SOUTHERLY ALONG THE ARC A DISTANCE OF 303.78 FEET; THENCE S.31°29'06"W., A DISTANCE OF 35.68 FEET; THENCE N.60°06'50"E., A DISTANCE OF 374.58 FEET; THENCE S.84°23'00"E., A DISTANCE OF 463.06 FEET; THENCE S.09°08'58"W., A DISTANCE OF 309.98 FEET; THENCE N.86°22'30"W., A DISTANCE OF 544.19 FEET; THENCE S.63°21'09"W., A DISTANCE OF 357.00 FEET; THENCE S.27°13'58"W., A DISTANCE OF 69.15 FEET TO A POINT OF CURVE TO THE LEFT HAVING A RADIUS OF 275.00 FEET AND A CENTRAL ANGLE OF 17°30'56"; THENCE SOUTHERLY ALONG THE ARC A DISTANCE OF 84.07 FEET; THENCE S.09°43'03"W., A DISTANCE OF 127.28 FEET TO A POINT OF CURVE TO THE RIGHT HAVING A RADIUS OF 175.00 FEET AND A CENTRAL ANGLE OF 27°05'24"; THENCE SOUTHWESTERLY ALONG THE ARC A DISTANCE OF 82.74 FEET; THENCE ALONG A LINE NON-TANGENT TO SAID CURVE, N.77°40'20"E., A DISTANCE OF 193.75 FEET; THENCE S.77°47'35"E., A DISTANCE OF 505.70 FEET; THENCE S.12°12'25"W., A DISTANCE OF 286.56 FEET; THENCE S.12°12'19"W., A DISTANCE OF 434.91 FEET; THENCE N.77°47'35"W., A DISTANCE OF 100.00 FEET; THENCE S.12°12'25"W., A DISTANCE OF 949.76 FEET; THENCE S.26°09'12"W., A DISTANCE OF 367.56 FEET; THENCE S.23°42'51"W., A DISTANCE OF 274.34 FEET; THENCE CONTINUE SOUTHWESTERLY ALONG SAID LINE, A DISTANCE OF 309.09 FEET; THENCE S.39°18'23"W., A DISTANCE OF 257.40 FEET; THENCE N.89°17'45"W., A DISTANCE OF 2,616.35 FEET; THENCE N.00°12'19"W., A DISTANCE OF 746.45 FEET; THENCE S.89°14'03"W., A DISTANCE OF 619.44 FEET; THENCE N.00°46'43"W., A DISTANCE OF 108.13 FEET; THENCE N.40°28'27"E., A DISTANCE OF 362.58 FEET; THENCE N.71°34'40"E., A DISTANCE OF 295.04 FEET; THENCE S.63°22'38"E., A DISTANCE OF 208.44 FEET; THENCE S.06°37'16"W., A DISTANCE OF 172.05 FEET; THENCE S.69°48'59"W., A DISTANCE OF 39.39 FEET TO THE POINT OF CURVE OF A NON TANGENT CURVE TO THE RIGHT, OF WHICH THE RADIUS POINT LIES S.69°48'59"W., A RADIAL DISTANCE OF 150.00 FEET; THENCE SOUTHERLY ALONG THE ARC, THROUGH A CENTRAL ANGLE OF 20°23'57", A DISTANCE OF 53.40 FEET; THENCE S.00°12'56"W., A DISTANCE OF 41.28 FEET TO A POINT OF CURVE TO THE LEFT HAVING A RADIUS OF 100.00 FEET AND A CENTRAL ANGLE OF 143°00'40"; THENCE EASTERLY ALONG THE ARC A DISTANCE OF 249.60 FEET; THENCE ALONG A LINE NON-TANGENT TO SAID CURVE, N.37°12'24"E., A DISTANCE OF 54.23 FEET TO THE POINT OF CURVE OF A NON TANGENT CURVE TO THE RIGHT, OF WHICH THE RADIUS POINT LIES S.52°32'42"E., A RADIAL DISTANCE OF 225.00 FEET; THENCE NORTHEASTERLY ALONG THE ARC, THROUGH A CENTRAL ANGLE OF 14°37'48", A DISTANCE OF 57.45 FEET; THENCE ALONG A LINE NON-TANGENT TO SAID CURVE, N.37°54'54"W., A DISTANCE OF 62.79 FEET; THENCE N.19°00'35"W., A DISTANCE OF 144.14 FEET; THENCE N.53°07'00"E., A DISTANCE OF 135.00 FEET; THENCE N.86°01'25"E., A DISTANCE OF 302.53 FEET; THENCE S.58°20'38"E., A DISTANCE OF 249.00 FEET; THENCE S.10°16'42"E., A DISTANCE OF 186.51 FEET; THENCE S.20°53'00"E., A DISTANCE OF 369.71 FEET; THENCE S.66°37'58"E., A DISTANCE OF 64.89 FEET; THENCE S.16°07'32"E., A DISTANCE OF 305.16 FEET; THENCE S.62°22'16"E., A DISTANCE OF 36.36 FEET TO THE POINT OF CURVE OF A NON TANGENT CURVE TO THE LEFT, OF WHICH THE RADIUS POINT LIES N.26°55'06"E., A RADIAL DISTANCE OF 150.00 FEET; THENCE EASTERLY ALONG THE ARC, THROUGH A CENTRAL ANGLE OF 32°02'02", A DISTANCE OF 83.86 FEET; THENCE ALONG A LINE NON-TANGENT TO SAID CURVE, N.16°07'32"W., A DISTANCE OF 677.21 FEET; THENCE

N.07°25'56"W., A DISTANCE OF 484.27 FEET; THENCE N.23°24'01"E., A DISTANCE OF 276.90 FEET; THENCE S.86°07'52"E., A DISTANCE OF 320.90 FEET; THENCE S.15°16'27"E., A DISTANCE OF 498.96 FEET; THENCE S.64°55'41"W., A DISTANCE OF 139.44 FEET TO THE POINT OF CURVE OF A NON TANGENT CURVE TO THE RIGHT, OF WHICH THE RADIUS POINT LIES S.64°55'41"W., A RADIAL DISTANCE OF 175.00 FEET; THENCE SOUTHEASTERLY ALONG THE ARC, THROUGH A CENTRAL ANGLE OF 04°45'17", A DISTANCE OF 14.52 FEET; THENCE S.20°19'03"E., A DISTANCE OF 39.91 FEET TO A POINT OF CURVE TO THE LEFT HAVING A RADIUS OF 15.00 FEET AND A CENTRAL ANGLE OF 77°50'48"; THENCE SOUTHEASTERLY ALONG THE ARC A DISTANCE OF 20.38 FEET TO A POINT OF REVERSE CURVE TO THE RIGHT HAVING A RADIUS OF 175.00 FEET AND A CENTRAL ANGLE OF 15°48'34"; THENCE EASTERLY ALONG THE ARC, A DISTANCE OF 48.29 FEET; THENCE S.82°21'17"E., A DISTANCE OF 127.61 FEET TO A POINT OF CURVE TO THE LEFT HAVING A RADIUS OF 150.00 FEET AND A CENTRAL ANGLE OF 15°17'56"; THENCE EASTERLY ALONG THE ARC A DISTANCE OF 40.05 FEET; THENCE ALONG A LINE NON-TANGENT TO SAID CURVE, N.07°39'14"W., A DISTANCE OF 20.00 FEET; THENCE N.35°02'34"W., A DISTANCE OF 159.29 FEET; THENCE N.00°00'58"E., A DISTANCE OF 271.06 FEET; THENCE N.26°32'55"W., A DISTANCE OF 214.55 FEET; THENCE N.63°27'05"E., A DISTANCE OF 204.05 FEET; THENCE N.54°23'55"E., A DISTANCE OF 177.11 FEET; THENCE N.54°33'13"E., A DISTANCE OF 154.53 FEET; THENCE N.73°45'06"E., A DISTANCE OF 252.41 FEET; THENCE S.86°41'22"E., A DISTANCE OF 139.29 FEET; THENCE N.03°18'38"E., A DISTANCE OF 139.18 FEET; THENCE N.51°26'16"W., A DISTANCE OF 137.43 FEET; THENCE N.32°38'04"W., A DISTANCE OF 218.99 FEET; THENCE N.53°04'13"E., A DISTANCE OF 111.39 FEET; THENCE CONTINUE NORTHEASTERLY ALONG SAID LINE, A DISTANCE OF 131.94 FEET; THENCE N.30°46'07"E., A DISTANCE OF 116.66 FEET; THENCE N.30°45'49"E., A DISTANCE OF 197.27 FEET; THENCE S.74°12'42"E., A DISTANCE OF 229.85 FEET TO THE POINT OF CURVE OF A NON TANGENT CURVE TO THE RIGHT, OF WHICH THE RADIUS POINT LIES S.66°04'07"E., A RADIAL DISTANCE OF 175.00 FEET; THENCE NORTHEASTERLY ALONG THE ARC, THROUGH A CENTRAL ANGLE OF 32°50'39", A DISTANCE OF 100.32 FEET; THENCE N.56°46'32"E., A DISTANCE OF 40.93 FEET TO A POINT OF CURVE TO THE LEFT HAVING A RADIUS OF 125.00 FEET AND A CENTRAL ANGLE OF 47°03'29"; THENCE NORTHEASTERLY ALONG THE ARC A DISTANCE OF 102.66 FEET; THENCE N.09°43'03"E., A DISTANCE OF 127.28 FEET TO A POINT OF CURVE TO THE RIGHT HAVING A RADIUS OF 325.00 FEET AND A CENTRAL ANGLE OF 17°30'56"; THENCE NORTHERLY ALONG THE ARC A DISTANCE OF 99.35 FEET; THENCE N.27°13'58"E., A DISTANCE OF 130.82 FEET; THENCE N.70°39'54"W., A DISTANCE OF 240.37 FEET; THENCE N.44°52'50"E., A DISTANCE OF 169.31 FEET; THENCE N.14°57'25"W., A DISTANCE OF 332.65 FEET; THENCE N.89°04'13"E., A DISTANCE OF 361.45 FEET; THENCE N.09°28'08"W., A DISTANCE OF 51.56 FEET TO A POINT OF CURVE TO THE RIGHT HAVING A RADIUS OF 825.00 FEET AND A CENTRAL ANGLE OF 10°26'27"; THENCE NORTHERLY ALONG THE ARC A DISTANCE OF 150.34 FEET; THENCE N.00°58'18"E., A DISTANCE OF 91.94 FEET TO A POINT OF CURVE TO THE RIGHT HAVING A RADIUS OF 825.00 FEET AND A CENTRAL ANGLE OF 02°26'42"; THENCE NORTHERLY ALONG THE ARC A DISTANCE OF 35.20 FEET; THENCE CONTINUE NORTHERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 08°57'16", A DISTANCE OF 128.93 FEET; THENCE N.12°22'16"E., A DISTANCE OF 54.04 FEET; THENCE N.83°01'00"W., A DISTANCE OF 192.80 FEET; THENCE N.51°46'49"W., A DISTANCE OF 267.44 FEET; THENCE N.22°02'05"E., A DISTANCE OF 164.10 FEET; THENCE S.75°13'48"E., A DISTANCE OF 405.99 FEET TO THE POINT OF CURVE OF A NON TANGENT CURVE TO THE RIGHT, OF WHICH THE RADIUS POINT LIES S.75°13'48"E., A RADIAL DISTANCE OF 625.00 FEET; THENCE NORTHERLY ALONG THE ARC, THROUGH A CENTRAL ANGLE OF 07°16'02", A DISTANCE OF 79.27 FEET; THENCE N.22°02'14"E., A DISTANCE OF 173.54 FEET TO A POINT OF CURVE TO THE RIGHT HAVING A RADIUS OF 175.00 FEET AND A CENTRAL ANGLE OF 21°58'52"; THENCE NORTHEASTERLY ALONG THE ARC A DISTANCE OF 67.14 FEET; THENCE N.44°01'06"E., A DISTANCE OF 81.36 FEET TO A POINT OF CURVE TO THE LEFT HAVING A RADIUS OF 75.00 FEET AND A CENTRAL ANGLE OF 165°33'20"; THENCE NORTHWESTERLY ALONG THE ARC A DISTANCE OF 216.71 FEET; THENCE S.58°27'47"W., A DISTANCE OF 49.23 FEET TO A POINT OF CURVE TO THE RIGHT HAVING A RADIUS OF 175.00 FEET AND A CENTRAL ANGLE OF 65°50'53"; THENCE WESTERLY ALONG THE ARC A DISTANCE OF 201.12 FEET; THENCE N.55°41'20"W., A DISTANCE OF 26.36 FEET TO A POINT OF CURVE TO THE LEFT HAVING A RADIUS OF 125.00 FEET AND A CENTRAL ANGLE OF 17°33'48"; THENCE NORTHWESTERLY ALONG THE ARC A

DISTANCE OF 38.32 FEET; THENCE ALONG A LINE NON-TANGENT TO SAID CURVE, N.73°15'05"W., A DISTANCE OF 93.67 FEET TO THE POINT OF CURVE OF A NON TANGENT CURVE TO THE RIGHT, OF WHICH THE RADIUS POINT LIES N.16°44'51"E., A RADIAL DISTANCE OF 175.00 FEET; THENCE NORTHWESTERLY ALONG THE ARC, THROUGH A CENTRAL ANGLE OF 39°11'40", A DISTANCE OF 119.71 FEET; THENCE N.34°03'29"W., A DISTANCE OF 29.90 FEET TO A POINT OF CURVE TO THE LEFT HAVING A RADIUS OF 75.00 FEET AND A CENTRAL ANGLE OF 88°53'57"; THENCE WESTERLY ALONG THE ARC A DISTANCE OF 116.37 FEET; THENCE S.57°02'34"W., A DISTANCE OF 200.87 FEET TO A POINT OF CURVE TO THE LEFT HAVING A RADIUS OF 225.00 FEET AND A CENTRAL ANGLE OF 17°03'41"; THENCE SOUTHWESTERLY ALONG THE ARC A DISTANCE OF 67.00 FEET; THENCE S.39°58'53"W., A DISTANCE OF 116.77 FEET TO A POINT OF CURVE TO THE RIGHT HAVING A RADIUS OF 150.00 FEET AND A CENTRAL ANGLE OF 90°51'52"; THENCE WESTERLY ALONG THE ARC A DISTANCE OF 237.88 FEET; THENCE N.49°09'15"W., A DISTANCE OF 35.10 FEET TO THE POINT OF CURVE OF A NON TANGENT CURVE TO THE LEFT, OF WHICH THE RADIUS POINT LIES S.40°50'25"W., A RADIAL DISTANCE OF 15.01 FEET; THENCE WESTERLY ALONG THE ARC, THROUGH A CENTRAL ANGLE OF 84°45'42", A DISTANCE OF 22.21 FEET; THENCE ALONG A LINE NON-TANGENT TO SAID CURVE, N.43°56'49"W., A DISTANCE OF 50.01 FEET TO THE POINT OF CURVE OF A NON TANGENT CURVE TO THE LEFT, OF WHICH THE RADIUS POINT LIES N.43°56'50"W., A RADIAL DISTANCE OF 375.03 FEET; THENCE NORTHEASTERLY ALONG THE ARC, THROUGH A CENTRAL ANGLE OF 09°05'48", A DISTANCE OF 59.54 FEET; THENCE ALONG A LINE NON-TANGENT TO SAID CURVE, N.36°57'21"E., A DISTANCE OF 95.87 FEET TO A POINT OF CURVE TO THE LEFT HAVING A RADIUS OF 87.00 FEET AND A CENTRAL ANGLE OF 20°58'33"; THENCE NORTHEASTERLY ALONG THE ARC A DISTANCE OF 31.85 FEET; THENCE N.15°58'48"E., A DISTANCE OF 34.77 FEET TO A POINT OF CURVE TO THE RIGHT HAVING A RADIUS OF 133.00 FEET AND A CENTRAL ANGLE OF 09°57'40"; THENCE NORTHERLY ALONG THE ARC A DISTANCE OF 23.12 FEET TO A POINT OF REVERSE CURVE TO THE LEFT HAVING A RADIUS OF 357.00 FEET AND A CENTRAL ANGLE OF 24°48'39"; THENCE NORTHERLY ALONG THE ARC, A DISTANCE OF 154.59 FEET; THENCE ALONG A LINE NON-TANGENT TO SAID CURVE, N.00°56'51"E., A DISTANCE OF 79.63 FEET TO A POINT OF CURVE TO THE LEFT HAVING A RADIUS OF 100.00 FEET AND A CENTRAL ANGLE OF 02°51'03"; THENCE NORTHERLY ALONG THE ARC A DISTANCE OF 4.98 FEET; THENCE N.01°54'12"W., A DISTANCE OF 53.81 FEET; THENCE N.89°11'21"E., A DISTANCE OF 60.01 FEET TO THE POINT OF BEGINNING.

LESS AND EXCEPTING THE FOLLOWING LOTS FROM CURRENT AND FUTURE PHASES OF WOHALI SUBDIVISION PHASE 1A THROUGH 1C,

2
3-7
9-12
14,15
54
64-67
69-73

## EXHIBIT A-1

## LEGAL DESCRIPTIONS OF AFFECTED PARCELS

**WOH-1-1**
LOT 1, WOHALI PHASE 1 SUBDIVISION; ACCORDING TO THE OFFICIAL PLAT THEREOF AND ON FILE IN THE SUMMIT COUNTY RECORDERS OFFICE CONT 103,996 SQ FT OR 2.387 AC. 2746-987

**WOH-1-3**
LOT 3, WOHALI PHASE 1 SUBDIVISION; ACCORDING TO THE OFFICIAL PLAT THEREOF AND ON FILE IN THE SUMMIT COUNTY RECORDERS OFFICE CONT 99,005 SQ FT OR 2.273 AC.

**WOH-1-8**
LOT 8, WOHALI PHASE 1 SUBDIVISION; ACCORDING TO THE OFFICIAL PLAT THEREOF AND ON FILE IN THE SUMMIT COUNTY RECORDERS OFFICE CONT 36,225 SQ FT OR 0.832 AC.

**WOH-1-13**
LOT 13, WOHALI PHASE 1 SUBDIVISION; ACCORDING TO THE OFFICIAL PLAT THEREOF AND ON FILE IN THE SUMMIT COUNTY RECORDERS OFFICE CONT 44,816 SQ FT OR 1.029 AC.

**WOH-1-68**
LOT 68, WOHALI PHASE 1 SUBDIVISION; ACCORDING TO THE OFFICIAL PLAT THEREOF AND ON FILE IN THE SUMMIT COUNTY RECORDERS OFFICE CONT 235.474 SQ FT OR 5.406 AC.

**CT-WOH-COMB**
BEGINNING AT THE NORTHWEST CORNER OF SECTION 18, TOWNSHIP 2 NORTH, RANGE 5 EAST, SALT LAKE BASE & MERIDIAN AND RUNNING THENCE NORTH 89°11'21" EAST 3743.70 FEET; THENCE SOUTH 56°22'29" EAST 406.43 FEET; THENCE SOUTH 17°05'28' EAST 369.20 FEET; THENCE SOUTH 48°07'57" EAST 780.00 FEET; THENCE SOUTH 12°44'02" WEST 123.14 FEET; THENCE SOUTH 19°38'38" WEST 291.90 FEET; THENCE SOUTH 19°38'38" WEST 1180.02 FEET; THENCE SOUTH 19°38'38" WEST 160.08 FEET; THENCE SOUTH 23°08'38" WEST 700.00 FEET; THENCE SOUTH 0°42'14" EAST 201.86 FEET; THENCE SOUTH 0°42'14" EAST 387.14 FEET; THENCE SOUTH 89°59'49" EAST 387.39 FEET; THENCE SOUTH 21°37'45" WEST 483.72 FEET; THENCE SOUTH 21°37'45'" WEST 960.50 FEET; THENCE SOUTH 88°26'37" WEST 1148.59 FEET; THENCE NORTH 89°17'17" WEST 2616.35 FEET; THENCE NORTH 0°11'51" WEST 746.45

FEET; THENCE SOUTH 89°14'02" WEST 245.57 FEET; THENCE SOUTH 89°14'02" WEST 1732.04 FEET; THENCE NORTH 24°14'35" EAST 114.04 FEET; THENCE SOUTH 61°22'24" WEST 4028.44 FEET; THENCE NORTH 57°24'30" WEST 5260.39 FEET; THENCE NORTH 69°41'17" EAST 935.37 FEET; THENCE NORTH 43°11'17" EAST 1900.00 FEET; THENCE NORTH 28°56'17" EAST 1025.00 FEET; THENCE NORTH 28°01'17" EAST 2293.08 FEET; THENCE NORTH 83°49'36" EAST 682.00 FEET; THENCE SOUTH 0°05'27" EAST 1048.23 FEET; THENCE SOUTH 88°52'20" EAST 5453.59 FEET; TO THE POINT OF BEGINNING. CONT 1525.72 AC. (LESS 72.48 AC #1168146 NKA WOHALI SUBDIVISION PH 1) BAL 1453.24 AC 2735-368