David P. Billings (11510)
FABIAN VANCOTT
95 South State Street, Suite 2300
Salt Lake City, Utah 84111
Telephone: (801) 531-8900
dbillings@fabianvancott.com
*Attorneys for the Wohali Concerned Owners*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| In re: | Case No. 25-24610 |
| Wohali Land Estates, LLC, | Chapter 11 |
| Debtor | Judge Peggy M. Hunt |

**WOHALI CONCERNED OWNERS' OBJECTION
TO CHAPTER 11 TRUSTEE'S MOTION FOR ENTRY OF INTERIM AND FINAL
ORDERS (I) AUTHORIZING THE TRUSTEE TO (A) OBTAIN POSTPETITION
FINANCING FROM EB5AN WOHALI UTAH FUND XV, LP, (B) UTILIZE CASH
COLLATERAL, AND (C) PAY THE WOHALI PUBLIC INFRASTRUCTURE
DEVELOPMENT 2025 ASSESSMENT, (II) GRANTING LIENS AND PROVIDING
CLAIMS WITH SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (III)
MODIFYING THE AUTOMATIC STAY, (IV) SCHEDULING A FINAL HEARING, AND
(V) GRANTING RELATED RELIEF**

Pursuant to 11 U.S.C. §§ 105(a), 361, 362, 363, 364(c)-(e), 503, 507, and 552, together

with Fed. R. Bankr. P. 2002, 4001, 6003, and 9014 and L.B.R. 2002-1, 4001-2, and 9013-1,

administrative claimholders the Wohali Concerned Owners[1] hereby object to Motion filed by the

---

[1] Collectively, at this time, the "**Wohali Concerned Owners**" consist of: General Hancock Enterprises LA, LLC, a Delaware limited liability company (Owner of Lots #2 and #66); ATOT Utah, LLC, a Utah limited liability company (Owner of Lot #3 and Airspace Unit #20); Whitestripe Mountain LLC, a Florida limited liability company (Owner of Lot #6); Ernest T. Wakabayashi, as Trustee of The Ernest T. Wakabayashi Trust (Owner of Lot #9); Timothy Kutzkey and Lisa Tenorio-Kutzkey, as Trustees of The Kutzkey Family Trust (Owner of Lot #11); WFH, LLC, a Wyoming limited liability company (Owner of Lot #12); Gumer C. Alvero and Amy J. Alvero, as Trustees of The Gumer C. Alvero Revocable Trust (Owner of Lot #28 and Airspace Unit #15); Whitestripe Wohali, LLC, a Florida limited liability company (Owner of Lot

Trustee of the estate of Wohali Land Estates, LLC (the "**Debtor**") selecting the term sheet of EB5AN Wohali Utah Fund XV, LP ("**EB5**") for postpetition financing (the "**EB5 DIP Motion**"). [Dkt. # 158] This objection is supported by the Declarations of Brian Ehman (Exhibit 1), Clayton Heckler (Exhibit 2), Ben Goldthrop (Exhibit 3), and Ernie Wakabayashi (Exhibit 4), all filed in connection herewith and incorporated herein for reference. The Wohali Concerned Owners state as follows:

### PRELIMINARY STATEMENT

The Court should deny the EB5 DIP Motion or, at most, grant only limited parts of it on an interim basis (as detailed below) until discovery can be conducted on EB5 and presented to the Court at an evidentiary hearing.

EB5 is anything but a traditional lender or secured creditor. Concerningly, the EB5 DIP Motion altogether fails to alert the Court as to *any* potential impact of that entity's extraordinary structure on these proceedings, instead opting to unreservedly endorse EB5 as the "first priority" secured lender on the Debtor's primary assets, the real property, (EB5 DIP Mot. at ¶¶ 12, 29 (subject only to a "reconciliation" of the claimed secured amount), and as a "good faith" DIP lender under Section 364(e). The Court, however, should be wary and take care to understand who EB5 is and how and why it lent money to the Debtor and how and why it seeks to be the DIP lender.

As detailed below, EB5 is a limited partnership funded by proceeds received from a group of foreign national investors qualified to participate in a securities offering conducted in connection with the EB-5 Immigrant Investor Program administered under the Immigration and

---

#56); Brian Ehman, an individual (Owner of Lot #67); Ellen M. Lampert and Mark A. Lampert, as Trustees of The Ellen M. Lampert Trust (Owner of Lot #70); Benjamin Goldthorp and Stephanie Goldthorp, individuals (Owner of Lot #71).

Nationality Act, 8 U.S.C. §§ 110 et seq., which is commonly known as the "EB-5 loan program" and which has the purpose of granting lawful permanent resident status (via green cards) to foreign investors who invest in a U.S. commercial enterprise, create at least 10 jobs for U.S. workers, and meet specific investment amount requirements. Participants of an EB-5 loan program have very strict guidelines, set by federal statutes, regulations, and policy statements, about how EB-5 investments can be spent. In short, the EB5 loan program encourages economic investment in the United States by foreign nationals, who in return receive visas when certain spending and job creation criteria are met.

The Wohali Concerned Owners believe, as they hope the Court will ultimately conclude, that as implemented by EB5, the EB-5 loan program here was inherently inconsistent with prudent real estate lending practices and merits equitable subordination (or avoidance) as to all or a portion of EB5's alleged first-priority secured lien. Simply put, the EB-5 loan program and EB5's loan herein strongly favored spending on job creation—with the goal of a visa issued to one of EB5's foreign national limited partners for every $800,000 invested and 10 jobs created—with little to no regard to reasonable investing or any sort of cost control. To that end, the Loan Agreement between EB5 and Debtor underlying these proceedings expressly required specific amounts of "job creation" as a condition precedent to the loan, even styling the Borrower (i.e., Debtor) as the "Job Creation Guarantor."

An important question yet to be presented to the Court is how, if EB5 disbursed close to $90 million to develop the golf resort, could "the value of the Debtor's assets … _not come close_ to exceeding the amount of EB5's Prepetition Claim," as conceded in the Declaration of EB5's authorized representative in support of the EB5 DIP Motion? The Wohali Concerned Owners believe that investigation and discovery (preferably by the Trustee) will answer this question and

reveal that EB5's lax lending practices, unmitigated demands for spending towards "job creation," and poor oversight were the primary, or at least significant, causes of this bankruptcy. And this is precisely why EB5 wants so desperately to be the DIP lender with a loan that does not allocate *a penny* to the Trustee to investigate EB5, shortens all creditors' statute of limitations against EB5 without consideration, grants EB5 super priority on more than it is entitled to receive, provides EB5 with various other unwarranted protections, and effectively converts this chapter 11 case into a fire sale where EB5 acquires the property with its credit bid. The Court should not condone this result.

Of course, the Trustee is in an unenviable position: either pick a third party to provide super-priority DIP lending and wage an adequate protection battle with EB5[2] or avoid that fight and surrender to a fait accompli whereby EB5 effectively muzzles any would be objectors and takes the golf club at a fire sale that literally provides nothing to the estate or other creditors. But just because the Trustee wants to avoid the time and expense of waging a battle against EB5 at this stage of the proceedings does not mean he should simply lay down to EB5. Indeed, doing so could very well come at the expense of *all* creditors other than EB5. And at least one other DIP proposal, from the Wohali Concerned Owners, provides significant funds for investigations of and a fight with EB5.

Moreover, if EB5 is approved as the DIP lender on the terms proposed, the Debtor will be mothballed, dooming the sales process just as the golf season restarts—all while refusing to permit the Wohali Concerned Owners or any other would be lender from paying for desperately needed infrastructure. Shockingly, despite over $100 million dollars having supposedly been lent

---

[2] The Wohali Concerned Owners understand that in addition to their term sheet, the Trustee received a term sheet from at least DGB Investments, Inc., ("**Bergeron**"), but does not know the terms of that offer or others.

and invested in the golf resort and the Wohali Public Improvement District Nos. 1 & 2 (collectively, the "**PID**"), this 18-hole championship golf planned community still has no approved electricity, sewer, water, gas, or other basic infrastructure. And EB5, who repeatedly failed to preserve this asset postpetition, even refuses to repay the Wohali Concerned Owners for their payroll payments out of EB5's proposed DIP.

Worse still, EB5 attempts to dramatically reduce the statute of limitations for bringing claims against it by not only the Trustee, but also *any* creditors. Again, the Trustee cannot use any of the DIP financing to investigate EB5. And EB5 has further tied the Trustee's hands by not permitting him to share EB5's August appraisal with the Wohali Concerned Owners, or others.

In the end, EB5's incentives are directly adverse to those of the estate. Prepetition, it carelessly handed out massive sums to the Debtor and its affiliates to get as many visas for its limited partner investors as possible, rather than doing anything to ensure the Debtor was spending the loaned money reasonably to improve the value of the Wohali project. Now, post-petition, EB5 wants the estate to spend as little as possible with the effect of protecting EB5 from any oversight, chilling bidding, making a chapter 11 plan unfeasible, and effectively turning the chapter 11 process into a court-sanctioned deed-in-lieu-of-foreclosure to EB5.

With no official committee acting as a watch dog, *see, e.g., In re Western Pacific Airlines, Inc.*, 219 BR 575, 578 (Bankr. D. Colo. 1998), and the US Trustee digging out from the longest government shutdown in history, *see* Gen. Ord. 25-0001, it again falls to the Wohali Concerned Owners to step up to the plate. The Wohali Concerned Owners respectfully urge the Court to closely scrutinize the EB5 DIP Motion and give the Trustee the leverage he needs against EB5 (and others) by denying the Motion as requested and encouraging the Trustee to seek approval of one of its other four (4) DIP.

<h2 style="text-align:center">JURISDICTION AND VENUE</h2>

1. The Court has jurisdiction over this Objection pursuant to 28 U.S.C. §§ 157 and 1334, and the standing order of reference from the United States District Court for the District of Utah.

2. Venue with this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

<h2 style="text-align:center">RELIEF REQUESTED</h2>

3. The Wohali Concerned Owners respectfully request the entry of an order denying the EB5 DIP Motion. Alternatively, the Wohali Concerned Owners respectfully request the entry of an order authorizing only the payment of certain items listed in EB5's budget on an interim basis—including payment of the bonds due and owing to the "PID"—but otherwise rejecting the Motion for the reasons set forth below until after investigation and discovery have occurred and the Court holds an evidentiary hearing.

<h2 style="text-align:center">FACTUAL BACKGROUND</h2>

4. On August 11, 2022, the Debtor and EB5 entered into the Loan Agreement underlying these proceedings. That Loan Agreement revealed EB5 to be a participant in the federal government's EB-5 immigrant investor loan program and, as a result, contained several non-standard provisions for a real estate development loan, including but not limited to:

<div style="border:1px solid; padding:1em">

<p style="text-align:center">LOAN AGREEMENT</p>

THIS LOAN AGREEMENT, dated as of August 11, 2022 (as amended, restated, replaced, supplemented, or otherwise modified from time to time, this "Agreement"), between Wohali Land Estates LLC, a Utah limited liability company (together with its successors and/or assigns, "Borrower") and EB5AN Wohali Utah Fund XV, LP, a Delaware limited partnership (together with its successors and/or assigns, "Lender").

<p style="text-align:center">RECITALS</p>

WHEREAS, Borrower has requested a loan from Lender in the principal amount of up to $79.2 million (the "Loan") to be funded by proceeds received from up to 99 investors (the "EB-5 Investors") qualified to participate in a securities offering (the "Offering") conducted in connection with the EB-5 Immigrant Investor Program administered under the Immigration and Nationality Act, Section 203(b)(5) et seq., as amended (the "EB-5 Program");

</div>

…

WHEREAS, as a condition precedent to the obligation of Lender to make the Loan to Borrower, Lender will receive from Borrower (the "Job Creation Guarantor") an EB-5 job creation guaranty in favor of Lender (as amended, supplemented, or otherwise modified from time to time, the "Job Creation Guaranty"), which, subject to certain conditions, shall guarantee the creation of at least 10 EB-5 eligible jobs for every $800,000 accepted by Borrower from Lender, and shall be in form and substance reasonably acceptable to Lender;

…

Section 2.11     Use of Proceeds.

(a)     The Loan proceeds may only be used to (i) replace Bridge Financing, dollar-for-dollar, until such Bridge Financing has been fully repaid; and thereafter (ii) to directly pay Qualifying Expenditures.

(b)     Borrower agrees and warrants that all money it receives pursuant to this Agreement shall be invested in the Project as set forth in herein and used only for advancement of the Project as set forth in the Plans and Specifications. Said funds shall not be used for any other purpose unless agreed upon in writing by the parties. Said funds shall in no case be used to replace or recapitalize any Developer Equity.

(c)     Borrower agrees to provide all information, financial statements, and any other documents regarding use of proceeds of the Loan or any Disbursement thereof necessary to properly calculate job creation and otherwise comply with the EB-5 Program.

…

Section 4.13     EB-5 Program Information Requirements. Within 30 days after any written request by Lender, (a) use its commercially reasonable efforts to provide documentation reports in form and content reasonably acceptable to Lender relating to the expenditures made by or on behalf of Borrower or related to or that are applicable to the Project, including a description and date of each expenditure in such detail as reasonably requested by Lender (the "EB-5 Documentation"), (b) state in the EB-5 Documentation the total expenditures on the Project at the time of the delivery of the EB-5 Documentation to Lender, (c) produce such EB-5 Documentation at its sole cost and expense, and (d) maintain, produce, and deliver to Lender any other documents, data, or any other information then-maintained by Borrower that is related to the Project and requested by Lender in connection with the EB-5 Program administered by USCIS, and specifically including, but not limited to, any information in connection with the job creation requirement under the EB-5 Program, in each case subject to the standard of Borrower's commercially reasonable efforts to comply.

…

Section 7.2     Additional Conditions Precedent to Lender's Obligations. Each of the following is an express condition precedent to the obligation of Lender to make the Loan or any Disbursement to Borrower pursuant to the terms of this Agreement. In the event any one or more of the following conditions are not satisfied to Lender's reasonable satisfaction, Lender may at its option (a) waive said condition and fund the Loan or the applicable Disbursement or (b) suspend performance and pursue such other remedies as may be otherwise available under this Agreement, at law or in equity.

…

(f)     No Budget Changes. There have been no changes to the Budget that would result in a material reduction in the number of jobs estimated to be created from the Project.

(g)     EB-5 Program. There has been no change to the EB-5 Program that would adversely affect the Loan or the ability of the Project to meet the requirements of the EB-5 Program.

[Dkt. # 69-1, at 11, 23, 29, 33-34; *see also* Ehman Decl. ¶¶ 9-10.]

7

5. The EB-5 immigrant investor loan program administered under the Immigration and Nationality Act has the purpose of granting lawful permanent resident status (via a green card) to foreign investors who invest in a U.S. commercial enterprise, create at least 10 jobs for U.S. workers, and meet specific investment amount requirements. Participants of an EB-5 loan program have very strict guidelines, set by federal statute, regulations, and policy, about how EB-5 investments can be spent. [Ehman Decl. ¶ 9; Heckler and Goldthrop Decls. ¶ 7.]

6. EB5 admits its job-focus at Wohali on its website: "Construction is well underway, with the golf course nearly completed and the clubhouse and infrastructure under construction. USCIS has approved the I-956F exemplar application for Wohali Utah.... As of December 31, 2023, Wohali Utah has created over 690 qualifying EB-5 jobs, enough to immediately satisfy the job creation requirements for the first 69 EB-5 investors who join the project. In total, the project is expected to create 4,396 jobs."

https://eb5visainvestments.com/2024/04/15/eb5an-sees-remarkable-surge-in-eb-5-investments-in-q1-2024/ (last visited November 18, 2025).

7. On November 9, 2022, EB5 recorded its deed of trust against some (but not all) property of the Debtor's estate (a) as Entry No. 01197541, in Book 2763, beginning at Page 1333, Official Records of the Summit County Recorder's Office, and (b) as Entry No. 162312, in Book 396, beginning at Page 599, Official Records of the Morgan County Recorder's Office. The Debtor scheduled EB5's claim as $85,414,728 as of the Petition Date. [Dkt. # No. 85] EB-5's proof of claim states that amount should be $86,167,955.67. [Claim No. 4-1]

8. On or about March 11, 2024, the Debtor entered into a lease with affiliate Wohali Resort, Inc. ("**Resort**").

9. EB5 filed a UCC-1 on May 15, 2025 against the Debtor, yet had not advanced funds to the Debtor since January 2025. The Trustee and EB5 agree this recordation is likely an avoidable preference under 11 U.S.C. § 547. [Dkt. # 158 at 5]

10. On August 8, 2025 (the "**Petition Date**"), the Debtor commenced a voluntary case under Chapter 11 of the Bankruptcy Code by filing a petition in this Court.

11. Very little information has been provided by the Debtor post-petition. The Debtor did not file a first day declaration detailing its operations, the reason for the bankruptcy filing, the capital structure, or other key information. And there have only been two Monthly Operating Reports filed with little information. [Dkts. # 129-30]

12. Notwithstanding the avoidablity of its UCC-1 filing, EB5 asserted an interest in cash collateral, whether it was held by the Debtor or in the name of a non-debtor affiliate (within the meaning of 11 U.S.C. § 101(2)), notified the Debtor, the Court, and all parties in interest that (i) EB5 "does not consent" to the Debtor's (or non-debtor affiliates) "use thereof absent an acceptable cash collateral agreement and adequate protection stipulation; and (ii) the Debtor and the estate are prohibited from using EB5's cash collateral, except as otherwise authorized by 11 U.S.C. § 363(c)(2)." [Dkt. # 10 at 3]

13. The Debtor and/or non-Debtor affiliates lack the financial wherewithal to adequately compensate those who provide valuable day-to-day services to keep the golf course and resort running.

14. EB5 refused to consent to the use of its cash collateral or to pay for ongoing required payroll at the resort, despite the need to keep staff employed t maintain the value of the estate and, most importantly, its golf course.

9

15. Despite not being affiliated with the Debtor or EB5, but solely as concerned owners of property in the resort and members of the golf club, the Wohali Concerned Owners saw the need for funding to maintain the estate post-petition and stepped up and funded approximately $650,000 for payroll for golf course and club workers to preserve the value of Debtor's estate.

16. On September 6, 2025, post-petition but before the Trustee was appointed, three members of the Wohali Concerned Owners met with EB5's authorized representative, Michael Schoenfeld. The four discussed matters related to the bankruptcy case, the Debtor, EB5, and possible DIP financing. [Ehman Decl. ¶¶ 10, 11; Heckler and Goldthrop Decls. ¶¶ 4-6]

17. During that September 6 meeting, the three Wohali Concerned Owners informed Mr. Schoenfeld, and thus EB5, that their group was interested in providing DIP financing in the bankruptcy so that, among other things, key infrastructure could be completed to protect the lot owners and add value to the estate. Mr. Schoenfeld responded that EB5 would only contribute approximately $3 million and that **EB5 was willing to pay only for the bare "minimum necessary" to facilitate getting the estate to an auction/sale as soon as possible so that EB5 could credit bid and acquire all the Debtor's property**. He further flatly stated that EB5 would not invest in infrastructure as part of any DIP, limiting expenditures to the minimum payroll and winterization required. [Ehman Decl. ¶¶ 12, 13; Heckler and Goldthrop Decls. ¶¶ 6-7]

18. During that same meeting, Mr. Schoenfeld also told the three Wohali Concerned Owners that EB5 intends to find a new developer to partner with post-sale. Above all, Mr. Schoenfeld said, EB5 wanted to continue distributing foreign nationals' investments because, in his words, "it's like free money" because it is very low (or possibly no) interest. He explained that EB5 has "got five years until we have to pay anything back; so, we're not worried." Mr.

Schoenfeld indicated that EB5's limited partners expect repayment of their approximately $800,000 investments without (or with little) interest, while obtaining visas and recovering their funds within five years. [Ehman Decl. ¶¶ 14, 15; Heckler and Goldthrop Decls. ¶¶ 6-7]

19. It was clear to the three Wohali Concerned Owners from their September 6, 2025 meeting with Mr. Schoenfeld that EB5's primary, if not sole, goal is and remains to continue to advance funds with the objective of creating jobs that will lead to the issuance of visas to EB5's limited partners, not to improve or maintain the resort as designed and envisioned. [Ehman Decl. ¶¶ 17; Heckler and Goldthrop Decls. ¶¶ 6-7]

20. And it was clear to the three Wohali Concerned Owners from their September 6, 2025 meeting with Mr. Schoenfeld that **EB5's goal with its DIP proposal would be to set up the bankruptcy proceedings so that EB5—*and only EB5*—could acquire the Debtor's property at any auction/sale**. EB5 definitely was not interested in participating in and losing any competitive bidding with a different purchaser. It also was clear to them that EB5 wants to keep the money and visas flowing. [Ehman Decl. ¶¶ 18; Heckler and Goldthrop Decls. ¶¶ 6-7]

21. In contrast, the Wohali Concerned Owners are and have been primarily interested in preserving and improving the value of the Debtor's estate so that it can be marketed and sold to the highest bidder at a competitive future sale, hopefully to a bidder who wants to improve and finish the resort consistent with its original vision, or close to it. [Ehman Decl. ¶¶ 19; Heckler and Goldthrop Decls. ¶ 8]

22. To that end, the Wohali Concerned Owners funded the approximate $650,000 for payroll noted above. These infusions allowed the golf course to continue to operate and maintain its value. Without those funds, the Debtor/Trustee would have been unable to pay golf course and club personnel, and many key employees likely would have left and found employment

elsewhere. [Ehman Decl. ¶ 20; Wakabayshi Decl. ¶¶ 14-15] ] In fact, a few did leave during the interregnum between the Debtor and the Trustee because EB5 failed to make payroll as it had promised to do, but did not. Absent payment to golf course maintenance personnel, the greens, fairways, and other portions of the golf course would not have been properly maintained in August, September, and October. The greens, fairways, and other grass areas on the golf course almost certainly would have dried out and turned brown in August (and perhaps died), which would have had a significantly negative impact on continued efforts to develop the overall project and sell additional lots and which as a result would have significantly devalued the Debtor's estate even further. [Ehman Decl. ¶¶ 20-22; Heckler and Goldthrop Decls. ¶ 8]

23. On September 25, 2025, the Court entered an Order directing the appointment of a Chapter 11 trustee. [Doc. No. 84].

24. On September 30, 2025, the U.S. Trustee appointed Matt McKinlay (the "Trustee") to be the Chapter 11 trustee of the Debtor. [Doc. No. 102].

25. Shortly after his appointment, the Trustee began looking for DIP financing, and the Wohali Concerned Owners began discussions with him in that regard.

26. On October 27, 2025, BCS Properties, LLC (whose members include a subset of the Wohali Concerned Owners) sent the Trustee a term sheet for proposed DIP financing that contained market-standard terms. A copy of BCS' term sheet sent is attached hereto as Exhibit 5. The material terms of BCS's proposed DIP financing are:

    a. A $15,117,500 DIP Facility designed not just to maintain the value of the estate, but to enhance the value of the estate by completing unfinished infrastructure (such as sewer, water, electricity), making any required PID payments (subject to prior notice and consent),[3] allowing an orderly sales

---

[3] A payment in the amount of $3,318,194.17 appears to be due to UMB Bank on behalf of the PID bondholders on December 1. The PID appears to be still run by Mr. Kaiser and Mr. Boyden, Debtor representatives, has raised over $30 million from bondholders, and reports approximately

or plan process, and funding investigations into potential chapter 5 claims the estate may have;

b. Maturity Date of the *later* of June 30, 2025 or the effective date of a plan of reorganization;

c. The DIP Facility is to be provided on a superpriority secured basis;

d. A 12% interest rate, which is paid in kind and which was presented as negotiable;

e. No funding fee, no commitment fee, no exit fee;

f. Adequate protection payments based upon the "value of the creditor's interest in the real estate," as expressly used in Section 362(d)(3)(B)(ii), with such value being determined by an appraisal conducted by the Trustee and being equal to the lesser of (1) such appraised value or (2) the amount of the Prepetition Secured Claims; and

g. An allowance of up to $250,000 for the Trustee to utilize towards such investigation/litigation of potential chapter 5 claims and other potential claims the Estate may have.

[*See also* Ehman Decl. ¶ 24; Heckler and Goldthrop Decls. ¶ 8]

27. The Wohali Concerned Owners have continued discussions with the Trustee regarding DIP financing, but learned last week that he was selecting EB5's proposal primarily to avoid the time and expense of a priming fight with EB5.

28. The Wohali Concerned Owners received the EB5 DIP proposal and terms last week after it was filed and quickly concluded that, without any funds dedicated to completing woefully needed infrastructure that should have been completed long ago and for investigating (and if necessary litigating) potential claims (including against EB5), the Trustee will be unable to conduct a truly competitive sale and auction process needed to generate value and instead

---

$8 million remaining. *See* https://www.utah.gov/pmn/sitemap/publicbody/8085.html (last visited November 18, 2025).

likely will sell the Debtor's property to EB5 at whatever amount it credit bids. [Ehman Decl. ¶ 24; Heckler & Goldthrop Decls. ¶ 8]

29.     Finally, the Wohali Concerned Owners believe that a DIP proposal that provides funds for various investigations, including into EB5 and its lending practices, is needed and that and that an investigation into EB5's lending practices with Debtor is more than warranted given that EB5 claims an almost $90M lien yet Mr. Schoenfeld in his Declaration concedes "that the value of the Debtor's assets does not come close to exceeding the amount of EB5's Prepetition Claim." This would have been unlikely had EB5 followed prudent lending practices. Instead, the Wohali Concerned Owners believe that EB5 was complicit in having the Debtor and/or its affiliates receive EB5's money and push it out the door with little, if any, oversight and confirmation because the result was money spent, jobs created, and visas issued to EB5's limited partners and that such actions evidence poor business judgment, abnormal lending practices, and inequitable conduct that undermines EB5's alleged secured claims. [Ehman Decl. ¶ 25; Heckler and Goldthrop Decls. ¶ 7]

<div align="center"><b><u>OBJECTION</u></b></div>

**I.     THE COURT SHOULD NOT ALLOW EB5 TO LEVERAGE THE ESTATE'S URGENT, AND IMMEDIATE NEED FOR LIQUIDITY INTO A COVER-UP OF ITS POOR LENDING PRACTICES THAT HELPED CAUSE THE BANKRUPTCY.**

30.     Undoubtedly, the Trustee requires immediate access to liquidity to ensure that the Debtor can continue as a going concern during this chapter 11 case and preserve (and hopefully improve) the value of its estate for the benefit of *all* stakeholders, *not just EB5*.

31.     But the EB5 DIP Motion and EB5's DIP proposal make clear that the Trustee will be unable to create a robust bidding and sale process because he will be attempting to sell a mothballed golf course and club without water, sewer, electricity and other basic amenities and

simultaneously will be hamstrung at the outset in any quest to investigate potential claims and recover for the estate. This serves no benefit to the estate as it chills bidding and tilts the playing field entirely in EB5's favor.

32. During the pendency of this case, EB5 has refused to fund any infrastructure and blocked other parties' efforts to do the same, openly admitting to the Wohali Concerned Owners that EB5 would do nothing for infrastructure development during the bankruptcy and then threatening the Trustee with a priming fight even if adequate assurance payments were included in another DIP proposal.

33. In short, the Debtor will effectively be shut down if the Motion is approved, causing immediate and irreparable harm to the value of the Debtor's estate and any collateral/sale value, to the detriment of all stakeholders, including the Wohali Concerned Owners. *Only EB5 will benefit*.

34. "A debtor cannot enter into a transaction that 'would amount to a *sub rosa* plan of reorganization' or an attempt to circumvent the chapter 11 requirements for confirmation of a plan of reorganization." *In Latam Airlines Gorup SA*, 620 B.R. 722, 812 (Bankr. S.D.N.Y. 2020) (quoting *Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 466 (2d Cir. 2007)); *see also In re Shubh Hotels Pittsburgh, LLC*, 439 B.R. 637, 644 (Bankr. W.D.Pa. 2010) ("Where a transaction has the effect of dictating the terms of a prospective chapter 11 plan, it will constitute a prohibited *sub rosa* plan."). "[A] bankruptcy court cannot, under the guise of section 364, approve financing arrangements that amount to a plan of reorganization but evade confirmation requirements." *Resolution Tr. Corp. v. Official Unsecured Creditors Comm. (In re Def. Drug Stores, Inc.)*,145 B .R. 312, 317 (9th Cir. BAP 1992); *In re Belk Props., LLC*, 421 B.R. 221, 226 (Bankr. N.D. Miss. 2009) (rejecting DIP

financing agreement that dictated terms of plan of reorganization); *In re Berry Good, LLC*, 400 B.R. 741, 746-48 (Bankr. D. Ariz. 2008) (holding that it was "not appropriate" to use the proceeds of a postpetition loan to pay the lender's prepetition debt in the absence of a confirmed plan)..

35.     Here, EB5's DIP facility obligates the Trustee to turn a blind eye to completing key infrastructure that has been started but not finished, ignoring key investigations (of itself, no less), and fast track the bankruptcy to the quickest fire sale possible.

36.     EB5 decided to hide its appraisal from the Court and other creditors and has muzzled the Trustee about what he can say about the appraisal. The Court should order its disclosure forthwith, as all parties in interest need to know how much the property is worth, especially because a low value as compared to what EB5 has lent is evidence of poor lending practices and a complete lack of oversight by EB5.

37.     Complete disclosure of who the five prospective DIP lenders where and their terms also is necessary to properly evaluate the Trustee's business judgment. (Three of the five term sheets are now available thanks to the Wohali Concerned Owners and DGB Investments' objections.)

38.     As the Trustee notes, his business judgment is entitled to deference "'so long as the financing arrangement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.'" [Dkt. # 158 at 23 (quoting *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990)). Such improper terms are precisely what EB5 has offered here.

39.     "Courts recognize that in connection with postpetition financing, lenders often exact favorable terms that may or may not have the effect of causing harm to the estate and

creditors." *In re Mid-State Raceway, Inc.,* 323 B.R. 40 (Bankr. N.D. N.Y. 2005). "While certain favorable terms may be permitted as a reasonable exercise of the debtor's business judgment, bankruptcy courts do not allow terms in financing arrangements that convert the bankruptcy process from one designed to benefit all creditors to one designed for the unwarranted benefit of the postpetition lender." *Defender Drug Stores*, 145 B.R. at 317.

40.     The business judgment standard may be satisfied "as long as the proposed action appears to enhance the debtor's estate." *Crystalin, LLC v. Selma Props. Inc.* (*In re Crystalin, LLC*), 293 B.R. 455, 463–64 (B.A.P. 8th Cir. 2003). The EB5 DIP terms do the opposite.

41.     The Wohali Concerned Owners submit that EB5's DIP budget will reduce rather than enhance the value of the estate because the provisions provide an unwarranted benefit for EB5, shielding EB5 from any inquiry and effectively dooming the sale process before it even starts.

42.     But EB5's lending model (in general and as applied here) is inconsistent with prudent lending practices because it encourages—*indeed, expressly requires*—spending on job creation without regard to oversight or cost control. A party who recklessly shoveled investor funds toward the Debtor and its affiliates should not be permitted now to steer this case into the reefs.

43.     This point is underscored by EB5's refusal and inability, during the pendency of these proceedings, to fund inarguably necessary payroll, even after EB5 said it would.

44.     "Property rights do not gain any absolute inviolability in the bankruptcy court because created and protected by state law. Most property rights are so created and protected. But if Congress is acting within its bankruptcy power, it may authorize the bankruptcy court to

affect these property rights, provided the limitations of the due process clause are observed." *Wright v. Union Central Life Ins. Co.*, 304 U.S. 502, 518 (1938).

45. Whatever EB5's interest in its collateral, "[t]he Bankruptcy Code, however, does not protect a secured creditor's upside potential; ***it protects the 'allowed secured claim.'*** If a creditor were over-secured, it could not demand to keep its collateral rather than be paid in full simply to protect the 'upside potential.'" *Bank of N.Y. Tr. Co., NA v. Official Unsecured Creditors' Comm.* (*In re Pac. Lumber*), 584 F.3d 229, 246 (5th Cir. 2009) (emphasis added). And if, as is the case at bar, the allegedly secured creditor states (without evidence) that it is undersecured, it is not entitled to kill the marketing and sales process in the crib by preventing the Trustee from getting infrastructure completed and online because that undersecured creditor wants that particular "upside potential" for itself post-bankruptcy. And that is precisely the motive that EB5's authorized representative, Mr. Schoenfeld, admitted to three Wohali Concerned Owners during a meeting on September 6, 2025.

46. Bankruptcy law "prevent[s] a party from receiving a windfall merely by reason of the happenstance of bankruptcy." *Butner v. United States*, 440 U.S. 48, 55 (1979). A secured creditors' property interest is not augmented by the debtor's bankruptcy petition. *See Mission Product Holdings, Inc. v. Tempnology, LLC*, 587 U.S. 370, 381 (2019).

47. Likewise, EB5's "[c]redit bidding rights are not without its limits." *In re CS Min., LLC*, 574 B.R. 259, 283 (Bankr. D. Utah 2017). Cause under § 363(k) "may be found to deny credit bidding if allowing lien holders to bid at a sale would benefit an insider, impede or delay a successful reorganization strategy, chill the bidding process, and reduce the overall benefits to the estate." *Id.*

48.     "Although the bankruptcy process provides debtors and creditors much latitude for negotiating and restructuring their relationships, the bankruptcy court retains the authority and obligation to ensure that the bankruptcy process progresses in a legally permissible fashion consistent with the Bankruptcy Code and Rules." *In re Gallegos Rsch. Grp. Corp.*, 193 B.R. 577, 583 (Bankr. D. Colo. 1995). "The notice requirements of 11 U.S.C. § 363(b) . . . are designed to protect creditors of the estate from financially unwise or overreaching postpetition transactions made by an operating debtor which would affect the creditors' ability to realize a distribution on their prepetition claims." *In re Git-N-Go, Inc.*, 322 B.R. 164, 175 n.12 (Bankr. N.D. Okla. 2004) (citing *In re Blehm Land & Cattle Co.*, 859 F.2d 137, 140 (10th Cir. 1988)).

49.     "Since 'value' is the linchpin of adequate protection, and since value is a function of many factual variables, it logically follows that adequate protection is a question of fact." *MBank Dallas, NA v. O'Connor* (*In re O'Connor*), 808 F.2d 1393, 1396 (10th Cir. 1987) (cleaned up). "A security interest is worth what it will bring at foreclosure." *In re Tenney Village Co.,* 104 B.R. 562, 565 (Bankr. D.N.H. 1989); *accord United Savings Ass'n v. Timbers of Inwood Forest Ass'n*, 484 U.S. 365, 369-73 (1988) (the "interest in property" entitled to protection is "the value of the collateral" that secures the claim).

50.     The purpose of adequate protection is to protect the secured lender from a diminution *in the value* of its collateral during the period in which it is prevented from foreclosing upon such collateral by the automatic stay. *See O'Connor*, 808 F.2d at 1396 (citing House Rep. No. 95-595, 95th Cong., 2d Sess. 53, *reprinted in* 1978 U.S.C.C.A.N. 5787, 5963, 6295). That purpose is defeated when it is that very same secured creditor that seeks to diminish the value of its collateral by mothballing it and stiffing the one party that preserved its value. *See id.* (Adequate protection is designed "to insure that the creditor receives the value for which the creditor

bargained prebankruptcy.") *Cf. Roth Steel Tube Co. v. Comm'r,* 620 F.2d 1176, 1182 (6th Cir. 1980) ("Where a debtor company continues to operate as a going concern the courts have often concluded that its debts are not worthless for tax purposes despite the fact that it is technically insolvent.").

51.     Moreover, adequate protection is designed to protect against a decline in a creditor's security interest, not to enable a prepetition secured creditor to improve on what it had prepetition. *See Gallegos Rsch. Grp.*, 193 B.R. 577, 584 (Bankr. D. Colo. 1995); *In re Reddington/Sunarrow Ltd. P'ship*, 119 B.R. 809, 813 (Bankr. D.N.M. 1990). The "[c]ourt is not obligated to protect the creditor better than it did itself when making the loan and obtaining security." *In re Heatron, Inc.,* 6 B.R. 493, 496 (Bankr. W.D. Mo. 1980). "The concept of adequate protection was not designed or intended to place an undersecured or minimally secured creditor in a better post-filing [position] that it was in before the stay." *In re Planned Systems, Inc.*, 78 B.R. 852, 862 (Bankr. S.D. Ohio 1987) (cleaned up).

52.     "In order to encourage the Debtors' efforts in the formative period prior to the proposal of a reorganization, the court must be flexible in applying the adequate protection standard." *O'Connor* 808 F.2d at 1398.

53.     "[V]aluation is not an exact science." *In re Centennial Park, LLC*, Case No. 11-22026, 2011 WL 5520968, at *2 (Bankr. D. Kan. Nov. 14, 2011) (cleaned up). "Depending on the purpose of the valuation, jurisdictions generally choose from four valuation dates: (1) the date of confirmation; (2) the date of the petition; (3) the date of the valuation hearing; or (4) the effective date of the plan." *In re Hales,* 493 B.R. 861, 864 (Bankr. D. Utah 2013). *Accord* 11 U.S.C. § 506(a)(1) ("value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of [the] property").

54.     "In a dispute concerning the amounts required to be paid pursuant to 11 U.S.C. § 362(d)(3)(B)(ii), the creditor will have the burden of establishing it has a secured interest in the property and the amount of its claim, and the debtor will have to demonstrate it timely made or proffered payments equal to the nondefault contract rate of interest on the value of the creditor's interest in the real estate." *In re RYYZ, LLC*, 490 B.R. 29, 37 (E.D.N.Y. 2013).

55.     "[W]hether payments to an undersecured creditor during the pendency of a case are made pursuant to Section 362(d)(3) or as adequate protection, they should be applied first to the principal amount of the debt." *In re S. Side House, LLC*, 474 B.R. 391, 418 (Bankr. E.D.N.Y. 2012); *see also* 3 Collier on Bankruptcy ¶ 362.07[5], at 362-70 (Alan N. Resnick & Henry J. Sommer eds., 16 ed.).

56.     The bankruptcy court has broad discretion "in arriving at valuations independent of any one expert's opinion." *In re Diamond Beach VP, LP,* 551 B.R. 590, 610 (S.D. Tex. 2016). In exercising that discretion, the bankruptcy court may "decide to credit or discredit, in whole or in part, the testimony of any expert witness, and decide the case on the evidence." *Id. See also In re Stockton Golf and Country Club*, 651 B.R. 39, 45 (Bankr. E.D. Cal. 2023) ("An appraisal may be rejected in its entirety when its value conclusion is based on assumptions fundamental to the conclusion that have no anchors in reality.").

57.     Such discretion cannot be exercised in the dark. The Court should order the release of EB5's appraisal and all five DIP term sheets and budgets.

58.     Finally, improvements that increase the value of the property can constitute adequate protection when the improvements are made in conjunction with the debtor's providing additional collateral beyond the contemplated improvements. *See, e.g., In re O'Connor,* 808 F.2d at 1396; *Bray v. Shenandoah Fed. Loan Sav. & Loan Ass'n* (*In re Snowshoe Co.*), 789 F.2d 1085,

1087-89 (4th Cir. 1986) (finding that ski resort would lose 50% to 90% of its fair market value if it ceased operations). Here, the Debtor does have additional property to pledge as a replacement lien that is not subject to EB5's lien. But the Trustee is prevented from that possibility by selecting EB5's DIP proposal.

## II. EB5's Prepetition Activity and Alleged Prepetition Lien Need to Be Thoroughly Investigated *by the Trustee*, Not Just Other Creditors on a Truncated Timeline.

59. Of great concern, EB5's DIP proposal forces an abbreviated case timeline, bars any meaningful investigation of the estate's claims, circumvents any valuation assessment or fight, and—shockingly—requires the Trustee to stipulate to the nature, amount, validity, extent, and priority of EB5's Prepetition Liens:

> Upon entry of the Interim Order, [that] the Trustee attests that Ampleo and his other advisors have conducted a reasonable investigation into the Prepetition Claim and the nature, amount, validity, extent, and priority of the Prepetition Liens and, upon the advice of counsel, and given the totality of the circumstances, … stipulates to the Prepetition Liens' asserted validity, extent, and priority and agrees, as set forth in greater detail elsewhere herein, to forgo any right to challenge the Prepetition Liens or the allowed amount of the Petition Date Claim.

[EB5 DIP Mot. at 17-18, Proposed Interim Order at 19]

60. In short, **the EB5 DIP proposal will remove *a statutory duty* of the Trustee to "investigate … any other matter relevant to the case or to the formulation of a plan," 11 U.S.C. §1106(a)(3), insofar as it relates to EB5**.

61. But the facts here indicate that EB5 is *not* a traditional lender or secured creditor meriting any such deference. Instead, the EB5 loan program under which EB5 operates and loaned money to the Debtor and its affiliates is inherently inconsistent with prudent lending practices because it strongly favors—in fact, requires—disbursements and resultant job creation with the goal of justifying visa issuance at the expense of cost control and oversight.

62.     The Wohali Concerned Owners are confident that, if investigated and prosecuted by the Trustee, EB5's prepetition conduct is likely to be deemed inequitable (or perhaps worse), meriting some, perhaps complete, avoidance of EB5's Prepetition Liens. Given what EB5 is and how obviously careless EB5 was with disbursing its investor's money, the Court need not, and should not, treat EB5 like any other prepetition secured creditor.

63.     More specifically, the Immigration and Nationality Act ("**INA**") authorizes the United States to issue visas "to qualified immigrants seeking to enter the United States for the purpose of engaging in a new commercial enterprise (including a limited partnership)," like EB5. 8 U.S.C. § 1153(b)(5). A foreign national investing in an enterprise seeking an "EB-5" visa must file an I-526 application with the United States Citizenship and Immigration Services ("**USCIS**") to prove that the investment will satisfy EB-5 program requirements. *See* 8 C.F.R. § 204.6(a), (j)(2). Approval results in conditional permanent resident status. Two years later, the investor may remove the conditions on lawful permanent resident status by filing an I-829 petition, demonstrating that the investment satisfied the EB-5 requirements and created, or will create within a reasonable period, ten qualifying jobs. *See id.* § 216.6.

64.     "**The EB-5 program is well known for its susceptibility to fraud and abuse**." *Mirror Lake Village, LLC v. Wolf,* 971 F.3d 373, 378 (D.C. Cir. 2020) (Henderson, J., concurring) (emphasis added); *see also Da Costa v. Immigr. Inv. Program Off.*, 643 F. Supp. 3d 1, 5 (D.D.C. 2022), *aff'd*, 80 F.4th 330 (D.C. Cir. 2023) ("Motivated in part by a desire to curb the corruption that had plagued regional centers for years, Senators Leahy and Grassley introduced the EB-5 Reform and Integrity Act.")

65.     To "invest" in a new commercial enterprise ("**NCE**"), the petitioner must "contribute capital." 8 C.F.R. § 204.6(e). "Capital," in turn, means "cash and all real, personal, or

mixed tangible assets owned or controlled by the alien investor[.]" 8 U.S.C. § 1153(b)(5)(D)(ii)(I); *see* 8 C.F.R. § 204.6(e) (similar); *see also In re Ho,* 22 I. & N. Dec. 206, 210 (B.I.A. 1998) (holding that the petitioner must establish (1) "that he has placed his own capital at risk, that is to say, he must show that he was the legal owner of the invested capital" and (2) "that he acquired the legal ownership of the invested capital through lawful means"). *Accord Zhou v. Noem,* No. 19-cv-2650, 2025 WL 416152, at *5-10 (D.D.C. Feb. 6, 2025).

66.     "To show that the petitioner has invested or is actively in the process of investing the required amount of capital, the petition must be accompanied by evidence that the petitioner has placed the required amount of capital at risk for the purpose of generating a return on the capital placed at risk. Evidence of mere intent to invest, or of prospective investment arrangements entailing no present commitment, will not suffice to show that the petitioner is actively in the process of investing. The alien must show actual commitment of the required amount of capital." 8 C.F.R. § 204.6(j)(2); *see also* 28 U.S.C. § 1153((b)(5)(F)(v) (allows new commercial enterprises within the United States for purposes of maintaining investors' "capital at risk").

67.     But a review of EB5's loan documents indicate that it took little risk—at least for itself. More importantly, a superpriority DIP loan under section 364 of the Code—which bears almost no risk—is fundamentally at odds with the EB-5 program's "at risk" requirement. *See also Matter of Izummi,* 22 I. & N. Dec. 169, 181 & 186-88 (BIA Assoc. Comm'r 1998) (petitioner's investment "cannot be said to be at risk because it is guaranteed to be returned, regardless of the success or failure of the business" because a redemption agreement entered into at the time of an investment "evidences a preconceived intent to unburden oneself of the

investment as soon as possible after unconditional permanent resident status is attained" and therefore the investment is not at risk.)

68. Additionally, at least one circuit has held that NCE EB-5 investments are securities and subject to the SEC's oversight and purview. *See, e.g., SEC v. Liu,* 754 Fed. Appx. 505, 507 (9th Cir. 2018), *vacated on other grounds,* 140 S. Ct. 1936 (2020). This is likely why EB5 filed a Schedule D with the SEC.

69. If ten (10) full-time jobs have not actually been created at the time of application, the I-526 petition must be accompanied by "a comprehensive business plan showing that . . . the need for not fewer than ten (10) qualifying employees will result . . . within the next two years." 8 C.F.R. § 204.6(j)(4)(B). This comprehensive "business plan must be credible" and the government need not rely on conclusory assertions. *In re Ho,* 22 I. & N. Dec. at 212.

70. This explains why the Loan Agreement between EB5 and the Debtor contained "job creation" (of 10 EB-5 eligible jobs per $800,000 invested) as a material condition precedent of that Loan Agreement.

71. And this also highlights the inherent tension between prudent real estate and development lending practices—which include careful loan administration and clear procedures for construction inspections, loan disbursements, collateral administration, and the like—and the goals of the EB-5 loan program and EB5's loan to the Debtor herein to maximize disbursements and job creation to yield visas for the foreign national investors.

72. Under Utah law, "a duty of a lender can be found when lender involvement goes beyond a traditional role or where the lender misrepresents materials facts to . . . third parties." *DeBry v. Valley Mortg. Co.,* 835 P.2d 1000, 1003 (Utah Ct. App. 1992). "Where 'special

25

circumstances' exist between a lender and a third party, courts have found a duty on the lender's part to reveal certain material facts." *Id.* at 1007 (cleaned up).

73. The EB-5 loan program clearly goes beyond traditional lender roles and creates special circumstances. But whether and to what extent, for example, EB5 directed or knew the Debtor or its affiliates were using loan proceeds to grossly overpay a club chef a whopping $350,000 annually plus cush benefits so another of EB5's investor's visa application could be pushed through may never be known by the Court if EB5 has its way.

74. These facts cry out for a fulsome investigation of EB5's prepetition activities and nature, extent, and priority of its Prepetition Claim. Only the Trustee has a full quiver of arrows at his disposal to undertake this task currently.[4] But if the EB5 DIP Motion is granted, the Trustee literally will be foreclosed from conducting any such investigation.

75. And, by foreclosing any Trustee investigation of EB5, the EB5 DIP proposal circumvents the Trustee's control of the case and potentially removes considerable value from the estate that could benefit numerous other creditors, not just EB5.

76. Courts, however, rightfully frown upon such limitations of trustees and debtors, as this Court should as well. *See, e.g.*, *In re Marvel Enter. Group, Inc.*, 140 F.3d 463, 471 (3d Cir. 1998) ("The debtor in possession is a fiduciary of the creditors and, as a result, has an obligation to refrain from acting in a manner which could damage the estate, or hinder a successful reorganization"); *In re Innkeepers USA Trust*, 442 B.R. 227, 235 (Bankr. S.D.N.Y. 2010) (debtors

---

[4] If EB5 and the Court will not permit the Trustee to have sufficient funds to investigate the prepetition conduct of the Debtor, EB5, and the PID, then the Court must empower the Wohali Concerned Owners to do so. *See, e.g., In re Roman Catholic Bishop of Great Falls, MT*, 585 B.R. 335, 338-41 (Bankr. D. Mont. 2018) (citing and applying *In re Yellowstone Mountain Club, LLC,* 2009 WL 982207 *6 (Bankr. D. Mont. 2009); *In re Valley Park, Inc.*, 217 B.R. 864, 866 (Bankr. D. Mont. 1998)).

should have "a wide berth to fulfill their fiduciary duties to conduct a plan process which maximizes value for all the estates and treats the various [interests of creditors and equity holders of each Debtor] with greater neutrality[.]"); *Tenney Vill. Co., Inc.*, 104 B.R. at 569 (rejecting DIP financing proposal when, among other things, "the execution of the Financing Agreement violates the Debtors' fiduciary obligations to the estate," noting "the general mandate of the Bankruptcy Code is clear. The Debtors' pervading obligation is to the bankruptcy estate and, derivatively, to the creditors who are its principal beneficiaries"); *Mid-State Raceway,* 323 B.R. at 59  (noting "[c]ourts recognize that in connection with post-petition financing, lenders often extract favorable terms that may or may not have the effect of causing harm to the estate and creditors . . . **bankruptcy courts do not allow terms in financing arrangements that convert the bankruptcy process from one designed to benefit all creditors to one designed for the unwarranted benefit of the post-petition lender**") (emphasis added) (quoting *Defender Drug Stores*, 145 B.R. at 317)).

### III.     THE TRUSTEE HAS FAILED TO MEET HIS BURDEN OF PROVING THAT EB5 IS A GOOD FAITH DIP LENDER.

77.     The EB5 DIP Motion asks the Court to deem EB5 a good faith lender under Section 364(e). The Court, however, should find that the Trustee has failed to meet his burden of proving that EB5 is a good faith lender or, at the very least, reserve any finding of good faith to the final hearing.

78.     "Section 364(e) provides that a lender is protected from the effects of a reversal or modification on appeal of an authorization to obtain credit or incur debt under section 364, or of a grant of a priority or a line in such a financing, *if the lender acted in good faith*." 3 Collier on Bankruptcy ¶ 364.05[2] (Alan N. Resnick & Henry J. Sommer eds., 16 ed.). (emphasis added).

Thus, an express finding of good faith is required before the protections of Section 364(e) are applicable. *See In re Revco D.S., Inc.*, 901 F.2d 1359, 1366 (6th Cir. 1990).

79.     The Bankruptcy Code, however, does not define good faith. The concept of good faith is derived from former Bankruptcy Rule 805. *See* 3 Collier on Bankruptcy ¶ 364.06[2] (15th ed. rev. 2007) (good faith requirement under Rule 805 speaks to integrity of the parties' conduct during the course of the proceeding (citing *In re Suchy*, 786 F.2d 900 (9th Cir. 1985))).

80.     Importantly, the issue of good faith is a question of fact that should not be presumed, and the party seeking to establish good faith bears the burden of proof. *See*, *e.g.*, *In re Colad Grp., Inc.*, 324 B.R. 208, 225 (Bankr. W.D.N.Y. 2005) (finding that debtor failed to carry affirmative burden to establish good faith of the proposed financing transaction; the presence of offensive terms and conditions in the financing agreement created uncertainty as to lender's intent and rendered inappropriate a finding of good faith); *Revco D.S.*, 901 F.2d at 1366 (good faith under § 364(e) "should not be presumed"); *In re Tamojira, Inc.*, 212 B.R. 824, 826 (Bankr. E.D. Va. 1997) (same).

81.     Where, as here, the Court is authorizing the post-petition financing on an interim basis, "[a]ny finding of good faith is more appropriately made with the benefit of testimony and argument after reversal or modification on appeal." *Colad*, 324 B.R. at 225.

82.     "Determination of 'good faith' is a mixed determination of fact and law." *Revco D.S.,* 901 F.2d at 1366. The Court cannot make this determination unless and until the Trustee's shackles are loosened. It should not fall on the Wohali Concerned Owners to investigate this on their own dime.

83.     As detailed below, the Trustee fails to meet his burden for three separate reasons.

84. <u>First</u>, case law is clear that a lender fails to act in good faith where it acts with an economically "interested" purpose and that "[a]n extension of credit having … an ulterior purpose is not in good faith within the meaning of section 364(e)." *In re EDC Holding Co.*, 676 F.2d 945, 949 (7th Cir. 1982) (holding that the DIP lender was not a disinterested lender but a settling litigant that saw an opportunity to reduce the cost of settlement).

85. The Wohali Concerned Owners have presented evidence via the Ehman, Heckler, and Goldthrop Declarations that EB5 is not disinterested and instead has an ulterior purpose with its proposed DIP loan: to wit, *to intentionally avoid urgently needed infrastructure that would greatly improve the value of the estate while simultaneously fast tracking these proceedings to a fire sale where EB5 will be the only (and successful) bidder so that EB5 can thereafter partner with a new developer and reap the gains of finishing the infrastructure at that later time, to the ultimate detriment of all other creditors to these proceedings*.

86. Another ulterior motive is obvious from the restrictions placed on the Trustee noted above vis-à-vis any investigation of EB5: *to wit, to shield EB5's prepetition activities and Prepetition Claim from any meaningful scrutiny*.

87. <u>Second</u>, "[w]here it is evident from the loan agreement itself that the transaction has an intended effect that is improper under the Bankruptcy Code," credit is not being extended in good faith. *In re EDC Holding Co.*, 676 F.2d at 948. "Knowledge of the illegality of a transaction also defeats good faith." *In re Adams Apple, Inc.*, 829 F.2d 1484, 1487-89 (9th Cir. 1987) (citations omitted).

88. Here, if the Court grants the EB5 DIP Motion, the order may very well violate federal law because, on its face and without more, the EB5 DIP loan could be illegal and violate the law governing the EB-5 loan program. The Trustee and EB5 have failed to provide the

29

necessary details in that regard, not even mentioning the EB-5 loan program and its governing statutes, regulations, and policy in the E5 DIP Motion.

89.     Of particular relevance, the USCIS Policy Manual, Vol. 6, Part G (Investors), Ch. 2 (Immigrant Petition Eligibility Requirements), states that, "[i]n cases with a separate job-creating entity or entities, the payment of administrative fees, management fees, [and] attorneys' fees, . . . and other types of expenses or costs by the new commercial enterprise that erode the amount of capital made available to the job-creating entity **do not count** toward the minimum required investment amount." *See* https://www.uscis.gov/policy-manual/volume-6-part-g-chapter-2 (emphasis added) (citing *In re Matter of Izummi* (PDF), 22 I&N Dec. 169, 178-79 (Assoc. Comm. 1998) (last visited November 18, 2025).

90.     EB5's DIP budget, however, includes several items totaling $1,404,622 for professional fees of the U.S. Trustee, the Trustee, the Trustee's Financial Advisors, and the Trustee's Attorney that appear to clearly exceed the USCIS policy just mentioned. And, it is unclear whether the $3.3 million "assessment" payable to the PID violates the USCIS guidelines as well.

91.     The Declaration of Michael Schoenfeld filed in support of EB5's DIP loan offers no help in this regard, instead creates more questions, and never says that the proposed EB5 DIP loan complies with federal law governing the EB-5 loan program. [Dkt. # 164¶¶ 2-6, 13-18]

92.     The Court should thus deny the EB5 DIP Motion because the Trustee has failed to provide any evidence showing compliance with federal law governing the EB-5 loan program.

93.     Third, EB5 has an abysmal pre- and post-petition record that belies good faith.

94.     EB5 has admitted it has engaged in at least one avoidable action—the recordation of UCC-1 within the preference period even though it had not advanced funds for months.

95. And, the last time EB5 told the parties it would cover payroll, it failed to perform. Weeks went by and employees left. [Dkt. # 139 at 7] Once again, the Wohali Concerned Owners were asked to pay up but only permitted to be repaid on an administrative expense-basis. Now EB5 will not repay for the preservation of its collateral.

96. EB5 turned around and refused to permit those payroll advances to be repaid, noting that the estate is administratively insolvent to boot. [Dkt. # 117 at 2 ("At least as things currently stand, the Chapter 11 Case is administratively insolvent, with postpetition expenses necessary to preserve and protect the estate having been paid by the Wohali Concerned Owners and EB5.")]

97. Finally, EB5's obvious complete lack of controls and supervision of the disbursement and expenditures of its loan proceeds is striking, and stands in stark contrast with traditional or even hard money lenders. Again, this is likely because EB5's incentives were not aligned with responsible lending. Rather, it was trying to get as many investors as possible visas.

## IV. EB5 IS NOT ENTITLED TO A POST-PETITION LIEN ON ALL THE DEBTOR'S REAL PROPERTY.

98. In its discretion, the Court may reject all or some of financing terms to the extent that term sheet "contains terms and conditions which exceed the nature and function of adequate protection" and instead "are designed to affect the course of the reorganization process and as a consequence may affect all creditors." *Gallegos Rsch. Grp.*, 193 B.R. at 586.

99. One key aspect the Court should reject is EB5's effort to convert its avoidable preference into an improper post-petition lien on items it ordinarily would not be entitled to receive.

100. "[T]he key to a golf club's generation of income is due to the regular planting, seeding, mowing, repositioning holes, watering, fertilizing, and maintaining the golf course." *In*

*re Premier Golf Props., LP*, 477 B.R. 767, 774 (9th Cir. BAP 2012). This is why Courts have repeatedly held that postpetition revenues from a golf course, such as greens fees, cart rental charges, and membership fees are not cash collateral within the meaning of section 552(b). *See, e.g., In re McKim*, 217 B.R. 97 (Bankr. D.R.I. 1998) (membership fees collected by debtors constituted prepaid greens fees for the use of the facility and the services provided by the debtors, and were not subject to the 552(b) exception); *In re Everett Home Town Ltd. P'Ship*, 146 B.R. 453, 458 (Bankr. D. Ariz. 1992) (payments for green fees, tennis fees, cart fees, meals lessons and merchandise were related more to the use services provided by the debtor than the underlying collateral and therefore were not proceeds of the lender's prepetition collateral under 552(b)); *In re GGVXX Ltd.*, 130 B.R. 322, 326 (Bankr. D. Colo. 1991).

101. This is because golf course revenues are analogous to "income generated by a restaurant or retail store, which although produced in part by the use of the real property upon which business is conducted, the income is not proceeds of the property but the result of the services provided." *GGVXX*, 130 B.R. at 326. *See also Premier Golf Props.*, 477 B.R. at 776 ("Revenue generated post-petition solely as a result of a debtor's labor is not subject to a creditor's pre-petition interest. Section 552(b) is intended to cover after-acquired property that is directly attributable to prepetition collateral, without addition of estate resources."); *Everett Home Town*, 146 B.R. at 456 ("Certain revenues at the Club, namely green fees, cart fees, restaurant revenue, tennis fees and pro shop revenue, appear to not fit within any of the Section 552(b) exceptions.").

102. Yet, EB5 has extracted a post-petition lien on such revenue sources from the Trustee, all while limiting the Trustee from being able to investigate or challenge EB5's prepetition mis-adventures. Other courts have rejected this. *See Tenney Village*, 104 B.R. at 568-

69 (finding cap on fees created an economic incentive to avoid bringing actions against lenders in disregard of fiduciary duties toward the estate, and therefore refusing to approve post-petition financing that included the cap).

## OTHER OBJECTIONS

1.      The Wohali Concerned Owners join in the objections to the EB5 DIP loan and EB5 DIP Motion raised in the DGB Investment's Objection. [Dkt. # 166]

2.      The Wohali Concerned Owners expressly reserve all rights, claims, defenses, remedies, and other objections, including, without limitation, to supplement and amend this Objection, to raise further and other objections to the EB5 DIP Motion and the proposed form of Interim Order and/or Final Order, and to introduce evidence prior to or at any hearing regarding the EB5 DIP Motion in the event the Wohali Concerned Owners' objections are not acceptably resolved prior to such hearing.

Dated:   November 18, 2025           Respectfully submitted,
         Salt Lake City, UT          /s/ David P. Billings
                                     David P. Billings
                                     Fabian VanCott

                                     *Attorneys for Wohali Concerned Owners*

# <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 18 2025, I caused a copy of the foregoing **WOHALI CONCERNED OWNERS' OBJECTION TO CHAPTER 11 TRUSTEE'S MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE TRUSTEE TO (A) OBTAIN POSTPETITION FINANCING FROM EB5AN WOHALI UTAH FUND XV, LP, (B) UTILIZE CASH COLLATERAL, AND (C) PAY THE WOHALI PUBLIC INFRASTRUCTURE DEVELOPMENT 2025 ASSESSMENT, (II) GRANTING LIENS AND PROVIDING CLAIMS WITH SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (III) MODIFYING THE AUTOMATIC STAY, (IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF** shall be served to the parties in the manner designated below:

**By Electronic Service**: On the parties of record in Case No. 25-24610, who are registered CM/ECF users.

/s/ David P. Billings

EHXHIBIT 1

David P. Billings (11510)
FABIAN VANCOTT
95 South State Street, Suite 2300
Salt Lake City, Utah 84111
Telephone: (801) 531-8900
dbillings@fabianvancott.com
*Attorneys for the Wohali Concerned Owners*

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF UTAH

| | |
|---|---|
| In re: | Case No. 25-24610 |
| Wohali Land Estates, LLC, | Chapter 11 |
| Debtor | Judge Peggy Hunt |

### DECLARATION OF BRIAN EHMAN

I, Brian Ehman, under penalty of perjury, do hereby depose and state:

1.      I am over eighteen years of age and am otherwise competent to make this declaration.

2.      I am a part-time resident of Wasatch/Summit County, State of Utah.

3.      I own Lot 67 within Wohali Land Estates, LLC (the "**Debtor**") and am a member of the Wohali Concerned Owners group in these bankruptcy proceedings.

4.      I understand that Clayton (Clay) Heckler, through General Hancock Enterprises LA, LLC, owns Lots 2 and 66 at Wohali and is a member of the Wohali Concerned Owners.

5.      I understand that Benjamin (Ben) Goldthrop and his wife Stephanie are the owners of Lot 71 at Wohali and also members of the Wohali Concerned Owners.

6.      On September 6, 2025, Mr. Heckler and Mr. Goldthrop informed me they had run into Michael Schoenfeld, whom I understand is an authorized representative of an alleged

1

secured creditor in these bankruptcy proceedings, EB5AN Wohali Utah Fund XV, LP ("**EB5**"), while playing golf at the Debtor's property the previous day. The three of us invited Mr. Schoenfeld to join us at the Sage Restaurant within the Promontory Club in Park City, which he did.

7. I also understand that, in addition to being an authorized representative of EB5, Mr. Schoenfeld is both the owner of Lot 72 and a member of the golf club within the Debtor's property.

8. I further understand that EB5 has what it alleges is a secured lien on substantially all, but not all, of Debtor's real property. I also am informed and believe that EB5's lien, if enforceable, is junior to that of the Wohali Public Improvement District Nos. 1 & 2 (collectively, the "**PID**").

9. And I understand that EB5 is a limited partnership funded by proceeds received from a group of foreign national investors qualified to participate in a securities offering conducted in connection with the EB-5 Immigrant Investor Program administered under the Immigration and Nationality Act, which is commonly known as the "EB-5 loan program" and which I understand has the purpose of granting lawful permanent resident status (via a green card) to foreign investors who invest in a U.S. commercial enterprise, create at least 10 jobs for U.S. workers, and meet specific investment amount requirements. I am not an attorney, but I am informed and believe that participants of an EB-5 loan program have very strict guidelines, set by federal statute, regulations, and policy, about how EB-5 investments can be spent.

10. I have looked at the copy of the August 11, 2022 Loan Agreement between Debtor and EB5 that EB5 that has been filed with Court herein and note that the Recitals on

page 1 of that Loan Agreement show that EB5 is functioning under the federal EB-5 loan program.

11. During our meeting at Promontory Club on September 6, 2025, Mr. Schoenfeld discussed with us matters related to the bankruptcy, the Debtor, EB5, and possible DIP financing.

12. We informed Mr. Schoenfeld that our group was interested in providing DIP financing in the bankruptcy so that, among other things, key infrastructure could be completed to protect the lot owners and add value to the estate.

13. Mr. Schoenfeld responded that EB5 would only contribute approximately $3 million and was willing to pay only for the bare "minimum necessary" to facilitate getting the estate to an auction/sale as soon as possible so that EB5 could credit bid and acquire all the Debtor's property. He further flatly stated that EB5 would not invest in infrastructure as part of any DIP, limiting expenditures to the minimum payroll and winterization required.

14. Mr. Schoenfeld also told us that EB5 intends to find a new developer to partner with post-sale.

15. Above all, Mr. Schoenfeld said, EB5 wanted to continue distributing foreign nationals' investments because, in his words, "it's like free money" because it is very low (or possibly no) interest. He explained that EB5 has "got five years until we have to pay anything back; so, we're not worried." Mr. Schoenfeld indicated that EB5's limited partners expect repayment of their approximately $800,000 investments without (or with little) interest, while obtaining visas and recovering their funds within five years.

16. As a Canadian, this comment stuck with me.

17. It was clear to me at our meeting with Mr. Schoenfeld that EB5's primary, if not sole, goal is and remains to continue to advance funds with the objective of creating jobs that will lead to the issuance of visas to EB5's limited partners, not to improve or maintain the resort as designed and envisioned.

18. And it was clear to me at our meeting with Mr. Schoenfeld that EB5's goal with its DIP proposal would be to set up the bankruptcy proceedings so that EB5—and only EB5—could acquire the Debtor's property at any auction/sale. EB5 definitely was not interested in participating in and losing any competitive bidding with a different purchaser. It was clear to me that EB5 wants to keep the money and visas flowing.

19. Wohali Concerned Owners are and have been primarily interested in preserving and improving the value of the estate so that it can be marketed and sold to the highest bidder at a competitive future sale, hopefully to a bidder who wants to improve and finish the resort consistent with its original vision, or close to it.

20. To that end, Wohali Concerned Owners have funded, post-petition, approximately $650,000 for payroll for golf course and club workers post-petition to preserve the value of Debtor's estate. These infusions allowed the golf course to continue to operate and maintain its value. Without those funds, the Debtor/Trustee would have been unable to pay golf course and club personnel, and many key employees likely would have left and found employment elsewhere. In fact, a few did leave during the interregnum between the Debtor and the Trustee because EB5 failed to make payroll as it had promised to do, but did not.

21. Absent payment to golf course maintenance personnel, the greens, fairways, and other portions of the golf course would not have been properly maintained in August, September, and October. The greens, fairways, and other grass areas on the golf course almost

certainly would have dried out and turned brown in August (and perhaps died), which would have had a significantly negative impact on continued efforts to develop the overall project and sell additional lots and which as a result would have significantly devalued the Debtor's estate even further.

22. In my opinion, the funds for payroll provided by Wohali Concerned Owners postpetition were necessary to preserve and maintain the value of the Wohali golf course and provided a significant benefit to the PID, EB5, the Debtor, and Debtor's estate by keeping its golf course and club from falling into a state of disrepair had key personnel not been paid and left.

23. Yet, Mr. Schoenfeld (and now EB5 in its DIP proposal) has made clear to us that EB5 has no intention of repaying the ~$650,000 the Wohali Concerned Owners advanced, unless the Trustee can somehow recover funds from elsewhere and even though those payments benefitted the estate as well as EB5.

24. I reviewed the budget and DIP term sheet prepared by Mr. Goldthrop, which our attorney presented to the Trustee's attorney. As part of that proposal, a subset of the Wohali Concerned Owners (of which I am also a member) offered to make § 362(d)(3)(B)(ii) adequate protection payments to EB5 as part of their DIP term sheet and budget, as well as making the PID payment, and investing appropriately $ 3 million into completing woefully needed infrastructure that should have been completed long ago. I believe that, without these additional funds from what EB5 proposed, the Trustee will be unable to conduct a truly competitive sale and auction process needed to generate value and instead will simply sell the Debtor's property to EB5 at whatever amount it credit bids.

25.      Moreover, our DIP proposal provided funds for various investigations, including into EB5 and its lending practices, which seems more than warranted given that EB5 claims an almost $90M lien yet Mr. Schoenfeld in his Declaration concedes "that the value of the Debtor's assets does not come close to exceeding the amount of EB5's Prepetition Claim." How can this be possible if EB5 followed prudent lending practices? I believe it cannot and that, instead, EB5 was complicit in having the Debtor and/or its affiliates receive EB5's money and push it out the door with little, if any, oversight and confirmation because the result would be money spent, jobs created, and visas issued to EB5's limited partners. I believe this shows poor business judgment, abnormal lending practices, and inequitable conduct that undermines EB5's alleged secured claims.

26.      Finally, to be clear, other than being a lot owner and member of the golf club, I am not otherwise affiliated with, employed by, an owner of, or invested in the Debtor, its affiliates, or EB5 or its known affiliates.

I declare under penalty of perjury of the laws of the United States that that foregoing is true and correct to the best of my knowledge.

DATED this 18  day of November, 2025.

_____
Brian Ehman

4923-4352-2426, v. 2

EXHIBIT 2

David P. Billings (11510)
FABIAN VANCOTT
95 South State Street, Suite 2300
Salt Lake City, Utah 84111
Telephone: (801) 531-8900
dpayne@fabianvancott.com

*Attorneys for the Wohali Concerned Owners*

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF UTAH

| In re: | Case No. 25-24610 |
|---|---|
| Wohali Land Estates, LLC, | Chapter 11 |
| Debtor | Judge Peggy Hunt |

## DECLARATION OF CLAYTON HECKLER

I, Clayton Heckler, under penalty of perjury, do hereby depose and state:

1.    I am over eighteen years of age and am otherwise competent to make this declaration.

2.    I am a resident of Wasatch/Summit County, State of Utah.

3.    Through General Hancock Enterprises LA, LLC, I own Lots 2 and 66 within Wohali Land Estates, LLC (the "Debtor") and am a member of the Wohali Concerned Owners.

4.    On September 5, 2025, Ben Goldthrop (owner of Lot 71, and a fellow member of the Wohali Concerned Owners) and I were playing golf at the Debtor's property, and ran into Michael Schoenfeld.

1

5.      Mr. Goldthrop and I began chatting with Mr. Schoenfeld about the bankruptcy case and we invited him to have lunch/ drinks with us the following day at the Promontory Club in Park City, where Mr. Goldthrop and I are also members. Mr. Schoenfeld agreed to join us, as well as Brian Ehman (Owner of Lot #67 and another Wohali Concerned Owner).

6.      I have reviewed the declarations Mr. Goldthrop and Mr. Ehman and share their recollections of the conversation during that lunch meeting.

7.      I also agree with Mr. Ehman's assessment of EB5's motivations and lending practices.

8.      Mr. Ehman's testimony regarding the Wohali Concerned Owners' payroll advances, the impact they had on the estate, as well as our budget and DIP term sheet is also correct.

9.      His declaration regarding the Wohali Concerned Owners' payroll advances, the impact they had on the estate, as well as our budget and DIP term sheet is also correct.

10.      Like Mr. Ehman and Mr. Mr. Goldthorp, other than being a lot owner and member of the golf club, I am not otherwise affiliated with, employed by, an owner of, or invested in the Debtor, its affiliates, or EB5.

I declare under penalty of perjury of the laws of the United States that that foregoing is true and correct to the best of my knowledge.

DATED this _18_ day of November, 2025.



_____
Clayton Heckler

EXHIBIT 3

David P. Billings (11510)
FABIAN VANCOTT
95 South State Street, Suite 2300
Salt Lake City, Utah 84111
Telephone: (801) 531-8900
dbillings@fabianvancott.com
*Attorneys for the Wohali Concerned Owners*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF UTAH**

| | |
|---|---|
| In re: | Case No. 25-24610 |
| Wohali Land Estates, LLC, | Chapter 11 |
| Debtor | Judge Peggy Hunt |

**DECLARATION OF BENJAMIN GOLDTHROP**

I, Ben Goldthrop, under penalty of perjury, do hereby depose and state:

1.     I am over eighteen years of age and am otherwise competent to make this declaration.

2.     I am a resident of Bucks County, Commonwealth of Pennsylvania.

3.     I own Lot 71 within Wohali Land Estates, LLC (the "Debtor") and am a member of the Wohali Concerned Owners.

4.     On September 5, 2025, Clayton (Clay) Heckler (owner of Lots 2 and 66 through General Hancock Enterprises LA, LLC and a fellow member of the Wohali Concerned Owners) and I were playing golf at the Debtor's property, and ran into Michael Schoenfeld.

5.     Mr. Heckler and I began chatting with Mr. Schoenfeld about the bankruptcy case and we invited him to have lunch / drinks with us the following day at the Promontory Club in

1

Park City, where Mr. Heckler is a member. Mr. Schoenfeld agreed to join us, as well as Brian Ehman (Owner of Lot #67 and another Wohali Concerned Owner).

6. I have reviewed the declaration of Mr. Ehman and agree with his recollections of the conversation during that lunch meeting.

7. Having reviewed Mr. Ehman's declaration, I also agree with him about his assessment of EB5's motivations and lending practices.

8. I also concur with Mr. Ehman's testimony regarding the Wohali Concerned Owners' payroll advances, the impact they had on the estate, as well as our budget and DIP term sheet, which I prepared.

9. Like Mr. Ehman, other than being a lot owner and member of the golf club, I am not otherwise affiliated with, employed by, an owner of, or invested in the Debtor, its affiliates, or EB5.

I declare under penalty of perjury of the laws of the United States that that foregoing is true and correct to the best of my knowledge.

DATED this 18 day of November, 2025.

_____
Ben Goldthrop

4930-4003-9034, v. 2

4930-4003-9034, v. 2

EXHIBIT 4

David P. Billings (11510)
Douglas J. Payne (04113)
FABIAN VANCOTT
95 South State Street, Suite 2300
Salt Lake City, Utah 84111
Telephone: (801) 531-8900
dbillings@fabianvancott.com
dpayne@fabianvancott.com

*Attorneys for the Wohali Concerned Owners*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| In re: | Case No. 25-24610 |
| Wohali Land Estates, LLC, | Chapter 11 |
| Debtor | Judge Peggy Hunt |

## DECLARATION OF ERNIE WAKABAYASHI
## IN SUPPORT OF ADMINISTRATIVE EXPENSE CLAIMS
## OF WOHALI CONCERNED OWNERS

Ernie Wakabayashi, under penalty of perjury, do hereby depose and state:

1.      I am over eighteen years of age and am otherwise competent to make this declaration.

2.      I am a resident of Wasatch/Summit County, State of Utah.

3.      I own Lot 9 within Wohali Land Estates, LLC (the "Debtor") and am a member of the Wohali Concerned Owners.

4.      I have a home that is and has been under construction on Lot 9. Here is a recent photo:

1



5. Unfortunately, water and sewer are supposedly connected to my property, but have been told they cannot be used and may not be approved by the City of Coalville, at least not for some time.

6. Also unfortunately, no electricity (or internet or cable service) is currently available to my property.

7. And I have no propane gas service to my property, meaning there is no ability to heat or cool my house, cook, bathe/shower, etc.

8. My under construction, unfinished home is now caught in the morass of Debtor's bankruptcy, and I am deeply concerned with the lack of utilities given the fast-approaching winter.

9. I also understand that Wohali Resort, Inc. ("Resort") and Wohali Master Owners Association ("WMOA"), which I believe are two other affiliates of the Debtor, employ all those that work to maintain the golf course and resort. While my house is unfinished, I still play golf on the Debtor's course frequently.

10. The golf course located on the Debtor's property, which I understand is an asset of the Debtor's estate, is a key factor in the Wohali development and has historically been a key factor in selling residential lots and attracting investors.

11. I know that the golf course located on property owned by the Debtor is operated by Resort pursuant to a 25-year lease agreement with the Debtor dated March 11, 2024. I recently obtained and saw a copy of that Lease.

12. From the bankruptcy and discussions I have had before and after that filing in recent months, I have come to understand that the income of Wohali Land Estates has been

insufficient to provide the level of funding necessary to adequately maintain the golf course and club.

13. Moreover, without an infusion of cash in August by a group of property owners called Wohali Concerned Owners, of which I am a member, there would have been insufficient cash to make payroll and pay workers who maintain the golf course and club. Workers almost certainly would have left the club as a result of non-payment, which would have been a terrible result for the golf course and the value of the golf course.

14. As a lot owner with a home under construction, I am keenly aware of the need to preserve the golf course and its value so that the community is not irreparably harmed going forward.

15. Wohali Concerned Owners funded approximately $160,000 for payroll for golf course and club workers for August 14th payroll and approximately $130,000 for August 28th payroll. These infusions allowed the golf course to continue to operate and preserved its value. Without those funds, the Debtor would have been unable to pay golf course and club personnel, and many likely would have left and found employment elsewhere.

16. Absent payment to golf course maintenance personnel, the greens, fairways, and other portions of the golf course would not have been properly maintained in August. The greens, fairways, and other grass areas on the golf course almost certainly would have dried out and turned brown in August (and perhaps died), which would have had a significantly negative impact on continued efforts to develop the overall project and sell additional lots.

17. In my opinion, the funds for payroll provided by Wohali Concerned Owners in August 2025 were necessary to preserve and maintain the value of the Wohali golf course and

make payroll and pay workers who maintain the golf course and club. Workers almost certainly would have left the club as a result of non-payment, which would have been a terrible result for the golf course and the value of the golf course.

14 As a lot owner with a home under construction, I am keenly aware of the need to preserve the golf course and its value so that the community is not irreparably harmed going forward.

15 Wohali Concerned Owners funded approximately $160,000 for payroll for golf course and club workers for August 14th payroll and approximately $130,000 for August 28th payroll. These infusions allowed the golf course to continue to operate and preserved its value. Without those funds, the Debtor would have been unable to pay golf course and club personnel, and many likely would have left and found employment elsewhere.

16 Absent payment to golf course maintenance personnel, the greens, fairways, and other portions of the golf course would not have been properly maintained in August. The greens, fairways, and other grass areas on the golf course almost certainly would have dried out and turned brown in August (and perhaps died), which would have had a significantly negative impact on continued efforts to develop the overall project and sell additional lots.

17 In my opinion, the funds for payroll provided by Wohali Concerned Owners in August 2025 were necessary to preserve and maintain the value of the Wohali golf course and provided a significant benefit to the Debtor and Debtor's estate by keeping its golf course and club from falling into a state of disrepair had key personnel not been paid and left.

18 Additionally, I have reviewed the 13-week budget and DIP term sheet drafted by Ben Goldthorp of our group and believe that without these additional funds, any value of the Debtor's assets will be destroyed as neither the Debtor, Builder, Resort, nor WMOA have the ability to make payroll, let alone complete the necessary infrastructure to enable my home to be connected to basic utilities.

19 Finally, to be clear, other than being a lot owner and member of the golf club, I am not otherwise affiliated with, employed by, an owner of, or invested in the Debtor, Builder, Resort, or WMOA.

I declare under penalty of perjury of the laws of the United States that that foregoing is true and correct to the best of my knowledge.

DATED this 10 day of September, 2025.

_____
Ernie Wakabayashi

EXHIBIT 5

4937-0399-1162, v. 3

# INDICATIVE TERMS FOR CHAPTER 11 CREDIT FACILITY
## WOHALI LAND ESTATES, LLC

*The following summary of indicative terms and conditions (the "Term Sheet") is not legally binding and is presented for discussion purposes only. All transactions contemplated below are subject to due diligence, internal approvals, and appropriate documentation acceptable to all applicable parties in their sole discretion. Except as may be set forth in a potential future written agreement that expressly states it is legally binding, no person or entity shall have any commitment or liability based on any failure to agree to the transactions contemplated by this Term Sheet or any past, present or future action or omission, course of dealing or conduct.*

| | |
|---|---|
| **Parties** | **Borrower**: Wohali Land Estates, LLC (the "Debtor") via Matthew McKinlay as the chapter 11 trustee of the Debtor's estate (the "Trustee") <br><br> **DIP Lender**: BCS Properties, LLC, as initial lender, and its permitted assignees from time to time (the "DIP Lender"). |
| **Facility Structure and Commitment** | Senior secured super-priority debtor-in-possession loan facility (the "DIP Facility") in the chapter 11 case (the "Chapter 11 Case") of the Debtor for the extension of loans not to exceed $15,117,500 in principal amount (the "DIP Loans") as set forth in the DIP Budget (defined below). <br><br> Funds shall be advanced upon request by the Trustee to the DIP Lender to fund expenditures permitted under the DIP Budget (defined below), which requests shall include (i) the specific amount requested and the proposed use of proceeds and (ii) a statement of the Trustee that the Estate is not in default under the DIP Documentation (defined below) and a summary explanation of any deviation from the DIP Budget. <br><br> The DIP Lender shall respond to subsequent funding requests within two business days of the date of the request. <br><br> The total amount of the DIP Facility (the "DIP Obligations") includes the principal amount of the DIP Loans as well as payment-in-kind interest, fees and anticipated reimbursable fees and costs. |
| **Documentation** | The DIP Facility would be evidenced by a credit agreement (the "DIP Credit Agreement") and related loan documentation (including the DIP Orders (as defined below), collectively, the "DIP Documents") consistent with this term sheet and otherwise acceptable to the Debtor and the DIP Lender. <br><br> Up to $6,500,000 of the DIP Loans shall be immediately available upon entry of an order (the "Interim Order") of the United States Bankruptcy Court for the District of Utah (the "Bankruptcy Court" or the "Court") approving the terms and conditions of the DIP Facility on an interim |

| | |
|---|---|
| | basis. The remaining capacity under the DIP Loan will be available upon entry of an order ("the "Final Order" and, collectively with Interim Orders, the "DIP Orders") of the Bankruptcy Court approving the DIP Facility on a final basis. The DIP Orders shall (i) authorize the extensions of credit in the aggregate amount of the DIP Loans, (ii) approve the payment by the Trustee of all of the fees and expenses provided for herein and in the DIP Credit Agreement, (iii) approve senior super-priority status and a senior, administrative super-priority lien on all property of the Debtor, including without limitation any avoidance actions and proceeds thereof, (iv) authorize the use of cash collateral and the priming of all prepetition liens and (v) provide such other customary and appropriate relief as the DIP Lender may request. |
| **Maturity Date** | The DIP Facility shall mature and the DIP Loan be payable in full on the "Maturity Date," which shall mean the earliest of the following dates (unless extended by the DIP Lender): <br><br> 1) June 30, 2026 (the "Scheduled Maturity Date"); <br><br> 2) the date on which the Debtor closes a sale of all or a substantial portion of its assets (a "Transaction"); <br><br> 3) the date of an Event of Default, if such Event of Default is either <br><br> (a) incapable of being cured or (b) capable of being cured but has not been cured within 10 business days of the Debtor receiving a written notice of an Event of Default from the DIP Lender; and <br><br> 4) effective date of a plan of reorganization. <br><br> If the Maturity Date is a result of the closing of a Transaction, all outstanding DIP Obligations shall be paid in full prior to or upon closing of the Transaction either (i) directly from the buyer in such Transaction or (ii) directly from the escrow account, via the escrow agent, established for the consummation of the Transaction. Such payment shall be made by wire transfer of immediately available funds to account(s) designated in writing by the DIP Lender prior to the closing of such Transaction. |
| **Interest Rate** | A *per annum* rate equal to 12%, payable only in kind, which shall be calculated on the basis of the actual days elapsed in a year of 365 days from the closing date (the "Closing Date") of the DIP Facility to the Maturity Date. Upon the occurrence of an Event of Default, and thereafter until such default is cured, and following the Maturity Date, if the DIP Facility has not been paid in full, interest on the unpaid amounts due under the DIP Facility shall accrue at a rate *per annum* of 18%, also payable only in kind. |

| | |
|---|---|
| **Funding Fee** | The DIP Lender shall be entitled to a funding fee of $0 (the "Funding Fee") payable to the DIP Lender in cash and due and payable on the Closing Date. |
| **Commitment Fee** | There shall be no commitment fee. |
| **Exit Fee** | The DIP Lender shall be entitled to an exit fee of $0 payable to the DIP Lender in cash and due and payable on the date that is the earliest of (i) the Maturity Date, (ii) the date of termination of the DIP Facility or acceleration of the DIP Loans, and (iii) the date on which the DIP Loans are otherwise paid in full. |
| **Fees and Costs** | The DIP Lender shall be entitled to reimbursement for any reasonable fees and costs, including attorneys' fees, incurred by the DIP Lender in connection with the DIP Facility; *provided* that, in connection with the initial negotiation and documentation of the DIP Facility shall be funded from the initial disbursements. |
| **DIP Budget** | Subject to the terms of the DIP Documents, as may be amended, the DIP Lender consents to, and the Trustee shall be authorized to, use any "cash collateral" of the DIP Lender, and any proceeds thereof, and the DIP Facility in accordance with the budget attached hereto as Schedule I (as modified in accordance with the DIP Documents from time to time, the "DIP Budget"). Notwithstanding the fact that is listed in the DIP Budget, prior to making any payment to Wohali Public Infrastructure District No. 1 and/or No. 2 (collectively, the "PID"), the Trustee shall give prior written notice to DIP Lender of at least five (5) business days and obtain express written consent from DIP Lender for all such PID payments. The Trustee, in the exercise of his business judgment, will review an accounting (to the extent available), prior to payment of any items on the DIP Budget to verify the beneficiaries of the funds to be paid and the amounts actually due to ensure that such expenditures are for the benefit of the Estate. The Trustee and the DIP Lender may agree to amend or otherwise alter the DIP Budget at any time without further approval of the Bankruptcy Court so long as the alteration does not increase the principal commitment under the DIP Facility.<br><br>For purposes of compliance with the DIP Documents, receipts, operating disbursements, capital expenditures and non-operating disbursements, shall be tested every week on a cumulative basis beginning on the week commencing November 3, 2025 on an aggregate basis (i.e., the aggregate applicable receipts less aggregate applicable disbursements reflected as net cash flow in the approved DIP Budget) and subject to a twenty (20%) permitted variance) (the "Permitted Variance"). |

| | Any modifications to the DIP Budget (including any extension beyond the current DIP Budget period) must be approved by the DIP Lender in its reasonable discretion.<br><br>On Friday of each calendar week, the Trustee shall provide (i) a variance report to the DIP Lender comparing the previous week's budget-to-actuals and (ii) updated cash flow projections through the Maturity Date, and the Trustee shall provide any backup information upon request. |
|---|---|
| **Collaboration on Sale and Investigations** | The Trustee shall develop in consultation with the DIP Lender bidding procedures, sales procedures, investigation and litigation plan in form and substance reasonably satisfactory to the DIP Lender (the "Sales Plan") that provides for the satisfaction of the DIP Obligations in a manner consistent with this Term Sheet on or prior to the Scheduled Maturity Date. To that end, the DIP Budget shall include an allowance of up to $250,000 for the Trustee to utilize towards such investigation/litigation of potential chapter 5 claims and other potential claims the Estate may have via Case Professionals (as defined below). The Sales Plan shall provide for a path towards expeditiously sell the DIP Collateral (as defined below) for the highest and best offer with a goal towards repaying not only the DIP Facility, but also all allowed administrative expenses and allowed secured claims or, if the DIP Lender determines such sale if not sufficiently likely to be accomplished by the Scheduled Maturity Date, the disposition of substantially all of the assets of the Estate and the application of the proceeds to repay the DIP Obligations. |

| | |
|---|---|
| **Security and Priority of DIP Facility** | Subject to Bankruptcy Court approval and, as applicable, the Carve-Out (defined below), the indebtedness and other amounts due under the DIP Facility to the DIP Lender, including, without limitation, all principal and accrued interest, costs, fees, expenses, and other amounts due under the DIP Facility (collectively, the "DIP Obligations"), shall be entitled to the following classification and treatment in the Debtor's chapter 11 case: |
| | 1) pursuant to Section 364(c)(1) of the Bankruptcy Code, the DIP Obligations shall constitute allowed senior secured super-priority administrative expense claims, having priority over all administrative expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code and any and all expenses and claims of the Debtor; |
| | 2) pursuant to Section 364(c)(2) of the Bankruptcy Code, the DIP Obligations shall be secured by a valid, non-avoidable, automatically perfected first priority priming lien and security interest in and lien on (the "DIP Lender Liens") the DIP Collateral and all cash and non-cash proceeds of the DIP Collateral,[1] including, without limitation, the collateral |

[1] "DIP Collateral" means: all property of the estate under Section 541 of the Bankruptcy Code, including all real and personal property, whether now existing or hereafter arising and wherever located, tangible and intangible, of the Debtor, including: (a) all cash, cash equivalents, deposit accounts, securities accounts, accounts, other receivables (including governmental and credit card receivables), chattel paper, contract rights, inventory (wherever located), instruments, documents, securities (whether or not marketable) and investment property, hedge agreements, real estate, furniture, fixtures, equipment (including documents of title), goods, franchise rights, trade names, trademarks, service marks, copyrights, patents, license rights, intellectual property, general intangibles (including, for the avoidance of doubt, payment intangibles), rights to the payment of money (including tax refunds and any other extraordinary payments), supporting obligations, guarantees, letter of credit rights, commercial tort claims, causes of action, and all substitutions, indemnification rights, all present and future intercompany debt, books and records related to the foregoing, accession and proceeds of the foregoing, wherever located, including insurance or other proceeds (provided that the liens and rights granted herein shall not interfere with any rights held by a landlord to insurance proceeds for damage to a landlord's property); (b) all proceeds of leased real property; (c) subject to entry of the Final Order, the proceeds of any avoidance actions brought pursuant to Chapter 5 of the Bankruptcy Code or applicable state law equivalents; (d) proceeds from the Debtor's exercise of rights under Sections 506(c) and 550 of the Bankruptcy Code; (e) all property of the Debtor that was not otherwise subject to valid, perfected, enforceable and unavoidable liens on the Petition Date; (f) all proceeds from the sale, assignment, or other disposition of (i) commercial real estate leases and (ii) the Debtor's right to select, identify, and designate which commercial leases may be assumed and assigned under Section 365 of the Bankruptcy Code. Notwithstanding the foregoing, DIP Collateral shall not include the Debtor's real property leases (but shall include all proceeds of such leases) solely to the extent that the grant of a DIP Lender Lien is prohibited or restricted by the terms of such real property lease or applicable non- bankruptcy law to attach to any such real property lease.

| | securing the obligations of the Estate under or in connection with any prepetition obligations (the "Prepetition Secured Claims"), between the Debtor and any person (a "Primed Party" and, such liens, the "Primed Liens"); |
|---|---|
| | 3) immediate payment in full in cash as a simultaneous condition to the consummation of a Transaction, subject to the DIP Lender Equity Election described below; |
| | 4) the right to credit bid the outstanding amount of DIP Obligations in connection with any Transaction involving the DIP Lender or an affiliate of the DIP Lender; and |
| | 5) at the consummation of any Transaction, any chapter 11 plan of reorganization or any similar event or transaction, the right (the "DIP Lender Equity Election") to convert the outstanding amount of the DIP Obligations into equity of the Debtor or any successor to the business of the Debtor at a valuation equal to 70% of the lesser of (x) fair market value and (y) the lowest valuation offered to any investor at any time, with other investment terms provided to the DIP Lender on an most-favored-nation basis and customary shareholder rights provisions acceptable to the DIP Lender in its reasonable discretion. |
| | The DIP Lender Liens shall be effective and perfected with the foregoing specified priority as of the entry of the Interim Order and without requiring the execution, filing, or recording of mortgages, security agreements, intercreditor agreements, subordination agreements, control agreements, acknowledgments, financing statements, fixture filings, or other agreements or instruments, or the taking of any action to obtain possession or control of any collateral; *provided*, *however*, if the DIP Lender so requires, the Debtor shall use reasonable efforts to execute, file or record any documents and/or take any actions necessary or prudent to ensure the perfection of the DIP Lender Liens. |

| | |
|---|---|
| **Adequate Protection** | The Prepetition Secured Claims and the Primed Liens would be primed by and made subject, and subordinate, to the perfected first priority, senior priming liens granted to the DIP Lender, which senior priming liens in favor of the DIP Lender would also prime any liens granted after the Petition Date to provide adequate protection in respect of any of the Primed Liens. It is the intention of the DIP Lender to provide the legally-required adequate protection of the Prepetition Secured Claims, if any, and such adequate protection and the treatment of Prepetition Secured Claims in any chapter 11 plan of reorganization and/or Sale Order shall be reasonably satisfactory to both the Debtor and the DIP Lender. To this end, the amount of the adequate protection payments allowed herein shall be calculated based upon the "value of the creditor's interest in the real estate," as used in Section 362(d)(3)(B)(ii), with such value being determined by an appraisal conducted by the Trustee and being equal to the lesser of (1) such appraised value or (2) the amount of the Prepetition Secured Claims. DIP Lender agrees that the cost of such an appraisal may be added to the DIP Budget and must be completed, along with resolution of any objection or challenge and Court order, prior to making the adequate protection payments allowed herein. The DIP Budget should account for such adequate protection payments. Also prior to making any adequate protection payments to Prepetition Secured Claims, the Trustee, in the exercise of his business judgment and in consultation with the DIP Lender, will review an accounting (to the extent available) of said Prepetition Secured Claimants that would otherwise receive adequate protection payments, and will verify the amounts due and whether there is any reason why one or more Prepetition Secured Claims are subject to, among other things, the Trustee's avoidance powers under chapter 5 of the Bankruptcy Code or other equitable and legal remedies under applicable nonbankruptcy law. Finally, for the avoidance of doubt, DIP Lender understands that there is no equity cushion in the real property collateral of the Prepetition Secured Claims, and the adequate protection provided herein is not intended to create one. |
| **Use of DIP Facility and Cash Collateral** | The proceeds of the DIP Loan will be used solely in accordance with the DIP Budget and the DIP Orders. |

| | |
|---|---|
| **Limitations on Use of DIP Facility and Cash Collateral** | Except as otherwise permitted in the DIP Orders, the DIP Budget, or the DIP Documents, neither the funds available under the DIP Facility, the DIP Collateral, nor the Carve-Out may be used to fund or pay expenses in connection with: (a) preventing, hindering, or delaying the DIP Lender's enforcement of the DIP Documents, collection of the DIP Obligations, or realization upon any of the DIP Collateral, subject to compliance with the DIP Documents, orders of the Bankruptcy Court, and applicable law; (b) using or seeking to use the DIP Collateral or selling or otherwise disposing of DIP Collateral outside the ordinary course of business without the prior written consent of the DIP Lender; (c) incurring any other indebtedness or conducting any marketing or sales process for a Transaction without the approval of the DIP Lender, not to be unreasonably withheld; (d) seeking to amend or modify any of the rights granted to the DIP Lender under the DIP Documents, including the DIP Orders; (e) objecting to or challenging in any way the DIP Lender Liens, the DIP Obligations, the DIP Collateral or any other claims or liens, held by or on behalf of the DIP Lender; (f) litigating, objecting to, challenging, contesting in any manner, or raising any of the DIP Obligations, the DIP Lender Liens, or any other rights or interests of the DIP Lender; or (g) seeking to subordinate, recharacterize, disallow, or avoid the DIP Obligations. |
| **Other Terms** | The DIP Facility shall include covenants to comply with the DIP Budget (subject to Permitted Variances) and conduct the chapter 11 case consistent with this Term Sheet and pursuant to agreed milestones, as well as customary representations, warranties and affirmative and negative covenants related to business of the Debtor and other matters mutually agreed by the Debtor and the DIP Lender. |
| **Carve-Out Reserve** | The DIP Lender agrees to a carve-out reserve (the "Carve-Out"), which sum as calculated herein shall remain in the estate notwithstanding the exercise of the DIP Lender of its rights as a result of an Event of Default and/or repayment of the DIP Loan.<br><br>The Carve-Out shall be calculated as the sum of the following amounts as of the earliest day the DIP Lender issues a Carve-Out Trigger Notice ("Carve-Out Effective Date"): (i) all unpaid professional fees and |

disbursements incurred by the Estate and any Bankruptcy Court-appointed professionals appointed in the Chapter 11 Case pursuant to Sections 327, 328, 330, 363 and 1106 of the Bankruptcy Code for any of their respective professionals retained by final order of the Bankruptcy Court, which order has not been reversed, vacated or stayed, unless such stay has been vacated (the "Case Professionals") at any time prior to the delivery of the Carve-Out Trigger Notice to the extent allowed by the Bankruptcy Court (the "Allowed Professional Fees"), in an aggregate amount not to exceed the amounts set forth in the DIP Budget for Professional Fees prior to the delivery of a Carve-Out Trigger Notice; and (ii) the payment of allowed and unpaid administrative expenses following the delivery of the Carve-Out Trigger Notice in an aggregate amount not in excess of $900,000 (the "Wind-Down Carve-Out Amount"), plus (iii) the payment of fees pursuant to 28 U.S.C. § 1930(a) and any fees required to be paid to the Clerk of the Court for the Debtor for the time period beginning on the Petition Date and ending on the Carve-Out Effective Date, which fees shall not be limited to amounts that may be set forth in the DIP Budget.

"Carve-Out Trigger Notice" means a written notice, delivered by email or U.S. Mail by the DIP Lender to the Trustee, its counsel, and the U.S. Trustee, of any default hereunder.

| | |
|---|---|
| **No Permitted Liens** | The Debtor shall not create or incur any senior priority or equal priority liens on any of the collateral to which the DIP Lender Liens attach, without the DIP Lender's consent. |
| **Assignments and Participations** | The DIP Facility may not be assigned by the Trustee without the prior written consent of the DIP Lender. DIP Loans may be freely participated or assigned by the DIP Lender to any person or entity not affiliated with the Debtor at the time of the assignment or participation. |
| **Events of Default** | The following shall be events of default (collectively, "Events of Default" and, each individually, an "Event of Default"):<br><br>1) The Trustee fails to operate in accordance with the DIP Budget (after considering Permitted Variances) or any reporting requirement, and such defect or deviation remains uncured 10 business days after the DIP Lender notifies the Trustee thereof;<br><br>2) The Trustee fails to make any required payment, including, but not limited to, the payment of the full balance of the DIP Facility upon default or at the Maturity Date, subject to the DIP Lender's equity conversion right;<br><br>3) Any order authorizing the Trustee to obtain the DIP Facility, whether on an interim or final basis, is not in a form satisfactory to the DIP Lender or is reversed, vacated, stayed, amended, |

|  | supplemented, or otherwise modified in a manner which shall materially and adversely affect the rights of the DIP Lender; |
|  | 4) The Chapter 11 Case is either dismissed or converted to a case under chapter 7 pursuant to a final order of the Bankruptcy Court, the effect of which has not been stayed; |
|  | 5) One or more Prepetition Secured Claim holder obtains relief from the automatic stay, pursuant to a final order of the Bankruptcy Court, the effect of which has not been stayed; or |
|  | 6) The Trustee fails to achieve any of the Milestones (the "Milestones") set forth below, unless extended or waived by the DIP Lender in writing:[2] <br><br> November 3, 2025 Interim approval of DIP Facility <br><br> January 26, 2026 Final approval of DIP Facility <br><br> February 23, 2026 Bidding and Sales Procedures Motion(s) <br><br> April 27, 2026 Approval of Bidding and Sale Procedures <br><br> May 7, 2026 Sale Motion Filed |
|  | 7) The Trustee makes a PID payment without providing the required prior written notice or obtaining the required written consent of DIP Lender. |

---

[2] DIP credit agreement may have additional sales-related milestones if Chapter 11 Plan toggles to a sale plan rather than a recapitalization.

| | |
|---|---|
| **Remedies** | Upon the occurrence of an Event of Default, the DIP Lender shall give written notice of such Event of Default (the "Default Notice") to counsel for the Trustee and to the Office of the United States Trustee (the "Notice Parties") (which notice shall be given by e-mail transmission, the automatic stay being deemed lifted for such purpose to the extent necessary).<br><br>Upon the delivery of a Default Notice, the Trustee and the DIP Lender consent to an expedited hearing on not less than five (5) business days' notice to consider: (i) whether an Event of Default has occurred; and (ii) the appropriate relief or remedies.<br><br>Until the earlier of (a) ten (10) business days following the date a Default Notice is delivered and (b) order of the Court (the "Remedies Notice Period"), the DIP Lender shall continue to perform under the DIP Facility and the DIP Orders and the Trustee shall have authority to use cash collateral and DIP Facility proceeds in accordance with the DIP Documents and applicable DIP Budget solely as necessary to avoid immediate and irreparable harm to the Debtor's estate.<br><br>At the end of the Remedies Notice Period, the Trustee's rights to use the DIP Facility or cash collateral shall immediately cease and all cash collateral or proceeds of the DIP Facility shall be held pending further order of the Bankruptcy Court, except as necessary to fund the Carve-Out, unless (i) otherwise agreed by the parties, (ii) otherwise ordered by the Bankruptcy Court, or (iii) the Event of Default has been cured or waived. |
| **Indemnity** | The Trustee agrees to indemnify and hold harmless the DIP Lender and each of its respective shareholders, directors, members, managers, principals, agents, advisors, officers, subsidiaries and affiliates in such capacity (each, an "Indemnified Person") from and against any and all damages, losses, settlement payments, obligations, liabilities, claims, actions or causes of action, and reasonable costs and expenses incurred, suffered, sustained or required to be paid by an Indemnified Person by reason of or resulting from the DIP Facility, the transactions contemplated thereby or hereby, or any claim, action, litigation, investigation or proceeding relating to any of the foregoing, whether or not any of such Indemnified Person is a party thereto and whether or not brought by the Trustee or any other person or entity, except to the extent resulting from the fraud, gross negligence, recklessness or willful misconduct of such Indemnified Person, as determined by a final non-appealable order of a court of competent jurisdiction. |

| | |
|---|---|
| **Amendment and Waiver** | No waiver, modification, or amendment of the terms of this Term Sheet shall be valid unless such waiver, modification, or amendment is in writing and has been signed by the Trustee and the DIP Lender. No waiver of any of the provisions of this Term Sheet shall be deemed or constitute a waiver of any other provisions of this Term Sheet, whether or not similar, nor shall any waiver be deemed a continuing waiver. |
| **Other Terms** | The Trustee shall consult with the DIP Lender in advance of any proposal to the Primed Parties and shall not enter into any agreement with the Primed Parties or with respect to the Prepetition Secured Claims without the consent of the DIP Lender, not to be unreasonably withheld. The rights of all parties with respect to the Prepetition Secured Claims and the Primed Liens, including their ranking against the Estate and its assets after repayment of the DIP Obligations, otherwise will be fully reserved. |

**Schedule I**
**DIP Budget**

[*To be provided separately*]