Ellen E. Ostrow (14743)
eostrow@foley.com
FOLEY & LARDNER LLP
95 State Street, Suite 2500
Salt Lake City, UT 84111
Telephone: 801.401.8900
*Attorneys for Chapter 11 Trustee*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| In re:<br><br>WOHALI LAND ESTATES, LLC,<br><br>Debtor. | **Bankruptcy Case No. 25-24610**<br><br>(Chapter 11)<br><br>Hon. Peggy Hunt |

**STIPULATED MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE REJECTION OF THE GOLF COURSE AND MANOR LEASE BY AND BETWEEN WOHALI LAND ESTATES, LLC AND WOHALI RESORT, INC. AND TERMINATION OF THE SAME**

Matthew McKinlay, the Chapter 11 Trustee (the "***Trustee***") of Wohali Land Estates, LLC ("***Wohali***" or the "***Debtor***"), and Wohali Resort, Inc. ("***Wohali Resort***") stipulate and respectfully request the Court enter an order authorizing the rejection of the Lease (defined herein). In support of the Motion, the Trustee states as follows:

### <u>JURISDICTION AND VENUE</u>

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the automatic reference of all bankruptcy cases to this Court pursuant to Rule 83-7.1 of the Local Rules of Civil Practice — District of Utah. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).

2. Venue is proper pursuant to 28 U.S.C. § 1408.

3. The statutory bases for the relief requested herein includes Section 365 of Title 11 of the United States Code (the "***Bankruptcy Code***") and Rule 6006 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***").

## **BACKGROUND**

4. On August 8, 2025, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Utah (the "***Court***").

5. On October 9, 2025, the Court appointed the Trustee as the Chapter 11 trustee of the Debtor.

6. The Debtor owns a planned development in Coalville, Utah known as the Wohali Project. A key piece of the Wohali Project is the 18-hole championship golf course referred to as the Eagle Championship Course.

7. On March 11, 2024, the Debtor and Wohali Resort entered into a lease agreement under which the Debtor leased the Eagle Championship Course and the adjacent Manor Clubhouse (the "***Premises***") to Wohali Resort for a term of 25 years (the "***Lease***"). A copy of the Lease is attached hereto as Exhibit A.

8. Wohali Resort is controlled by former principals of the Debtor, John Kaiser and Dave Boyden.

9. The Lease is a "triple-net lease" whereby Wohali Resort is responsible for all expenses associated with the use, maintenance, and operation of the Premises.

10. The Annual Base Rent under the Lease for the first five years is $100,000 per year beginning on the earlier of (1) Wohali Resort opening for business on the Premises, or (2) one year from the Commencement Date, or March 11, 2025.

11.     Wohali Resort opened for business on July 4, 2024. Since that time, Wohali Resort has not made any payment under the Lease. As of the date of filing this Motion, Wohali Resort owes Wohali Land Estate at least $200,000 under the terms of the Lease.

12.     Further, Wohali Resort has failed to pay expenses associated with the use, maintenance, and operation of the Premises as required pursuant to the terms of the Lease. While the Trustee and his advisors are still investigating, the current open accounts receivable from Wohali Resort to the Debtor is $678,837.26.

13.     The Trustee is working diligently to maximize the value of the Bankruptcy Estate. Wohali Resort is in default under the terms of the Lease and has agreed to termination of the Lease and to immediately surrender of the Premises to the Debtor pursuant to Section 3.3 of the Lease.

14.     The rejection of and agreed to immediate termination of the Lease will benefit the bankruptcy estate by providing certainty to potential purchasers or plan proponents regarding any leasehold interests in the Premises.

15.     Accordingly, the Trustee seeks authorization to reject the Lease and, as stipulated, treat the Lease as terminated.

## BASIS FOR RELIEF

16.     Section 365 of the Bankruptcy Code provides that, subject to Court approval, a Chapter 11 trustee "may reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a); *see also In re Summit Land Co.*, 13 B.R. 310 (Bankr. D. Utah 1981). A motion to reject an unexpired lease is analyzed under the business judgment standard. *See NLRB v. Bildisco and Bildisco*, 465 U.S. 513, 523 (1984); *In re Mile High Medal Systems, Inc.*, 899 F.2d 887, 896 (10th Cir. 1990); *In re Brick House Props., LLC*, 633 B.R. 410 (Bankr. D. Utah 2021). The Court may approve a trustee's rejection of an executory contract or unexpired lease if such rejection is made

in the exercise of the trustee's sound business judgment, and if such rejection benefits the estate. *See, e.g., Matter of Tilco, Inc.*, 558 F.2d 1369, 1372 (10th Cir. 1977); *In re Bildisco*, 682 F.2d 72, 79 (3rd Cir. 1982), aff'd, 465 U.S. 513 (1984).

17.     As noted in *In re Brick House Props., LLC*, in applying the business judgment standard, "the Court acts as an overseer of the wisdom with which the bankruptcy estate's property is being managed by the trustee . . . . Generally, the Court should not interfere with the debtor in possession's exercise of business judgment to reject a lease or executory contract unless the decision is so manifestly unreasonable that it could not be based on sound business judgment." *Brick House Props.*, 633 B.R. at 424 (*quoting W. Wood Prods., Inc. v. W. Pellet Prods., LLC (In re W. Wood Prods., Inc.)*, 2013 Bankr. LEXIS 1521 (Bankr. D.N.M. Apr. 4, 2013)) (internal quotations removed).

18.     Rejection of an unexpired lease is appropriate where it would benefit the estate. *In re Univ. Med. Ctr.*, 973 F.2d 1065, 1075 (3d Cir. 1992) (explaining that section 365 is intended to give the trustee "a reasonable time within which to determine whether adoption or rejection of the executory contract would be beneficial to an effective reorganization") (quoting *In re Whitcomb & Keller Mortg. Co.*, 715 F.2d 375, 379 (7th Cir. 1983); *see also In re Kong*, 162 B.R. 86, 96 (Bankr. E.D.N.Y. 1993) (stating that the business judgment standard is satisfied where the trustee merely shows that rejection of the unexpired lease will benefit the estate).

19.     It is enough if a trustee determines in his business judgment that a benefit will be realized. *See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 39 (3rd Cir. 1989) (*citing In re Wheeling-Pittsburgh Steel Corp.*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987)). The business judgment standard requires that the Court approve the trustee's business decision unless

that judgment is the product of bad faith, whim, or caprice. *Lubrizol Enter., Inc. v. Richmond Metal Finishers*, 756 F.2d 1043, 1047 (4th Cir. 1985).

20.     Court approval under section 365(a) "should be granted as a matter of course." *In re Summit Land Co.*, 13 B.R. 310, 315 (Bankr. D. Utah 1981). Section 365(a) "places responsibility for administering the estate with the trustee, not the court, and therefore furthers the policy of judicial independence considered vital by the authors of the Code." *Id*. It also "expedites the administration of estates" and "encourages rehabilitation by permitting the replacement of marginal with profitable business arrangements." *Id*.

21.     Here, as part of the Trustee's efforts to maximize value for the estate and its creditors, the Trustee has determined the rejection of the Lease is in the best interest of the Debtor and its estate, and sufficient business justification exists to approve the proposed rejection of the Lease under § 365(a). The Trustee, in consultation with his professionals, has determined the Lease provides no value to the estate and may in fact harm the value of the estate if not rejected and terminated as agreed. Further, Wohali Resorts has made no payments under the Lease and is in default. Rather than wait the 180 days under the Lease termination provisions, Wohali Resorts has agreed to treat the Lease as terminated. Rejection of the Lease is within the Trustee's sound business judgment.

22.     The Trustee requests that the Court approve rejection of the Lease as of the date of the filing of this motion. The Trustee further requests the Court order any claim arising from the rejection of the Lease be filed by no later than thirty (30) days after entry of the Court's order. The Trustee reserves all claims of the bankruptcy estate against Wohali Resorts.

## **RESERVATION OF RIGHTS**

23.     Nothing contained herein is or should be construed as: (a) an admission as to the validity of any claim against the Debtor; (b) a waiver of the Trustee's rights to dispute any claim on any grounds; (c) a promise to pay any claim; or (d) otherwise affect the Trustee's rights under § 365 to dispute any claim for damages arising from the rejection of the Lease.

## **CONCLUSION**

24.     Wherefore, the Trustee respectfully requests that this Court enter an order authorizing the rejection of the Lease.

Dated: January 12, 2026.

FOLEY & LARDNER LLP

/s/ *Ellen E. Ostrow*

Ellen E. Ostrow
*Attorneys for Chapter 11 Trustee*

*Agreed to and Approved by:*

Wohali Resort, Inc.

By: _____
Name: John Kaiser
Its: Director

# CERTIFICATE OF SERVICE

I hereby certify that on the 13th day of January, 2026, a true and correct copy of the foregoing **STIPULATED MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE REJECTION OF the GOLF COURSE AND MANOR LEASE** by and between wohali land estates, llc and wohali resort, inc. and termination of the same was electronically filed and therefore served via ECF on the following:

- **David P. Billings**  dbillings@fabianvancott.com, cbuhler@fabianvancott.com;khaynes@fabianvancott.com
- **Bryan H Booth**  bryan@mountainwestlaw.com, lisa@mountainwestlaw.com
- **Scott S Bridge**  sbridge@keslerrust.com
- **Matthew James Burne**  matthew.burne@usdoj.gov, Lindsey.Huston@usdoj.gov;Rinehart.Peshell@usdoj.gov;Rachelle.D.Hughes@usdoj.gov;Brittany.Dewitt@usdoj.gov
- **Ryan C. Cadwallader**  rcadwallader@kmclaw.com, twhite@kmclaw.com
- **P. Matthew Cox**  mcox@spencerfane.com, ecall@spencerfane.com;mwatson@spencerfane.com
- **Michael Allen Gehret**  mike.gehret@dentons.com, kim.altamirano@dentons.com
- **Patricia Geary Glenn**  pgearyglenn@gmail.com
- **Jason W. Hardin**  jhardin@fabianvancott.com, aclark@fabianvancott.com
- **Carson Heninger**  heningerc@gtlaw.com, carson-heninger-5642@ecf.pacerpro.com,Candy.Long@gtlaw.com
- **George B. Hofmann**  ghofmann@ck.law, mparks@ck.law;enilson@ck.law
- **Annette W. Jarvis**  jarvisa@gtlaw.com, longca@gtlaw.com
- **Michael R. Johnson**  mjohnson@rqn.com, docket@rqn.com;ASanchez@rqn.com;RQN@ecfalerts.com
- **Penrod W. Keith**  penrod.keith@dentons.com, kristin.hughes@dentons.com
- **Justin J. Keys**  justin@hlhparkcity.com, nancy@hlhparkcity.com
- **Bryce L. Krieger**  bryce.krieger@dentons.com
- **Matt McKinlay**  mmckinlay@ampleo.com
- **Elijah L. Milne**  eli.milne@dentons.com, deb.calegory@dentons.com,jaime.gargano@dentons.com,kristen.ivory@dentons.com
- **Matt C. Osborne**  matt@oblawpc.com
- **Ellen E. Ostrow**  eostrow@foley.com, ellen-ostrow-4512@ecf.pacerpro.com;docketflow@foley.com;geysa.peeler@foley.com
- **Douglas J. Payne**  dpayne@fabianvancott.com, lwilson@fabianvancott.com;dadamson@fabianvancott.com
- **Charles Louis Pearlman**  charles@hlh.law
- **Mark C. Rose**  mrose@rqn.com, docket@rqn.com;asanchez@rqn.com
- **Jeffrey Weston Shields**  jshields@rqn.com, 5962725420@filings.docketbird.com;docket@rqn.com;ecasaday@rqn.com
- **Jeremy C. Sink**  jsink@kmclaw.com, mcarlson@kmclaw.com
- **Abigail Jennifer Stone**  abigail.stone@gtlaw.com

- **Jeffrey L. Trousdale**    jtrousdale@cohnekinghorn.com, mparks@ck.law;enilson@ck.law
- **United States Trustee**    USTPRegion19.SK.ECF@usdoj.gov

**By U.S. Mail -** In addition to the parties of record receiving notice through the CM/ECF system, the following parties shall be served notice pursuant to Fed R. Civ. **P.** 5(b):

- Wohali Resort, Inc.
  c/o David Boyden
  247 Village View Drive
  Coalville, Utah 84017

# EXHIBIT A

# LEASE AGREEMENT

## ARTICLE 1
## FUNDAMENTAL PROVISIONS:

COMMENCEMENT DATE:     Dated as of March 11, 2024

LANDLORD:     **Wohali Land Estates, LLC**, a Utah limited liability company
247 Village View Drive
Coalville, Utah 84017

TENANT:     **Wohali Resort, Inc.**, a Utah benefit corporation
247 Village View Drive
Coalville, Utah 84017

PREMISES:     That certain real property owned by Landlord and generally depicted in **Exhibit A** attached hereto, together with all buildings, improvements, easements, rights, privileges, and appurtenances belonging thereto, including, without limitation, all rights of Landlord to ingress and egress to and from, and parking over, in and on designated areas (collectively, the **"Premises"**). The Premises includes that certain building owned by Landlord, and referred to by the parties as the **"Manor House"**, and located at or about 633 Vardon Drive, Coalville, Utah 84017, and the adjacent championship golf course, referred to by the parties as the **"Eagle Championship Course"**, the practice facilities of the Eagle Championship Course, and cartways, pathways, and other improvements connecting the same.

TERM:     The Term shall commence as of the Commencement Date set forth above and shall expire twenty-five (25) Lease Years (as defined herein) thereafter (the **"Initial Term"**); provided, however, the Term (as defined herein) shall automatically renew for consecutive five (5) year periods (each, a **"Renewal Term"** and with the Initial Term, the **"Term"**), unless earlier terminated in accordance with this Lease. "Lease Year" shall include twelve (12) full calendar months, except that the first Lease Year shall include the first twelve (12) full calendar months plus the partial month, if any, that falls between the Commencement Date and the first day of the first full calendar month after the Commencement Date.

PERMITTED USE:     The Premises may be used for any lawful purpose (the **"Permitted Use"**).

FOR VALUABLE CONSIDERATION, the receipt and sufficiency of which hereby acknowledged, it is agreed as follows:

## ARTICLE 2
## LEASE OF PREMISES

2.1     Lease of Premises to Tenant. Landlord leases the Premises to Tenant, and Tenant leases the Premises from Landlord, on the terms and conditions set forth in this Lease, including the Fundamental Provisions above. Tenant is currently in possession of the Premises and Tenant accepts the Premises in its **"AS IS, WHERE IS"** condition, including any and all defects, patent, latent or otherwise, with no representation or warranty whatsoever by Landlord as to the fitness, suitability, habitability, or usability of

the Premises. Landlord and its agents, at all reasonable times, shall have access to the Premises for the purpose of examining or inspecting the condition thereof.

**ARTICLE 3**
**TERM**

3.1     Term of Lease.  The Term of this Lease shall be as stated in the Fundamental Provisions, subject to the terms and conditions set forth in this Lease.

3.2     Termination.  As set forth in the Fundamental Provisions, the Term shall automatically renew for successive Renewal Terms, unless and until either party elects to terminate this Lease by providing written notice to the other party at least one hundred and eighty (180) days prior to the then-applicable expiration of the Term (the "**Termination Deadline**"). Except as otherwise agreed by the parties or as otherwise provided in this Lease, if a party elects not to terminate or otherwise fails to timely terminate the Lease by the Termination Deadline, then this Lease shall continue in full force and effect and upon the same terms and conditions, except for the changes to the Base Rent in accordance with Section 4.3 below.

3.3     Surrender of Premises.  Upon the termination of this Lease, Tenant shall immediately surrender to Landlord peaceable possession of the Premises in substantially the condition the Premises is in at the commencement of this Lease (reasonable wear and tear and damage caused by casualty or by Landlord or its employees, agents or contractors excepted).

**ARTICLE 4**
**RENT**

4.1     Base Rent.  Commencing as of the Rent Commencement Date (as defined below), Tenant shall pay to Landlord, at Landlord's address in the Fundamental Provisions, or to such other person or at such other place as Landlord may designate in writing, the base rent amount set forth on **Exhibit B**, attached hereto and incorporated herein (the "**Base Rent**").

4.2     Rent Commencement Date.  Tenant shall begin to pay Base Rent on the date (the "**Rent Commencement Date**") that is the earlier to occur of: (a) Tenant opening for business in the Premises; or (b) the date that is three hundred sixty-five (365) days from the Commencement Date.

4.3     Renewal Term Base Rent.  Base Rent for each Renewal Term shall be determined in accordance with this Section 4.3. Base Rent for each Extension Term shall be an amount equal to the then-current Fair Market Rent for the Premises. As used herein, "**Fair Market Rent**" means an amount equal to the then-prevailing rate for tenants taking similarly situated real property and improvements, located within or near Coalville City, Utah during the previous six (6)-month period.

(a)     Landlord shall make the initial determination of the annual Fair Market Rent. Landlord shall notify Tenant in writing (the "**FMR Notice**") of Landlord's determination of the Fair Market Rent within thirty (30) days after the Termination Deadline. Tenant shall notify Landlord in writing ten (10) days of its receipt of Landlord's FMR Notice whether or not it accepts Landlord's determination of Fair Market Rent. If Tenant accepts Landlord's determination, the Fair Market Rent shall be final and binding and Landlord shall prepare an amendment to the Lease that amends the Base Rent to reflect the new Fair Market Rent. Tenant's failure to respond to Landlord's FMR Notice within the 10-day period shall be deemed an acceptance by Tenant of Landlord's determination of Fair Market Rent. If Tenant delivers written notice ("**Tenant's Rejection Notice**") to Landlord within the 10-day period rejecting Landlord's determination of Fair Market Rent, the

parties agree to negotiate their differences in good faith within thirty (30) days (the "**FMR Negotiation Period**") following Landlord's receipt of Tenant's Rejection Notice. If the parties fail to agree on a Fair Market Rent within the FMR Negotiation Period, then the parties agree to determine the Fair Market Rent in accordance with the terms and conditions contained below.

(b)     Not later than ten (10) days after the date of the expiration of the FMR Negotiation Period, Landlord and Tenant shall each: (i) appoint an appraiser, at their own cost and expense, and (ii) give written notice to the other identifying that party's appraiser. Each appraiser shall make its determination of Fair Market Rent within thirty (30) days from appointment. Any appraiser selected under this subsection shall be an appraiser or licensed real estate broker who has substantial experience in leasing in the geographic real estate market where the Premises are situated and who has not been regularly employed or retained as a consultant, appraiser, or agent of either Landlord or Tenant during the immediately preceding twelve (12) months.

(c)     Not later than ten (10) days after both appraisers have delivered their appraisals to Landlord and Tenant, respectively, each party shall submit to the other party's appraiser containing its proposed Fair Market Rent. After each of the appraisers receives a proposed Fair Market Rent determination from both parties, Tenant's appraiser shall provide a copy of each submission to both Tenant and Landlord. Within twenty (20) days after receipt of both parties' proposals, the appraisers shall review the submissions and shall select one proposal as closer to the actual Fair Market Rent for the Premises, which shall become the Fair Market Rent for the Premises for the applicable Renewal Term. The appraisers shall promptly notify the parties of their decision, which shall be final and binding upon Landlord and Tenant.

(d)     If the appraisers do not agree as to which party's proposal is closest to the actual Fair Market Rent, then not later than ten (10) days after the appraisers have notified the parties of this fact, unless both Landlord and Tenant direct otherwise, the appraisers shall jointly select a third appraiser (the "**Final Appraiser**") who shall determine which proposal is the closest to the actual Fair Market Rent. The Final Appraiser must have the same qualifications stated for an appraiser under subsection (b) above and shall conduct an arbitration under the provisions of the commercial arbitration rules of the American Arbitration Association. The Final Appraiser shall decide, within twenty (20) days from appointment, only which Fair Market Rent submission is closest to the actual Fair Market Rent for the Premises. Landlord and Tenant shall equally share one-half (1/2) of the costs for the Final Appraiser.

(e)     In the event that the parties have not determined the Fair Market Rent by the then-current expiration of the Term, Tenant may in any event continue to occupy the Premises and pay Base Rent to Landlord at a rate equal to the Base Rent paid for the last full month immediately preceding the then-current expired Term, until the Fair Market Rent is determined. In such case, Fair Market Rent, once fully and finally determined, shall be applied retroactively to the beginning of the applicable Renewal Term and Landlord and Tenant shall make the necessary adjustments and payments to Tenant's rental account within thirty (30) days of such final determination of Fair Market Rent.

4.4     Triple Net. This Lease is a "Triple Net Lease" pursuant to which Tenant shall either (i) pay directly for Premises Costs; or (ii) reimburse Landlord for the Premises Costs. Tenant shall provide Landlord, upon request, with copies of invoices receipts canceled checks, and/or other documentation substantiating Tenant's payment of any Premises Costs. For purposes of this Section 4.3, "**Premises Costs**" means Tenant's actual costs and expenses for use and operation of the Premises for that same year, whether imposed under this Lease or otherwise reasonably incurred by Tenant in operating the Premises, including taxes, insurance premiums, capital expenditures, repairs, maintenance, landscaping, property management

fees, utilities (including water, heat, gas, electricity, waste removal, sewers, and other utilities or services supplied to the Premises), janitorial, and security services, all as set forth in this Lease.

## ARTICLE 5
### USE; CONSTRUCTION; MAINTENANCE AND REPAIR;
### ALTERATIONS AND IMPROVEMENTS; INGRESS AND EGRESS

5.1     Permitted Use.  Tenant may use the Premises for the Permitted Use.

5.2     No Waste; Compliance with Law.  Tenant agrees not to commit any waste of the Premises. Tenant shall not use the Premises in any manner which causes or threatens to cause a nuisance upon the Premises or to adjacent properties. Tenant agrees to comply with all laws, ordinances, regulations, governmental stipulations, covenants, conditions, and restrictions, public or private, affecting or relating to the Premises, and Tenant's use thereof including, without limitation, such laws, rules and regulations as may from time to time be in effect with respect to the use of hazardous waste, hazardous materials, or hazardous or toxic substances, as defined in any local, state, or federal law or regulation related to protection of health, safety, or the environment, on the Premises.

5.3     Maintenance and Repair Obligations.  During the Term, Tenant, at Tenant's sole cost and expense, shall keep and maintain the Premises and any improvements, now or hereafter, serving the Premises in good, useable, and safe condition.

5.4     Alterations and Improvements.

(a)     Tenant's Right to Make Additions and Alterations.  Tenant shall have the right to make additions, alterations and improvements to the Premises without the prior written consent of Landlord. Any and all additions, alterations and improvements which are made or caused to be made by Tenant, before or during the Term, shall be made at Tenant's sole expense in accordance with the following: (i) such work shall be done in conformity with a valid building permit when required, a copy of which shall be furnished to Landlord before the work is commenced, and any work not acceptable to the appropriate governmental entity shall be promptly replaced at Tenant's expense; and (ii) such work shall not unreasonably cause or create a dangerous or hazardous condition.  Without limiting the generality of the foregoing, Tenant shall cause all such work to be performed in a good and workmanlike manner.  Landlord shall have no responsibility for any alterations or additions made to the Premises.

(b)     Title to Additions, Alterations and Improvements.  Any additions, alterations, decorations, fixtures, hardware, non-trade fixtures and all improvements, temporary or permanent, in or upon the Premises (including the installation of floor coverings) made or caused to be made by Tenant during the Term shall be considered permanent improvements and shall become part of the Premises, and with Tenant retaining no ownership thereof, except as otherwise mutually agreed upon by the parties prior to such installation.  If mutually agreed by the parties prior to installation, Tenant shall, within thirty (30) days of expiration or sooner termination of the Term, remove any and all such additions, alterations, or improvements.  If, despite the parties' mutual agreement, Tenant does not remove said additions, decorations, fixtures, hardware, non-trade fixtures and improvements, Landlord may remove them and Tenant shall pay the cost of such removal to Landlord upon demand.  Upon any permitted or required removal of such items, or upon any removal thereof in violation of this Section, Tenant shall repair any damage caused by such removal and restore the Premises to their condition prior to the making of such additions, alterations and improvements, reasonable wear and tear excepted.

(c)     Mechanics' Liens.  Without limiting Landlord's approval rights under this Section 5.4, Tenant shall give Landlord twenty (20) days' prior written notice before any construction work

on the Premises is undertaken by or on behalf of Tenant. Tenant shall do all things reasonably necessary to prevent the filing of any mechanic's liens or other liens against the Premises or Wohali, or any part thereof, by reason of work, labor, services or materials supplied or claimed to have been supplied to Tenant or anyone holding the Premises, or any part thereof, through or under Tenant. Without limiting the generality of the foregoing, Tenant shall record a notice of completion promptly upon the completion of any such work, labor, services or supplying of materials, in the manner permitted by law. If any such lien shall at any time be filed, Tenant shall promptly notify Landlord of same and shall either cause the same to be discharged of record within twenty (20) days after the date of filing the same, or, if Tenant, in its discretion and good faith, determines that such lien should be contested, it shall furnish such security as may be required by law to prevent any foreclosure proceedings against the Premises, or any part thereof, during the pendency of such contest. If Tenant shall fail to discharge such lien within such period or fail to furnish such security, then, in addition to all other rights or remedies, Landlord may, but shall not be obligated to, discharge the same (i) by paying the amount claimed to be due, (ii) by procuring the discharge of such lien by deposit in court, (iii) by giving security, or (iv) in such other manner as is, or may be prescribed by law. Any amount paid by Landlord for any of the aforesaid purposes, including all reasonable attorneys' fees to procure the discharge of such lien with all necessary disbursements in connection therewith, with interest thereon at the maximum rate permitted by law from the date of payment, shall be repaid by Tenant to Landlord on demand and, if unpaid, may at Landlord's election, be treated as additional rent. Nothing herein contained shall imply any consent or approval by Landlord to the filing of any mechanics' liens against the Premises or any part thereof.

     5.5    <u>Ingress and Egress to and from the Premises</u>. Tenant shall have the non-exclusive right during the Term of this Lease to use the accessways now, or hereafter, existing and made available by Landlord from time-to-time upon or for the Premises for itself, its tenants, employees, agents, invitees, and licensees for pedestrian access and vehicular ingress, egress, regress, and temporary parking of vehicles (including trucks and heavy machinery) to and from the Premises and adjacent public rights-of-way.

**ARTICLE 6**
**GENERAL INDEMNITY; INSURANCE; CASUALTY**

     6.1    <u>General Tenant Indemnity Provisions</u>. Tenant covenants and agrees to indemnify and save Landlord and its Related Parties (as defined below) harmless for, from and against each and every claim, demand, liability, loss, cost, damage and expense, including, without limitation, attorneys' fees and court costs, arising out of (i) any failure on the part of Tenant to perform or comply with any of the terms of this Lease; and (ii) any injury to or death of persons or damage to property caused by Tenant or its agents, contractors, licensees, invitees, or employees, except in each instance to the extent the same is caused by any willful or grossly negligent act or omission of Landlord, its agents, employees or contractors. These indemnity provisions, as well as all other indemnity provisions in this Lease, shall survive the expiration of this Lease or the earlier termination thereof.

     6.2    <u>Casualty Insurance</u>. Landlord will, at all times during the Term and at the sole cost and expense of Landlord, obtain and maintain in effect an all risk property and casualty insurance policy for the benefit of Landlord and Tenant insuring one hundred percent (100%) of replacement cost of the buildings located on the Premises. The original of such policy or policies shall remain in possession of Landlord.

     6.3    <u>Liability Insurance</u>. Tenant, at the sole cost and expense of Tenant, shall at all times during the Term maintain in force an insurance policy or policies which will name Tenant as insured and Landlord as an additional insured, insuring against all liability resulting from injury or death occurring to persons in or about the Premises and from property damage occurring in or about the Premises, the liability under such insurance to be not less than $1,000,000 (combined single limit for personal injury, including death, and property damage).

6.4     Insurance Policy Requirements. The insurance policies and certificates required by this Article 6 shall require the insurance company to furnish Landlord and Tenant, as the case may be, thirty (30) days' prior written notice of any cancellation or lapse, or the effective date of any reduction in the amounts or scope of coverage. Except with respect to self-insurance, all such policies shall be issued by a company or companies, rated "A" or better by Best's Insurance Guide, responsible and authorized to do business in the State of Utah. Landlord and Tenant agree that Landlord may satisfy its insurance obligations under this Lease by a blanket policy of insurance. Upon request, each party shall cause certificates of insurance reasonably evidencing compliance with the requirements of this Article 6 to be delivered to the other party.

6.5     Mutual Waiver of Subrogation Rights. Tenant and Landlord each hereby release and relieve the other and any parent, subsidiary or affiliate of the other, and their respective directors, officers, shareholders, employees, representatives and agents (the "**Related Parties**") and waive their entire right of recovery against the other and the Related Parties of the other, for loss or damage arising out of or incident to the perils insured against under this Article 6, which perils occur in, on or about the Premises, whether due to the negligence of Landlord or Tenant or their Related Parties but only to the extent of insurance proceeds actually paid.

6.6     Damage. If any buildings, structures or other improvements upon the Premises shall be destroyed or damaged in whole or in part by fire or other casualty so as to render the Premises untenantable, this Lease may be terminated at the election of Tenant or Landlord, by sending written notice thereof to the Landlord, which termination shall be effective immediately upon receipt thereof. Upon any termination of this Lease pursuant to this Section 6.6, Tenant's rental obligations shall immediately cease, and except as otherwise expressly provided herein, all of the obligations of Landlord and Tenant shall terminate.

## ARTICLE 7
## UTILITIES AND TAXES

7.1     Utility Charges. Tenant shall pay or cause to be paid, when due and prior to delinquency, any and all charges for water, gas, electricity, telephone service, and any other utilities, including any or all utility connection fees associated therewith) used in, upon, or for the Premises by or on behalf of Tenant during the Term and agrees not to permit any charges of any kind to accumulate or become a lien against the Premises.

7.2     Real Estate Taxes. Tenant shall pay all Real Estate Taxes (as defined below) levied or assessed by lawful taxing authorities against the land, buildings, and improvements within or otherwise comprising the Premises. "**Real Estate Taxes**" shall mean all taxes, assessments, or levies, whether special, extraordinary, or otherwise, whether foreseen or unforeseen, which may be levied, assessed, or imposed on, on account of, or with respect to (i) the land, buildings, and personal property owned by Landlord and comprising, and/or situated on or within, the Premises, and (ii) rents paid by Tenant to Landlord, whether such tax is levied on Landlord or Tenant, but excluding any income taxes. To the extent taxing authorities include in such Real Estate Taxes the value of any improvements made by Tenant to the Premises, or include machinery, equipment, fixtures, inventory, or other personal property of Tenant, then Tenant shall also pay the entire Real Estate Taxes for such items. Tenant at all times shall be responsible for and shall pay, before delinquency, all municipal, county, state, or federal taxes assessed against any leasehold interest in the Premises or any personal property of any kind owned, installed, or used by Tenant.

# ARTICLE 8
## ASSIGNMENT AND SUBLETTING

8.1    <u>Assignments</u>. Tenant may assign all or any part of this Lease, or sublet or license all or any part of the Premises, without the prior written consent of Landlord. In the event of an assignment, sublet, or license, Tenant shall remain liable to Landlord for the performance of all obligations to be performed by Tenant under this Lease, including payment of the Base Rent.

8.2    <u>Sale by Landlord</u>. Landlord may sell, transfer, assign or otherwise dispose of its interest in the Premises or this Lease, or any part thereof or interest therein, without the consent of Tenant. This Lease shall not be affected by any such sale, transfer, assignment or disposal of Landlord's interest and Tenant agrees to attorn to Landlord's purchaser or assignee.

# ARTICLE 9
## DEFAULTS AND REMEDIES

9.1    <u>Default</u>. Tenant shall be in default hereunder (i) the non-payment of the whole or any portion of the Base Rent after more than twenty (20) days following Tenant's receipt of written notice from Landlord thereof, or (ii) the non-performance by Tenant of any other covenant or condition herein set forth on the part of said Tenant to be kept and performed after more than thirty (30) days following Tenant's receipt of written notice of the default from Landlord (or in the case of a default that cannot be cured within thirty (30) days, Tenant shall not have commenced to cure such default and be diligently prosecuting such cure). Tenant shall also be in default under this Lease and Landlord shall be entitled to exercise its remedies under this Lease for default (a) if Tenant shall file a petition in bankruptcy or for reorganization or for an arrangement pursuant to any federal or state bankruptcy law or any similar federal or state law, or shall be adjudicated a bankrupt or shall make an assignment for the benefit of creditors or shall admit in writing its inability to pay its debts generally as they become due; or (b) if a receiver, trustee or liquidator of Tenant or of all or substantially all of the assets of Tenant or Tenant's leasehold interest in the Premises shall be appointed in any proceeding brought by Tenant, or if any such receiver, trustee or liquidator shall be appointed in any proceeding brought against Tenant and shall not be discharged within sixty (60) days after the occurrence thereof, or if Tenant shall consent to or acquiesce in such appointment.

9.2    <u>Remedies</u>. On any event of default, Landlord, at Landlord's option, may exercise any and all rights and remedies available at law or in equity or pursuant to this Lease, in any order, successively or concurrently, including the following:

      (a)    <u>Cure of Default</u>. Landlord may take any action deemed necessary by Landlord, in Landlord's reasonable discretion, to cure the default. Tenant shall be liable to Landlord for all of Landlord's reasonable expenses so incurred, as additional rent, payable by Landlord to Tenant within ten (10) days of receipt by Tenant of an invoice therefor.

      (b)    <u>Termination of Lease</u>. Landlord may terminate this Lease by written notice to Tenant of Landlord's election to do so. Upon the giving of such notice, this Lease shall expire and terminate on the date set forth in such notice as fully and completely and with the same effect as if such date were the date herein fixed for the expiration of the Term, and all rights of Tenant shall expire and terminate, but Tenant shall remain liable as hereinafter provided.

      (c)    <u>Right to Re-enter</u>. Landlord shall have the right pursuant to proper legal process, whether or not the term of this Lease shall have been terminated pursuant to <u>Section 9.2(b)</u>, to re-enter and repossess the Premises by summary proceedings, ejectment, any other legal action or in any lawful manner Landlord determines to be necessary or desirable and to remove all persons

and property therefrom. No such re-entry or repossession of the Premises shall be construed as an election by Landlord to terminate the term of this Lease unless a notice of such termination is given to Tenant pursuant to Section 9.2(b).

(d)     Reletting of the Premises.  At any time or from time to time after the re-entry or repossession of the Premises pursuant to Section 9.2(c), whether or not the term of this Lease shall have been terminated pursuant to Section 9.2(b), Landlord shall use reasonable efforts to relet the Premises for the account of Tenant at a rental which is reasonable in light of the then existing market conditions in the community, in the name of Tenant or Landlord or otherwise, without notice to Tenant, for such term or terms and on such other conditions and for such uses as Landlord, in its reasonable discretion, may determine. Landlord may collect and receive any rents payable by reason of such reletting.

9.3     Waiver of Breach.  No waiver by Landlord or Tenant of the breach of any provision of this Lease shall be construed as a waiver of any preceding or succeeding breach of the same or any other provision of this Lease, nor shall the acceptance of rent by Landlord during any period of time in which Tenant is in default in any respect other than payment of rent be deemed to be a waiver of such default.

## ARTICLE 10
## FINANCING; SUBORDINATION; ESTOPPEL CERTIFICATES

11     Tenant's Right to Obtain Financing.  Tenant (including any permitted assignee or subtenant of Tenant) shall have the right, without Landlord's consent, to encumber or mortgage (including collaterally assign) the Tenant Estate (as defined below) or any portion thereof or interest therein pursuant to one or more Permitted Mortgages (as defined below) and to execute and deliver to any mortgagee a Permitted Mortgage encumbering the Tenant Estate at any time and from time to time during the Term hereof, provided that:  (a) the Mortgagee (as defined below) shall not be any person who (i) is not in compliance with the regulations of the Office of Foreign Assets Control ("OFAC") of the U.S. Department of Treasury and any statute, executive order (including Executive Order 13224, dated September 24, 2001 and entitled "Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism") or regulation relating thereto or (ii) is listed on the Specially Designated Nationals and Blocked Persons List maintained by OFAC and/or on any other similar list maintained by OFAC or other governmental authority pursuant to any authorizing statute, executive order or regulation; (b) the Mortgagee, including any trustee or other person claiming by, through, or under any Mortgagee shall not by virtue thereof acquire any greater right in the Premises than Tenant then had under this Lease, except for the rights expressly granted to such Mortgagee, trustee, or other person under the terms of this Lease; and (c) the Permitted Mortgage, and the indebtedness secured thereby, shall at all times be and remain subject to all of the conditions, covenants, and obligations of this Lease. A Permitted Mortgage shall not be deemed to constitute an assignment or transfer of the Tenant Estate by Tenant, nor shall any Mortgagee be deemed to be an assignee, transferee, or mortgagee-in-possession of the tenant estate merely by entering into a Permitted Mortgage with Tenant.

For purposes of this Section 11.1, the following defined terms are provided:

1.     **"Mortgagee"** means any one or more holders of the beneficial interest and secured position under any Permitted Mortgage. The term "Mortgagee " shall also be deemed to include any and all affiliates of such Mortgagee which have succeeded by assignment or otherwise to any rights, interests or liabilities of the Mortgagee with respect to the Permitted Mortgage, or which have been designated by the Mortgagee to exercise any rights or remedies under the Permitted Mortgage or to

take title to the leasehold estate under this Lease, and such affiliates shall enjoy all of the rights and protections given to Mortgagees under this Lease.

2. **"Permitted Mortgage"** means collectively any mortgage, deed of trust or other collateral security instruments (including, without limitation, financing statements, security agreements and other documentation required pursuant to the Uniform Commercial Code, and any absolute or conditional assignments of rents and Subleases) serving as security for one or more construction loans and/or permanent loans (otherwise permitted to be incurred hereunder) which encumber solely the Tenant Estate, together with any modification, substitution, amendment, extension, increase, refinancing, replacement or recasting (otherwise permitted to be incurred hereunder) thereof; provided, however, in no event shall any such Permitted Mortgage encumber the Landlord's fee estate or Landlord's interest in the Demised Premises.

3. **"Tenant Estate"** shall mean, collectively, (i) Tenant's rights, title and interest in, to and under this Lease, (ii) Tenant's rights, title and interest and leasehold estate in the Premises arising under this Lease, and (iii) Tenant's rights, title and interest in each of the improvements erected by Tenant.

10.2 <u>Fee Mortgages</u>. Without the necessity of any additional document being executed by Tenant for the purpose of effecting a subordination, this Lease shall be subject and subordinate at all times to the lien of any mortgages or deeds of trust now or hereafter placed on, against or affecting the Landlord's fee interest or estate in the Premises; provided, however, that Tenant shall have first received a non-disturbance agreement in a form reasonably acceptable to Tenant and providing that so long as Tenant is not in default under this Lease, Tenant's possession of the Premises shall not be disturbed (a **"Non-Disturbance Agreement"**). Notwithstanding the foregoing, Tenant covenants and agrees to execute and deliver, within ten (10) business days of Landlord's written request, such further instruments evidencing such subordination of this Lease as may be required by Landlord, provided that as a condition of such subordination the holder of such mortgage or deed of trust executes and delivers a Non-Disturbance Agreement.

10.3 <u>Delivery of Estoppel Certificate</u>. Each party shall at any time upon twenty (20) days' prior written notice from the other party execute, acknowledge and deliver to the requesting party an estoppel certificate regarding the terms and provisions of this Lease, in a commercially reasonable form. Any such statement may be conclusively relied upon by any prospective purchaser or encumbrancer of the Premises or any interest therein.

**ARTICLE 11**
**TENANT'S RIGHT OF FIRST OFFER**

11.1 <u>Right of First Offer</u>. Landlord hereby grants to Tenant an ongoing right of first offer (the **"ROFO"**) during the Term to purchase the fee interest in the real property underlying the Premises, and the improvements thereon, therein, and/or thereto, subject to and in accordance with the terms of this <u>Section 11.1</u>.

(a) <u>Notice</u>. In the event that Landlord decides, from and after the Commencement Date or otherwise during the Term, to offer for sale all or any portion of the fee simple ownership interest of Landlord in the Premises (the **"Fee Interest"**), Landlord shall deliver to Tenant written notice of such intention ("**Notice to Sell**"). The Notice to Sell shall summarize the price and general terms upon which Landlord intends to offer the Fee Interest for sale.

(b)    Tenant's Response. Tenant shall have thirty (30) days after receipt of Landlord's Notice to Sell within which to provide written notice of Tenant's interest in purchasing the Fee Interest (the "**ROFO Response**"). The ROFO Response, if given, shall summarize the price and general terms upon which Tenant would be willing to purchase such interest. The price and general terms so described by Tenant may, but need not, be the same as those described in the Notice to Sell.

(c)    Negotiations.

(i)    In the event that the price and general terms described in Tenant's ROFO Response are the same as those described in Landlord's Notice to Sell, the parties shall negotiate in good faith over a period not exceeding thirty (30) days for a binding agreement of purchase and sale at the same price and with specific, more detailed terms that are reasonably consistent with the general terms described in the said notices. In the event the parties do so negotiate in good faith, but are unable to agree on such specific terms, no binding agreement of purchase and sale shall be entered into, and either of the parties may then terminate their negotiations for such an agreement.

(ii)    In the event that the price or any of the general terms described in Tenant's ROFO Response are not the same as those described in Landlord's Notice to Sell, Landlord and Tenant shall promptly meet and negotiate in good faith the terms of a binding agreement of purchase and sale at a price, if any, and on specific terms, if any, that are mutually acceptable to both parties.

(d)    Thirty-Party Sale of Fee Interest. In the event that Landlord issues a Notice to Sell, and in the further event that either (i) Tenant does not respond within thirty (30) days of its receipt thereof, (ii) Tenant does so respond with a ROFO Response at the same price and general terms described in the Notice to Sell, but the parties' good faith negotiations fails to produce a mutually acceptable binding agreement of purchase and sale within thirty (30) days thereafter, or (iii) Tenant responds with a ROFO Response, but not at the same price and same general terms described in the Notice to Sell, then, Landlord shall be entitled to sell the Fee Interest to a third party provided that: (1) the aggregate economic value of all terms and conditions of such third-party sale must not be equal to or less than ninety-five percent (95%) of the aggregate economic value of the terms and conditions offered in the Notice to Sell; (2) the terms and conditions of such third-party sale must not otherwise be materially more favorable to the buyer than those terms and conditions offered in the Notice to Sell; and (3) such third-party sale must close within one (1) year after the date of the Notice to Sell. In the event that any of the foregoing conditions is not met, then Landlord shall provide Tenant with a new Notice to Sell and the process shall be as set forth above. Notwithstanding anything to the contrary herein, any purchaser and its successors and assigns shall acquire the Fee Interest subject to the ROFO, which shall survive any such sale or transfer and be triggered anew in the event of any subsequent offers for sale of the Fee Interest.

(e)    Exceptions. Notwithstanding anything to the contrary in this Section 11.1, the ROFO shall not apply to any of the following hypothecations, transfers, conveyances, or assignments (in the event such events do not violate the terms of the Lease): (i) if Landlord elects to convey it to any entity owned or controlled by Landlord, (ii) because of any involuntary conveyance, (iii) by reason of any foreclosure or trustee's sale or deed in lieu of foreclosure or trustee's sale, or (iv) ROFO is specifically not applicable pursuant to the terms of a provision of this Lease.

## ARTICLE 12
## GENERAL PROVISIONS

12.1 <u>Notices</u>. Notices shall be in writing and shall be given by personal delivery, by deposit in the United States mail, certified mail, return receipt requested, postage prepaid, or by express delivery service, freight prepaid. Notices shall be delivered or addressed to Landlord and Tenant at the addresses set forth in the Fundamental Provisions or at such other address or number as a party may designate in writing. The date notice is deemed to have been given, received and become effective shall be the date on which the notice is delivered, if notice is given by personal delivery, or the date of actual receipt, if the notice is sent through the United States mail or by express delivery service.

11.2 <u>Interpretation</u>. The captions of the Articles or Sections of this Lease are to assist the parties in reading this Lease and are not a part of the terms or provisions of this Lease. Unless the context clearly requires otherwise, (a) the plural and singular numbers will each be deemed to include the other; (b) the masculine, feminine, and neuter genders will each be deemed to include the others; (c) "shall," "will," "must," "agrees," and "covenants" are each mandatory; (d) "may" is permissive; (e) "or" is not exclusive; and (f) "includes" and "including" are not limiting. In the event of a dispute between Landlord and Tenant over the interpretation of this Lease, both parties shall be deemed to have been the drafter of this Lease, and any applicable laws that state that contracts are to be construed against the drafter shall not apply. The language in all parts of this Lease shall in all cases be construed as a whole according to its fair meaning and not strictly for or against either party.

11.3 <u>Whole Agreement; Modifications</u>. This Lease is the only lease between the parties pertaining to the lease of the Premises. All amendments to this Lease shall be in writing and signed by the parties hereto. Any other purported amendments shall be void. All attached exhibits are hereby expressly incorporated into this Lease by this reference.

11.4 <u>Binding Effect; Choice of Law; Jury Waiver</u>. This Lease binds any party who legally acquires any rights or interest in this Lease from either party. The laws of the State of Utah shall govern this Lease, without regard to the State of Utah's conflicts of law principles. Either party may bring any action or claim to enforce or interpret the provisions of this Lease in the State of Utah and the County of Salt Lake, and that each irrevocably consents to personal jurisdiction in the State of Utah for the purposes of any such action or claim. Any action or claim brought by either party to enforce or interpret the provisions of this Lease, or otherwise arising out of or related to this Lease or to the use and occupancy of the Premises, regardless of the theory of relief or recovery and regardless of whether third parties are involved in the action, may only be brought in the State of Utah and the County of Salt Lake, unless otherwise agreed in writing by the other party prior to the commencement of any such action. In the interest of obtaining a speedier and less costly adjudication of any dispute, each party waives the right to trial by jury in any legal action, proceeding, claim, or counterclaim brought by either of them against the other on all matters arising out of or related to this Lease or the use and occupancy of the Premises or any other relationships between them of any kind or nature, whether such claims asserted be in contract, tort, equity, statute or otherwise.

11.5 <u>Relationship of Parties</u>. Nothing contained in this Lease shall be deemed or construed by the parties hereto or by any third party to create the relationship of principal and agent, partnership, joint venturer, or any association between Landlord and Tenant, it being expressly understood and agreed that neither the method of computation of rent nor any act of the parties hereto shall be deemed to create any relationship between Landlord and Tenant, other than the relationship of lessor and lessee.

11.6 <u>Partial Invalidity</u>. If any term, covenant, condition or provision of this Lease shall be invalid or unenforceable at any time or to any extent, the remainder of this Lease shall not be affected

thereby, and each remaining term, covenant, condition and provision of this Lease shall remain valid and enforceable to the fullest extent permitted by law.

  11.7 <u>Counterparts</u>. This Lease may be executed in counterparts and, when all counterpart documents are executed, the counterparts shall constitute a single binding instrument. Receipt of electronic signatures (regardless of the means of transmission, whether by PDF, email, or other format (including DocuSign or the like)) shall be as binding on the parties as an original signature.

  11.8 <u>Authority</u>. Each individual executing this Lease represents, warrants, and covenants that he or she is authorized to execute this Lease on behalf of the entity which he or she purports to represent.

  11.9 <u>Attorneys' Fees</u>. In the event of any action to enforce the provisions of this Lease, the prevailing party shall be entitled to receive reimbursement from the other party for reasonable costs and attorneys' fees in an amount determined by the court.

*[Signature Page Follows]*

IN WITNESS WHEREOF, this Lease has been executed and delivered by Landlord and Tenant as of the Commencement Date.

**LANDLORD:**

**Wohali Land Estates, LLC,**
a Utah limited liability company

By: _____
Name: _____
Its: _____

**TENANT:**

**Wohali Resort, Inc.,**
a Utah benefit corporation

By: _____
Name: _____
Its: _____

EXHIBIT A

**General Depiction of the Premises**

The "Premises" is generally depicted as outline below as the "18 Hole Championship Golf Course" and the "The Manor Clubhouse", as follows:



*Exhibit A*

**EXHIBIT B**

**Base Rent Table**

| Lease Years | Annual Base Rent |
|---|---|
| 1-5 | $100,000.00 |
| 6-10 | $145,000.00 |
| 11-15 | $180,000.00 |
| 16-20 | $225,000.00 |
| 21-25 | $250,000.00 |
| Renewal Term(s) | *Base Rent for Renewal Terms shall be established in accordance with Section 4.3 of the Lease. |