Ellen E. Ostrow (14743)
**FOLEY & LARDNER LLP**
95 South State Street, Suite 2500
Salt Lake City, UT 84111
Telephone: (801) 401-8900
eostrow@foley.com

*Attorney for the Chapter 11 Trustee*

---

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF UTAH**

| | |
|---|---|
| In re: | **Bankruptcy No. 25-24610** |
| **WOHALI LAND ESTATES, LLC,** | Chapter 11 |
| Debtor. | Honorable Peggy Hunt |

---

**CHAPTER 11 TRUSTEE'S MOTION, PURSUANT TO 11 U.S.C. §§ 105(a) AND 363(b), AND FEDERAL RULES OF BANKRUPTCY PROCEDURE 6004, 9014 AND 9019, FOR ENTRY OF AN ORDER APPROVING A SETTLEMENT AGREEMENT AND RELEASE OF CLAIMS BETWEEN THE TRUSTEE, ON THE ONE HAND, AND EB5AN WOHALI UTAH FUND XV, LP, ON THE OTHER HAND**

**(Relates to Adv. No. 25-02175)**

---

Matt McKinlay, in his capacity as the Chapter 11 trustee (the "***Trustee***") of Wohali Land Estates, LLC (the "***Debtor***"), hereby moves the Court (the "***Motion***") for entry of an order under sections 105 and 363(b) of title 11 of the United States Code (the "***Bankruptcy Code***") and Rules 6004, 9014 and 9019 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***") approving the entry by the Trustee into the *Settlement Agreement and Release of Claims* attached hereto as Exhibit A (the "***Agreement***" and the settlement it contemplates, the "***Settlement***") by and between the Trustee and EB5AN Wohali Utah Fund XV, LP ("***EB5***"), and authorizing the Trustee to consummate the Settlement in accordance with the terms of the Agreement.

In support of the Motion, the Trustee, by and through his undersigned counsel, respectfully represents:

<strong><u>PRELIMINARY STATEMENT[1]</u></strong>

1.      Since the Trustee's appointment in October 2025, one thing has been clear: the path to a value-maximizing resolution of the Chapter 11 Case must go either through or around EB5. After months of increasingly formal marketing efforts, the market has spoken and the Trustee believes the Debtor's tangible real and personal property assets are unlikely to sell for more than $65 million, which is less than the EB5 Prepetition Claim by more than $20 million and nearly $30 million less than the EB5 Prepetition Claim and DIP Claim combined.

2.      The Agreement delivers six things the estate cannot obtain through protracted litigation against EB5: certainty, speed, guaranteed cash for Non-EB5 Unsecured Creditors, guaranteed cap of EB5's deficiency claim, a competitive and reasonable marketing period, and preserved upside. Specifically, the Agreement provides:

    a.  A $65 million stalking horse credit bid by EB5 (and up to $89 million at auction)—ensuring a competitive sale process and establishing a market floor;

    b.  $1.8 million in immediate cash to fund all allowed administrative claims, including the WCOs' administrative expense claim, and seed avoidance action litigation and/or a Liquidating Trust;

---

[1] Capitalized terms used but not otherwise defined in the Preliminary Statement shall have the meanings ascribed to such terms in later sections of this Motion.

c. A $3 million guaranteed distribution for Non-EB5 Unsecured Creditors ($4 million if the WP Parcels become estate property), secured by a standby letter of credit issued by Banesco USA: a bankable, third-party instrument, not a promise;

d. EB5's deficiency claim capped at $10 million (against a potential uncapped deficiency of $28 million or more that would dwarf all other unsecured claims combined);

e. EB5's assumption of all PID obligations and tax liabilities and payment of pre-closing golf course preservation or operation costs;

f. EB5's assumption of all obligations arising under the Boyden Farms loan documents, to the extent the Court determines the subordination agreement is unenforceable; and

g. EB5's obligation to purchase the WP Parcels at fair market value upon the Trustee's recovery of them, plus monthly rent of $14,583.33 if EB5 delays closing of the WP Parcels beyond 120 days.

3. The backdrop is straightforward. Months of active marketing by CBRE have produced no indication that the Wohali Project will sell for anywhere close to the amount of the EB5 Prepetition Claim, let alone the prepetition secured debt and DIP. Recent indications of value have been less than $65 million—approximately $21 million less than the EB5 Prepetition Claim. In any litigation scenario, the Trustee must begin with the baseline that EB5 currently holds a recorded first-priority lien (subject to the PID) on the Collateral, is the Court-approved DIP lender, and has demonstrated the resources and willingness to defend its rights and claims fully through trial and even on appeal if necessary. Even a favorable ruling for the estate could require years of litigation and appellate review before any dollars or property changed hands.

4. An unfavorable ruling for the estate would significantly and adversely affect unsecured creditor recoveries. If the EB5 Prepetition Claim is left completely intact, and EB5 credit bids its DIP Claim of approximately $7 million and another $58 million of the EB5 Prepetition Claim, EB5 might take possession of the entire Wohali Project while leaving behind an unsecured deficiency claim of more than $28 million. Such a deficiency claim would be more than four times the estimated aggregate total of all other unsecured claims against the Debtor's estate. Thus, EB5 would receive the lion's share of any distributions made from the estate's avoidance action recoveries which would be depleted by significant additional administrative expenses incurred by litigating with EB5.

5. If any litigation against EB5 is partially successful such that EB5's credit bidding rights are materially compromised, but the EB5 Prepetition Claim stands, EB5 may not take the property but could nevertheless receive substantially all cash proceeds from a sale and still be left with a significant deficiency claim – a much worse outcome for the estate and the other unsecured creditors than the Settlement achieves.

6. In other words, even partially successful litigation or a challenge to EB5's credit bidding rights would not meaningfully benefit the estate's other unsecured creditors. That implicates two of the four *Kopexa* factors: How likely is litigation against EB5 to succeed, and is litigation actually in the best interests of the Debtor's other creditors?

7. The Trustee carefully evaluated the estate's potential claims against EB5 for constructive fraudulent transfer, recharacterization, equitable subordination, unjust enrichment, and other potential claims raised by other interested parties. Following receipt of over 300,000 documents, depositions of six fact witnesses, and two days of private mediation with James T.

Markus followed by ten days of continued negotiations, the Trustee concluded that those claims—while colorable—face substantial headwinds. EB5's position as a non-insider, non-fiduciary lender that holds validly recorded liens securing the obligations for money that the Debtor received from EB5 pursuant to loan documents is a formidable starting point. The Trustee has thoroughly evaluated and understands the risk that pursuing the estate's potential claims against EB5 could be for naught.

8.      On March 17 and 18, 2026, the Trustee, EB5, and the Wohali Concerned Owners engaged in a private mediation (the "*Mediation*") with James T. Markus (the "*Mediator*") at the offices of the Trustee's counsel in Salt Lake City. Prior to the Mediation, the Trustee shared with the other parties a comprehensive mediation brief detailing his views and providing the specific factual support that would go into a complaint. The Wohali Concerned Owners (the "*WCOs*") shared their own mediation statement which set forth additional arguments in support of the Trustee's chosen causes of action and outlined certain other causes of action the WCOs think may be worth pursuing.[2] In advance of the Mediation, EB5 provided a detailed response to the statements submitted by the Trustee and the WCOs.

9.      Though the Trustee continues to believe litigation against EB5 *could* succeed, the Trustee is unable to conclude that litigation against EB5 *would* succeed. After hours of consideration with counsel and with the Mediator, the Trustee believes there is no guarantee (and an uncertain likelihood) that the Trustee—or any other party granted derivative standing—would meaningfully prevail on any theory for compromising the EB5 Prepetition Claim. The outcome

---

[2] In accordance with the agreement governing the Mediation, the Wohali Concerned Owners' arguments are not discussed herein.

outlined above—wherein EB5 succeeds in litigation, takes the property, and is left with an overwhelming deficiency claim—is distinctly possible. Overall, there is no clear path to victory for the estate through litigation, which would present substantial risk and an uncertain benefit. Many potential outcomes would be severely detrimental to the Debtor's estate and non-EB5 creditors.

10. Other parties may seek to discredit the Settlement by arguing that the Trustee is forced to avoid litigation by the upcoming DIP Facility maturity date of April 30, 2026. The Trustee was not strong-armed into an unfavorable settlement. Instead, the Trustee carefully and thoroughly explored numerous possible alternatives and outcomes and ultimately concluded that the Settlement is in the best interest of creditors and the estate.

11. Prior to any settlement being reached, the Trustee considered debtor-in-possession financing offers that would allow the Trustee to pay EB5's DIP Claim in full prior to the stated maturity date of April 30, 2026, and then pursue claims against EB5 or cede derivative standing to another party to do so. But these were not actionable offers for various reasons. Even if they were, the benefits of the guaranteed outcomes in the Settlement outweighed the risk of saddling the estate with higher DIP financing and uncertain litigation and creditor recoveries.

12. Moreover, even if the Trustee were unable to pay the DIP Claim at maturity and the Chapter 11 Case were converted or EB5 were granted immediate stay relief to begin a lengthy state law foreclosure process, the Trustee believes that some return to unsecured creditors would remain possible. EB5 does not have a lien on the estate's avoidance actions. Though avoidance actions can in certain circumstances present difficulties with collection, that is less true when the property transferred by the Debtor cannot readily be moved—for example, when the transferred

property is land. The Trustee has preliminarily estimated the present value of the estate's avoidance actions at $3 million. The actual recovered value may fall short of or exceed that estimate. There is no *guarantee* of a return, but the Trustee believes that some return is likely.

13. Given these alternatives and negotiations that were occurring with other parties concurrent with the Mediation, the Trustee was willing not to settle with EB5. For EB5, given its confidence in its prospects at litigation—and the possibility it could acquire the Debtor's assets and a sizable percentage of any avoidance action proceeds solely by paying its attorneys—EB5 was also willing not to settle. The Agreement now before the Court had to work for both sides. The Trustee needed a substantial, guaranteed return for unsecured creditors other than EB5; EB5 needed certainty for itself sufficient to outweigh the out-of-pocket cost of funding that return.

14. The Trustee and EB5 left the two-day Mediation with new clarity but no settlement and substantial doubts that any settlement could be reached. Yet, they continued to negotiate over the following week and a half, exchanging and rejecting numerous proposals. Both parties nearly walked away and *did* walk away on multiple occasions. For every step forward as they continued to talk, there was one step back. Throughout, the Trustee continued to communicate with the WCOs, who remain inexorably opposed to the idea of EB5 owning the Wohali Project and want to preserve or obtain rights, certain of which are not preservable or deliverable in bankruptcy. The interests of the WCOs are not neatly aligned with the Trustee's fiduciary duties to the estate. The WCOs' position, or their focus, is understandable: in their own words, they are most interested in

preserving "a place they want to build their homes."[3] They do not believe EB5 is the right party to develop the Wohali Project.

15. But the Trustee's duty is not to ensure the Wohali Project is developed at a particular pace, to any particular specifications, or by any particular developer—it is to maximize the distributable value of the Debtor's estate to the benefit of all creditors. That is exactly what the Agreement does.

16. For the reasons set forth below, the Trustee unequivocally believes the Settlement is in the best interests of the estate and its creditors and reflects the Trustee's sound business judgment. As a result, the Trustee asks the Court to approve the Agreement and authorize the Trustee to consummate the Settlement in accordance with its terms.

**THE SETTLEMENT**

17. Among other benefits to the Debtor's estate and its creditors, the Settlement pays administrative claims in full and provides a guaranteed cash distribution of $4 million — or $3 million in the event the WP Parcels (as defined below) are not recovered within eighteen months of closing — to Non-EB5 Unsecured Creditors. The EB5 payment guarantee is fully secured by a standby letter of credit.

18. Furthermore, in exchange for a release of all estate claims and the allowance in full of the EB5 Prepetition Claim, EB5 has agreed to provide a stalking horse bid for the Debtor's assets comprising a $65 million credit bid—which may be increased to up to $89 million (which

---

[3] *Wohali Concerned Owners' Limited Objection to Chapter 11 Trustee's Motion for: (1) an Order (A) Approving Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases; (C) Scheduling the Auction and Sale Hearing; and (D) Granting Related Relief; and (II) an Order (A) Approving the Sale, Free and Clear of all Claims, Liens, and Encumbrances; and (B) Approving the Assumption and Assignment or Rejection of Executory Contracts and Unexpired Leases; and (III) Granting Related Relief [Dkt. 348].*

is less than the full amount of its approximately $93M prepetition and DIP Loan secured claim) in an auction scenario—and $1.8 million in immediate new cash to fund administrative expenses and initial seed funding for the continuing administration of the estate or a Liquidating Trust, as applicable. Further, regardless of the amount EB5 credit bids for the Debtor's assets, its deficiency claim will be no more than $10 million—without the agreed-upon cap, EB5's deficiency claim could be $28 million or more.[4]

19.     EB5 has also agreed to assume all of the Debtor's PID obligations, tax liabilities, and the Debtor's obligations to Boyden Farms, subject to the outcome of pending litigation. EB5 will also fund either the preservation or operation of the golf course prior to a sale, with such funding expected to be added to EB5's DIP Claim upon the Court's approval—leaving both administrative claimants and Non-EB5 Unsecured Creditors unaffected.

20.     The chart below summarizes the compromises that the Trustee has obtained from EB5 regarding the sale of the Debtor's assets:

**The Sale Compromises**

| Item | Details |
| --- | --- |
| Credit Bid Amount | $65 million (up to $89 million at auction), comprising first amounts outstanding under the DIP Claim (estimated at $7 million), and second, amounts outstanding under the EB5 Prepetition Claim up to the credit bid total. |
| Limit on Credit Bid | EB5 has agreed to reduce its credit bid by approximately $4M.  It may credit bid up to $89M at auction, although EB5's secured claim, including the DIP is approximately $93M. |
| Immediate Cash | $1.8 million to fund administrative expenses. |
| PID Obligations and Tax Liabilities | EB5 assumes all of the Debtor's obligations under the Public Infrastructure Development district and tax liabilities. |

---

[4] CBRE has been engaged to market the project. Although over 90 groups have signed NDAs, it is not expected that the value at auction will come close to the amount of the secured debt. That market feedback informs the Trustee's decision to negotiate a cap on EB5's deficiency claim.

| Boyden Farms | EB5 assumes the Debtor's obligations to Boyden Farms, subject to the outcome of pending litigation. |
|---|---|
| Golf Course | EB5 agrees to fund the preservation or operation of the golf course as determined by mutual agreement of the Trustee and EB5, with such funding added to the DIP Claim. |

21. Following the Sale, the Trustee intends to establish a liquidating trust (the "*Liquidating Trust*") under a Chapter 11 plan to pursue estate causes of action, make distributions to unsecured creditors, and administer the Debtor's remaining affairs as needed. The primary assets of the Liquidating Trust will be estate causes of action, all of which inure to the benefit of unsecured creditors.

22. To enhance distributions to unsecured creditors, the Trustee will seek to acquire three key Wohali Project parcels currently held by BLD71048-A25 (the "*WP Parcels*"), an entity controlled by the Debtor's former principals through their personal limited liability companies. If and when the WP Parcels are recovered, EB5 will pay the Trustee their fair market value, as determined by an average of two independent appraisals conducted by qualified MAI-certified appraisers within 180 days before the close of such acquisition. The Settlement provides EB5 with up to three years to consummate its acquisition of the WP Parcels. If EB5 fails to close the acquisition within 120 days of the Trustee acquiring the WP Parcels, it must begin making monthly rent payments of $14,583.33.

23. In addition to the WP Parcels, the Trustee believes he may be able to recover parcels transferred to the Debtor's equity investors in exchange for credits against such parties' respective equity positions. Any such land recovered will be sold at open market.

24. All proceeds of the foregoing sales, plus any additional cash recoveries made by the Trustee, but excluding rent payments made by EB5, will be distributed on a pro rata basis to

unsecured creditors, including EB5. *However*, EB5 has agreed to *guarantee* at least $4 million in returns to Non-EB5 Unsecured Creditors, or $3 million if the Trustee fails to bring the WP Parcels into the estate. The guarantee will take the form of 12 quarterly payments of $333,333.33 made over three years, with EB5's payment obligations reduced by any prior distributions to Non-EB5 Unsecured Creditors.[5] If the Trustee fails to bring the WP Parcels into the estate, EB5 will not be obligated to make the final 3 quarterly payments. The Trustee projects that the class of Non-EB5 Unsecured Creditors will ultimately hold claims in the allowed amount of approximately $6.5 million. Thus, EB5 has agreed to guarantee a floor return of approximately 60% of the amount owed of this estimated $6.5 million. This is a strong recovery for Non-EB5 Unsecured Creditors given that the Debtor's principal asset will likely sell at auction at a value well below the total amount of secured debt.

25.     The Agreement also contains mutual releases.

26.     The following chart summarizes the post-closing compromises the Trustee was able to obtain from EB5 under the Agreement:

**Post-Closing Compromises**

| Item | Details |
|---|---|
| Non-EB5 Unsecured Creditor Guarantee | $4 million guarantee (reduced to $3 million if the Trustee fails to recover the WP Parcels within 18 months of the Sale), secured by a standby letter of credit acceptable to the Trustee. Payments made quarterly ($333,333.33) over three years, subject to dollar-for-dollar reductions for other recoveries. |
| EB5 Deficiency Claim Cap | Capped at $10 million (against a potential uncapped deficiency of $28 million or more if EB5's credit bid was less than $65 million). |
| WP Parcel Acquisition | EB5 will acquire the WP Parcels from the Trustee upon the earlier of (i) EB5's election or (ii) the end of the three-year |

---

[5] For example, if Non-EB5 Unsecured Creditors recover $300,000 from the Trustee's open market sale of a recovered property, EB5's next quarterly payment obligation would be reduced by $300,000.

| | Backstop Period. Purchase price equals the average of two independent MAI-certified appraisals within 180 days before closing. If EB5 does not close within 120 days of the Trustee's acquisition, EB5 must pay monthly base rent of $14,583.33. |
|---|---|
| Other Land Parcels | Any other recovered parcels will be sold at open market no earlier than 120 days from the Trustee's acquisition. |
| Distribution Waterfall | All cash recovered from the WP Parcel Acquisition, Other Land Parcel sales, and prosecution of estate causes of action shall be distributed: first, to pay administrative costs and expenses; and second, to the Debtor's unsecured creditors (including EB5 on account of its Deficiency Claim) on a pro rata basis. |
| Mutual Releases | The Settlement contemplates mutual releases between the Trustee and EB5. |

27.     In short, the Settlement takes the possibility of uncertain, expensive, time-consuming litigation and an overwhelming return for EB5 if litigation were to fail and turns it into full payment of administrative expenses and a substantial, guaranteed recovery for Non-EB5 Unsecured Creditors, plus fair treatment for the PID and Boyden Farms. As will be further demonstrated herein, the Settlement is unequivocally in the best interests of the Debtor's estate, and the Trustee respectfully requests that it be approved.

## JURISDICTION AND VENUE

28.     The Court has jurisdiction respecting the Motion and the relief requested herein pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue of this case and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

29.     The legal predicates for the relief sought herein are 11 U.S.C. § 105(a), 11 U.S.C. § 363(b), and Bankruptcy Rules 6004 and 9019.

## FACTUAL BACKGROUND

30.     On August 11, 2022, the Debtor, as borrower, and EB5, as lender, entered into a loan agreement (the "***Loan Agreement***") pursuant to which EB5 agreed to lend the Debtor up to a principal amount of $79.2 million (the "***EB5 Loan***") funded by proceeds received from up to 99 investors qualified to participate in a securities offering conducted in connection with the EB-5 Immigrant Investor Program administered under the Immigration and Nationality Act, Section 203(b)(5) *et seq.*, as amended.

31.     Contemporaneously therewith, the Debtor and EB5 executed a promissory note (the "***Note***") for up to a principal amount of $79.2 million issued pursuant to the Loan Agreement. Pursuant to the Note, the Debtor promised to pay EB5 an amount equal to the outstanding principal amount of the EB5 Loan, plus interest thereon.

32.     On October 31, 2022, the Debtor executed and delivered to EB5 the trust deed (the "***Trust Deed***"), pursuant to which it granted EB5 a lien on and security interest in various assets, including real property, rents, improvements, buildings, water rights, and all other property described in the Trust Deed (collectively, the "***Collateral***"), which Collateral is located in both Summit County and Morgan County, Utah, and relates to the following tax parcels identified by Tax ID Number:

**<u>Summit County Tax ID Number(s):</u>**

CT-WOH-COMB, CT-441, CT-449, WOH-1-3, WOH-1-7, WOH-1-8, WOH-1-9, WOH-1-13, WOH-1-14, WOH-1-15, WOH-1-64, WOH-1-65, WOH-1-68, WOH-1-69, WOH-1-73, NS-294, NS-295, NS-296, NS-298-A, NS-299, NS-317, NS-BDY-21, and NS-BDY-20.

<u>**Morgan County Tax ID Number(s):**</u>

00-0005-0375; Serial No. 01-002-125-03, 00-0000-2731; Serial No. 01-002-134, 00-0084-9030; Serial No. 01-002-135-01, 00-0000-2749; Serial No. 01-002-136, 00-0000-2764; Serial No. 01-002-137 and 00-0000-2780; and Serial No. 01-002-138.

33.     The Trust Deed was duly recorded in the office of the Summit County Recorder's Office on November 9, 2022, as Entry Number 01197541, in Book 2763, beginning at Page 1333 of the Official Records.  The Trust Deed also was duly recorded in the office of the Morgan County Recorder's Office on November 9, 2022, as Entry Number 162312, in Book 396, beginning at Page 599 of the Official Records.

34.     The Debtor failed to make the quarterly debt service payment due January 10, 2025. EB5 issued a related notice of default on February 17, 2025.

35.     The Debtor failed to make the quarterly debt service payment due April 10, 2025. EB5 issued a related notice of default on May 13, 2025, and further issued a notice of acceleration pursuant to which EB5 (i) terminated the EB5 Loan and its obligations to make any additional disbursements under the Loan Agreement and (ii) declared all principal and interest owing under the Loan Agreement to be immediately due and payable.

36.     On August 8, 2025 (the "***Petition Date***"), the Debtor commenced the ("***Chapter 11 Case***") by filing a voluntary petition under Chapter 11 of Title 11 of the United States Code (the "***Bankruptcy Code***") with the United States Bankruptcy Court for the District of Utah (the "***Court***").

37.     Based on the proof of claim it has filed in the case, as of the Petition Date, the outstanding balance due and owing with respect to the EB5 Loan stood at $86,167,955.67 (the "***EB5 Prepetition Claim***"), consisting of (i) unpaid principal in the amount of $78,870,000.00, (ii)

accrued and unpaid interest in the amount of $7,161,962.98, and (iii) attorneys' fees and costs incurred and booked to the EB5 Loan in the amount of $135,992.69.

38. On September 11, 2025, EB5 filed the *Emergency Motion to Appoint a Chapter 11 Trustee, and Memorandum in Support of Motion* [Dkt. No. 69] (the "**Trustee Motion**").

39. On September 17, 2025, the Debtor, EB5, the U.S. Trustee, and a group of landowners within the Wohali development identifying as the "**Wohali Concerned Owners**" stipulated to the appointment of a Chapter 11 trustee pursuant to the Trustee Motion [Dkt. No. 80].

40. On September 25, 2025, the Court entered an order granting the Trustee Motion and directing the appointment of a Chapter 11 trustee [Dkt. No. 84]. On September 30, 2025, the U.S. Trustee appointed the Trustee; the Trustee's appointment was approved by the Court on October 9, 2025 [Dkt. No. 102].

41. On November 14, 2025, the Trustee filed the *Chapter 11 Trustee's Motion for Entry of Interim and Final Orders (I) Authorizing the Trustee to (A) Obtain Postpetition Financing From EB5AN Wohali Utah Fund XV, LP, (B) Utilize Cash Collateral, and (C) Pay the Wohali Public Infrastructure Development 2025 Assessment, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Dkt. No. 158] (the "**DIP Motion**").

42. Pursuant to the DIP Motion, the Trustee sought approval of a debtor-in-possession financing facility offered by EB5 (the "**DIP Facility**") under which EB5 would lend the Debtor up to an aggregate principal amount of $6.3 million (the "**DIP Loan**" and EB5's claim arising from the DIP Loan, the "**DIP Claim**").

43.     On December 12, 2025, EB5 commenced adversary proceeding 25-02175 (the "*Adversary Proceeding*") against the Debtor, WCOs, and DGB Investment, Inc. seeking a judgment of the Court (a) determining the nature, validity, and extent of EB5's liens on the Debtor's real property and declaring there is no valid basis to challenge said nature, validity, and extent; and (b) declaring there is no valid basis to equitably subordinate the EB5 Prepetition Claim. EB5 later voluntarily dismissed the WCOs and DGB Investment, Inc. from the Adversary Proceeding.

44.     The Court entered an interim order approving the DIP Facility on December 17, 2025 [Dkt. No. 211].

45.     On December 30, 2025, EB5 provided approximately 25,000 pages of written discovery to the Trustee and the Wohali Concerned Owners. In January, the Trustee conducted depositions of Debtor founders John Kaiser, Dave Boyden, and Tom Cottone; former Debtor CFO and controller Phil Dunn; former Debtor accounting consultant Tom Viscelgie; and EB5 principal Mike Schoenfeld.

46.     On January 22 and 23, 2026, the Court held a final hearing with respect to the DIP Facility. Though the final order [Dkt. No. 323] (together with the interim order, the "*DIP Orders*") was not entered until February 27, 2026, the Court made the substance of the order effective from the bench at the conclusion of the hearing a month earlier.

47.     Under the DIP Orders, which approved a modified DIP Facility that contemplated an increased DIP Loan aggregate principal amount of $6.8 million, the Trustee and all other parties in interest were granted until January 30, 2026, to lodge any challenge to the EB5 Prepetition

Claim or EB5's liens on the Debtor's property. On January 27, 2026, the Trustee filed a notice of his intent to challenge the EB5 Prepetition Claim.

48.     On  January 29, 2026, the Trustee and EB5 filed a *Stipulation and Joint Motion for Order Referring Parties to* Mediation *and Extending Challenge Period* [Dkt. No. 281] (the "**Mediation Stipulation**"). Though the Court approved the Mediation Stipulation [Dkt. No. 288], the Trustee and EB5, now joined by the Wohali Concerned Owners, ultimately chose to pursue a private mediation (the "**Mediation**") with James T. Markus.

49.     On March 6, 2026, the Trustee filed the *Chapter 11 Trustee's Motion for: (I) An Order (A) Approving Bid Procedures for the Sale of Assets; (B) Approving Procedures for the Assumption and Assignment of Executory* Contracts *and Unexpired Leases; (C) Scheduling the Auction and Sale Hearing; and (D) Granting* Related *Relief; and (II) An Order (A) Approving the Sale, Free and Clear of All Claims, Liens, and Encumbrances; and (B) Approving the Assumption and Assignment or Rejection of Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* [Dkt. No. 333] (the "**Bid Procedures Motion**").

50.     By the Bid Procedures Motion, which is anticipated to be considered by the Court at least preliminarily on April 2, 2026, the Trustee seeks the Court's approval of bid procedures which contemplate that the Trustee will select and provide notice of a "Stalking Horse Bidder" for the Debtor's assets by a date to be approved by the Court and set forth in the bid procedures order.

51.     On March 17 and 18, 2026, the Trustee, EB5, and the Wohali Concerned Owners participated in the Mediation. No agreement was reached at that time.  However, after more than a week of additional negotiations following the Mediation, the Trustee and EB5 agreed to the Settlement.

## **RELIEF REQUESTED**

52.     By this Motion, the Trustee respectfully asks the Court to enter an order approving the Settlement, as reflected in the Agreement, pursuant to 11 U.S.C. § 105(a) and Federal Rules of Bankruptcy Procedure 9014 and 9019.

### A. Basis for Relief

53.     For clear reason, time- and cost-saving settlements are favored in bankruptcy. *See In re Southern Medical Arts Co. Inc.,* 343 B.R. 250 (10th Cir. BAP 2006); *In re Kaiser Steel Corp.,* 105 B.R. 971, 978 (D. Colo. 1989).  Appellate courts have held that a bankruptcy court's approval of a compromise must be affirmed unless the court's determination is either (1) completely devoid of minimum evidentiary support displaying some hue of credibility, or (2) bears no rational relationship to the supportive evidentiary data.  *Id.*  The underlying test for the bankruptcy court's approval of a settlement is whether the trustee's actions are "within the universe of reasonable actions," not whether pressing onward might produce more funds. *See In re Mailman Steam Carpet Cleaning Corp.,* 212 F.3d 632, 636 (1st Cir. 2000), *cert denied,* 531 U.S. 960, 121 S.Ct. 385, 148 L.Ed.2d 297 (2000); s*ee also In re CS Mining, LLC*, 574 B.R. 259, 273 (Bankr. D. Utah 2017).

54.     Courts in the Tenth Circuit weigh the following four factors outlined in *In re Kopexa Realty Venture Co*., 213 B.R. 1020, 1022 (10th Cir. BAP 1997), when considering whether to approve a settlement: (i) the probable success of the underlying litigation on the merits, (ii) the possible difficulty in collection of a judgment, (iii) the complexity and expense of the litigation, and (iv) the interests of creditors in deference to their reasonable views.

55.     As shown below, the *Kopexa* factors favor approval of the Agreement and the Settlement it contemplates.

**B. The Settlement Should Be Approved**

    **i.**    *Kopexa* **Factor 1: Litigation Success Is Far From Certain.**

56.    The first *Kopexa* factor weighs strongly in favor of the Settlement. The Trustee believes his claims are colorable and would likely survive a motion to dismiss and/or a motion for summary judgment. But that does not mean they should be pursued. While acknowledging other stakeholders may disagree, the Trustee believes a favorable outcome in litigation is possible, but not necessarily probable. And any litigation will likely be costly to the Debtor's estate. EB5 has asserted defenses to all the estate's potential claims and may ultimately find favor with the Court. The reality is that secured lenders, particularly those whose interests are secured by unavoidable liens, enter any dispute with distinct advantages, and the differences between EB5 and more traditional lenders  may not be enough to materially shift that balance and result in a favorable outcome for the Debtor's estate.

    **ii.**    *Kopexa* **Factor 2: Collection Would Not Be Simple.**

57.    Subordination or recharacterization of EB5's claim would not require the estate to "collect" money from EB5 in the traditional sense. However, EB5 would undoubtedly appeal any adverse ruling—it has said as much—potentially delaying any benefit to the estate by three to five years or more, during which administrative expenses would continue to accrue against an estate with no operating revenues. Factor 2 is neutral at best and, accounting for appellate risk, favors settlement.

    **iii.**    *Kopexa* **Factor 3: Litigation Would Be Profoundly Expensive and Prolonged.**

58.    The third *Kopexa* factor weighs strongly in favor of approving the Settlement. Though the Trustee has conducted substantial discovery, litigation with respect to the EB5

Prepetition Claim has yet to truly begin. Litigation could be profoundly expensive as the estate claims are fact-intensive. The Trustee believes that, if he were to lodge formal claims against EB5, EB5 would first seek to dismiss them under Rule 12(b)(6). If some or all of the Trustee's claims were to survive, the Trustee assumes that EB5 would then actively and vigorously defend them, seek summary judgment and, if summary judgment were unsuccessful, try them. The Trustee does not see a path to obtaining a summary disposition of the claims he would assert against EB5. Rather, the claims would need to be tried. Further, the Trustee would likely need to retain and pay several expert witnesses to present his best possible case. The WCOs have offered the Trustee a $3.5 million litigation budget, which, though generous, is also an indication of just how expensive even other parties think litigation could be. And any such litigation is ultimately on the back of the unsecured creditor recoveries. Litigating certain factual issues, such as the Debtor's undercapitalization, would be both complex and time-intensive. Litigation costs alone could amount to well over 50% of the estimated unsecured claims.

59. Even crediting the WCOs' offer to fund litigation, that funding does not eliminate the delay, the distraction on Trustee and estate resources, or the appellate risk. The Trustee would be trading $1.8 million today, plus a guaranteed $3-4 million in hand—payable quarterly over three years from a standby letter of credit—for an uncertain recovery years from now. Litigation costs alone would consume a material portion of any recovery that did not also benefit EB5 through its deficiency claim participation. Factor 3 strongly favors settlement.

### iv. *Kopexa* Factor 4: The Settlement Maximizes Returns to Non-EB5 Unsecured Creditors.

60. The fourth and final *Kopexa* factor might weigh most heavily of all in favor of approving the Settlement. The Trustee projects the net distributable return from the estate's

avoidance actions at $3 million. Absent the Settlement, that money would first go to administrative expenses and then to unsecured creditors, including EB5, absent a complete victory against EB5 after years of litigation.

61. The Settlement, on the other hand, provides Non-EB5 Unsecured Creditors with an absolute guarantee of a $3 million return, and a likely $4 million guarantee—the Trustee is confident he will be able to acquire the key WP Parcels. That guarantee backstops what may be a larger recovery from avoidance actions and the recovery and sale of the WP Parcels. $4 million for Non-EB5 Unsecured Creditors—not to mention the assumption of the PID and Boyden Farms obligations—may represent a better outcome for the Debtor's estate than could be achieved even if litigation against EB5 were *successful*.

## C. Conclusion

62. Based upon the foregoing, the Trustee believes and represents to the Court that the application of the *Kopexa* factors to the Settlement strongly support its approval. The Agreement before the Court is the product of lengthy, hard-fought, arm's length negotiations between and among the Trustee, EB5, and their respective professionals. Furthermore, the Mediator, Jim Markus, is a well-known and highly respected insolvency professional. He is a long-time fellow of the American College of Bankruptcy and served as the Chapter 11 trustee in the *Geneva Steel* case. While the parties did not leave their two-day mediation with a settlement in hand, the Mediator undoubtedly aided the parties in framing their positions and setting the course for the Settlement.

63. Simply put, the Settlement provides the means to resolve the Chapter 11 Case in an efficient, value-maximizing fashion. The Trustee respectfully requests the Court approve the Settlement.

## NOTICE

64.     Notice of this Motion, of the deadline to object thereto and of the scheduled hearing thereon will be provided in accordance with the applicable provisions of the Bankruptcy Code and Bankruptcy Rules, including Federal Rule of Bankruptcy Procedure 2002(a)(3). The Trustee submits that no further notice is required.

65.     No prior request for the relief sought in this Motion has been made to this or any other court.

66.     WHEREFORE, the Trustee respectfully asks the Court to (a) grant the Motion, (b) approve the Agreement and the Settlement it contemplates, and (c) grant the Trustee such other and further relief as the Court deems just and proper.


DATED: April 2, 2026                                    Respectfully submitted,


                                                        /s/ *Ellen E. Ostrow*
                                                        Ellen E. Ostrow
                                                        Foley & Lardner LLP
                                                        *Counsel for Chapter 11 Trustee*

# CERTIFICATE OF SERVICE

I hereby certify that on the 2nd day of April, 2026, a true and correct copy of the foregoing **NOTICE OF CHAPTER 11 TRUSTEE'S MOTION, PURSUANT TO 11 U.S.C. §§ 105(a) AND 363(b), AND FEDERAL RULES OF BANKRUPTCY PROCEDURE 6004, 9014 AND 9019, FOR ENTRY OF AN ORDER APPROVING A SETTLEMENT AGREEMENT AND RELEASE OF CLAIMS BETWEEN THE TRUSTEE, ON THE ONE HAND, AND EB5AN WOHALI UTAH FUND XV, LP, ON THE OTHER HAND AND NOTICE OF HEARING** was electronically filed and therefore served via ECF on the following:

- **David P. Billings**   dbillings@fabianvancott.com, khaynes@fabianvancott.com
- **Bryan H Booth**   bryan@mountainwestlaw.com, lisa@mountainwestlaw.com
- **Scott S Bridge**   sbridge@keslerrust.com
- **Matthew James Burne**   matthew.burne@usdoj.gov, Lindsey.Huston@usdoj.gov;Rinehart.Peshell@usdoj.gov;Rachelle.D.Hughes@usdoj.gov;Brittany.Dewitt@usdoj.gov
- **Ryan C. Cadwallader**   rcadwallader@kmclaw.com, twhite@kmclaw.com
- **P. Matthew Cox**   mcox@spencerfane.com, ecall@spencerfane.com;mwatson@spencerfane.com
- **Michael Allen Gehret**   mike.gehret@dentons.com, kim.altamirano@dentons.com
- **Patricia Geary Glenn**   pgearyglenn@gmail.com
- **Jason W. Hardin**   jhardin@fabianvancott.com, sirvin@fabianvancott.com
- **Carson Heninger**   heningerc@gtlaw.com, carson-heninger-5642@ecf.pacerpro.com,Candy.Long@gtlaw.com
- **George B. Hofmann**   ghofmann@ck.law, mparks@ck.law;enilson@ck.law
- **Annette W. Jarvis**   jarvisa@gtlaw.com, longca@gtlaw.com
- **Michael R. Johnson**   mjohnson@rqn.com, docket@rqn.com;ASanchez@rqn.com;RQN@ecfalerts.com
- **Penrod W. Keith**   penrod.keith@dentons.com, kristin.hughes@dentons.com
- **Justin J. Keys**   justin@hlhparkcity.com, nancy@hlhparkcity.com
- **Bryce L. Krieger**   bryce.krieger@dentons.com
- **Trevor C Lang**   tclang@agutah.gov, staff@mohtrial.com
- **Matt McKinlay**   mmckinlay@ampleo.com
- **Elijah L. Milne**   eli.milne@dentons.com, deb.calegory@dentons.com,jaime.gargano@dentons.com,kristen.ivory@dentons.com
- **Matt C. Osborne**   matt@oblawpc.com
- **Ellen E. Ostrow**   eostrow@foley.com, ellen-ostrow-4512@ecf.pacerpro.com;docketflow@foley.com;geysa.peeler@foley.com
- **Douglas J. Payne**   dpayne@fabianvancott.com, lwilson@fabianvancott.com;dadamson@fabianvancott.com
- **Charles Louis Pearlman**   charles@hlh.law
- **Mark C. Rose**   mrose@rqn.com, docket@rqn.com;asanchez@rqn.com
- **Jeffrey Weston Shields**   jshields@rqn.com,

5962725420@filings.docketbird.com;docket@rqn.com;ecasaday@rqn.com
- **Jeremy C. Sink**   jsink@kmclaw.com, mcarlson@kmclaw.com
- **Abigail Jennifer Stone**   abigail.stone@gtlaw.com
- **Jeffrey L. Trousdale**   jtrousdale@cohnekinghorn.com, mparks@ck.law;enilson@ck.law
- **United States Trustee**   USTPRegion19.SK.ECF@usdoj.gov

**By U.S. Mail**: In addition to the parties of record receiving notice through the CM/ECF system, the following parties should be served notice pursuant to Fed. R. P. 5(b).

- All parties on the Court's official matrix.

/s/ *Elisha Burton*

<u>**Exhibit A**</u>

**Settlement Agreement**

## SETTLEMENT AGREEMENT AND RELEASE OF CLAIMS

This Settlement Agreement and Release of Claims (the "**Agreement**") is made and entered into this 24th day of March, 2026, by and between EB5AN Wohali Utah Fund XV, LP ("**EB5**"), a Delaware limited partnership, on the one hand, and Matthew McKinlay, not individually but solely in his capacity as the Chapter 11 trustee (the "**Trustee**") of Wohali Land Estates, LLC (the "**Debtor**"), a Utah limited liability company, on the other.  EB5 and the Trustee are each a "**Party**" and may be collectively referred to herein as the "**Parties**."

## RECITALS

1. On August 11, 2022, the Debtor, as borrower, and EB5, as lender, entered into a loan agreement (the "**Loan Agreement**") pursuant to which EB5 agreed to lend the Debtor up to a principal amount of $79.2 million (the "**EB5 Loan**") funded by proceeds received from up to 99 investors qualified to participate in a securities offering conducted in connection with the EB-5 Immigrant Investor Program administered under the Immigration and Nationality Act, Section 203(b)(5) *et seq.*, as amended.

2. Contemporaneously therewith, the Debtor and EB5 executed a promissory note (the "**Note**") for up to a principal amount of $79.2 million issued pursuant to the Loan Agreement. Pursuant to the Note, the Debtor promised to pay EB5 an amount equal to the outstanding principal amount of the EB5 Loan, plus interest thereon.

3. On October 31, 2022, the Debtor executed and delivered to EB5 that certain Deed of Trust, Assignment of Rents and Leases, Security Agreement and Fixture Filing  (the "**Trust Deed**"), pursuant to which it granted EB5 a lien on and security interest in various assets, including real property, rents, improvements, buildings, water rights, and all other property described in the

Trust Deed (collectively, the "**Collateral**"), which Collateral is located in both Summit County and Morgan County, Utah, and relates to the following tax parcels identified by Tax ID Number:

**Summit County Tax ID Number(s):**

CT-WOH-COMB, CT-441, CT-449, WOH-1-3, WOH-1-7, WOH-1-8, WOH-1-9, WOH-1-13, WOH-1-14, WOH-1-15, WOH-1-64, WOH-1-65, WOH-1-68, WOH-1-69, WOH-1-73, NS-294, NS-295, NS-296, NS-298-A, NS-299, NS-317, NS-BDY-21, and NS-BDY-20.

**Morgan County Tax ID Number(s):**

00-0005-0375; Serial No. 01-002-125-03, 00-0000-2731; Serial No. 01-002-134, 00-0084-9030; Serial No. 01-002-135-01, 00-0000-2749; Serial No. 01-002-136, 00-0000-2764; Serial No. 01-002-137 and 00-0000-2780; and Serial No. 01-002-138.

4. The Trust Deed was duly recorded in the office of the Summit County Recorder's Office on November 9, 2022, as Entry Number 01197541, in Book 2763, beginning at Page 1333 of the Official Records. The Trust Deed also was duly recorded in the office of the Morgan County Recorder's Office on November 9, 2022, as Entry Number 162312, in Book 396, beginning at Page 599 of the Official Records.

5. After the Debtor defaulted under the Loan Agreement, EB5 issued sequential notices of default and, on May 13, 2025, a notice of acceleration pursuant to which EB5 (i) terminated the EB5 Loan and its obligations to make any additional disbursements under the Loan Agreement and (ii) declared all outstanding principal and accrued interest under the Loan Agreement immediately due and payable.

6. On August 8, 2025 (the "**Petition Date**"), the Debtor commenced the "**Chapter 11 Case**" by filing a voluntary petition under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") with the United States Bankruptcy Court for the District of Utah (the "**Court**").

4937-6077-4300.1

7. As of the Petition Date, EB5 asserts that the outstanding balance due and owing with respect to the EB5 Loan stood at $86,167,955.67 (the "**EB5 Prepetition Claim**"), consisting of (i) unpaid principal in the amount of $78,870,000.00, (ii) accrued and unpaid interest in the amount of $7,161,962.98, and (iii) attorneys' fees and costs incurred and booked to the EB5 Loan in the amount of $135,992.69. Subject to approval of this Agreement, the Trustee has reviewed the Loan Agreement and other relevant documents and confirmed the correct calculation of the EB5 Prepetition Claim.

8. On September 11, 2025, EB5 filed in the Chapter 11 Case that certain *Emergency Motion to Appoint a Chapter 11 Trustee, and Memorandum in Support of Motion* [Dkt. No. 69] (the "**Trustee Motion**").

9. On September 17, 2025, the Debtor, EB5, the U.S. Trustee, and a group of landowners within the Wohali development self-identifying as the "**Wohali Concerned Owners**" stipulated to the appointment of a Chapter 11 trustee pursuant to the Trustee Motion [Dkt. No. 80].

10. On September 25, 2025, the Court entered an order granting the Trustee Motion and directing the appointment of a Chapter 11 trustee [Dkt. No. 84]. On September 30, 2025, the U.S. Trustee appointed the Trustee; the Trustee's appointment was approved by the Court on October 9, 2025 [Dkt. No. 102].

11. On November 14, 2025, the Trustee filed the *Chapter 11 Trustee's Motion for Entry of Interim and Final Orders (I) Authorizing the Trustee to (A) Obtain Postpetition Financing From EB5AN Wohali Utah Fund XV, LP, (B) Utilize Cash Collateral, and (C) Pay the Wohali Public Infrastructure Development 2025 Assessment, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Dkt. No. 158] (the "**DIP Motion**"). Pursuant to

4937-6077-4300.1

the DIP Motion, the Trustee sought approval of a debtor-in-possession financing facility offered by EB5 (the "**DIP Facility**") under which EB5 would lend the Debtor up to an aggregate principal amount of $6.3 million (the "**DIP Loan**" and EB5's claim arising from the DIP Loan, the "**DIP Claim**"). The Court entered an interim order approving the DIP Loan on December 17, 2025 [Dkt. No. 211], and a final order approving the DIP Loan on February 27, 2026 [Dkt. No. 323] (together, the "**DIP Orders**"). The Court previously made the final order effective from the bench on January 23, 2026.

12. Under the DIP Orders, which approved a modified DIP Facility that contemplated an increased DIP Loan aggregate principal amount of $6.8 million, the Trustee and all other parties in interest were granted until January 30, 2026, to lodge any challenge to the EB5 Prepetition Claim or EB5's liens on the Debtor's property. On January 27, 2026, the Trustee filed a notice of his intent to challenge the EB5 Prepetition Claim.

13. On January 29, 2026, the Trustee and EB5 filed a *Stipulation and Joint Motion for Order Referring Parties to Mediation and Extending Challenge Period* [Dkt. No. 281] (the "**Mediation Stipulation**"). Though the Court approved the Mediation Stipulation [Dkt. No. 288], the Trustee and EB5, joined by the Wohali Concerned Owners, ultimately chose to pursue a private mediation (the "**Mediation**") with James T. Markus on March 17, 2026 and March 18, 2026. The Mediation continued through March 24, 2026.

14. On March 6, 2026, the Trustee filed the *Chapter 11 Trustee's Motion for: (I) An Order (A) Approving Bid Procedures for the Sale of Assets; (B) Approving Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases; (C) Scheduling the Auction and Sale Hearing; and (D) Granting Related Relief; and (II) An Order (A) Approving the Sale, Free and Clear of All Claims, Liens, and Encumbrances; and (B) Approving the Assumption*

4937-6077-4300.1

*and Assignment or Rejection of Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* [Dkt. No. 333] (the "**Bidding Procedures Motion**"). By the Bidding Procedures Motion, which is anticipated to be considered by the Court on April 2, 2026 (the "**Bidding Procedures Hearing**"), the Trustee seeks the Court's approval of bidding procedures with respect to the sale of the Debtor's assets (such sale, the "**Sale**"), which bidding procedures contemplate that the Trustee will select and provide notice of a "Stalking Horse Bidder" for the Debtor's assets by a date to be approved by the Court.

15. In advance of the Mediation, the Trustee shared a mediation statement (the "**Trustee's Statement**") with EB5 in which the Trustee articulated the basis for potential claims held by the Debtor and the Debtor's estate against EB5 including constructive fraudulent transfer, equitable subordination, recharacterization, and unjust enrichment. These claims, if successful, could impact the EB5 Prepetition Claim. EB5 responded to the Trustee's Statement denying liability on all potential counts.

16. At the Mediation, the Parties discussed the merits of their respective positions and reached an agreement, incorporated herein, whereby (a) EB5 will provide the Trustee with a "stalking horse bid" for the Debtor's assets on the terms set forth herein and (b) the Trustee will (i) release and discharge EB5 from any and all claims or potential claims the Debtor or its estate may be able to assert against EB5 relating to the EB5 Loan or the EB5 Prepetition Claim; and (ii) fulfill the covenants set forth herein.

<u>**AGREEMENT**</u>

Based upon the foregoing Recitals, which are expressly incorporated herein by this reference, and for good and valuable other consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be bound, stipulate and agree as follows:

5

1. <u>Stalking Horse Bid</u>. Upon the effective date of this Agreement, EB5 will provide the Trustee with a stalking horse bid for the Debtor's assets comprising:

    a.    a credit bid in the amount of $65,000,000 comprising (i) first, the full amount of the DIP Claim (estimated $7,000,000 principal and interest) and (ii) second, the EB5 Prepetition Claim in the amount of $58,000,000; *provided* that EB5 reserves the right to credit bid up to $89,000,000 at any auction or other sale of the Debtor's assets, with such credit bid comprising (i) first, the full amount of the DIP Claim and (ii) second, the EB5 Prepetition Claim up to the amount of $82,000,000;

    b.    $1,800,000.00 in cash, the proceeds of which shall be used to fund allowed administrative claims, including those of EB5 and the Wohali Concerned Owners, and, to the extent funds remain, to fund the Trustee's administration of the estate;

    c.    a binding agreement that EB5's allowed general unsecured deficiency claim against the Debtor's estate, being the difference between the EB5 Prepetition Claim and the amount that EB5 credit-bids the EB5 Prepetition Claim at the sale of the Debtor's assets, shall not exceed the lesser of (i) the actual amount of the deficiency claim (e.g., the difference between the all amounts owed to EB5 less the amount of its successful bid), or (ii) Ten Million Dollars ($10,000,000) (the "**Deficiency Claim**");

    d.    a binding promise to acquire the three parcels of real property previously titled in the name of Wohali Partners, LLC ("**Wohali Partners**"), the direct or indirect parent of the Debtor, and now believed to be titled in the name of BLD71048-A25, LLC, identified as Parcels X, Y, and Z on Exhibit [\_\_] hereto (the "**WP Parcels**"), at appraised fair market value, as more fully described in Section 3 below;

    e.    a binding promise to provide the Unsecured Creditor Guarantee (as defined below) as more fully described in Paragraph 6 below;

    f.    an assumption of all outstanding obligations to the Wohali Public Infrastructure District No. 1 and No. 2 ("**PID**") and tax liabilities; and

    g.    an assumption of all obligations arising under the Boyden Farms loan documents, solely to the extent that the subordination agreement relating to the Boyden Farms loan is determined by a final, non-appealable order of the Court to be invalid or unenforceable.

2. <u>Liquidating Trust</u>. A liquidating trust (the "**Liquidating Trust**") shall be established pursuant to a plan of reorganization or liquidation proposed by the Trustee and

6

confirmed in the Chapter 11 Case. The Trustee shall assign to the Liquidating Trust any and all causes of action belonging to the Debtor's estate (except for the claims released under this Agreement), including but not limited to avoidance actions, fraudulent transfer claims, preference claims, and any other claims against third parties whether arising under state or federal law and whether legal or equitable in nature (collectively, the "**Trust Causes of Action**"). The Trustee will serve as the liquidating trustee of the Liquidating Trust, and EB5 shall have consultation rights in the administration of the Liquidating Trust. EB5 and all other holders of allowed general unsecured claims shall be the beneficiaries of the Liquidating Trust. Considering the mutual releases set forth herein, nothing shall preclude the Trustee and EB5 from executing a common interest agreement to better facilitate the sharing of information and the Trustee's pursuit of the Trust Causes of Action to the benefit of the Debtor's estate. Nothing herein shall prevent the Trustee from converting the case to one under Chapter 7 if the Trustee determines in his business judgment that conversion is in the best interest of creditors and the estate. The terms of this Agreement will be binding on any subsequently appointed Chapter 7 trustee. EB5 reserves all rights to respond to any motion to convert filed by the Trustee.

3. <u>EB5's Acquisition of WP Parcels</u>. The Trustee will pursue recovery of the WP Parcels in good faith, and upon the Trustee's receipt of clear marketable record title to the WP Parcels, free and clear of all adverse liens, interests, and claims, through substantive consolidation or otherwise (the "**Trustee WP Parcel Acquisition**"), EB5 agrees to acquire the WP Parcels (the "**EB5 WP Parcel Acquisition**") at a purchase price equal to the average of two independent appraisals of the fair market value of each parcel, each conducted by a qualified MAI-certified appraiser selected by each Party respectively within 180 days before the close of the EB5 WP Parcel Acquisition. The closing of the EB5 WP Parcel Acquisition shall occur upon the earlier of

4937-6077-4300.1

(i) EB5's election or (ii) the end of the Backstop Period (as defined below). If EB5 does not close on the WP Parcels within 120 days of the Trustee WP Parcel Acquisition, EB5 shall enter into a lease with the estate or Liquidating Trust, as applicable, with monthly base rent of $14,583.33 (the "**WP Rent Payments**"). Between the Trustee WP Parcel Acquisition and the commencement of the WP Rent Payments, EB5 will pay all carrying costs of the WP Parcels. The WP Rent Payments shall be used by the Trustee to pay carrying costs incurred by the bankruptcy estate or Liquidating Trust relating to carrying the WP Parcels until the close of the EB5 WP Parcel Acquisition. The WP Rent Payments shall be distributed in accordance with the waterfall set forth in Section 5 of this Agreement; *provided however*, any such distributions after payment of carrying costs and administrative costs and expenses of the Bankruptcy Estate and Liquidating Trust will be paid only to non-EB5 unsecured creditors at a date determined by the Trustee in his sole discretion and will be credited against the Unsecured Creditor Guarantee.

4.     Other Land Parcels. In the relevant lookback period prior to the Petition Date, a certain number of parcels in the Wohali Project (the "**Other Land Parcels**") were transferred to certain of the Debtor's equity investors (the "**Land Recipients**") in exchange for credits against such Land Recipients' respective equity investments. The Trustee intends to pursue causes of action with respect to the Other Land Parcels. If the Trustee recovers real property in pursuing the estate's causes of action, such property shall be sold at open market no earlier than 120 days from the close of the Trustee's acquisition of such real property. All cash proceeds actually received by the estate from the Other Land Parcels Sales shall be distributed in accordance with the waterfall set forth in Section 5 of this Agreement.

5.     Distribution of Proceeds. All (i) cash proceeds recovered through the prosecution of the estate's causes of action, (ii) cash proceeds of the EB5 WP Parcel Acquisition, and (iii) cash

4937-6077-4300.1

proceeds of the Other Land Parcels Sales (collectively, the "**Proceeds**") shall be distributed in accordance with the following order of priority, with each tier to be satisfied in full before any distribution is made to the next tier:

    a.   *First*, administrative costs and expenses of the Bankruptcy Estate and Liquidating Trust;

    b.   *Second*, the Debtor's unsecured creditors, including EB5 on account of the Deficiency Claim, on a pro rata basis.

6.     <u>Unsecured Creditor Guarantee</u>. EB5 hereby guarantees, subject only to the conditions set forth in section 8 of this Agreement, that non-EB5 holders of allowed general unsecured claims against the Debtor's estate (the "**Non-EB5 Unsecured Creditors**") shall receive for their claims a minimum of their pro rata share of Four Million Dollars ($4,000,000) (the "**Unsecured Creditor Guarantee**"). Subject to section 7 of this Agreement, EB5 shall make to the Liquidating Trust twelve (12) equal quarterly installment payments of $333,333.33 (the "**Unsecured Creditor Guarantee Payments**"), commencing ninety (90) days following the closing of the sale of the Debtor's assets and continuing each quarter thereafter until 12 quarters, or three years, have passed (such period, the "**Backstop Period**"). The Trustee shall distribute the Unsecured Creditor Guarantee Payments to Non-EB5 Unsecured Creditors on a pro rata basis based on the face amount of their respective allowed general unsecured claims at appropriate intervals decided by the Trustee. EB5's obligation to make the Unsecured Creditor Guarantee Payments shall be secured by a standby letter of credit in the full amount of $4,000,000, issued by a financial institution reasonably acceptable to the Trustee, which EB5 shall obtain and deliver to the Trustee prior to the closing of the Sale.

7.     <u>Credit Reductions to the Unsecured Creditor Guarantee Payments</u>. All proceeds of causes of action received by Non-EB5 Unsecured Creditors shall be credited against the Unsecured Creditor Guarantee Payments dollar-for-dollar in chronological order. For example, if an

Unsecured Creditor Guarantee Payment is due in October, and Non-EB5 Unsecured Creditors receive $1,000,000 in September, EB5 will no longer be obligated to make the Unsecured Creditor Guarantee Payments due the following October ($333,333.33), January ($333,333.33), and April ($333,333.33).

8.      Constructive Default; WP Parcel Condition. Notwithstanding the foregoing, in the event the Trustee does not effectuate the Trustee WP Parcel Acquisition within eighteen (18) months following the closing of the sale (a "**Constructive Default**"), the Unsecured Creditor Guarantee shall be reduced to $3,000,000. A Constructive Default shall not constitute a default by the Trustee of his obligations under this Agreement nor a default by EB5. Subject to Section 7, if the Trustee cures the Constructive Default by effectuating the Trustee WP Parcel Acquisition, EB5 shall pay the full amount ($4 million) of the Unsecured Creditor Guarantee with the Unsecured Creditor Guarantee payments resuming on a quarterly basis beginning on the last day of the month of such cure.

9.      Release of Claims Against EB5. Effective upon the Court's approval of this Agreement by a final, unstayed order issued pursuant to Federal Rule of Bankruptcy Procedure 9019, the Trustee, for himself and on behalf of the Debtor and its estate (collectively, the "**Trustee Releasing Parties**") shall be deemed to release and forever discharge EB5 and its general and limited partners, agents, attorneys, affiliates, representatives, predecessors, successors, and assigns (collectively, the "**EB5 Released Parties**") from any and all manner of actions, causes of action in law or in equity, suits, debts, liens, contracts, liabilities, claims, demands, damages, losses, fees, costs, or expenses, set offs, or claims for recoupment, of any nature whatsoever, known or unknown, fixed or contingent that the Debtor or the Debtor's estate has or may have against the EB5 Released Parties from the beginning of time to the date of this Agreement relating in any way

10

to the EB5 Loan or the EB5 Prepetition Claim or any other matter relating to EB5's prepetition actions and relationship with the Debtor; *provided, however,* that the release provided under this paragraph is not a release of any rights arising under or related to this Agreement. The Trustee will take all necessary actions to enforce the Agreement.

10. <u>Release of Claims Against the Trustee Releasing Parties</u>. The EB5 Released Parties hereby release and forever discharge the Trustee Releasing Parties and the Trustee's agents, attorneys, affiliates, representatives, successors, and assigns (together, the "**Trustee Released Parties**") from any and all manner of actions, causes of action in law or in equity, suits, debts, liens, contracts, liabilities, claims, demands, damages, losses, fees, costs, or expenses, set offs, or claims for recoupment, of any nature whatsoever, known or unknown, fixed or contingent that the EB5 Released Parties have or may have against the Trustee Released Parties from the beginning of time to the date of this Agreement other than the EB5 Prepetition Claim, the DIP Claim or any claims arising under or related to this Agreement. The foregoing release shall not be interpreted to apply to any of the Debtor's agents, attorneys, affiliates, representatives, predecessors, successors (other than the Trustee), and assigns (other than the Trustee).

11. <u>Golf Course Operations</u>. Prior to a closing of a Sale of the Debtor's assets and no later than April 15, 2026, unless extended by mutual written agreement of the Parties, the Trustee and EB5 shall confer and jointly determine whether to open and operate the Debtor's golf course as a going concern or to maintain the property in its current condition pending disposition of the Debtor's assets. The Trustee shall implement the jointly determined course of action promptly following such determination subject to necessary court approvals. However, if the Parties cannot agree, then the Debtor's golf course will remain closed. In the event there is a shortfall in terms of the required capital to open the golf course and any revenue received from the sale of golf

4937-6077-4300.1

memberships and seasonal passes, and EB5 agrees to open the golf course as a going concern, EB5 will fund the balance required to open the golf course. In the event the Parties determine not to open the golf course, EB5 shall fund up to $400,000 in reasonable, agreed-upon, and documented preservation and maintenance costs for the golf course property from the date of such determination through the closing of the sale of the Debtor's assets (the "**Preservation Funding**"). The Preservation Funding shall be added to and increase the DIP budget and shall constitute an advance under the DIP Loan, secured and entitled to repayment on the same terms as all other DIP advances, subject to court approval.

12.     PID Assumption and Assignment. In connection with the closing of the sale, the Parties shall cooperate in good faith to negotiate and execute a formal assumption and assignment agreement with the PID on terms reasonably acceptable to EB5. The Trustee shall use reasonable efforts to obtain the PID's consent to such assumption, and shall cooperate in good faith with EB5 in any efforts to restructure its assumed obligations with respect to the PID.

13.     Boyden Farms Assumption and Assignment. In the event that the subordination agreement relating to the Boyden Farms loan is determined by a final, non-appealable order of the Court to be invalid or unenforceable, EB5 shall assume all obligations arising under the Boyden Farms loan documents, and shall further have the right to assert all of the Debtor's or the Estate's defenses, if any, under the Boyden Farm loan documents. The Trustee shall use reasonable efforts to obtain the Boyden Farms lender's consent to such assumption. EB5's obligation to assume the Boyden Farms loan obligations shall arise only upon a final, non-appealable determination of subordination invalidity and execution of a formal assumption agreement with the Boyden Farms lender.

4937-6077-4300.1

14. <u>DIP Maturity Extension</u>. The maturity date of the DIP Loan is hereby extended to the closing date of the sale of the Debtor's assets pursuant to the Bidding Procedures Motion, but in no event later than May 15, 2026, unless further extended by mutual written agreement of the Parties. The Parties agree to execute and deliver such amendments to the DIP Loan documents as are necessary to effectuate this extension within five (5) business days of the effective date of this Agreement.

15. <u>EB5 Representations</u>. EB5 represents and warrants that the person signing this Agreement on behalf of EB5 has full power and authority to enter into this Agreement, that this Agreement is a valid and enforceable document and agreement according to its terms and conditions, and that the terms and conditions of the Agreement are fully enforceable by the Trustee against EB5.

16. <u>Trustee Representations</u>. The Trustee represents and warrants that, subject to the approval of the Court, he has full power and authority to enter into this Agreement on behalf of the Debtor, that this Agreement is a valid and enforceable document and agreement according to its terms and conditions, and that the terms and conditions of the Agreement are fully enforceable by EB5 against the Debtor and the Trustee as the Debtor's representative.

17. <u>Effectuation of Agreement; Court Approval</u>. The Parties agree to perform any other or further acts, and execute and deliver any other or further documents, as may be necessary or appropriate to implement this Agreement. The Parties agree that the Trustee shall seek entry of the proposed order by the Court attached to this Agreement as <u>Exhibit A</u> as soon as reasonably possible following execution of this Agreement.

18. <u>Binding Effect</u>. Subject to the approval of the Court, this Agreement shall be binding upon each of the Parties, and upon their respective successors-in-interest and/or assigns.

4937-6077-4300.1

All representations and warranties made herein shall survive execution of this Agreement and shall at all times subsequent to the execution of this Agreement remain binding and fully enforceable.

19. <u>Governing Law</u>. This Agreement is made pursuant to and shall be governed and interpreted by laws of the State of Utah, without giving effect to conflict of law principles.

20. <u>No Admission of Liability</u>. This Agreement represents a compromise of disputed claims and shall not be construed as an admission of liability or fault by either of the Parties.

21. <u>Construction of Agreement</u>. This Agreement shall be construed as a whole in accordance with its fair meaning and in accordance with governing law. This Agreement has been negotiated by each of the Parties (or their respective counsel) and the language of the Agreement shall not be construed for or against any particular party.

22. <u>Voluntary Agreement</u>. This Agreement has been carefully read by the Parties and has been reviewed by the Parties' respective legal counsel; the contents hereof are known and understood by the Parties; and each of the Parties acknowledges that such party is under no duress or undue influence and that each of the Parties executes this Agreement as its own free and voluntary act.

23. <u>Integration and Amendments</u>. This Agreement shall constitute the entire agreement and understanding of and between the Parties in relation to matters described herein, and no statements, representations, inducements or promises other than as expressly set forth herein have been given or received by any of the Parties (nor by their respective agents, employees, attorneys or representatives) in return for same. All negotiations, oral conversations, statements, representations and/or agreements leading up to the execution of this Agreement are merged herewith and shall not be the basis for any legal rights, claims or defenses in relation to any litigation or otherwise. No parole or extrinsic evidence may be used to contradict any of the terms

of this Agreement. Any amendment to this Agreement must be in writing, signed by duly authorized representatives of the Parties hereto, and specifically state the intent of the Parties to amend this Agreement.

24. <u>Severability</u>. To the extent that any portion of this Agreement is held unenforceable by a court, tribunal or arbiter of competent jurisdiction, the remainder of this Agreement shall remain binding and enforceable provided that the primary purpose of the Agreement is not frustrated.

25. <u>Counterparts</u>. This Agreement may be executed by the Parties hereto in any number of identical counterparts, each of which, once executed and delivered in accordance with the terms of this Agreement, will be deemed an original with all such counterparts taken together constituting one and the same instrument. Delivery by facsimile, encrypted e-mail or e-mail file attachment of any such executed counterpart to this Agreement will be deemed the equivalent of the delivery of the original executed agreement or instrument.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date and year first above written.

**EB5AN WOHALI UTAH FUND XV, LP**

Signed by:

*Michael Shoenfeld*
086F7B22463B4DC...

By: Michael B. Schoenfeld
Its: Authorized Signatory

**WOHALI LAND ESTATES, LLC**

DocuSigned by:

*Matt Mckinlay*
A6D02098FD41440...

By: Matthew McKinlay
Its: Chapter 11 Trustee