Ellen E. Ostrow (14743)
eostrow@foley.com
FOLEY & LARDNER LLP
95 State Street, Suite 2500
Salt Lake City, UT  84111
Telephone:  801.401.8900

*Counsel for the Chapter 11 Trustee*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| In re:<br><br>Wohali Land Estates, LLC<br><br><br>               Debtor. | Bankruptcy No. 25-24610<br><br>(Chapter 11)<br><br>Hon. Peggy Hunt |

## CHAPTER 11 TRUSTEE'S SUPPLEMENTAL MOTION FOR APPROVAL OF SELECTION OF STALKING HORSE BIDDER

Matt McKinlay, in his capacity as the Chapter 11 Trustee (the "***Trustee***") of Wohali Land Estates, LLC (the "***Debtor***"), in the above-captioned chapter 11 case, by and through his undersigned counsel, hereby submits this supplemental motion for approval to designate EB5AN Wohali Utah Fund XV, LP as the stalking horse bidder (the "***Stalking Horse Bidder***") for the sale of substantially all of the Debtor's real and personal property and assumption of certain executory contracts and unexpired leases as set forth in the form *Purchase and Sale Agreement* attached hereto as Exhibit A (the "***Stalking Horse APA***").

On March 6, 2026, the Trustee filed his *Motion for (I) an Order (A) Approving Bid Procedures for the Sale of Assets; (B) Approving Procedures for the Assumption and Assignment*

*of Executory Contracts and Unexpired Lease; (C) Scheduling the Auction and Sale Hearing; and (D) Granting Related Relief; and (II) an Order (A) Approving the Sale, Free and Clear of All Claims, Liens, and Encumbrances; and (B) Approving the Assumption and Assignment or Rejection of Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* [Docket No. 333] (the "***Bid Procedures Motion***"). The Court conducted two hearings on the Motion, and the Trustee has submitted a proposed order which is pending before the Court. While an order approving the proposed Bid Procedures has not been entered, the proposed Bid Procedures required the Trustee to select and provide notice of a Stalking Horse Bidder by April 7, 2026. On April 7, 2026, the Trustee filed a *Notice of Continued Negotiation Regarding Form of Stalking Horse APA* [Docket No. 385] informing parties in interest that the Trustee and EB5 were continuing negotiations regarding an agreed upon form of the Stalking Horse APA. The parties have agreed to the Stalking Horse APA.

The Trustee believes that a stalking horse bid submitted by the proposed Stalking Horse Bidder will serve the critical function of setting a "floor" for further competitive bidding. Since filing the Bid Procedures Motion, the Trustee has engaged in extensive negotiation with EB5, and, after mediation, has entered into a settlement agreement with EB5 (the "***Settlement Agreement***"), whereby EB5 has agreed, in part, to serve as the Stalking Horse Bidder and set a floor of $65 million for the Debtor's assets. The Trustee is seeking approval of the Settlement Motion pursuant to his *Motion, Pursuant to 11 U.S.C. §§ 105(a) and 363(b), and Federal Rules of Bankruptcy Procedure 6004, 9014, and 9019, for Entry of an Order Approving a Settlement Agreement and Release of Claims Between the Trustee, on the one Hand, and EB5AN Wohali Utah Fund XV, LP, on the Other Hand* (the "***Settlement Motion***") [Docket No. 366], which is set to be heard by the

Court on April 15, 2026. EB5 has agreed to the terms of the Stalking Horse APA subject to the Court's approval of the Settlement Agreement.

The Stalking Horse Bidder will be the stalking horse for competitive bids, potentially leading to further competition and the establishment of a baseline against which higher or otherwise better offers can be measured. The Trustee, with the assistance of his professionals, will further solicit proposals for the purchase of the Assets prior to the proposed bid deadline (April 20), and based on such efforts, the estate will have reasonably and sufficiently marketed the Assets prior to the Sale Hearing.

Importantly, the Stalking Horse APA does *not* provide for any bid protections to be paid to the Stalking Horse Bidder. The Stalking Horse APA sets the floor for potential bidders without bid protections and will be subject to higher and better offers. If no higher or better offers are received, the Trustee will provide notice of the same by April 21, 2026 and approval of any sale to the Stalking Horse Bidder will be subject to the Court's approval at the Sale Hearing scheduled for May 7, 2026 at 9:00 a.m. (MT).

Based on the foregoing, the Trustee requests, upon approval of the Settlement Agreement, that the Court authorize the Trustee to designate EB5 as the Stalking Horse Bidder subject to higher and better offers.

Dated: April 9, 2026.

*/s/ Ellen E. Ostrow*  
Ellen E. Ostrow  
Foley & Lardner LLP

*Counsel for Chapter 11 Trustee*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 10th day of April, 2026, a true and correct copy of the foregoing **CHAPTER 11 TRUSTEE'S SUPPLEMENTAL MOTION FOR APPROVAL OF SELECTION OF STALKING HORSE BIDDER** was electronically filed and therefore served via ECF on the following:

- **David P. Billings** dbillings@fabianvancott.com, khaynes@fabianvancott.com
- **Bryan H Booth** bryan@mountainwestlaw.com, lisa@mountainwestlaw.com
- **Scott S Bridge** sbridge@keslerrust.com
- **Matthew James Burne** matthew.burne@usdoj.gov, Lindsey.Huston@usdoj.gov;Rinehart.Peshell@usdoj.gov;Rachelle.D.Hughes@usdoj.gov;Brittany.Dewitt@usdoj.gov
- **Ryan C. Cadwallader** rcadwallader@kmclaw.com, twhite@kmclaw.com
- **P. Matthew Cox** mcox@spencerfane.com, ecall@spencerfane.com;mwatson@spencerfane.com
- **Michael Allen Gehret** mike.gehret@dentons.com, kim.altamirano@dentons.com
- **Patricia Geary Glenn** pgearyglenn@gmail.com
- **Jason W. Hardin** jhardin@fabianvancott.com, sirvin@fabianvancott.com
- **Carson Heninger** heningerc@gtlaw.com, carson-heninger-5642@ecf.pacerpro.com,Candy.Long@gtlaw.com
- **George B. Hofmann** ghofmann@ck.law, mparks@ck.law;enilson@ck.law
- **Annette W. Jarvis** jarvisa@gtlaw.com, longca@gtlaw.com
- **Michael R. Johnson** mjohnson@rqn.com, docket@rqn.com;ASanchez@rqn.com;RQN@ecfalerts.com
- **Penrod W. Keith** penrod.keith@dentons.com, kristin.hughes@dentons.com
- **Justin J. Keys** justin@hlhparkcity.com, nancy@hlhparkcity.com
- **Bryce L. Krieger** bryce.krieger@dentons.com
- **Trevor C Lang** tclang@agutah.gov, staff@mohtrial.com
- **Matt McKinlay** mmckinlay@ampleo.com
- **Elijah L. Milne** eli.milne@dentons.com, deb.calegory@dentons.com,jaime.gargano@dentons.com,kristen.ivory@dentons.com
- **Matt C. Osborne** matt@oblawpc.com
- **Ellen E. Ostrow** eostrow@foley.com, ellen-ostrow-4512@ecf.pacerpro.com;docketflow@foley.com;geysa.peeler@foley.com
- **Douglas J. Payne** dpayne@fabianvancott.com, lwilson@fabianvancott.com;dadamson@fabianvancott.com
- **Charles Louis Pearlman** charles@hlh.law
- **Mark C. Rose** mrose@rqn.com, docket@rqn.com;asanchez@rqn.com
- **Jeffrey Weston Shields** jshields@rqn.com, 5962725420@filings.docketbird.com;docket@rqn.com;ecasaday@rqn.com
- **Jeremy C. Sink** jsink@kmclaw.com, mcarlson@kmclaw.com
- **Abigail Jennifer Stone** abigail.stone@gtlaw.com
- **Jeffrey L. Trousdale** jtrousdale@cohnekinghorn.com, mparks@ck.law;enilson@ck.law

- **United States Trustee**   USTPRegion19.SK.ECF@usdoj.gov


<span style="text-align:right; display:block">/s/ <em>Elisha Burton</em></span>


**<u>EXHIBIT A</u>**

**Stalking Horse APA**

**PURCHASE AND SALE AGREEMENT**

**WOHALI LAND ESTATES, LLC,**
**A UTAH LIMITED LIABILITY COMPANY**

**"SELLER"**

**AND**

**EB5AN WOHALI UTAH FUND XV, LP,**

**A DELAWARE LIMITED PARTNERSHIP**

**"BUYER"**

**WOHALI LAND ESTATES, LLC**

4913-8130-8319.1

# TABLE OF CONTENTS

ARTICLE 1 CERTAIN DEFINITIONS ................... **ERROR! BOOKMARK NOT DEFINED.**

ARTICLE 2 PURCHASE, PURCHASE PRICE AND PAYMENT ...... **ERROR! BOOKMARK NOT DEFINED.**

2.1    Purchase and Sale of Property .............................**Error! Bookmark not defined.**
2.2    Purchase Price....................................................**Error! Bookmark not defined.**
2.3    Allocation............................................................**Error! Bookmark not defined.**

ARTICLE 3 ESCROW ........................................... **ERROR! BOOKMARK NOT DEFINED.**

ARTICLE 4 CONDITION OF TITLE TO REAL PROPERTY ... **ERROR! BOOKMARK NOT DEFINED.**

ARTICLE 5 SELLER'S DELIVERIES ................... **ERROR! BOOKMARK NOT DEFINED.**

5.1    Seller's Deed......................................................**Error! Bookmark not defined.**
5.2    Intentionally omitted...........................................**Error! Bookmark not defined.**
5.3    Bill of Sale ........................................................**Error! Bookmark not defined.**
5.4    Assignment of Trade Names and Trademarks.......**Error! Bookmark not defined.**
5.5    Assignment and Assumption of Contracts.............**Error! Bookmark not defined.**
5.6    Assignment and Assumption of Leases .................**Error! Bookmark not defined.**
5.7    Assignment of Permits, Entitlements, Intangibles and IP.... **Error! Bookmark not defined.**
5.8    Assignment and Assumption of Water Rights and Water Contracts.............. **Error! Bookmark not defined.**
5.9    Certificate of Non-Foreign Status and Form 1099 **Error! Bookmark not defined.**
5.10   Assignment of PID..............................................**Error! Bookmark not defined.**
5.11   Seller's Closing Statement...................................**Error! Bookmark not defined.**
5.12   Seller's Charges .................................................**Error! Bookmark not defined.**
5.13   Seller's Affidavits, Certificates and Evidence of Authority **Error! Bookmark not defined.**
5.14   Keys and Additional Items..................................**Error! Bookmark not defined.**
5.15   Additional Documents .........................................**Error! Bookmark not defined.**
5.16   Acknowledgement of Direction Letter. .................**Error! Bookmark not defined.**
5.17   Lien Release Deliverables....................................**Error! Bookmark not defined.**

ARTICLE 6 BUYER'S DELIVERIES ..................... **ERROR! BOOKMARK NOT DEFINED.**

6.1    Assignment of Trade Names and Trademarks.......**Error! Bookmark not defined.**
6.2    Assignment and Assumption of Contracts.............**Error! Bookmark not defined.**
6.3    Assignment and Assumption of Leases .................**Error! Bookmark not defined.**
6.4    Assignment of Permits, Entitlements, Intangibles and IP.... **Error! Bookmark not defined.**

6.5     Assignment and Assumption of Water Rights and Water Contracts.............**Error! Bookmark not defined.**

6.6     Assignment of PID.................................................**Error! Bookmark not defined.**

6.7     Buyer's Closing Statement ...................................**Error! Bookmark not defined.**

6.8     Buyer's Charges...................................................**Error! Bookmark not defined.**

6.9     Buyer's Affidavits, Certificates and Evidence of Authority **Error! Bookmark not defined.**

6.10    Additional Documents .........................................**Error! Bookmark not defined.**

6.11    Direction Letter...................................................**Error! Bookmark not defined.**

6.12    Cash Component...................................................**Error! Bookmark not defined.**

ARTICLE 7 CONDITIONS TO CLOSING; CLOSING;  TERMINATION UPON DEFAULT; AND SPECIAL BANKRUPTCY TERMS ............... **ERROR! BOOKMARK NOT DEFINED.**

7.1     Conditions to Obligations of Buyer ......................**Error! Bookmark not defined.**

7.2     Conditions to Obligations of Seller ......................**Error! Bookmark not defined.**

7.3     Casualty...............................................................**Error! Bookmark not defined.**

7.4     Closing ...............................................................**Error! Bookmark not defined.**

7.5     Failure of Conditions to Closing..........................**Error! Bookmark not defined.**

7.6     Additional Buyer Termination Rights ...................**Error! Bookmark not defined.**

7.7     Breach/Termination .............................................**Error! Bookmark not defined.**

7.8     Pre-Closing Covenants of Seller...........................**Error! Bookmark not defined.**

7.9     Back-Up Bidder: .................................................**Error! Bookmark not defined.**

7.10    No Successor Liability.........................................**Error! Bookmark not defined.**

7.11    Bankruptcy Court Approval.................................**Error! Bookmark not defined.**

ARTICLE 8 REPRESENTATIONS AND WARRANTIES OF SELLER.......................**ERROR! BOOKMARK NOT DEFINED.**

8.1     Organization, Power and Authority ......................**Error! Bookmark not defined.**

8.2     Non-Foreign Status .............................................**Error! Bookmark not defined.**

8.3     Survival ...............................................................**Error! Bookmark not defined.**

ARTICLE 9 REPRESENTATIONS AND WARRANTIES OF BUYER ........................**ERROR! BOOKMARK NOT DEFINED.**

9.1     Organization, Power and Authority ......................**Error! Bookmark not defined.**

9.2     No Conflicts or Violations...................................**Error! Bookmark not defined.**

9.3     Approvals............................................................**Error! Bookmark not defined.**

9.4     Prohibited Persons and Transactions ....................**Error! Bookmark not defined.**

9.5     Survival ...............................................................**Error! Bookmark not defined.**

ARTICLE 10 COSTS, EXPENSES AND PRORATIONS........... **ERROR! BOOKMARK NOT DEFINED.**

10.1    Costs and Expenses..............................................**Error! Bookmark not defined.**

ARTICLE 11 ACTIONS TO BE TAKEN AT THE CLOSING... **ERROR! BOOKMARK NOT DEFINED.**

    11.1    Actions by Escrow Agent .....................................**Error! Bookmark not defined.**

ARTICLE 12 PROPERTY CONVEYED "AS-IS"; SELLER RELEASE; INDEMNIFICATION ................................................................... **ERROR! BOOKMARK NOT DEFINED.**

    12.1    Condition of the Property....................................**Error! Bookmark not defined.**
    12.2    Buyer's Release ..................................................**Error! Bookmark not defined.**
    12.3    Seller's Release...................................................**Error! Bookmark not defined.**
    12.4    Restrictions on Transfer of Property; Third Party Consents **Error! Bookmark not defined.**
    12.5    Survival ..............................................................**Error! Bookmark not defined.**

ARTICLE 13 BROKERS ........................................ **ERROR! BOOKMARK NOT DEFINED.**

ARTICLE 14 MISCELLANEOUS ........................... **ERROR! BOOKMARK NOT DEFINED.**

    14.1    Assignment .........................................................**Error! Bookmark not defined.**
    14.2    Notices ...............................................................**Error! Bookmark not defined.**
    14.3    Binding Offer from Buyer ..................................**Error! Bookmark not defined.**
    14.4    Entire Agreement................................................**Error! Bookmark not defined.**
    14.5    Severability .......................................................**Error! Bookmark not defined.**
    14.6    Remedies............................................................**Error! Bookmark not defined.**
    14.7    Headings ............................................................**Error! Bookmark not defined.**
    14.8    Counterparts.......................................................**Error! Bookmark not defined.**
    14.9    Attorneys' Fees .................................................**Error! Bookmark not defined.**
    14.10   Governing Law and Adjudication........................**Error! Bookmark not defined.**
    14.11   No Third Party Beneficiary.................................**Error! Bookmark not defined.**
    14.12   Binding Effect....................................................**Error! Bookmark not defined.**
    14.13   Survival..............................................................**Error! Bookmark not defined.**
    14.14   Time of the Essence ...........................................**Error! Bookmark not defined.**
    14.15   Rules of Construction ........................................**Error! Bookmark not defined.**
    14.16   Further Assurances.............................................**Error! Bookmark not defined.**

EXHIBITS

A     Legal Description of the Land
B     Seller's Deed
C     Quitclaim Deed for Water Rights
D     Bill of Sale
E     Assumption and Assignment of Leases
F     Assignment of Trade Names and Trademarks
G     Assumption and Assignment of Contracts
H     Assignment of Permits, Entitlements, Intangibles and IP
I     Assumption and Assignment of Water Rights and Water Contracts
J     Certificate of Non-Foreign Status
K     Assumption and Assignment of Rights and Obligations of Debtor related to PID

SCHEDULES

1.0     Excluded Property
2.1(b)  Personal Property
2.1(c)  Leases
2.1(d)  Assumed Contracts
2.1(e)  Permits
2.1(f)  Intangibles
2.1(g)  Entitlements
2.1(h)  Trade Names and Trademarks
2.1(j)  Water Rights and Water Contracts
4.0     Permitted Title Exceptions

4913-8130-8319.1

## PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT ("Agreement") is made and dated as of the __th day of April, 2026 (the "Effective Date"), by and between WOHALI LAND ESTATES, LLC, a Utah limited liability company, debtor in the Bankruptcy Case (as defined below) ("Seller" or "Debtor"), and EB5AN Wohali Utah Fund XV, LP, a Delaware limited partnership (herein together with the permitted assign(s), referred to as "Buyer"), each of whom shall sometimes separately be referred to herein as a "Party" and both of whom shall sometimes collectively be referred to herein as the "Parties," and constitutes a binding purchase and sale agreement between Seller and Buyer.

## RECITALS

A.      WHEREAS, Seller is the debtor in connection with a Chapter 11 bankruptcy case pending in the United States Bankruptcy Court for the District of Utah, Case No. 25-24610 (the "Bankruptcy Case").

B.      WHEREAS, Matthew McKinlay was appointed as the Chapter 11 trustee ("Trustee") of Seller on October 9, 2025.

C.      WHEREAS, Seller owns the Property (as defined below), located in Summit and Morgan Counties, State of Utah.

D.      WHEREAS, Seller is authorized by the Bankruptcy Court to offer the Property for sale, subject to the terms and conditions hereunder, receipt of final approval and order of the Bankruptcy Court pursuant to the Bankruptcy Code, and to the matters set forth in that certain *Order (A) Approving Bid Procedures for the Sale of Assets; (B) Approving Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases; (C) Scheduling the Auction and Sale Hearing; and (D) Granting Related Relief* (the "Sale Procedures Order") entered by the Bankruptcy Court on April __, 2026 [Docket No. ___].  This Agreement shall constitute a Stalking Horse Asset Purchase Agreement, as referenced by the Bid Procedures attached as Exhibit "A" to the Sale Procedures Order.

E.      WHEREAS, Buyer desires to purchase from Seller, and Seller desires to sell to Purchaser, the Property (as defined below), all in accordance with the terms and provisions of this Agreement.

F.      WHEREAS, Buyer is entering into this Agreement as a "Bidder" (as such term is defined in the Sale Procedures Order).

NOW, THEREFORE, in consideration of the mutual covenants, promises and agreements contained herein and for other good and valuable consideration, the receipt and sufficient of which is acknowledged, and intending to be legally bound, Seller and Buyer agree as follows:

# ARTICLE 1
# CERTAIN DEFINITIONS

In addition to those terms defined elsewhere in this Agreement, the following terms have the meanings set forth below:

"<u>2026 Golf Discovery Memberships</u>" shall mean those 2026-only memberships or other rights, licenses or privileges sold by the Trustee which authorize the holder to utilize all or any portion of the Club Facilities.

"<u>2026 Golf Discovery Membership Documents</u>" shall mean originals and copies of any and all contracts for 2026 Golf Discovery Memberships.

"<u>Affiliate</u>" when used with respect to any Person from time to time, has the meaning set forth in § 101(2) of the Bankruptcy Code.

"<u>Agreement</u>" shall mean this Purchase and Sale Agreement dated as of the ___th day of April, 2026, by and between Seller and Buyer, together with all Exhibits and Schedules attached hereto.

"<u>Assignment and Assumption of Contracts</u>" means the Assignment and Assumption of Contracts, substantially in the form of Exhibit "G" attached hereto and incorporated herein by reference.

"<u>Assignment and Assumption of Leases</u>" means the Assignment and Assumption of Leases, substantially in the form of Exhibit "E" attached hereto and incorporated herein by reference.

"<u>Assignment and Assumption of PID</u>" means the Assignment and Assumption of all obligations and rights of the Debtor relating to the Wohali Public Infrastructure District Nos. 1 and 2, substantially in the form of Exhibit "K" attached hereto and incorporated herein by reference.

"<u>Assignment of Permits, Entitlements, Intangibles and IP</u>" means the Assignment of Permits, Entitlements, Intangibles and IP, substantially in the form of Exhibit "H" attached hereto and incorporated herein by reference.

"<u>Assignment of Trade Names and Trademarks</u>" means the Assignment and License of Trade Names and Trademarks, substantially in the form of Exhibit "F" attached hereto and incorporated herein by reference.

"<u>Assignment and Assumption of Water Rights and Water Contracts</u>" means the Assignment and Assumption of Water Rights and Water Contracts, substantially in the form of Exhibit "I" attached hereto and incorporated herein by reference.

"<u>Assumed Contracts</u>" shall have the meaning given to such term in Section 2.1(d) hereof.

"<u>Assumed Liabilities</u>" means: (i) the Permitted Title Exceptions; (ii) all costs and expenses payable by Buyer pursuant to this Agreement (including, without limitation, pursuant to Section

10.1(b) hereof); (iii) real and business personal property taxes and assessments secured by statutory liens against the Property in favor of taxing authorities; (iv) all liabilities and obligations relating to the Assumed Contracts, the Leases, the Permits, the Intangibles, the Entitlements, the IP, the Trade Names and Trademarks, the Water Rights and Water Contracts, and any other Property, that accrue from and after the Closing; and (v) the obligation to pay any "cure" amount under § 365 of the Bankruptcy Code pursuant to this Agreement, in each case together with all Claims with respect thereto. For the avoidance of doubt, in no event shall the term "Assumed Liabilities" include any liabilities or obligations of Seller to any employees or independent contractors of Seller arising or accruing prior to the Closing Date.

"Auction" means the auction, if any, for the Property conducted pursuant to the Bid Procedures.

"Bankruptcy Case" shall have the meaning ascribed to such term in Recital A of this Agreement.

"Bankruptcy Code" shall mean Title 11 of the United States Code, as the same may be amended from time to time.

"Bankruptcy Court" shall mean the United States Bankruptcy Court for the District of Utah or such other court having jurisdiction over the Bankruptcy Case.

"Bid Procedures" means the bid procedures governing the sale of the Property, which procedures were approved in the Sale Procedures Order.

"Bill of Sale" means the Bill of Sale, substantially in the form of Exhibit "D" attached hereto and incorporated herein by reference.

"Books and Records" shall mean the books and records relating to the business of owning, operating, maintaining and/or managing the Property, including, without limitation: (i) all accounting, financial, tax, employment, sales, billing, collection and other records, (ii) all policy manuals, marketing plans and promotional materials; (iii) all machinery and equipment diagrams and plans, operating manuals and other information relating to equipment and systems; (iv) all books and records relating to any Claims; and (v) all maps, plats, suppliers lists and catalogs. The term "Books and Records" shall specifically exclude the Excluded Property. Buyer shall provide Seller with written notice of the Books and Records Buyer desires to have copied within five (5) Business Days after the Effective Date, and copies of the Books and Records shall thereafter be made by Seller (at Buyer's sole cost and expense) and made available to Buyer.

"Business Day" means any day other than a Saturday, Sunday or any United States federal legal holiday.

"Buyer" shall have the meaning given to such term in the Preamble of this Agreement.

"Calendar Day" means any day of the week including a Business Day.

"Cash" means legal tender of the United States of America represented by either: (a) currency; or (b) immediately available funds wire transferred or otherwise deposited into the

designated recipient's account pursuant to wiring instructions provided at such recipient's direction.

"Cash Component" means the sum of $1,800,000 in immediately available funds to be paid by Buyer at Closing and distributed as directed by the Sale Order to fund allowed administrative claims of the estate, with any remaining funds available to the Trustee to administer the bankruptcy estate and Liquidating Trust.  The Cash Component shall be reduced at Closing by the amount of the Cash Deposit previously delivered by Buyer to Escrow Agent.

"Cash Deposit" means the sum of Three Hundred and Sixty Thousand Dollars ($360,000), deposited by Buyer with Escrow Agent concurrently with the execution of this Agreement in accordance with the Bid Procedures.

"Certificate of Non-Foreign Status" means a certificate substantially in the form of Exhibit "J" attached hereto and incorporated herein by reference.

"Claims" means Seller's rights, claims, counterclaims, cross claims, credits, causes of action and rights of set off against third parties:  (a) under any manufacturers' and/or vendors' warranties relating to the Property; and (b) with respect to the Assumed Liabilities.  For the avoidance of doubt, the term "Claims" shall specifically exclude Claims that arise out of or relate to the Excluded Property.

"Closing" means the consummation of the purchase and sale of the Property hereunder and the recordation of Seller's Deed in the Official Records of Summit and Morgan Counties, State of Utah.

"Closing Date" means that date that is on or before ten (10) Calendar Days after the entry by the Bankruptcy Court of the Sale Order approving the Sale at the Sale Hearing (or, if applicable, such other date mutually agreed to in writing by the Parties and as approved by the Bankruptcy Court), but in no event later than May 13, 2026, unless a later date is approved by the Bankruptcy Court.

"Clubhouse" shall refer to the clubhouse and related improvements located on the Land, as the context may require.

"Club Facilities" shall collectively refer to the Golf Courses, the Clubhouse, and the unbuilt amenities, as the context may apply.

"Code" shall mean the Internal Revenue Code of 1986, as amended, or corresponding provisions of subsequent federal revenues laws.

"Contracts" shall mean all written or oral agreements relating to the management, maintenance and/or operation of the Property.  The term "Contracts" shall specifically exclude the Leases and the Water Rights and Water Contracts.

"Credit Bid" means the credit bid by Buyer pursuant to Section 363(k) of the Bankruptcy Code in the aggregate amount of $65,000,000, comprising:  (a) first, the full outstanding amount of all DIP Obligations under the DIP Credit Agreement as of the Closing Date (estimated at

$7,000,000 in principal and accrued interest, subject to any pre-closing advances added thereto pursuant to the Settlement Agreement); and (b) second, amounts outstanding under the EB5 Prepetition Claim in the amount of $58,000,000; provided that Buyer reserves the right to increase the Credit Bid at any Auction up to an aggregate maximum of $89,000,000 (comprising first the full DIP Obligations and second up to $82,000,000 of the EB5 Prepetition Claim). The Credit Bid shall be satisfied at Closing in accordance with Section 2.2(a) hereof.

"DIP Credit Agreement" means the debtor-in-possession financing agreement approved by Final DIP Order [Dkt. No. 323] between the Debtor as borrower and EB5AN Wohali Utah Fund XV, LP as lender, providing for a DIP Loan aggregate principal amount of $6,800,000, as amended from time to time, including all amendments effectuating the maturity extension contemplated by Section 14 of the Settlement Agreement.

"Direction Letter" means the letter, a true and correct copy of which is attached hereto as Exhibit [___], executed by Buyer in its capacity as lender and administrative agent under the DIP Credit Agreement and the EB5 Loan Agreement, directing the applicable agent(s) to credit bid the DIP Obligations and the EB5 Prepetition Claim at Closing in the amounts specified in the Credit Bid definition, and authorizing the filing and recording of all Lien Release Deliverables upon consummation of the Credit Bid.

"DIP Obligations" means all outstanding principal, accrued and unpaid interest, fees, costs, and expenses owing by Seller to Buyer under the DIP Credit Agreement as of the Closing Date.

"EB5 Prepetition Claim" means the claim of Buyer against Seller's estate arising from the EB5 Loan Agreement dated August 11, 2022, secured by the Trust Deed, in the aggregate amount of $86,167,955.67 as of the Petition Date (consisting of principal of $78,870,000.00, accrued interest of $7,161,962.98, and attorneys' fees and costs of $135,992.69), as allowed pursuant to the Settlement Agreement.

"EB5 Loan Agreement" means the loan agreement dated August 11, 2022, between Seller, as borrower, and EB5AN Wohali Utah Fund XV, LP, as lender, pursuant to which EB5 agreed to lend up to $79.2 million to Seller, together with the related promissory note and all other related loan documents.

"Effective Date" shall have the meaning given to such term in the Preamble of this Agreement.

"Eagle Championship Course" shall mean that certain 18-hole championship golf course, maintenance facility and related improvements located on the Land.

"Entitlements" shall have the meaning given to such term in Section 2.1(g) hereof.

"Environmental Laws" means all present federal, state or local laws, ordinances, codes, statutes, regulations, administrative rules, policies and orders, and other authorities, which relate to the environment and/or which classify, regulate, impose liability, obligations, restrictions on ownership, occupancy, transferability or use of the Real Property, and/or list or define hazardous substances, materials, wastes, contaminants, pollutants and/or the Hazardous Materials and any similar federal, state or local laws and ordinances and the regulations now or hereafter adopted,

published and/or promulgated pursuant thereto and other state and federal laws relating to industrial hygiene, environmental protection or the use, analysis, generation, manufacture, storage, disposal or transportation of any Hazardous Materials.

"Escrow" means the escrow established with Escrow Agent for the purposes of this Agreement.

"Escrow Agent" shall mean Cottonwood Title.

"Excluded Liabilities" shall mean all Liabilities that are not Assumed Liabilities.

"Excluded Property" shall mean any and all of Seller's right, title or interest in, to, or under the following: (i) Seller's original Books and Records; (ii) Seller's Tax Records; (iii) records pertaining to Seller's limited liability company affairs or contributions, distributions or payments of member loans or capital; (iv) any and all records relating to the Excluded Property, inclusive of claims or litigation proceedings relating thereto; (v) any and all records subject to attorney-client privilege, attorney work product doctrine or other legal privilege; (vi) business plans and information; (vii) personnel records of past, current and prospective personnel; (viii) any and all claims and/or causes of action arising in favor of Seller or the bankruptcy estate of Seller pursuant to any provision of the Bankruptcy Code, including, without limitation, any avoidance actions; (ix) any and all claims and/or causes of action against any Person existing as of the date of the filing of the Bankruptcy Case or arising thereafter; (x) any and all Cash, accounts, accounts receivable, deposits, deposit accounts, refunds, retainers and other cash equivalents, including without limitation any and all instruments, stocks, securities, investments, bonds, and financial investments or financial assets; and (xi) all of the specific items listed on Schedule 1.0 attached hereto and incorporated herein by reference. For the avoidance of doubt, the term "Excluded Property" shall not include any Claims that are to be transferred, conveyed and assigned to Buyer pursuant to the terms and conditions of this Agreement.

"Golf Course" and "Golf Courses" shall individually and collectively refer to the Eagle Championship Course and the Short Course, as the context may apply.

"Hazardous Materials" means all hazardous wastes, toxic substances, pollutants, contaminants, radioactive materials, flammable explosives, other such materials, including without limitation substances defined as "hazardous substances," "hazardous materials," "toxic substances," "toxic pollutants," or "infectious waste" under any applicable Environmental Laws in effect as of the Effective Date which are regulated by reason of actual or threatened risk of toxicity causing injury or illness.

"Improvements" means all buildings, structures, fixtures and other improvements now or hereafter located on, over and under the Land, including, without limitation, the Club Facilities and all cart barns, maintenance facilities and storage areas and all irrigation and water control systems, utility lines and related fixtures and improvements, drainage facilities, landscaping, improvements, common areas, fencing, signs, cart paths, restrooms, drinking fountains, roadways, walkways and parking facilities.

"Intangibles" shall have the meaning given such to term in Section 2.1(f) hereof.

"IP" means all intellectual property and other similar proprietary rights, whether registered or unregistered, relating to all WWW addresses, uniform resource locators and domain names and applications and registrations therefor, currently used by Seller. The term "IP" specifically excludes the Trade Names and Trademarks and the Excluded Property.

"Land" means those certain tracts or parcels of real property located in Summit and Morgan Counties, State of Utah, the description of which is set forth on Exhibit "A" attached hereto and incorporated herein by reference.

"Leases" shall have the meaning given to such term in Section 2.1(c) hereof.

"Liabilities" shall mean any liabilities, debts or obligations of any nature, whether accrued, absolute, fixed, or contingent, liquidated, unliquidated or otherwise and whether due or to become due, and whether known or unknown.

"Lien Release Deliverables" means: (a) executed UCC-3 termination statements terminating all UCC financing statements filed in favor of Buyer against Seller or the Property; (b) a deed of reconveyance or mortgage release discharging the Trust Deed recorded in Summit County, Utah (Entry No. 01197541, Book 2763, Page 1333) and Morgan County, Utah (Entry No. 162312, Book 396, Page 599); and (c) any other instruments necessary to evidence the full release of Buyer's security interests in and liens upon the Property, each in customary and recordable form.

"Liquor Licenses" means the liquor licenses held by Wohali Master Owners' Association, allowing for the sale of alcoholic beverages.

"Liquidating Trust" means a liquidating trust established pursuant to the terms of the Settlement Agreement under a Chapter 11 plan of reorganization or liquidation proposed by the Trustee and confirmed in the Bankruptcy Case, to which the Trustee shall assign all estate causes of action (other than those released under the Settlement Agreement), including avoidance actions, fraudulent transfer claims, preference claims, and other claims against third parties arising under state or federal law. The Liquidating Trust shall be administered by the Trustee (or a successor liquidating trustee) for the benefit of the Debtor's unsecured creditors, including Buyer on account of its allowed deficiency claim, all in accordance with the Settlement Agreement.

"Losses" shall mean any and all losses, claims (including, without limitation, any and all mechanics' or materialmen's liens or claims of liens), demands, causes of action, lawsuits, arbitrations, injuries, damages, costs, fees and expenses (including reasonable attorneys' fees and costs of litigation).

"Material Adverse Effect" means any event, change, condition, development, or occurrence that, individually or in the aggregate, has had, or would reasonably be expected to have, a material adverse effect on (a) the value, condition (physical or otherwise), or operability of the Property (taken as a whole), (b) the ability of Seller to consummate the transactions contemplated by this Agreement by the Closing Date, or (c) the ability of Buyer to own and operate the Property following the Closing; provided that none of the following shall constitute or be taken into account in determining whether a Material Adverse Effect has occurred: (i) changes in general economic, financial market, or real estate market conditions, (ii) changes in applicable law or GAAP, (iii) the

announcement or pendency of this Agreement or the transactions contemplated hereby, (iv) any action required or contemplated by this Agreement or the Settlement Agreement, or (v) any action taken or omitted with Buyer's prior written consent.

"Material Loss" means damage, loss or destruction to any portion of the Real Property, the loss of which is equal to or greater than Three Hundred Thousand Dollars ($300,000.00) (measured by the cost of repair or replacement).

"M/OP Parties" shall have the meaning given such to term in Section 12.1(a) hereof.

"Non-Material Loss" means damage, loss or destruction to any portion of the Real Property, the loss of which is less than Three Hundred Thousand Dollars ($300,000.00) (measured by the cost of repair or replacement).

"Notice" shall have the meaning given to such term in Section 14.2 hereof.

"OFAC" shall have the meaning given to such term in Section 9.4 hereof.

"Ordinary Course of Business" means any action taken by Seller that is consistent in nature, scope and magnitude with the historical practices of Seller and is taken in the ordinary course of the normal day-to-day operations of the Property by the Seller.

"Permits" shall have the meaning given to such term in Section 2.1(e) hereof.

"Permitted Title Exceptions" shall mean all covenants, conditions, restrictions, easements, including conservation easements, interests, encumbrances and other matters of record against the Real Property as of the Closing, as set forth on Schedule 4.0 attached hereto and incorporated herein by reference.

"Person" means any corporation, partnership, joint venture, limited liability company, organization, entity, association, business trust or natural person.

"Petition Date" means August 8, 2025, the date on which Seller filed its voluntary petition commencing the Bankruptcy Case.

"Personal Property" shall have the meaning given to such term in Section 2.1(b) hereof.

"Property" shall have the meaning given to such term in Section 2.1 hereof.

"Purchase Price" shall have the meaning given to such term in Section 2.2 hereof.

"Quitclaim Deed for Water Rights" means the Quitclaim Deed for Water Rights to be executed and acknowledged by Seller and delivered to Buyer on or before the Closing, substantially in the form of Exhibit "C" attached hereto and incorporated herein by reference

"Real Property" shall have the meaning given to such term in Section 2.1(a) hereof.

"Sale Hearing" shall have the meaning given to such term in the Sale Procedures Order.

"Sale Order" means an Order of the Bankruptcy Court, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, authorizing and approving the sale of the Property to Buyer free and clear of all encumbrances (other than Permitted Title Exceptions and Assumed Liabilities) to the extent permitted by Section 363(f) of the Bankruptcy Code, and the assumption and assignment of the Assumed Contracts to Buyer, and containing findings of fact and conclusions of law that Buyer has acted in good faith within the meaning of Section 363(m) of the Bankruptcy Code, and expressly approving Buyer's credit bid pursuant to Section 363(k) of the Bankruptcy Code, in a form acceptable to Buyer and Seller.

"Sale Procedures Order" shall have the meaning given to such term in Recital D hereof.

"Seller" shall have the meaning given to such term in the Preamble of this Agreement.

"Seller's Broker" shall mean CBRE Inc.

"Seller's Broker's Commission" shall have the meaning given to such term in Article 13 hereof.

"Seller's Deed" means the Quitclaim Deed to be executed and acknowledged by Seller and delivered to Buyer on or before the Closing, in the form of Exhibit "B" attached hereto and incorporated herein by reference.

"Settlement Agreement" means the Settlement Agreement and Release of Claims dated March 24, 2026, by and between Buyer and Seller (through the Trustee), which is subject to approval by the Bankruptcy Court pursuant to Federal Rule of Bankruptcy Procedure 9019.

"Short Course" shall mean that certain incomplete 15-hole golf course, maintenance facility and related improvements located on the Land.

"Successful Bidder" has the meaning given to such term in the Bid Procedures.

"Tax Records" means originals and copies of Seller's income tax returns, sales tax returns, files and related books and records.

"Trade Names and Trademarks" shall have the meaning given to such term in Section 2.1(h) hereof.

"Transaction Documents" means the Seller's Deed, the Quitclaim Deed for Water Rights, the Bill of Sale, the Assignment and Assumption of Contracts, the Assignment and Assumption of Leases, the Assignment of Permits, Entitlements, Intangibles and IP, the Assignment of Trade Names and Trademarks, the Assignment and Assumption of Water Rights and Water Contracts, the Certificate of Non-Foreign Status, the Assumption and Assignment of all of the Debtor's rights and obligations relating to the PID and all other instruments or agreements to be executed and delivered pursuant to this Agreement or any of the foregoing.

"Trust Deed" means the Deed of Trust, Assignment of Rents and Leases, Security Agreement and Fixture Filing executed by Seller in favor of Buyer dated October 31, 2022, recorded in the office of the Summit County Recorder's Office on November 9, 2022, as Entry

Number 01197541, in Book 2763, beginning at Page 1333 of the Official Records, and recorded in the office of the Morgan County Recorder's Office on November 9, 2022, as Entry Number 162312, in Book 396, beginning at Page 599 of the Official Records.

"Water Rights and Water Contracts" shall have the meaning given to such term in Section 2.1(j) hereof.

"Wohali Concerned Owners" or "WCOs" means the group of landowners within the Wohali development who have appeared in the Bankruptcy Case and identified themselves as the Wohali Concerned Owners.

"Wohali Project" means the Wohali Land Estates development project located in Summit and Morgan Counties, Utah, as described in the Bankruptcy Case filings.

## ARTICLE 2
## PURCHASE, PURCHASE PRICE AND PAYMENT

2.1     Purchase and Sale of Property.  Subject to the terms and conditions set forth in this Agreement, Seller shall sell, convey, assign, transfer and deliver to Buyer, and Buyer shall purchase, acquire and assume from Seller, all of the right, title and interest of Seller in and to the following property, if any, and to the extent property of the Bankruptcy Estate (collectively, the "Property"); free and clear of any and all liens, liabilities, interests, encumbrances and obligations of whatsoever kind or nature, other than the Assumed Liabilities:

(a)     Real Property.  The Land and the Improvements together with (a) all rights, privileges, tenements, hereditaments, easements, rights-of-way, development rights, entitlements, air rights, appurtenances, appendages, projections, streets, ways, alleys, and strips and gores of land now or hereafter in anyway belonging, adjoining, crossing or pertaining to the Land and/or the Improvements, (b) all water wells, and all portions of streams, creeks, ponds, lakes or other bodies of water in, on or under the Land, whether such rights are riparian, appropriated, prescriptive or otherwise, and all water rights, water allocations and water stock and all ditch and ditch rights including, without limitation, the Water Rights and Water Contracts, (c) all sewer, septic and waste disposal rights and interests applicable or appurtenant to and/or used in connection with the operation of the Improvements, and (d) all minerals, oil, gas and other hydrocarbons located in, on or under the Land, together with all rights to surface or subsurface entry (collectively, the "Real Property").

(b)     Personal Property.  All fixtures, building materials, equipment, machinery, vehicles, tools, appliances, furnishings, furniture, fixtures, trade fixtures, goods held for resale, inventory (including, without limitation, food and beverage inventory and fertilizer and pesticide inventory), supplies, telephone and computer equipment, office machines, and other items of tangible personal property located on the Land, in the Improvements, or used in connection with the business of owning, operating, maintaining and/or managing the Real Property, including, without limitation:  (i) copies of the Books and Records as authorized by the Bankruptcy Court pursuant to the Sale Order; and (ii) all as set forth on Schedule 2.1(b), attached hereto and incorporated herein by reference (collectively, the "Personal Property").  The Personal Property is

subject to depletion, replacement and addition in the Ordinary Course of Business. The term "Personal Property" shall specifically exclude the Excluded Property and the Excluded Liabilities.

(c) Leases. All of the leases, agreements and amendments thereto in effect on the Closing with respect to the Real Property and the Personal Property as authorized by the Bankruptcy Court pursuant to the Sale Order, all as set forth on Schedule 2.1(c), attached hereto and incorporated herein by reference (collectively, the "Leases"); provided, Buyer acknowledges and agrees that the responsibility to obtain any required consent to assignment of the Leases (if necessary beyond the authority of the Bankruptcy Court), is the sole responsibility of Buyer and Buyer shall pay any cost or expense related to such assignment, including any "cure" amount under § 365 of the Bankruptcy Code, if applicable. The term "Leases" shall specifically exclude the Excluded Property and the Excluded Liabilities.

(d) Assumed Contracts. Only those Contracts set forth on Schedule 2.1(d), attached hereto and incorporated herein, shall be assumed by Buyer (collectively, the "Assumed Contracts"). All Contracts not listed on Schedule 2.1(d) are expressly excluded from this Agreement and shall not be assumed by Buyer. Buyer acknowledges and agrees that the responsibility to obtain any required consent to assignment of the Assumed Contracts (if necessary beyond the authority of the Bankruptcy Court) is the sole responsibility of Buyer, and Buyer shall pay any cost or expense related to such assignment, including any "cure" amount under § 365 of the Bankruptcy Code, if applicable. For the avoidance of doubt, the term "Assumed Contracts" shall specifically exclude the Excluded Property and the Excluded Liabilities.

(e) Permits. All certificates of occupancy, approvals, authorizations and orders obtained from any governmental authority and relating to the Property or the business of owning, operating, maintaining or managing the Property, including, without limitation, the Liquor Licenses and the NOAS Documents, as authorized by the Bankruptcy Court pursuant to the Sale Order, all as set forth on Schedule 2.1(e) attached hereto and incorporated herein by reference (collectively, the "Permits"); provided, (i) Seller makes no representation or warranty as to whether or not such Liquor Licenses are assignable or transferable, and Buyer acknowledges and agrees that Buyer must separately apply to the applicable governmental authorities for the issuance of such Liquor Licenses; and (ii) Buyer acknowledges and agrees that the responsibility to obtain any required consent to assignment of the Permits (if necessary beyond the authority of the Bankruptcy Court) is the sole responsibility of Buyer and Buyer shall pay any cost or expense related to such assignment, including any "cure" amount under § 365 of the Bankruptcy Code, if applicable. The term "Permits" shall specifically exclude the Excluded Property and the Excluded Liabilities.

(f) Intangibles. All of the intangible personal property relating to the Property or the business of owning, operating, maintaining or managing the Property, including, without limitation, goodwill and Claims as authorized by the Bankruptcy Court pursuant to the Sale Order, all as set forth on Schedule 2.1(f), attached hereto and incorporated herein (collectively, the "Intangibles"); provided, Buyer acknowledges and agrees that the responsibility to obtain any required consent to assignment of the Intangibles (if necessary beyond the authority of the Bankruptcy Court), is the sole responsibility of Buyer and Buyer shall pay any cost or expense related to such assignment, including any "cure" amount under § 365 of the Bankruptcy Code, if applicable. The term "Intangibles" shall specifically exclude the Excluded Property and the Excluded Liabilities.

(g)    Entitlements.    All land use entitlements, development rights, sewer capacity, density allocations and other rights or approvals relating to or authorizing the ownership, development and/or operation of the Real Property; all plans and specifications, all contract rights (including, without limitation, any and all guarantees and warranties relating to the construction of any Improvements); all development and land use rights, applications, architectural and engineering plans and reports, specifications and drawings, as-built drawings, maps; and any documents of the same or similar nature pertaining to the Real Property, all as set forth on Schedule 2.1(g), attached hereto and incorporated herein by reference (collectively the "Entitlements"); provided, Buyer acknowledges and agrees that the responsibility to obtain any required consent to assignment of the Entitlements (if necessary beyond the authority of the Bankruptcy Court), is the sole responsibility of Buyer and Buyer shall pay any cost or expense related to such assignment, including any "cure" amount under § 365 of the Bankruptcy Code, if applicable.  The term "Entitlements" shall specifically exclude the Excluded Property and the Excluded Liabilities.

(h)    Trade Names and Trademarks.  All trademarks, service marks and logos of "Wohali" whether or not registered, and all trademarks, service marks, logos, domain names and metatag rights relating to the domain names of "Wohali" whether or not registered, and all fictitious business names and other intellectual property registrations or filings with regard to the foregoing, as authorized by the Bankruptcy Court pursuant to the Sale Order, all as set forth on Schedule 2.1(h), attached hereto and incorporated herein by reference (collectively, the "Trade Names and Trademarks"); provided:  (i) Buyer acknowledges and agrees that the responsibility to obtain any required consent to assignment of the Trade Names and Trademarks (if necessary beyond the authority of the Bankruptcy Court), is the sole responsibility of Buyer and Buyer shall pay any cost or expense related to such assignment, including any "cure" amount under § 365 of the Bankruptcy Code, if applicable; and (ii) as of the Closing, Buyer shall grant and shall be deemed to have granted to Seller a nonexclusive and royalty free license to use the Trade Names and Trademarks in connection with winding up the affairs of Seller and the Bankruptcy Case.  This license shall expire upon the later of:  (i) the termination of the Liquidating Trust and (ii) closure of the Bankruptcy Case.  The term "Trade Names and Trademarks" shall specifically exclude the Excluded Property and the Excluded Liabilities.

(i)    IP.  All of the IP as authorized by the Bankruptcy Court pursuant to the Sale Order, provided, Buyer acknowledges and agrees that the responsibility to obtain any required consent to assignment of the IP (if necessary beyond the authority of the Bankruptcy Court), is the sole responsibility of Buyer and Buyer shall pay any cost or expense related to such assignment, including any "cure" amount under § 365 of the Bankruptcy Code, if applicable.  The term "IP" shall specifically exclude the Excluded Property and the Excluded Liabilities.

(j)    Water Rights and Water Contracts.  All of the water allocations, rights to use water and water contracts relating to the Real Property as authorized by the Bankruptcy Court pursuant to the Sale Order, all as set forth on Schedule 2.1(j), attached hereto and incorporated herein by reference (collectively, the "Water Rights and Water Contracts") provided, Buyer acknowledges and agrees that the responsibility to obtain any required consent to assignment of the Water Rights and Water Contracts (if necessary beyond the authority of the Bankruptcy Court), is the sole responsibility of Buyer and Buyer shall pay any cost or expense related to such assignment, including any "cure" amount under § 365 of the Bankruptcy Code, if applicable.  The

term "Water Rights and Water Contracts" shall specifically exclude the Excluded Property and the Excluded Liabilities.

The term "Property" shall specifically exclude the Excluded Property and the Excluded Liabilities, and assets are sold on an as-is, where-is, if-is basis.  Furthermore, for the avoidance of doubt:  (i) Seller shall sell, transfer, assign and convey to Buyer, and Buyer shall purchase and acquire from Seller, the Property pursuant to the terms and conditions of this Agreement, free and clear of any and all liens, liabilities, encumbrances, interests and obligations of whatsoever kind or nature, other than the Assumed Liabilities; and (ii) Buyer's obligation relating to securing the required consent to assignment and the payment of related costs and expenses (including any "cure" amounts), all as described in this Section 2.1, shall survive the Closing.

2.2    Purchase Price.  The purchase price for the Property (the "Purchase Price") shall be Sixty-Five Million Dollars ($65,000,000), payable by credit bid pursuant to Section 363(k) of the Bankruptcy Code, plus the Cash Component of One Million Eight Hundred Thousand Dollars ($1,800,000).  The Purchase Price shall be paid by Buyer to Seller as follows:"

(a)    Credit Bid.  At Closing, Buyer shall deliver the Direction Letter directing the applicable agent(s) to credit bid the DIP Obligations and the EB5 Prepetition Claim in the amounts set forth in the definition of Credit Bid. Upon delivery of the Direction Letter and consummation of the Credit Bid, Seller shall be deemed fully and irrevocably discharged from all outstanding DIP Obligations under the DIP Credit Agreement and from the portion of the EB5 Prepetition Claim credit bid hereunder, and all corresponding liens and security interests of Buyer on the Property shall be released via delivery of the Lien Release Deliverables concurrently with Closing.  For the avoidance of doubt, the Credit Bid shall satisfy and discharge Buyer's payment obligation with respect to the Property in an amount equal to the aggregate Credit Bid amount.

(b)    Cash Component.  At or before Closing, Buyer shall wire transfer the Cash Component in immediately available funds to the Escrow Agent.  The Escrow Agent shall disburse the Cash Component as directed by the Sale Order, including to fund all allowed administrative claims of the estate such as the Wohali Concerned Owners' administrative expense claim and the Seller's Broker's Commission. The Cash Component is in addition to, and not a credit against, the Credit Bid.

(c)    Auction Increase.   At any Auction conducted pursuant to the Bid Procedures, Buyer may, in its sole discretion, increase the Credit Bid in increments of at least the minimum overbid increment specified in the Bid Procedures, up to an aggregate maximum of $89,000,000 (comprising first the full DIP Obligations and second up to $82,000,000 of the EB5 Prepetition Claim).  Any such increased Credit Bid shall be effectuated through an updated Direction Letter delivered at Closing.

(d)    Cash Deposit.  Concurrently with the execution of this Agreement, Buyer shall deposit the Cash Deposit ($360,000) into escrow with Escrow Agent in accordance with the Bid Procedures.  The Cash Deposit shall be held by Escrow Agent and applied as a credit against the Cash Component at Closing.  If this Agreement is terminated prior to Closing for any reason other than Buyer's material default hereunder, the Cash Deposit shall be returned to Buyer within two (2) Business Days.  If this Agreement is terminated as a result of Buyer's material default, the

Cash Deposit shall be retained by Seller as Seller's sole and exclusive remedy on account of such default, and Seller shall have no further claim against Buyer.

2.3     Allocation.  Prior to the Closing, if applicable, Buyer and Seller shall agree on an allocation of the Purchase Price for the Property.  All allocations pursuant to this Section 2.3 shall be made in accordance with Section 1060 of the Code, and Buyer and Seller agree to file their respective tax returns and reports (federal, state, local and foreign) consistent therewith in all respects.

## ARTICLE 3
## ESCROW

This Agreement shall constitute joint escrow instructions to Escrow Agent, which joint escrow instructions shall supersede all prior escrow instructions related to the Escrow, if any. Seller and Buyer hereby agree to promptly execute and deliver to Escrow Agent any additional or supplementary escrow instructions as may be necessary or convenient to consummate the transactions contemplated by this Agreement provided, however, that such instructions shall not supersede this Agreement, and in all cases this Agreement shall control unless such instructions expressly provide otherwise.

## ARTICLE 4
## CONDITION OF TITLE TO REAL PROPERTY

At Closing, Seller shall sell, convey, assign, transfer and deliver to Buyer all of Seller's right, title and interest in and to the Real Property, free and clear of all liens, claims, encumbrances and interests, other than the Assumed Liabilities.  Buyer shall be solely responsible for evaluating the condition of title to the Real Property and for obtaining, at its own expense prior to or at Closing, any title insurance and surveys relating to the Real Property it desires.

## ARTICLE 5
## SELLER'S DELIVERIES

On or before 5:00 p.m. MST on the last Business Day prior to the Closing Date, Seller shall deliver to Escrow Agent the items described in this Article 5.

5.1     Seller's Deed.   One (1) original of the Seller's Deed, duly executed and acknowledged by Seller.  Pursuant to Section 12.1.1 hereof, any required documentary transfer tax information shall be affixed to Seller's Deed after recordation.

5.2     Quitclaim Deed for Water Rights.  Intentionally omitted.

5.3     Bill of Sale.  One (1) original of the Bill of Sale, duly executed by Seller.

5.4     Assignment of Trade Names and Trademarks.  Two (2) counterpart originals of the Assignment of Trade Names and Trademarks, duly executed by Seller.

5.5     Assignment and Assumption of Contracts.  Two (2) counterpart originals of the Assignment and Assumption of Contracts, duly executed by Seller.

5.6     Assignment and Assumption of Leases.  Two (2) counterpart originals of the Assignment and Assumption of Leases, duly executed by Seller.

5.7     Assignment of Permits, Entitlements, Intangibles and IP.  Two (2) counterpart originals of the Assignment of Permits, Entitlements, Intangibles and IP, duly executed by Seller.

5.8     Assignment and Assumption of Water Rights and Water Contracts.  Two (2) counterpart originals of the Assignment and Assumption of Water Rights and Water Contracts, duly executed by Seller.

5.9     Certificate of Non-Foreign Status and Form 1099.  The Certificate of Non-Foreign Status and Form 1099, duly executed by Seller.

5.10    Assignment of PID.  Two (2) counterpart originals of the Assignment of the Debtor's rights and obligations related to the PID, duly executed by Seller.

5.11    Seller's Closing Statement.  Seller's closing statement, duly executed by Seller.

5.12    Seller's Charges.  Except as otherwise provided herein, Seller shall not be obligated to pay any costs, fees or expenses in connection with the Escrow and the transactions contemplated by this Agreement.

5.13    Seller's Affidavits, Certificates and Evidence of Authority.  To the extent reasonably required by the Escrow Agent:  (a) all certificates required to be delivered by Seller pursuant to this Agreement; and (b) evidence that Seller and those acting for Seller have full authority to consummate the transaction contemplated by this Agreement, as modified through the Closing, including, without limitation, copies of the corporate or other resolutions authorizing the transaction contemplated by this Agreement.

5.14    Keys and Additional Items.  All keys, combinations to locks and/or other codes, passwords or instructions for other security devices relating to the Property.

5.15    Additional Documents.  Such additional documents, instructions or other items as may be reasonably necessary or appropriate to comply with the provisions of this Agreement, the Sale Procedures Order and the Sale Order to effect the transactions contemplated hereby and thereby.

5.16    Acknowledgement of Direction Letter.  A written acknowledgment by Seller and the applicable agent(s) under the DIP Credit Agreement and the EB5 Loan Agreement confirming receipt of the Direction Letter and their obligation to effectuate the Credit Bid and to deliver all Lien Release Deliverables at or prior to Closing.  Seller shall use commercially reasonable efforts prior to Closing to obtain such acknowledgment from all necessary parties.

5.17    Lien Release Deliverables.  All Lien Release Deliverables, duly executed and in recordable form, ready for concurrent filing and recording with recordation of Seller's Deed.  Seller and Buyer shall cooperate to ensure that the Escrow Agent is authorized and instructed to cause all Lien Release Deliverables to be filed and recorded concurrently with or immediately

following recordation of Seller's Deed, so that no gap exists between conveyance of title and release of Buyer's liens.

## ARTICLE 6
## BUYER'S DELIVERIES

On or before 5:00 p.m. MST on the last Business Day prior to the Closing Date, Buyer shall deliver to Escrow Agent the items described in this Article 6.

6.1 <u>Assignment of Trade Names and Trademarks</u>. To the extent required and appropriate, two (2) counterpart originals of the Assignment of Trade Names and Trademarks, duly executed by Buyer.

6.2 <u>Assignment and Assumption of Contracts</u>. Two (2) counterpart originals of the Assignment and Assumption of Contracts, duly executed by Buyer.

6.3 <u>Assignment and Assumption of Leases</u>. Two (2) counterpart originals of the Assignment and Assumption of Leases, duly executed by Buyer.

6.4 <u>Assignment of Permits, Entitlements, Intangibles and IP</u>. To the extent required and appropriate, two (2) counterpart originals of the Assignment of Permits, Entitlements, Intangibles and IP, duly executed by Buyer.

6.5 <u>Assignment and Assumption of Water Rights and Water Contracts</u>. Two (2) counterpart originals of the Assignment and Assumption of Water Rights and Water Contracts, duly executed by Buyer.

6.6 <u>Assignment of PID</u>. Two (2) counterpart originals of the Assignment of the Debtor's rights and obligations related to the PID, duly executed by Buyer.

6.7 <u>Buyer's Closing Statement</u>. Buyer's closing statement, duly executed by Buyer.

6.8 <u>Buyer's Charges</u>. Funds sufficient to pay all amounts required to be paid by Buyer in accordance with the provisions of Article 11 hereof, in the form of Cash.

6.9 <u>Buyer's Affidavits, Certificates and Evidence of Authority</u>. To the extent reasonably required by the Escrow Agent: (a) all certificates required to be delivered by Buyer pursuant to this Agreement; and (b) evidence that Buyer and those acting for Buyer have full authority to consummate the transaction contemplated by this Agreement, as modified through the Closing, including, without limitation, copies of the corporate or other resolutions authorizing the transaction contemplated by this Agreement.

6.10 <u>Additional Documents</u>. Such additional documents, instructions or other items as may be reasonably necessary or appropriate to comply with the provisions of this Agreement, the Sale Procedures Order and the Sale Order to effect the transactions contemplated hereby and thereby.

6.11    Direction Letter.  The Direction Letter, duly executed by Buyer, together with any related authorizations required by the DIP Credit Agreement or the EB5 Loan Agreement to effectuate the Credit Bid.

6.12    Cash Component.    Wire transfer of the Cash Component ($1,800,000) in immediately available funds to the Escrow Agent's designated account, received no later than 12:00 noon MST on the Closing Date, with disbursement instructions consistent with the Sale Order.

6.13    Settlement Agreement.    The Settlement Agreement, duly executed by Buyer, together with any authorizations required to effectuate the Settlement Agreement and all of its terms, including without limitation, the Unsecured Creditor Guarantee (as defined in the Settlement Agreement) and the standby letter of credit securing such guarantee.

**ARTICLE 7**
**CONDITIONS TO CLOSING; CLOSING;**
**TERMINATION UPON DEFAULT; AND SPECIAL BANKRUPTCY TERMS**

7.1    Conditions to Obligations of Buyer.  The Closing of the transaction contemplated pursuant to this Agreement and Buyer's obligation to purchase the Property are subject to satisfaction, prior to the Closing Date, of all of the following conditions, each of which is for the benefit of Buyer and may be waived by Buyer in its sole discretion:

(a)    Sale Order.  The Bankruptcy Court shall have issued the Sale Order, and such Sale Order shall not be stayed nor shall an injunction enjoining the Closing be in effect.

(b)    Representations and Warranties True/Seller's Certificate.    All of the representations and warranties of Seller set forth in Article 8 of this Agreement shall be true and correct in all material respects on the Closing Date as though made at the time of the Closing.

(c)    Delivery of Items.    Seller shall have executed and timely delivered to Escrow Agent all of the items referred to in Article 5 hereof.

(d)    Performance of Obligations.    Seller shall have performed all of the obligations under this Agreement, the Sale Procedures Order and the Sale Order to be performed by Seller prior to the Closing.

(e)    Damage or Destruction; Operations.    There shall have been no Material Loss.

(f)    Lien Release Deliverables.  Seller shall have delivered to Escrow Agent all Lien Release Deliverables in recordable form, and the Escrow Agent shall be authorized and instructed to cause all Lien Release Deliverables to be filed and recorded concurrently with recordation of Seller's Deed.  This condition is for the sole benefit of Buyer and may be waived by Buyer in its sole discretion without affecting any other condition to Closing.

(g)    No Material Adverse Effect.  Since the date of this Agreement, no Material Adverse Effect shall have occurred and be continuing.  In the event of any casualty, condemnation,

or taking affecting the Property prior to Closing, Seller shall notify Buyer in writing within two (2) Business Days and: (i) if such event constitutes or results in a Material Adverse Effect, Buyer may elect in its sole discretion to (A) terminate this Agreement pursuant to Section 7.5 or (B) proceed to Closing, in which case Seller shall assign to Buyer at Closing all insurance proceeds, condemnation awards, and other compensation attributable to such event; and (ii) if such event does not constitute a Material Adverse Effect, Buyer shall be obligated to proceed to Closing with Seller assigning all insurance and condemnation proceeds to Buyer at Closing.

(h)     <u>Credit Bid Right</u>.  No Order of the Bankruptcy Court or any other Governmental Authority shall be in effect limiting, conditioning, or restricting Buyer's right to credit bid the Credit Bid pursuant to Section 363(k) of the Bankruptcy Code, and Buyer shall not have been determined by any court of competent jurisdiction to be unable to credit bid all or any portion of the Credit Bid as set forth in Section 2.2(a) hereof.

(i)     <u>No Injunction</u>.  No preliminary or permanent injunction, restraining order, or other legal or regulatory restraint or prohibition issued by any court of competent jurisdiction or Governmental Authority shall be in effect preventing or restricting the consummation of the transactions contemplated by this Agreement, including any injunction sought by the Wohali Concerned Owners or any other party in interest in the Bankruptcy Case.

7.2     <u>Conditions to Obligations of Seller</u>.  The Closing of the transactions contemplated pursuant to this Agreement and Seller's obligation to sell, convey, assign, transfer and deliver the Property to Buyer are subject to satisfaction, prior to or at the Closing, of all of the following conditions, each of which is for the benefit of Seller and may be waived by Seller in its sole discretion:

(a)     <u>Sale Order</u>.  The Bankruptcy Court shall have issued the Sale Order, and such Sale Order shall not be stayed nor shall an injunction enjoining the Closing be in effect.

(b)     <u>Settlement Agreement Order</u>.  The Bankruptcy Court shall have entered an order approving the Settlement Agreement, and such order shall not be stayed.

(c)     <u>Representations, Warranties and Covenants True</u>. All of the representations, warranties and covenants of Buyer set forth in Article 9 of this Agreement shall be true and correct in all material respects on the date of the Closing as though made at the time of the Closing.

(d)     <u>Performance of Obligations</u>.  Buyer shall have performed all of the obligations of Buyer under this Agreement, the Sale Procedures Order and the Sale Order to be performed by Buyer prior to the Closing.

(e)     <u>Delivery of Items</u>.  Buyer shall have executed and timely delivered to Escrow Agent all of the items referred to in Article 6 hereof.

7.3     <u>Casualty</u>.

(a)     <u>Material Loss</u>.  In the event that, prior to the Closing, the Property shall suffer a Material Loss, Seller shall immediately notify the Bankruptcy Court, the Buyer and Escrow Agent of such Material Loss and, in such a case: (a) Buyer shall have the right to terminate

this Agreement and its obligation to purchase the Property pursuant to the terms of Section 7.5 hereof; or (b) accept the Property in its then existing condition and purchase and acquire the Property in accordance with the terms and conditions of this Agreement, subject to the terms and conditions described in this Section 7.3. If Buyer exercises its right to purchase and acquire the Property in its present condition, then Buyer shall not be entitled to an offset, credit or reduction in the Purchase Price; provided, however, Seller shall assign to Buyer on the Closing any and all casualty insurance proceeds previously paid or payable to Seller in connection with such Material Loss. Buyer's termination right or Buyer's acceptance right shall be exercised by written notice to Seller and the Bankruptcy Court within three (3) Business Days after Buyer receives written notice from Seller of the occurrence of the Material Loss.

(b)     Non-Material Loss. In the event that, prior to the Closing, the Property shall suffer a Non-Material Loss, Seller shall immediately notify the Bankruptcy Court, the Buyer and Escrow Agent of such Non-Material Loss and, in such a case, Buyer shall be obligated to purchase the Property (in its then existing condition) in accordance with the terms and conditions of this Agreement, subject to the terms and conditions of this Section 7.3. In such a case, Buyer shall not be entitled to an offset, credit or reduction in the Purchase Price; provided, however, Seller shall assign to Buyer on the Closing any and all casualty insurance proceeds previously paid or payable to Seller in connection with such Non-Material Loss.

7.4     Closing. Subject to the provisions of Section 7.3 hereof, in the event all of the conditions set forth in Sections 7.1 and 7.2 are timely satisfied (or waived in writing by Buyer or Seller, as applicable), Seller and Buyer shall take such action as may be required to cause the purchase and sale of the Property to be effected in accordance with this Agreement, the Sale Procedures Order and the Sale Order on or before the Closing Date. All such conditions shall be deemed waived in the event the Closing occurs hereunder.

7.5     Failure of Conditions to Closing. In the event one or more of the conditions to the Closing described in Section 7.1 of this Agreement are not satisfied or waived on or before the Closing Date, and the failure of such conditions to be satisfied is not a result of a default by Seller or Buyer in the performance of their respective obligations under this Agreement, then Buyer shall have the right to terminate this Agreement and the Escrow by giving written notice of termination to the Bankruptcy Court and Seller. In the event one or more of the conditions to the Closing described in Section 7.2 of this Agreement are not satisfied or waived on or before the Closing Date, and the failure of such conditions to be satisfied is not a result of a default by Seller or Buyer in the performance of their respective obligations under this Agreement, then Seller shall have the right to terminate this Agreement and the Escrow by giving written notice of termination to Buyer. Furthermore, in the event either Party elects to terminate this Agreement and the Escrow for the reasons and in accordance with the procedures set forth in this Section 7.5, Escrow Agent shall cause to be paid and distributed to Buyer the amount of the Cash Deposit previously paid by Buyer to Escrow Agent pursuant to Section 2.2 hereof, together with any accrued interest thereon. In the event either Party elects to terminate this Agreement and the Escrow for the reasons and in accordance with the provisions set forth in this Section 7.5, this Agreement shall automatically terminate and Seller and Buyer agree to execute such escrow cancellation instructions as may be necessary to effectuate the cancellation of the Escrow. Except as otherwise provided in Sections 7.6(d), 10.1, 12.2 and 14.10, any escrow cancellation, title cancellation and other cancellation charges shall be borne by Buyer. Upon the satisfaction by Seller and Buyer of each of their

respective obligations set forth in this Section 7.5, neither Seller nor Buyer shall have any further rights or obligations to each other (except as expressly provided in this Agreement).

7.6 <u>Additional Buyer Termination Rights</u>. In addition to the termination rights set forth in Section 7.5, Buyer may terminate this Agreement by written notice to Seller in the following circumstances, in each case without liability to Seller and with the immediate return of any Cash Component funds held by Escrow Agent.

(a) <u>Credit Bid Impairment</u>. If for any reason not caused by Buyer's material breach of this Agreement, Buyer is determined by any Bankruptcy Court order to be unable to credit bid all or any portion of the Credit Bid pursuant to Section 363(k) of the Bankruptcy Code, Buyer may terminate this Agreement immediately upon written notice.

(b) <u>Pre-Closing Covenant Breach</u>. If Seller materially breaches any covenant set forth in Section 7.8 and does not cure such breach within ten (10) Business Days of written notice from Buyer, Buyer may terminate this Agreement.

(c) <u>Alternative Transaction Selection</u>. If Seller, without Buyer's consent, designates any party other than Buyer as the Successful Bidder or enters into any definitive agreement for an alternative transaction while this Agreement remains in effect (except as permitted by the Bid Procedures as a result of a higher and better bid at the Auction), Buyer may terminate this Agreement.

7.7 <u>Breach/Termination</u>. In the event either Seller or Buyer defaults hereunder or otherwise fails to perform any of their respective obligations to be performed, other than in the case of Buyer's termination pursuant to 7.3 hereof or Buyer or Seller's termination pursuant to Section 7.5 hereof, then the non-breaching Party may elect the applicable remedies set forth in this Section 7.6, which remedies shall constitute the sole and exclusive remedies of the non-breaching Party with respect to a default by the other Party under this Agreement.

(a) <u>Remedies of Buyer</u>. Except as otherwise expressly set forth in this Agreement, in the event Buyer is the non-breaching Party, as Buyer's sole and exclusive remedy, Buyer may elect to: (i) pursue the equitable remedy of specific performance to require conveyance of the Property to Buyer; or (ii) terminate this Agreement and the Escrow by giving Seller written notice describing Seller's default and setting forth Buyer's election to immediately terminate this Agreement and the Escrow. In the event Buyer so elects to terminate this Agreement and the Escrow pursuant to this Section 7.6(a), Escrow Agent shall cause to be paid to Buyer the Cash Deposit previously paid by Buyer to Escrow Agent pursuant to Section 2.2 hereof, together with any interest accrued thereon.

(b) <u>Remedies of Seller</u>. Except as otherwise expressly set forth in this Agreement, in the event Seller is the non-breaching Party, as Seller's sole and exclusive remedy, Seller may elect to terminate this Agreement and the Escrow by giving Buyer and Escrow Agent written notice describing Buyer's default and stating Seller's election to immediately terminate this Agreement and the Escrow. In the event Seller elects to terminate this Agreement and the Escrow pursuant to this Section 7.6(b), the sole and exclusive remedy of Seller upon any such

termination shall be to receive the amount specified as liquidated damages pursuant to Section 7.6(c) hereof.

(c)     SELLER'S LIQUIDATED DAMAGES.    IF BUYER FAILS TO COMPLETE THE PURCHASE OF THE PROPERTY IN ACCORDANCE WITH THE TERMS AND CONDITIONS OF THIS AGREEMENT, THE SALE PROCEDURES ORDER AND/OR THE SALE ORDER (OTHER THAN AS A RESULT OF BUYER'S ELECTION TO TERMINATE PURSUANT TO SECTIONS 7.3 OR SECTION 7.6(a) OR OTHER SECTION REQUIRING A RETURN OF THE CASH DEPOSIT TO BUYER, AND OTHER THAN IN THE CASE OF SELLER'S OR BUYER'S TERMINATION PURSUANT TO SECTION 7.5 HEREOF, BY REASON OF THE DEFAULT OF BUYER, SELLER SHALL BE RELEASED FROM ITS OBLIGATION TO SELL THE PROPERTY TO BUYER.   IN SUCH A CASE, SELLER AND BUYER AGREE THAT IT WOULD BE DIFFICULT OR IMPOSSIBLE TO DETERMINE THE AMOUNT OF DAMAGES OF SELLER AS A RESULT OF ANY SUCH BREACH BY BUYER AND, ACCORDINGLY, AS SELLER'S SOLE AND EXCLUSIVE REMEDY, SELLER SHALL BE ENTITLED TO RETAIN THE CASH DEPOSIT, TOGETHER WITH ANY ACCRUED INTEREST THEREON, AS LIQUIDATED DAMAGES.   THE PAYMENT OF SUCH LIQUIDATED DAMAGES TO SELLER SHALL CONSTITUTE THE EXCLUSIVE REMEDY OF SELLER ON ACCOUNT OF THE DEFAULT BY BUYER.

(d)     Cancellation Instructions and Costs. Upon any termination of this Agreement pursuant to this Section 7.6, this Agreement will automatically terminate without any further acts of either Seller or Buyer.  In such a case, Seller and Buyer agree to execute such escrow cancellation instructions as may be necessary to effectuate the cancellation of the Escrow as may be required by Escrow Agent.  The breaching Party hereunder shall pay any and all escrow costs incurred in connection herewith. Upon the satisfaction by Seller and Buyer of each of their respective obligations set forth in this Section 7.6 hereof, neither Seller nor Buyer shall have any further rights or obligations to each other except with respect to any indemnity obligations hereunder.

7.8     Pre-Closing Covenants of Seller.  From the date of this Agreement through the earlier of the Closing Date and the termination of this Agreement (the "Pre-Closing Period"), except as expressly contemplated by this Agreement or the Settlement Agreement, as required by applicable law or Bankruptcy Court order, or as consented to in writing by Buyer (which consent shall not be unreasonably withheld, conditioned, or delayed):

(a)     Affirmative Obligations.  Solely to the extent Buyer provides Seller with sufficient funds to do each of the following, and solely to the extent that such obligations are within Seller's control, Seller shall:  (i) operate, maintain, and preserve the Property (including all Improvements, Golf Courses, Clubhouse, water rights, and personal property) in the ordinary course consistent with past practice and in good operating condition and repair, reasonable wear and tear excepted; (ii) maintain all existing property, casualty, liability, and other insurance policies covering the Property in full force and effect with the same coverage, limits, and deductibles as in effect on the date hereof, and shall not allow any such policy to lapse, be canceled, or be materially reduced; (iii) maintain all existing Permits, entitlements, water rights, and zoning approvals relating to the Property in full force and effect; (iv) continue to perform all material contractual obligations under the Assumed Contracts, 2026 Golf Discovery Membership

Documents, vendor agreements, and utility contracts relating to the Property to the extent the Debtor is party to any such agreements or contracts; (v) pay all post-petition obligations and administrative expenses of the estate as they become due; and (vi) promptly notify Buyer (within two (2) Business Days) upon becoming aware of any event, notice, claim, litigation, governmental action, casualty, or development that has had or would reasonably be expected to have a Material Adverse Effect.

(b)     Negative Obligations.  Without Buyer's prior written consent, and except as otherwise set forth in the Settlement Agreement, Seller shall not:  (i) sell, transfer, convey, assign, lease, license, mortgage, pledge, or otherwise encumber or dispose of any Property or any portion thereof or any interest therein, except in the ordinary course; (ii) terminate, materially modify, amend, or renew (on terms materially different from existing terms) any 2026 Golf Discovery Membership Documents, Assumed Contract or other material agreement relating to the Property; (iii) enter into any new contract or agreement that would bind the Property or Buyer following Closing, other than ordinary course vendor agreements with terms not exceeding 30 days that are terminable on 30 days' notice without penalty; (iv) cancel, reduce, or allow the lapse of any insurance coverage required under Section 7.8(a)(ii); (v) waive, release, assign, settle, or compromise any material claim, right, or cause of action of the estate relating to the Property; or (vi) take any action that would cause any representation or warranty of Seller set forth in Article 8 to be untrue or inaccurate in any material respect as of the Closing Date.

7.9     Back-Up Bidder:  If an Auction is conducted pursuant to the Bid Procedures and Buyer is not selected as the Successful Bidder at the Auction:

(a)     Buyer will serve as the Back-Up Bidder.

(b)     Obligations as Back-Up Bidder.  (i) Buyer's bid to consummate the transactions contemplated by this Agreement shall remain open and irrevocable at the Credit Bid amount as bid at the Auction (subject to any increases made by Buyer at the Auction), until the earlier of (A) entry by the Bankruptcy Court of the Sale Order approving the Successful Bidder's transaction, (B) consummation of the Successful Bidder's transaction, or (C) written notice from Buyer to Seller withdrawing its back-up bid; (ii) Buyer's obligation to pay the Cash Component shall be suspended during the Back-Up Bidder period and shall only become payable if Buyer is ultimately selected as the purchaser; and (iii) if the Successful Bidder fails to close within the time period specified in the Sale Order, Seller shall promptly notify Buyer in writing, and Buyer shall have five (5) Business Days to elect to proceed to Closing on the terms of its back-up bid.

7.10     No Successor Liability.  The Parties intend that, to the fullest extent permitted by applicable Law (including Section 363 of the Bankruptcy Code), upon and after the Closing:

(a)     Buyer shall not be deemed to be a successor (de facto, de jure, or otherwise) to Seller or the bankruptcy estate of Seller, shall not be deemed to have merged with or into Seller, and shall not be a mere continuation or substantial continuation of Seller or Seller's enterprise;

(b)     Buyer shall have no liability for any Excluded Liability or any obligation of Seller arising prior to or relating to any period before the Closing Date, including without limitation:  (i) any claims asserted by or on behalf of the Wohali Concerned Owners, except to the

extent of any obligations that are Permitted Entitled Exceptions or otherwise run with the land and are accordingly not discharged under section 363 of the Bankruptcy Code; (ii) any golf membership or club obligations not included in the Assumed Contracts; (iii) any environmental liabilities relating to the Property arising from pre-Closing acts or omissions; and (iv) any employment, labor, or employee benefit liabilities of Seller;

(c) the Parties agree that the Sale Order shall contain findings and provisions expressly consistent with this Section 7.10, including a specific finding that Buyer is not a successor to Seller and that none of the Wohali Concerned Owners' claims or other third-party claims shall attach to, or be enforceable against, Buyer or the Property following Closing.

7.11 <u>Bankruptcy Court Approval</u>.

(a) <u>Cooperation</u>. The Parties shall use commercially reasonable efforts to obtain entry of the Sale Order as promptly as practicable and in any event prior to the Closing Date. Each Party shall cooperate with the other, provide information reasonably requested, and appear before the Bankruptcy Court as necessary to support approval of the Sale Order.

(b) <u>Sale Free and Clear</u>. Seller acknowledges and agrees, and the Sale Order shall provide, that on the Closing Date and concurrently with the Closing: (i) all then-existing or thereafter-arising obligations, liabilities, and encumbrances, including for the avoidance of doubt all successor liability, of, against, or created by Seller or the bankruptcy estate, shall be fully released from and with respect to the Property, other than the Permitted Title Exceptions and the Assumed Liabilities; (ii) the Property shall be transferred to Buyer free and clear of all obligations, liabilities, and encumbrances, including without limitation all successor liability and any successorship obligations with respect to the Wohali Concerned Owners' claims, and any third-party claims arising from Seller's pre-Closing conduct, other than the Permitted Title Exceptions and the Assumed Liabilities; and (iii) the Sale Order shall expressly approve Buyer's credit bid pursuant to Section 363(k) of the Bankruptcy Code and authorize the applicable agents under the DIP Credit Agreement and the EB5 Loan Agreement to effectuate the Credit Bid and deliver all related payoff and release documentation.

(c) <u>Form Acceptable to Buyer</u>. The form of Sale Order, including all findings and operative provisions, shall be in form and substance reasonably acceptable to Buyer before it is submitted to the Bankruptcy Court.

(d) <u>Appeal</u>. If the Sale Order is appealed, the Parties shall cooperate in good faith to defend such appeal. The pendency of an appeal shall not delay Closing unless a stay of the Sale Order is granted by a court of competent jurisdiction. If a stay is granted, either Party may elect to terminate this Agreement pursuant to Section 7.5(a) hereof.

## ARTICLE 8
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby makes the following representations and warranties, each of which representation and warranty (a) is material and being relied upon by Buyer; and (b) is true, complete and not misleading in all material respects as of the date hereof and as of the Closing.

8.1     <u>Organization, Power and Authority</u>.  Seller is a limited liability company duly organized and validly existing under the laws of the State of Utah.  Seller, through the Trustee subject to the Court's approval, has all requisite power and authority to own, operate, maintain, manage and administer the Property, to execute and deliver this Agreement and the Transaction Documents to which Seller is a party, and to perform its obligations hereunder and thereunder and effect the transactions contemplated hereby and thereby.  All requisite limited liability company actions and/or other necessary actions have been taken as of the Closing to authorize and approve the execution, delivery and performance by Seller of this Agreement and the Transaction Documents to which Seller is a party.

8.2     <u>Non-Foreign Status</u>.  Seller is not a "foreign person" as such term is defined in Section 1445 of the Code.  Seller shall deliver to Buyer at the Closing, a Certificate of Non-Foreign Status, in the form of Exhibit "J" duly acknowledged by Seller.

8.3     <u>Survival</u>.  The representations and warranties of Seller set forth in this Article 8, as well as the right and ability of Buyer to enforce the same, shall survive the Closing indefinitely.

**ARTICLE 9**
**REPRESENTATIONS AND WARRANTIES OF BUYER**

Buyer hereby makes the following representations and warranties, each of which representation and warranty (a) is material and being relied upon by Seller; and (b) is true, complete and not misleading in all material respects as of the date hereof and as of the Closing.

9.1     <u>Organization, Power and Authority</u>.  Buyer is a limited partnership, duly organized and validly existing under the laws of the State of Delaware and authorized to do business in the State where the Real Property is located.  Buyer has all requisite power and authority to execute and deliver this Agreement and the Transaction Documents to which Buyer is a party, and to perform its obligations hereunder and thereunder and to effect the transactions contemplated hereby and thereby, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar federal or state laws affecting the rights of creditors.  All requisite [corporate, limited liability company or partnership] or other action has been taken to authorize and approve the execution, delivery and performance by Buyer of this Agreement and the Transaction Documents to which Buyer is a party.

9.2     <u>No Conflicts or Violations</u>.  The execution, delivery and performance by Buyer of this Agreement and the Transaction Documents to which Buyer is a party, and the consummation of the transactions contemplated hereby and thereby, will not (a) violate any provision of Buyer's organization documents, (b) to Buyer's actual knowledge, violate, conflict with or result in a breach of or default under any term or provision of any contract or agreement to which Buyer is a party or by or to which Buyer or any of its assets or properties are or may be bound or subject, (c) violate the Sale Procedures Order, the Sale Order and/or any order, judgment, injunction, award or decree of the Bankruptcy Court in connection with the Bankruptcy Case; or (d) to Buyer's actual knowledge, any court or arbitration body, or any governmental, administrative or regulatory authority, or any other body, by or to which Buyer or the Property are or may be bound or subject.

9.3    Approvals.  To Buyer's actual knowledge, no approval or consent of any foreign or domestic governmental, administrative or regulatory body or any other person or entity is required for the execution, delivery or performance by Buyer of this Agreement or the Transaction Documents to which Buyer is a party.

9.4    Prohibited Persons and Transactions.  Neither Buyer, nor any of its affiliates, nor any of their respective members, officers or directors is, nor prior to Closing, or the earlier termination of this Agreement, will they become, a person or entity with whom U.S. persons or entities are restricted from doing business under the regulations of the Office of Foreign Asset Control ("OFAC") of the Department of the Treasury (including those name on OFAC's Specially Designated Blocked Persons List) or under any U.S. statute, executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit or Support Terrorism), or other governmental action and is not, and prior to Closing or the earlier termination of this Agreement will not, engage in any dealings or transactions with or be otherwise associated with such persons or entities.

9.5    Survival.  The representations and warranties of Buyer set forth in this Article 9, as well as the right and ability of Buyer to enforce the same, shall survive the Closing indefinitely.

## ARTICLE 10
## COSTS, EXPENSES AND PRORATIONS

10.1    Costs and Expenses.

(a)    Seller.  Seller shall not be obligated to pay any of the costs, fees or expenses in connection with the closing of the transactions hereunder, which costs, fees and expenses are to be paid by Buyer pursuant to the terms and conditions of this Agreement, the Sale Procedures Order and/or the Sale Order.  Under no circumstances shall such Closing costs include, without limitation, any sums due and owing under the Assumed Contracts, the Leases, the Permits, the Intangibles, the Entitlements, the IP, the Trade Names and Trademarks, the Water Rights and Water Contracts and any other Property (including, without limitation, all "cure" payments under § 365 of the Bankruptcy Code).

(b)    Buyer.  At Closing, Buyer shall pay, in addition to the Purchase Price, all costs, fees and expenses in connection with the closing of the transactions contemplated by this Agreement, the Sale Procedures Order and the Sale Order including, without limitation:  (a) all recording costs; (b) all documentary transfer taxes, deed stamps and similar costs, fees and expenses payable in connection with Seller's Deed and the Quitclaim Deed for Water Rights; (c) the premium for any title policy obtained by Buyer; (d) the premium of any binders or endorsements to any title policy requested by Buyer; (e) Escrow Agent's fees and costs for the Escrow; (f) all accrued and unpaid real and business personal property taxes and assessments secured by statutory liens against the Property in favor of taxing authorities, which are due and owing as of the Closing; (g) all sales and use taxes arising out of the sale and transfer of the Property by Seller to Buyer; (h) all sums due and owing under the Assumed Contracts, the Leases, the Permits, the Intangibles, the Entitlements, the IP, the Trade Names and Trademarks, the Water Rights and Water Contracts and any other Property (including, without limitation, all "cure" payments under § 365 of the Bankruptcy Code); and (i) Buyer's attorneys' fees.  Notwithstanding

the foregoing, to the extent any cost, expense, tax, or obligation listed in this Section 10.1(b) has been funded, or is to be funded, by Buyer through advances under the DIP Credit Agreement that have been or will be added to the DIP Obligations being credit bid at Closing (including, without limitation, any pre-closing golf course advances added to the DIP Loan pursuant to the Settlement Agreement and any post-petition PID assessment payments advanced by Buyer through the DIP), such amounts shall not be separately required to be paid by Buyer at Closing from funds other than the Credit Bid, and Buyer shall have no obligation to make any duplicative cash payment at Closing in respect of such DIP-funded obligations.  For the avoidance of doubt, Buyer shall not be required to pay any obligation twice — once through the DIP credit bid and again as a Closing cost under this Section 10.1(b).

(c) <u>Prorations</u>.  There will be no prorations between Seller and Buyer at Closing.

## ARTICLE 11
## ACTIONS TO BE TAKEN AT THE CLOSING

11.1 <u>Actions by Escrow Agent</u>. In connection with the Closing, Escrow Agent shall take the following actions:

(a) <u>Recording</u>.  Escrow Agent shall cause Seller's Deed (with any required documentary transfer tax information to be affixed after recording) for the Real Property and the Quitclaim Deed for Water Rights to be recorded in the Official Records of Summit and Morgan Counties, Utah, and obtain a conformed copy thereof for distribution to Seller and Buyer.

(b) <u>Distribution of Funds</u>.  Escrow Agent shall disburse all funds deposited with Escrow Agent by Buyer in payment of the Purchase Price as directed by the Seller or as otherwise directed by the Sale Order.  All disbursements by Escrow Agent shall be by wire transfer to the designated account of the receiving Party or shall be by checks of Escrow Agent, as may be directed by the receiving Party.

(c) <u>Distribution of Recorded Documents</u>.  Disburse to Seller an executed original of each of the Transaction Documents and a conformed copy of the Seller's Deed, a conformed copy of the Quitclaim Deed for Water Rights and any other documents deposited into Escrow by Seller.

(d) <u>Distribution of Transaction Documents</u>.  Disburse to Buyer an executed original of each of the Transaction Documents and a conformed copy of the Seller's Deed, a conformed copy of the Quitclaim Deed for Water Rights and any other documents deposited into Escrow by Buyer.

(e) <u>Credit Bid and Lien Release Coordination</u>.  In connection with the Closing, Escrow Agent shall:  (i) upon receipt of the Direction Letter and confirmation from the applicable agent(s) that the Credit Bid has been executed, mark the DIP Obligations and the credit-bid portion of the EB5 Prepetition Claim as fully satisfied and discharged; (ii) cause all Lien Release Deliverables to be filed with the applicable state UCC filing offices and recorded in the official records of Summit County and Morgan County, Utah, concurrently with or immediately following the recording of Seller's Deed; (iii) disburse the Cash Component ($1,800,000) as directed by the

Sale Order to fund allowed administrative claims, pursuant to the Settlement Agreement, including, without limitation, to provide seed funding for the benefit of the Liquidating Trust; and (iv) provide written confirmation to the Parties within two (2) Business Days following Closing that all Lien Release Deliverables have been filed and recorded.

## ARTICLE 12
## PROPERTY CONVEYED "AS-IS"; SELLER RELEASE; INDEMNIFICATION

12.1    <u>Condition of the Property</u>.

(a)    <u>"As-Is" Nature of Transaction</u>. BUYER ACKNOWLEDGES, AGREES, REPRESENTS AND WARRANTS TO AND WITH SELLER AND THE TRUSTEE THAT, EXCEPT AS EXPRESSLY PROVIDED HEREIN, (i) BUYER IS PURCHASING THE PROPERTY IN ITS EXISTING CONDITION "AS IS, WHERE IS, IF IS AND WITH ALL FAULTS" AND SPECIFICALLY AND EXPRESSLY WITHOUT ANY WARRANTIES, REPRESENTATIONS OR GUARANTEES, EXPRESS OR IMPLIED, OF ANY KIND, NATURE OR TYPE WHATSOEVER FROM OR ON BEHALF OF SELLER WITH RESPECT TO ALL FACTS, CIRCUMSTANCES, CONDITIONS AND DEFECTS; (ii) SELLER AND TRUSTEE HAVE NO OBLIGATION TO INSPECT FOR OR REPAIR OR CORRECT ANY SUCH FACTS, CIRCUMSTANCES, CONDITIONS OR DEFECTS OR TO COMPENSATE BUYER FOR THE SAME; (iii) SELLER AND TRUSTEE HAVE SPECIFICALLY BARGAINED FOR THE ASSUMPTION BY BUYER OF ALL RESPONSIBILITY WITH RESPECT TO THE PROPERTY AND OF ALL RISK OF ADVERSE CONDITIONS AND HAS STRUCTURED THE PURCHASE PRICE AND OTHER TERMS OF THIS AGREEMENT IN CONSIDERATION THEREOF; (iv) BUYER IS AND WILL BE RELYING STRICTLY AND SOLELY UPON ITS INSPECTIONS AND EXAMINATIONS, AND THE ADVICE AND COUNSEL OF ITS OWN CONSULTANTS, AGENTS, LEGAL COUNSEL AND OFFICERS TO DETERMINE IF THE PURCHASE PRICE IS FAIR AND ADEQUATE CONSIDERATION FOR THE PROPERTY; (v) SELLER AND TRUSTEE ARE NOT MAKING AND HAVE NOT MADE ANY STATEMENTS, AGREEMENTS, PROMISES, ASSURANCES, REPRESENTATIONS OR WARRANTIES, WHETHER EXPRESS, IMPLIED OR OTHERWISE, REGARDING SELLER, THE PROPERTY, THE STATE OF TITLE TO THE PROPERTY, THE ABILITY OF SELLER TO ASSIGN THE PROPERTY OR ANY PORTION THEREOF WITHOUT CONSENT AND/OR ANY OTHER ASPECT OR MATTER PERTAINING TO SELLER OR THE PROPERTY OR ANY OTHER FACT OR MATTER WHATSOEVER AND/OR WITH RESPECT TO ANY MATERIALS OR OTHER DATA PROVIDED BY SELLER, TRUSTEE, OR ANY REPRESENTATIVE OF SELLER OR TRUSTEE TO BUYER (WHETHER PREPARED BY OR FOR THE SELLER OR OTHERS) OR THE EDUCATION, SKILLS, COMPETENCE OR DILIGENCE OF THE PREPARERS THEREOF, AS AN INDUCEMENT TO BUYER TO ENTER INTO THIS AGREEMENT AND THEREAFTER TO PURCHASE THE PROPERTY OR FOR ANY OTHER PURPOSE; (vii) NEITHER THE TRUSTEE NOR HIS COUNSEL, PROFESSIONALS, OFFICERS, EMPLOYEES, REPRESENTATIVES OR AGENTS (COLLECTIVELY, THE "M/OP PARTIES") MAKE ANY REPRESENTATION REGARDING THE DEBTOR (AS DEFINED IN THE BID PROCEDURES), ITS OPERATIONS, THE PROPERTY OR RELATED LIABILITIES, INCLUDING, WITHOUT LIMITATION, LIENS, INTERESTS AND ENCUMBRANCES AFFECTING THE PROPERTY OR THE FINANCIAL CONDITION OF

DEBTOR, TO BE PROVIDED OR PROVIDED TO ANY POTENTIAL BIDDER, INCLUSIVE OF SELLER, PURSUANT TO THE BID PROCEDURES OR OTHERWISE AND, CONSEQUENTLY, THERE ARE NO REPRESENTATIONS OR WARRANTIES MADE BY OR ON BEHALF OF ANY OF THE M/OP PARTIES REGARDING THE ACCURACY, RELIABILITY, VERACITY, ADEQUACY OR COMPLETENESS OF ANY OF THE INFORMATION PROVIDED IN CONNECTION WITH OR RELATED TO THE BID PROCEDURES OR THE PROPERTY, THE AUCTION (AS DEFINED IN THE BID PROCEDURES) OR THE SALE OF THE PROPERTY, AND BUYER ACKNOWLEDGES THAT IT WAS ADVISED AND ENCOURAGED TO CONSULT WITH ITS OWN ADVISORS REGARDING THE BID PROCEDURES, THE PROPERTY, THE AUCTION, THE SALE OF THE PROPERTY AND THIS AGREEMENT; AND (viii) BY REASON OF ALL THE FOREGOING, BUYER ASSUMES THE FULL RISK OF ANY LOSS OR DAMAGE FOLLOWING CLOSING OCCASIONED BY ANY FACT, CIRCUMSTANCE, CONDITION OR DEFECT PERTAINING TO THE PROPERTY. WITHOUT LIMITING THE GENERALITY OF ANY OF THE FOREGOING, BUYER SPECIFICALLY ACKNOWLEDGES THAT THE TRUSTEE AND HIS PROFESSIONALS DO NOT REPRESENT OR IN ANY WAY WARRANT THE ACCURACY OF ANY INFORMATION OR MATERIALS LISTING OR DESCRIBING THE PROPERTY OR THE INFORMATION, IF ANY, PROVIDED BY THE TRUSTEE AND/OR HIS REPRESENTATIVES TO BUYER.

(b)     No Warranties.  TRUSTEE AND SELLER HEREBY DISCLAIM ALL WARRANTIES OF ANY KIND OR NATURE WHATSOEVER (INCLUDING WARRANTIES OF CONDITION, MERCHANTABILITY, HABITABILITY AND FITNESS FOR PARTICULAR PURPOSES), WHETHER EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, WARRANTIES WITH RESPECT TO THE PROPERTY, TAX LIABILITIES, ZONING, LAND VALUE, SUBDIVISION OR LAND USE, AVAILABILITY OF ACCESS OR UTILITIES, INGRESS OR EGRESS, GOVERNMENTAL APPROVALS, OR THE SOIL CONDITIONS OF THE LAND.  BUYER FURTHER ACKNOWLEDGES THAT BUYER IS BUYING THE PROPERTY "AS IS," "WHERE IS" AND "WITH ALL FAULTS," IN ITS PRESENT CONDITION, INCLUDING, WITHOUT LIMITATION, LATENT DEFECTS AND OTHER MATTERS NOT DETECTED IN BUYER'S INSPECTIONS, WITHOUT ANY WARRANTIES OF TRANSFER, QUALITY, MERCHANTABILITY, VALUE, UTILITY OR FITNESS FOR A PARTICULAR USE OR PURPOSE, AND THAT EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS AGREEMENT, BUYER IS NOT RELYING UPON ANY REPRESENTATION OF ANY KIND OR NATURE MADE BY SELLER, TRUSTEE, OR ANY OF THEIR EMPLOYEES, AGENTS OR OTHER REPRESENTATIVES WITH RESPECT TO THE PROPERTY, AND THAT, IN FACT, NO SUCH REPRESENTATIONS WERE MADE EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT.

(c)     Hazardous Materials.  FURTHER AND WITHOUT IN ANY WAY LIMITING ANY OTHER PROVISION OF THIS AGREEMENT, SELLER AND TRUSTEE DO NOT MAKE ANY WARRANTY WITH RESPECT TO THE PRESENCE ON OR BENEATH THE REAL PROPERTY (OR ANY PARCEL IN PROXIMITY THERETO) OF HAZARDOUS MATERIALS.  BY ACCEPTANCE OF THIS AGREEMENT AND SELLER'S DEED, BUYER ACKNOWLEDGES THAT BUYER'S OPPORTUNITY FOR INSPECTION AND INVESTIGATION OF THE REAL PROPERTY (AND OTHER PARCELS IN PROXIMITY THERETO) PRIOR TO THE EXECUTION DATE WAS ADEQUATE TO ENABLE BUYER

4913-8130-8319.1

TO MAKE BUYER'S OWN DETERMINATION WITH RESPECT TO THE PRESENCE ON OR BENEATH THE REAL PROPERTY (AND OTHER PARCELS IN PROXIMITY THERETO) OF SUCH HAZARDOUS MATERIALS. FURTHERMORE, BUYER'S CLOSING HEREUNDER SHALL BE DEEMED TO CONSTITUTE AN EXPRESS WAIVER OF BUYER'S AND ITS SUCCESSORS' AND ASSIGNS' RIGHTS TO SUE SELLER AND OF BUYER'S RIGHT TO CAUSE SELLER TO BE JOINED IN AN ACTION BROUGHT UNDER ANY FEDERAL, STATE OR LOCAL LAW, RULE, ACT, OR REGULATION NOW EXISTING OR HEREAFTER ENACTED OR AMENDED WHICH PROHIBITS OR REGULATES THE USE, HANDLING, STORAGE, TRANSPORTATION OR DISPOSAL OF HAZARDOUS MATERIALS OR WHICH REQUIRES REMOVAL OR REMEDIAL ACTION WITH RESPECT TO SUCH HAZARDOUS MATERIALS, SPECIFICALLY INCLUDING, BUT NOT LIMITED TO, FEDERAL "CERCLA", "RCRA", AND "SARA" ACTS.

12.2    Buyer's Release.  Buyer hereby releases, remises, acquits and forever discharges Seller, Trustee, the M/OP Parties and their respective members, managers, directors, officers, shareholders, partners, employees, agents, representatives, affiliates, attorneys and their respective successors and assigns (collectively, the "Seller Released Parties"), from and against any and all claims, causes of actions, suits, legal or administrative orders or proceedings, demands, damages, punitive damages, losses, costs, liabilities and expenses, whether known or unknown, arising subsequent to the Closing and further arising out of or in any way relating to the following:  (a) the Bankruptcy Case; (b) the completeness or accuracy of any and all materials, data and information regarding the Property, (c) the physical condition of the Real Property or the Personal Property; (d) the existence or presence of any Hazardous Materials on, under or about the Real Property and/or the release or discharge of any Hazardous Materials from the Real Property; (e) the violations of any applicable statutes or laws with regard to the Real Property, including any Environmental Laws; and (f) any and all other matters regarding the Property, in each case whether existing prior to or after the Closing.  The provisions of this Section 12.2 shall not apply to (i) rights and remedies of Buyer under this Agreement or the Settlement Agreement, (ii) claims for actual fraud or willful misconduct of Seller Released Parties, or (iii) obligations of Seller Released Parties arising under or related to this Agreement.

12.3    Seller's Release.  Effective as of the Closing, Seller, the Trustee (solely in his capacity as Chapter 11 Trustee and not in his individual capacity), and the estate (collectively, the "Seller Releasors") hereby irrevocably release and forever discharge Buyer and its past and present general and limited partners, members, managers, officers, agents, attorneys, affiliates, representatives, successors, and assigns (collectively, the "Buyer Released Parties") from any and all claims, demands, causes of action, suits, liabilities, losses, damages, costs, fees, and expenses of any nature, whether known or unknown, fixed or contingent, in contract, tort, or equity, that the Seller Releasors have, may have, or may assert at any time arising out of or relating to:  (a) the Property, the Wohali Project, or Buyer's prepetition relationship with Seller as lender under the EB5 Loan Agreement or Trust Deed; (b) the DIP Credit Agreement and DIP Loan; (c) any conduct or omission of Buyer relating to the Property or the Wohali Project occurring prior to the Closing Date; or (d) any matter released pursuant to the Settlement Agreement.  For the avoidance of doubt, the Seller's Release shall not apply to (i) rights and remedies of the Seller Releasors under this Agreement or the Settlement Agreement, (ii) claims for actual fraud or willful misconduct of Buyer, or (iii) obligations of Buyer arising under or related to this Agreement.

12.4    Restrictions on Transfer of Property; Third Party Consents.  Buyer acknowledges that Seller is not selling or otherwise transferring to Buyer any property that Seller may not sell or transfer under applicable law, including, without limitation, any such property the sale, transfer or use of which is restricted under applicable copyright, patent or other similar laws, and the use, sale or disposition of the Property may be limited as a result thereof.  Furthermore, Buyer assumes responsibility for obtaining all required licenses, permits and/or other agreements as may be required so that Buyer may lawfully sell, distribute, operate and/or otherwise use the Property.

12.5    Survival.  The terms of this Article 12, as well as the right and ability of the Buyer to enforce the same, shall survive the Closing and are incorporated into the Transaction Documents by reference as if fully set forth therein.

## ARTICLE 13
## BROKERS

Upon the Closing, and only in the event of the Closing, Buyer shall pay to Seller's Broker a commission through Escrow at the Closing pursuant to and in accordance with the separate agreement by and between Seller and Seller's Broker ("Seller's Broker's Commission"), subject to the amount thereof being approved by the Bankruptcy Court.  The Seller's Broker's Commission shall be paid from the Cash Component as an allowed administrative expense of the estate.  Except as described in this Article 13, Seller and Buyer hereby represent and warrant to each other that the warranting party has not entered into nor will such warranting party enter into any agreement, arrangement or understanding with any other person or entity which will result in the obligation of the other party to pay any finder's fee, commission or similar payment in connection with the transactions contemplated by this Agreement.  Seller and Buyer hereby agree to and shall indemnify, defend and hold harmless the other from and against any and all claims, costs, damages and/or liabilities arising from the breach of the foregoing representation by either Seller or Buyer, as the case may be.  The provisions of this Article 13 shall survive the Closing.

## ARTICLE 14
## MISCELLANEOUS

14.1    Assignment.  No assignment of this Agreement or Buyer's rights, duties and obligations hereunder shall be made by Buyer without first having obtained written approval of any such assignment by Seller, which approval may be granted or withheld in Seller's sole discretion and for any reason or no reason, and the approval of the Bankruptcy Court. Notwithstanding the foregoing, Buyer may assign this Agreement and all of Buyer's rights, duties and obligations hereunder, to an affiliate of Buyer without the prior consent or approval of Seller, but subject to the approval of the Bankruptcy Court.  Furthermore, in connection with any such assignment, Buyer shall remain obligated to perform all of the terms and conditions of this Agreement as set forth herein.

14.2    Notices.  Any tender, delivery, notice, demand or other communication ("Notice") required or permitted under this Agreement shall be in writing, and shall be sent by email, telecopier or telefacsimile machine capable of confirming transmission and receipt, and shall be deemed delivered, given and received when sent, all in accordance with the following:

| If to Seller: | Matthew McKinlay, Chapter 11 Trustee |
|---|---|
| | 5598 N. Eagle Rd. #102 |
| | Boise, ID 83713 |
| | Email:  mmckinlay@ampleo.com |
| | |
| With a copy to: | Foley & Lardner LLP |
| | 95 S. State St., Ste. 2500 |
| | Salt Lake City, Utah 84111 |
| | Attn:  Ellen E. Ostrow |
| | Email:  eostrow@foley.com |
| | |
| If to Buyer: | EB5AN Wohali Utah Fund XV, LP |
| | 954 Avenida Ponce de Leon, Suite 205 |
| | San Juan, Puerto Rico 00907 |
| | Attn:  Michael B. Schoenfeld |
| | Email:  mike.schoenfeld@eb5an.com |
| | |
| With copy to: | Ray Quinney & Nebeker P.C. |
| | 36 S. State St, Ste. 1400 |
| | Salt Lake City, Utah 84111 |
| | Attn:  Michael R. Johnson |
| | Email:  mjohnson@rqn.com |

14.3    Binding Offer from Buyer.  Buyer acknowledges and agrees that this Agreement is being submitted by Buyer pursuant to the Sale Procedures Order and is irrevocable and binding upon Buyer as set forth therein until the earlier to occur of the Closing or _____.

(a)    Inspection of Real Property and Books and Records.  To the extent permitted by law and any relevant confidentiality agreements and upon reasonable prior notice by Buyer to Seller, Seller shall afford to Buyer, and to the accountants, counsel and representatives of Buyer, reasonable access, during normal business hours, to the Real Property and originals (or copies, as applicable), of the Books and Records; provided, however, Seller shall not be required to incur any cost and expense relating thereto (including any copying charges).  Following the Closing and through the earlier of (i) 36 months following the Closing Date and (ii) the final distribution and termination of the Liquidating Trust, if any, Buyer shall have reasonable access (with reasonable prior notice and during normal business hours) to all Books and Records retained by the estate or the Liquidating Trust relating to the Property or the Debtor for the period prior to Closing, to the extent reasonably required for tax, litigation, insurance, or regulatory purposes. Any Liquidating Trust shall similarly provide Buyer with access to estate records relevant to Buyer's participation in Liquidating Trust distributions, Buyer's consultation rights under the Settlement Agreement, and any tax audit, proceeding, or litigation relating to the Property for the pre-Closing period.

(b)    Entry Onto Real Property.  Buyer may enter the Real Property prior to Closing by contacting Seller's Broker.  Any entry upon the Real Property by or on behalf of Buyer shall be at Buyer's sole risk and expense.  Buyer shall not cause or permit any damage to the Real Property (including, without limitation, any boring or invasive testing) or the imposition of any

lien on the Real Property due to Buyer's or its agents' entry and activities on the Real Property pursuant to this Section 14.4.  If any such lien shall be filed against the Real Property, Buyer promptly and at its own expense shall cause any such lien to be removed, and, in the event of such damage, shall restore the Real Property, as close as reasonably possible, to the condition existing immediately prior to Buyer's entry (or entry by Buyer's representatives, agents, employees and other persons or entities claiming by or through it agent's).  BUYER SHALL INDEMNIFY, DEFEND AND HOLD SELLER, TRUSTEE AND TRUSTEE'S AGENTS, REPRESENTATIVES, AFFILIATES, ATTORNEYS, SUCCESSORS AND ASSIGNS, HARMLESS FROM AND AGAINST ANY CLAIMS, DAMAGES, EXPENSES OR LOSSES, RESULTING FROM OR RELATED TO BUYER'S (OR BUYER'S AGENT'S) ENTRY UPON THE REAL PROPERTY OR ACTIVITIES IN RESPECT OF THE PROPERTY.

(c)     The terms of this Section 14.4, as well as the right and ability of Seller to enforce the same, shall survive the Closing or earlier termination of this Agreement.

14.4    Entire Agreement.  This Agreement, including the Schedules and Exhibits referred to herein, constitutes the entire contract between the Parties with respect to the subject matter covered by this Agreement.  This Agreement supersedes all previous representations, arrangements, agreements and understandings by and among the Parties with respect to the subject matter covered by this Agreement, including without limitation all prior letters of intent executed between Buyer and Seller, and any such representations, arrangements, agreements and understandings are hereby canceled and terminated in all respects.  This Agreement may not be amended, changed or modified except by a writing duly executed by both of the Parties hereto and authorized and approved by the Bankruptcy Court.

14.5    Severability.  If any provision of this Agreement, or any portion of any such provision, is held to be unenforceable or invalid, the remaining provisions and portions shall nevertheless be carried into effect.

14.6    Remedies.  The Parties shall not be deemed to waive any of their rights or remedies under this Agreement, unless such waiver is in writing and signed by the Party to be bound.  No delay or omission on the part of either Party in exercising any right or remedy shall operate as a waiver of such right or remedy or any other right or remedy.

14.7    Headings.  The headings contained in this Agreement are for convenience only and are not a part of this Agreement, and do not in any way interpret, limit or amplify the scope, extent or intent of this Agreement, or any of the provisions of this Agreement.

14.8    Counterparts.  This Agreement may be executed in counterparts, each of which shall constitute an original, but all of which together shall constitute one and the same agreement.

14.9    Attorneys' Fees.  In the event any action is initiated for any breach or default in any of the terms or conditions of this agreement, then the Party in whose favor judgment shall be entered shall be entitled to have and recover from the non-prevailing Party all costs and expenses (including attorneys' fees) incurred in such action and any appeal therefrom.

14.10   Governing Law and Adjudication.  This Agreement shall be governed by and interpreted in accordance with the laws (other than that body of law relating to conflicts of law) of

the State of Utah. The proper venue for any claims, causes of action or other proceedings concerning this Agreement shall be in the Bankruptcy Court.

14.11 <u>No Third Party Beneficiary</u>. This Agreement creates rights and duties only between the Parties, and no third party is or shall be deemed to be or shall have any rights as a third party beneficiary.

14.12 <u>Binding Effect</u>. Subject to Section 14.1, this Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective successors, assigns and legal and personal representatives.

14.13 <u>Survival</u>. Except as otherwise provided in this Agreement to the contrary, the covenants and obligations of the Parties to this Agreement shall survive the Closing indefinitely.

14.14 <u>Time of the Essence</u>. Time is of the essence for the performance of each and every obligation hereunder.

14.15 <u>Rules of Construction</u>. The Parties agree that they have been represented by counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any law, regulation, holding or rule of construction providing that ambiguities in an agreement or other document will be construed against the party drafting such agreement or document.

14.16 <u>Further Assurances</u>. Each of the Parties agrees to execute and deliver such instruments and take such actions as the other may, from time to time, request in order to effectuate the purpose and to carry out the terms of this Agreement. By way of example and not limitation, and subject to the approval of the Bankruptcy Court, in the event Buyer determines that any item of Property was not sold, transferred, assigned or conveyed to Buyer pursuant to this Agreement (exclusive of any Excluded Property), and a reasonable reading or interpretation of this Agreement indicates that such item of Property was inadvertently omitted, then each of the Parties agrees to cooperate with the other and to execute such additional agreements and documents and take such additional actions as may be reasonably required to transfer, assign or convey such item of Property.

*[Signature page to follow]*

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

SELLER:

WOHALI LAND ESTATES, LLC, a
Utah limited liability company

By: _____
Matthew McKinlay, Chapter 11 Trustee

BUYER:

EB5AN WOHALI UTAH FUND XV, LP, a
Delaware limited partnership

By: _____
Michael B. Schoenfeld, Authorized
Signatory

## CONSENT OF ESCROW AGENT

The undersigned Escrow Agent hereby agrees to (i) accept the foregoing Purchase Agreement, (ii) be Escrow Agent under said Purchase Agreement, (iii) to make all filings required under Section 6045 of the Internal Revenue Code of 1986, as amended, and (iv) be bound by said Purchase Agreement in the performance of its duties as Escrow Agent; provided, however, the undersigned shall have no obligations, liability or responsibility under (a) this Consent or otherwise, unless and until said Purchase Agreement, fully signed by the parties, has been delivered to the undersigned, or (b) any amendment to said Purchase Agreement unless and until the same is accepted by the undersigned in writing.

Dated:  April ___, 2026

[_____]


By  _____
Its  _____

*[Consent of Escrow Agent]*

**EXHIBIT "A"**

**Legal Description of the Land**

PARCEL 1: (SUMMIT COUNTY)

FOR INFORMATIONAL PURPOSES ONLY: PARCEL NO. CT-WOH-COMB

BEGINNING AT THE NORTHWEST CORNER OF SECTION 18, TOWNSHIP 2 NORTH, RANGE 5 EAST, SALT LAKE BASE & MERIDIAN AND RUNNING THENCE NORTH 89°11'21" EAST 3743.70 FEET; THENCE SOUTH 56°22'29" EAST 406.43 FEET; THENCE SOUTH 17°05'28' EAST 369.20 FEET; THENCE SOUTH 48°07'57" EAST 780.00 FEET; THENCE SOUTH 12°44'02" WEST 123.14 FEET; THENCE SOUTH 19°38'38" WEST 291.90 FEET; THENCE SOUTH 19°38'38" WEST 1180.02 FEET; THENCE SOUTH 19°38'38" WEST 160.08 FEET; THENCE SOUTH 23°08'38" WEST 700.00 FEET; THENCE SOUTH 0°42'14" EAST 201.86 FEET; THENCE SOUTH 0°42'14" EAST 387.14 FEET; THENCE SOUTH 89°59'49" EAST 387.39 FEET; THENCE SOUTH 21°37'45" WEST 483.72 FEET; THENCE SOUTH 21°37'45" WEST 960.50 FEET; THENCE SOUTH 88°26'37" WEST 1148.59 FEET; THENCE NORTH 89°17'17" WEST 2616.35 FEET; THENCE NORTH 0°11'51" WEST 746.45 FEET; THENCE SOUTH 89°14'02" WEST 245.57 FEET; THENCE SOUTH 89°14'02" WEST 1732.04 FEET; THENCE NORTH 24°14'35" EAST 114.04 FEET; THENCE SOUTH 61°22'24" WEST 4028.44 FEET; THENCE NORTH 57°24'30" WEST 5260.39 FEET; THENCE NORTH 69°41'17" EAST 935.37 FEET; THENCE NORTH 43°11'17" EAST 1900.00 FEET; THENCE NORTH 28°56'17" EAST 1025.00 FEET; THENCE NORTH 28°01'17" EAST 2293.08 FEET; THENCE NORTH 83°49'36" EAST 682.00 FEET; THENCE SOUTH 0°05'27" EAST 1048.23 FEET; THENCE SOUTH 88°52'20" EAST 5453.59 FEET; TO THE POINT OF BEGINNING.

LESS AND EXCEPTING THEREFROM THE FOLLOWING DESCRIBED LAND AS CONVEYED TO WOHALI LAND ESTATES, LLC, A UTAH LIMITED LIABILITY COMPANY BY THAT CERTAIN SPECIAL WARRANTY DEED RECORDED JULY 12, 2021 AS ENTRY NO. 1168146 IN BOOK 2678 AT PAGE 405 AND AS CORRECTED BY THAT CERTAIN AFFIDAVIT OF SCRIVENER'S ERROR RECORDED NOVEMBER 2, 2021 AS ENTRY NO. 1176663 IN BOOK 2703 AT PAGE 1043 OF OFFICIAL RECORDS:

A PARCEL OF LAND LOCATED IN SECTION 18, TOWNSHIP 2 NORTH, RANGE 5 EAST, SALT LAKE BASE AND MERIDIAN, COALVILLE, SUMMIT COUNTY, UTAH, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT WHICH IS N89°11'21"E 2365.67 FEET ALONG THE NORTH SECTION LINE OF SECTION 18 FROM THE NORTHWEST CORNER OF SECTION 18, TOWNSHIP 2 NORTH, RANGE 5 EAST, SALT LAKE BASE AND MERIDIAN; THENCE NORTH 89°11'21" EAST 60.01 FEET; THENCE SOUTH 10°28'25" EAST 134.39 FEET TO A POINT ON A 100.00 FOOT RADIUS CURVE TO THE RIGHT, THE CENTER OF WHICH BEARS SOUTH 79°31'35" WEST; THENCE SOUTHERLY 23.58 FEET ALONG THE ARC OF SAID CURVE THROUGH A CENTRAL ANGLE OF 13°30'27" (CHORD BEARS SOUTH 03°43'12" EAST 23.52 FEET) TO A POINT ON A 443.00 FOOT RADIUS COMPOUND

A-1

4913-8130-8319.1

CURVE TO THE RIGHT, THE CENTER OF WHICH BEARS NORTH 86°57'58" WEST; THENCE SOUTHERLY 171.95 FEET ALONG THE ARC OF SAID CURVE THROUGH A CENTRAL ANGLE OF 22°14'21" (CHORD BEARS SOUTH 14°09'13" WEST 170.87 FEET) TO A POINT ON A 133.00 FOOT RADIUS COMPOUND CURVE TO THE RIGHT, THE CENTER OF WHICH BEARS NORTH 64°43'37" WEST; THENCE SOUTHWESTERLY 70.46 FEET ALONG THE ARC OF SAID CURVE THROUGH A CENTRAL ANGLE OF 30°21'13" (CHORD BEARS SOUTH 40°27'00" WEST 69.64 FEET) TO A POINT ON A 87.00 FOOT RADIUS REVERSE CURVE TO THE LEFT, THE CENTER OF WHICH BEARS SOUTH 34°22'24" EAST; THENCE SOUTHWESTERLY 28.35 FEET ALONG THE ARC OF SAID CURVE THROUGH A CENTRAL ANGLE OF 18°40'16" (CHORD BEARS SOUTH 46°17'28" WEST 28.23 FEET); THENCE SOUTH 36°57'21" WEST 96.91 FEET TO A POINT ON A 15.00 FOOT RADIUS NON-TANGENT CURVE TO THE LEFT, THE CENTER OF WHICH BEARS SOUTH 58°07'52" EAST; THENCE SOUTHERLY 21.21 FEET ALONG THE ARC OF SAID CURVE THROUGH A CENTRAL ANGLE OF 81°01'24" (CHORD BEARS SOUTH 08°38'34" EAST 19.49 FEET); THENCE SOUTH 49°09'15" EAST 35.06 FEET TO A POINT ON A 100.00 FOOT RADIUS CURVE TO THE LEFT, THE CENTER OF WHICH BEARS NORTH 40°50'45" EAST; THENCE EASTERLY 158.59 FEET ALONG THE ARC OF SAID CURVE THROUGH A CENTRAL ANGLE OF 90°51'52" (CHORD BEARS NORTH 85°24'49" EAST 142.48 FEET); THENCE NORTH 39°58'53" EAST 116.77 FEET TO A POINT ON A 275.00 FOOT RADIUS CURVE TO THE RIGHT, THE CENTER OF WHICH BEARS SOUTH 50°01'07" EAST; THENCE NORTHEASTERLY 81.89 FEET ALONG THE ARC OF SAID CURVE THROUGH A CENTRAL ANGLE OF 17°03'41" (CHORD BEARS NORTH 48°30'44" EAST 81.59 FEET); THENCE NORTH 57°02'34" EAST 200.87 FEET TO A POINT ON A 125.00 FOOT RADIUS CURVE TO THE RIGHT, THE CENTER OF WHICH BEARS SOUTH 32°57'26" EAST; THENCE EASTERLY 193.95 FEET ALONG THE ARC OF SAID CURVE THROUGH A CENTRAL ANGLE OF 88°53'57" (CHORD BEARS SOUTH 78°30'27" EAST 175.07 FEET); THENCE SOUTH 34°03'29" EAST 29.90 FEET TO A POINT ON A 125.00 FOOT RADIUS CURVE TO THE LEFT, THE CENTER OF WHICH BEARS NORTH 55°56'31" EAST; THENCE SOUTHEASTERLY 85.51 FEET ALONG THE ARC OF SAID CURVE THROUGH A CENTRAL ANGLE OF 39°11'40" (CHORD BEARS SOUTH 53°39'19" EAST 83.85 FEET); THENCE SOUTH 73°15'09" EAST 93.68 FEET TO A POINT ON A 175.00 FOOT RADIUS CURVE TO THE RIGHT, THE CENTER OF WHICH BEARS SOUTH 16°44'51" WEST; THENCE SOUTHEASTERLY 53.64 FEET ALONG THE ARC OF SAID CURVE THROUGH A CENTRAL ANGLE OF 17°33'48" (CHORD BEARS SOUTH 64°28'14" EAST 53.43 FEET); THENCE SOUTH 55°41'20" EAST 26.36 FEET TO A POINT ON A 125.00 FOOT RADIUS CURVE TO THE LEFT, THE CENTER OF WHICH BEARS NORTH 34°18'40" EAST; THENCE EASTERLY 143.66 FEET ALONG THE ARC OF SAID CURVE THROUGH A CENTRAL ANGLE OF 65°50'53" (CHORD BEARS SOUTH 88°36'47" EAST 135.88 FEET); THENCE NORTH 58°27'47" EAST 49.23 FEET TO A POINT ON A 125.00 FOOT RADIUS CURVE TO THE RIGHT, THE CENTER OF WHICH BEARS SOUTH 31°32'13" EAST; THENCE EASTERLY 157.41 FEET ALONG THE ARC OF SAID CURVE THROUGH A CENTRAL ANGLE OF 72°09'00" (CHORD BEARS SOUTH 85°27'43" EAST 147.21 FEET); THENCE NORTH 40°36'47" EAST 189.93 FEET; THENCE NORTH 10°37'48" EAST 189.19 FEET; THENCE NORTH 89°11'21" EAST 79.72 FEET; THENCE SOUTH 56°22'29" EAST 169.81 FEET; THENCE SOUTH

A-2

33°37'31" WEST 193.48 FEET; THENCE SOUTH 52°52'18" EAST 156.58 FEET; THENCE SOUTH 09°56'22" EAST 480.27 FEET; THENCE SOUTH 86°16'33" WEST 82.25 FEET; THENCE SOUTH 01°41'07" WEST 263.56 FEET; THENCE SOUTH 88°18'53" EAST 198.14 FEET; THENCE SOUTH 09°08'58" WEST 1,261.94 FEET; THENCE NORTH 83°04'19" WEST 187.88 FEET; THENCE SOUTH 12°12'25" WEST 558.18 FEET; THENCE NORTH 77°47'35" WEST 481.29 FEET; THENCE SOUTH 12°12'25" WEST 332.08 FEET; THENCE SOUTH 87°51'01" WEST 380.73 FEET TO A POINT ON A 275.00 FOOT RADIUS NON-TANGENT CURVE TO THE LEFT, THE CENTER OF WHICH BEARS NORTH 87°04'58" EAST; THENCE SOUTHERLY 25.05 FEET ALONG THE ARC OF SAID CURVE THROUGH A CENTRAL ANGLE OF 05°13'07" (CHORD BEARS SOUTH 05°31'36" EAST 25.04 FEET); THENCE SOUTH 81°51'51" WEST 50.00 FEET; THENCE SOUTH 58°47'03" WEST 205.16 FEET; THENCE NORTH 51°26'07" WEST 137.45 FEET; THENCE NORTH 32°37'56" WEST 218.97 FEET; THENCE NORTH 53°04'13" EAST 243.33 FEET; THENCE NORTH 30°45'49" EAST 650.95 FEET; THENCE NORTH 19°44'42" EAST 259.65 FEET; THENCE NORTH 44°52'50" EAST 169.31 FEET; THENCE NORTH 14°57'19" WEST 813.24 FEET; THENCE NORTH 22°01'51" EAST 621.24 FEET; THENCE NORTH 07°47'43" EAST 216.90 FEET TO A POINT ON A 175.00 FOOT RADIUS NON-TANGENT CURVE TO THE RIGHT, THE CENTER OF WHICH BEARS NORTH 16°44'51" EAST; THENCE NORTHWESTERLY 119.71 FEET ALONG THE ARC OF SAID CURVE THROUGH A CENTRAL ANGLE OF 39°11'40" (CHORD BEARS NORTH 53°39'19" WEST 117.39 FEET); THENCE NORTH 34°03'29" WEST 29.90 FEET TO A POINT ON A 75.00 FOOT RADIUS CURVE TO THE LEFT, THE CENTER OF WHICH BEARS SOUTH 55°56'31" WEST; THENCE WESTERLY 116.37 FEET ALONG THE ARC OF SAID CURVE THROUGH A CENTRAL ANGLE OF 88°53'57" (CHORD BEARS NORTH 78°30'27" WEST 105.04 FEET); THENCE SOUTH 57°02'34" WEST 200.87 FEET TO A POINT ON A 225.00 FOOT RADIUS CURVE TO THE LEFT, THE CENTER OF WHICH BEARS SOUTH 32°57'26" EAST; THENCE SOUTHWESTERLY 67.00 FEET ALONG THE ARC OF SAID CURVE THROUGH A CENTRAL ANGLE OF 17°03'41" (CHORD BEARS SOUTH 48°30'44" WEST 66.75 FEET); THENCE SOUTH 39°58'53" WEST 116.77 FEET TO A POINT ON A 150.00 FOOT RADIUS CURVE TO THE RIGHT, THE CENTER OF WHICH BEARS NORTH 50°01'07" WEST; THENCE WESTERLY 237.88 FEET ALONG THE ARC OF SAID CURVE THROUGH A CENTRAL ANGLE OF 90°51'52" (CHORD BEARS SOUTH 85°24'49" WEST 213.73 FEET); THENCE NORTH 49°09'15" WEST 35.10 FEET TO A POINT ON A 15.00 FOOT RADIUS CURVE TO THE LEFT, THE CENTER OF WHICH BEARS SOUTH 40°50'45" WEST; THENCE WESTERLY 22.20 FEET ALONG THE ARC OF SAID CURVE THROUGH A CENTRAL ANGLE OF 84°47'03" (CHORD BEARS SOUTH 88°27'13" WEST 20.23 FEET); THENCE NORTH 43°56'49" WEST 50.01 FEET TO A POINT ON A 375.00 FOOT RADIUS NON-TANGENT CURVE TO THE LEFT, THE CENTER OF WHICH BEARS NORTH 43°56'49" WEST; THENCE NORTHEASTERLY 59.54 FEET ALONG THE ARC OF SAID CURVE THROUGH A CENTRAL ANGLE OF 09°05'51" (CHORD BEARS NORTH 41°30'16" EAST 59.48 FEET); THENCE NORTH 36°57'21" EAST 95.87 FEET TO A POINT ON A 87.00 FOOT RADIUS CURVE TO THE LEFT, THE CENTER OF WHICH BEARS NORTH 53°02'39" WEST; THENCE NORTHEASTERLY 31.85 FEET ALONG THE ARC OF SAID CURVE THROUGH A CENTRAL ANGLE OF 20°58'33" (CHORD BEARS NORTH 26°28'04" EAST 31.67 FEET); THENCE NORTH 15°58'48" EAST 34.77 FEET TO A POINT ON A 133.00 FOOT RADIUS CURVE TO THE RIGHT, THE

A-3

4913-8130-8319.1

CENTER OF WHICH BEARS SOUTH 74°01'12" EAST; THENCE NORTHERLY 23.12 FEET ALONG THE ARC OF SAID CURVE THROUGH A CENTRAL ANGLE OF 09°57'40" (CHORD BEARS NORTH 20°57'38" EAST 23.09 FEET) TO A POINT ON A 357.00 FOOT RADIUS REVERSE CURVE TO THE LEFT, THE CENTER OF WHICH BEARS NORTH 64°03'32" WEST; THENCE NORTHERLY 154.59 FEET ALONG THE ARC OF SAID CURVE THROUGH A CENTRAL ANGLE OF 24°48'39" (CHORD BEARS NORTH 13°32'09" EAST 153.39 FEET); THENCE NORTH 00°56'51" EAST 79.63 FEET TO A POINT ON A 100.00 FOOT RADIUS CURVE TO THE LEFT, THE CENTER OF WHICH BEARS NORTH 89°03'09" WEST; THENCE NORTHERLY 4.98 FEET ALONG THE ARC OF SAID CURVE THROUGH A CENTRAL ANGLE OF 02°51'03" (CHORD BEARS NORTH 00°28'41" WEST 4.98 FEET); THENCE NORTH 01°54'12" WEST 53.81 FEET TO THE POINT OF BEGINNING.

LESS AND EXCEPTING THEREFROM ANY PORTION LYING WITHIN THE BOUNDS OF WOHALI PHASE 1B SUBDIVISION, ACCORDING TO THE OFFICIAL PLAT THEREOF RECORDED OCTOBER 26, 2023 AS ENTRY NO. 1211487 IN THE OFFICE OF THE SUMMIT COUNTY RECORDER.

ALSO LESS AND EXCEPTING THEREFROM ANY PORTION LYING WITHIN THE BOUNDS OF WOHALI PHASE 2A, A UTAH RESORT UNIT PROJECT, ACCORDING TO THE OFFICIAL PLAT THEREOF RECORDED NOVEMBER 28, 2023 AS ENTRY NO. 1212847 IN THE OFFICE OF THE SUMMIT COUNTY RECORDER.

ALSO LESS AND EXCEPTING THEREFROM ANY PORTION LYING WITHIN THE BOUNDS OF WOHALI PHASE 2B, A UTAH RESORT UNIT PROJECT, ACCORDING TO THE OFFICIAL PLAT THEREOF RECORDED NOVEMBER 28, 2023 AS ENTRY NO. 1212848 IN THE OFFICE OF THE SUMMIT COUNTY RECORDER.

ALSO LESS AND EXCEPTING THEREFROM ANY PORTION LYING WITHIN THE BOUNDS OF WOHALI PHASE 2C, A UTAH RESORT UNIT PROJECT, ACCORDING TO THE OFFICIAL PLAT THEREOF RECORDED NOVEMBER 28, 2023 AS ENTRY NO. 1212849 IN THE OFFICE OF THE SUMMIT COUNTY RECORDER.

PARCEL 1A: (SUMMIT COUNTY)

PERPETUAL NON-EXCLUSIVE AND CONTINUOUS EASEMENTS AND RIGHTS-OF-WAY FOR (A) PRIMARY ACCESS ROAD; (B) SECONDARY ACCESS ROAD; (C) TEMPORARY CONSTRUCTION ACCESS ROADS AND (D) WEST LOOP ACCESS ROAD, AND UTILITY EASEMENTS ALL AS MORE SPECIFICALLY DEFINED IN THAT CERTAIN ACCESS AND UTILITY EASEMENT AGREEMENT RECORDED JULY 7, 2020 AS ENTRY NO. 1136110 IN BOOK 2581 AT PAGE 1150 OF OFFICIAL RECORDS OF SUMMIT COUNTY, STATE OF UTAH.

PARCEL 2: (SUMMIT COUNTY)

FOR INFORMATIONAL PURPOSES ONLY: PARCEL NO. CT-441

4913-8130-8319.1

BEGINNING AT THE NORTHWEST CORNER OF SECTION 17, TOWNSHIP 2 NORTH, RANGE 5 EAST, SALT LAKE BASE AND MERIDIAN AND RUNNING THENCE SOUTH 88°36'14" EAST 1,803.94 FEET ALONG THE SECTION LINE, MORE OR LESS, TO THE USA PROPERTY; THENCE SOUTH 06°59'54" EAST 237.06 FEET; THENCE SOUTH 18°53'54" EAST 502.00 FEET; THENCE SOUTH 28°19'54" EAST 190.60 FEET; THENCE SOUTH 01°08'06" WEST 182.65 FEET TO PARCEL NS-440; THE NEXT (3) COURSES ARE ALONG THE EXISTING FENCE LINE COMMON TO PARCEL NS-440; THENCE NORTH 88°40'16" WEST 1,902.33 FEET; THENCE SOUTH 00°58'29" EAST 992.30 FEET; THENCE SOUTH 88°37'54" EAST 1,039.76 FEET TO A 3 WAY FENCE CORNER; THENCE SOUTH 15°31'34" EAST 636.72 FEET ALONG AN EXISTING LINE OF FENCE COMMON TO PARCEL NS- 437; THENCE NORTH 89°06'43" WEST 1,363.89 FEET ALONG THE PROJECTION OF AN EXISTING LINE OF FENCE TO THE WEST QUARTER CORNER OF SAID SECTION 17, SAID QUARTER CORNER BEING MARKED WITH AN ORIGINAL STONE; THENCE NORTH 00°55'18" WEST 2,670.12 FEET ALONG THE SECTION LINE TO THE POINT OF BEGINNING.

PARCEL 3: (SUMMIT COUNTY)

FOR INFORMATIONAL PURPOSES ONLY: PARCEL NO. CT-449

BEGINNING AT THE NORTHEAST CORNER OF SECTION 18, TOWNSHIP 2 NORTH, RANGE 5 EAST, SALT LAKE BASE AND MERIDIAN AND RUNNING THENCE SOUTH 89°10'22" WEST 138.00 FEET ALONG THE SECTION LINE; THENCE SOUTH 08°20'22" WEST 168.00 FEET; THENCE SOUTH 03°10'22" WEST 128.00 FEET; THENCE SOUTH 16°55'22" WEST 788.00 FEET; THENCE SOUTH 13°28'41" WEST 71.32 FEET; THE NEXT (5) COURSES ARE ALONG THE ADJACENT WOHALI PARTNERS BOUNDARY AS DELINEATED BY AN EXISTING RECORD OF SURVEY; THENCE SOUTH 12°43'34" WEST 123.14 FEET; THENCE SOUTH 19°38'10" WEST 1,632.00 FEET; THENCE SOUTH 23°08'10" WEST 700.00 FEET; THENCE SOUTH 00°42'42" EAST 589.00 FEET; THENCE NORTH 89°59'43" EAST 1,313.27 FEET, MORE OR LESS, TO THE SECTION LINE; THENCE NORTH 00°29'49" WEST 1,339.27 FEET ALONG SAID LINE TO THE EAST QUARTER CORNER OF SECTION 18, SAID QUARTER CORNER BEING MARKED WITH AN ORIGINAL STONE; THENCE NORTH 00°55'18" WEST 2,670.12 FEET ALONG THE SECTION LINE TO THE POINT OF BEGINNING.

PARCEL 4: (SUMMIT COUNTY)

FOR INFORMATIONAL PURPOSES ONLY: PARCEL NOS. WOH-1-7 AND WOH-1-65.

LOTS 7 AND 65, WOHALI PHASE 1 SUBDIVISION, ACCORDING TO THE OFFICIAL PLAT THEREOF AS RECORDED JANUARY 21, 2022 AS ENTRY NO. 1181925 IN BOOK 2719 AT PAGE 562 IN THE OFFICE OF THE SUMMIT COUNTY RECORDER.

PARCEL 4A: (SUMMIT COUNTY)

4913-8130-8319.1

PERPETUAL NON-EXCLUSIVE AND CONTINUOUS EASEMENTS AND RIGHTS-OF-WAY FOR (A) PRIMARY ACCESS ROAD; (B) SECONDARY ACCESS ROAD; (C) TEMPORARY CONSTRUCTION ACCESS ROADS AND (D) WEST LOOP ACCESS ROAD, AND UTILITY EASEMENTS ALL AS MORE SPECIFICALLY DEFINED IN THAT CERTAIN ACCESS AND UTILITY EASEMENT AGREEMENT RECORDED JULY 7, 2020 AS ENTRY NO. 1136110 IN BOOK 2581 AT PAGE 1150 OF OFFICIAL RECORDS OF SUMMIT COUNTY, STATE OF UTAH.

PARCEL 5: (SUMMIT COUNTY)

FOR INFORMATIONAL PURPOSES ONLY: PARCEL NO. NS-294

THAT PORTION OF THE FOLLOWING DESCRIBED PARCEL LYING IN SUMMIT COUNTY:

GOVERNMENT LOTS 9, 10, 11, 12, 13, 14, 15, AND 16 OF SECTION 16, TOWNSHIP 2 NORTH, RANGE 4 EAST, SALT LAKE BASE AND MERIDIAN.

PARCEL 6: (SUMMIT COUNTY)

FOR INFORMATIONAL PURPOSES ONLY: PARCEL NO. NS-295

THAT PORTION OF THE FOLLOWING DESCRIBED PARCEL LYING IN SUMMIT COUNTY:

ALL OF SECTION 21, TOWNSHIP 2 NORTH, RANGE 4 EAST, SALT LAKE BASE AND MERIDIAN.

LESS AND EXCEPTING THE FOLLOWING:

A TRACT OF LAND BEING PART OF THE NORTHEAST QUARTER OF SECTION 21, TOWNSHIP 2 NORTH, RANGE 4 EAST, SALT LAKE BASE AND MERIDIAN, AND MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHEAST CORNER OF STONE OF THE SAID SECTION 21; AND RUNNING THENCE SOUTH 0°02' WEST 2719.0 FEET TO A POINT MIDWAY TO THE SOUTHEAST CORNER STONE OF SAID SECTION 21; THENCE SOUTH 85°49' WEST 1048.0 FEET ALONG THE QUARTER SECTION LINE; THENCE ALONG A RIDGE THREE COURSES AS FOLLOWS: NORTH 25° EAST 1514.0 FEET; THENCE NORTH 33° EAST 532.6 FEET; THENCE NORTH 5°30' WEST 965.4 FEET TO SECTION LINE; THENCE NORTH 85°43' EAST 210.0 FEET TO THE POINT OF BEGINNING.

ALSO LESS AND EXCEPTING THE FOLLOWING:

A TRACT OF LAND BEING PART OF THE SOUTHEAST QUARTER OF SECTION 21, TOWNSHIP 2 NORTH, RANGE 4 EAST, SALT LAKE BASE AND MERIDIAN, AND MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE SOUTHEAST CORNER STONE OF SAID SECTION 21; AND RUNNING THENCE SOUTH 85°55' WEST 812.3 FEET ALONG THE SECTION LINE; THENCE ALONG A RIDGE FIVE COURSES AS FOLLOWS: NORTH 41° WEST 1180.0 FEET; THENCE NORTH 11° WEST 377.0 FEET; THENCE NORTH 2° EAST 1079.3 FEET; THENCE NORTH 59° EAST 659.0 FEET; THENCE NORTH 25° EAST 24.0 FEET TO THE QUARTER SECTION LINE; THENCE ALONG SAID LINE NORTH 85°49' EAST 1048.0 FEET TO A POINT MIDWAY ALONG THE EAST BOUNDARY OF SAID SECTION 21 BETWEEN THE NORTHEAST AND SOUTHEAST CORNER STONES; THENCE SOUTH 0°02' WEST 2719.0 FEET TO THE POINT OF BEGINNING.

PARCEL 7: (SUMMIT COUNTY)

FOR INFORMATIONAL PURPOSES ONLY: PARCEL NO. NS-296

BEGINNING AT THE NORTHEAST CORNER OF STONE OF THE SAID SECTION 21; AND RUNNING THENCE SOUTH 0°02' WEST 2719.0 FEET TO A POINT MIDWAY TO THE SOUTHEAST CORNER STONE OF SAID SECTION 21; THENCE SOUTH 85°49' WEST 1048.0 FEET ALONG THE QUARTER SECTION LINE; THENCE ALONG A RIDGE THREE COURSES AS FOLLOWS: NORTH 25° EAST 1514.0 FEET; THENCE NORTH 33° EAST 532.6 FEET; THENCE NORTH 5°30' WEST 965.4 FEET TO SECTION LINE; THENCE NORTH 85°43' EAST 210.0 FEET TO THE POINT OF BEGINNING.

PARCEL 8: (SUMMIT COUNTY)

FOR INFORMATIONAL PURPOSES ONLY: PARCEL NO. NS-298-A

THE WEST HALF OF THE NORTHWEST QUARTER AND THE NORTHWEST QUARTER OF THE SOUTHWEST QUARTER, SECTION 22, TOWNSHIP 2 NORTH, RANGE 4 EAST, SALT LAKE BASE AND MERIDIAN.

PARCEL 9: (SUMMIT COUNTY)

FOR INFORMATIONAL PURPOSES ONLY: PARCEL NO. NS-299

THE EAST HALF OF THE WEST HALF OF SECTION 22, TOWNSHIP 2 NORTH, RANGE 4 EAST, SALT LAKE BASE AND MERIDIAN.

PARCEL 10: (SUMMIT COUNTY)

FOR INFORMATIONAL PURPOSES ONLY: PARCEL NO. NS-317

THAT PORTION OF THE FOLLOWING DESCRIBED PARCEL LYING IN SUMMIT COUNTY:

ALL OF SECTION 27, TOWNSHIP 2 NORTH, RANGE 4 EAST, SALT LAKE BASE AND MERIDIAN.

LESS AND EXCEPTING THE FOLLOWING:

BEGINNING AT A POINT NORTH 85°53' EAST 82.4 FEET FROM THE SOUTH QUARTER SECTION STONE OF SAID SECTION 27; RUNNING THENCE 16 COURSES ALONG A RIDGE AS FOLLOWS: NORTH 13°30' WEST 170.0 FEET; NORTH 3°30' EAST 137.0 FEET; NORTH 5° WEST 112.0 FEET; NORTH 4° EAST 146.0 FEET; NORTH 12°30' WEST 148.0 FEET; NORTH 44° EAST 90.0 FEET; NORTH 26°30' EAST 91.0 FEET; NORTH 34°10' EAST 815.5 FEET; NORTH 40° EAST 143.0 FEET; NORTH 33° EAST 566.5 FEET; NORTH 4° EAST 412.5 FEET; NORTH 2°10' WEST 740.0 FEET; NORTH 7°25' WEST 1274.0 FEET; NORTH 28°30' EAST 393.0 FEET; NORTH 36° WEST 192.0 FEET; NORTH 3° WEST 422.5 FEET TO THE NORTH BOUNDARY OF SAID SECTION 27 AT A POINT WHICH BEARS NORTH 85°32' EAST 862.6 FEET FROM THE NORTH QUARTER SECTION CORNER STONE OF SAID SECTION 27; THENCE NORTH 85°32' EAST 1779.4 FEET TO THE NORTHEAST CORNER OF SAID SECTION 27; THENCE SOUTH 0°03' WEST 5400.0 FEET TO THE SOUTHEAST CORNER OF SAID SECTION 27; THENCE SOUTH 85°53' WEST 2562.8 FEET TO THE POINT OF BEGINNING.

PARCEL 11: (SUMMIT COUNTY)

FOR INFORMATIONAL PURPOSES ONLY: PARCEL NO. NS-BDY-21

A TRACT OF LAND BEING PART OF THE SOUTHEAST QUARTER OF SECTION 21, TOWNSHIP 2 NORTH, RANGE 4 EAST, SALT LAKE BASE AND MERIDIAN, AND MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE SOUTHEAST CORNER STONE OF SAID SECTION 21; AND RUNNING THENCE SOUTH 85°55' WEST 812.3 FEET ALONG THE SECTION LINE; THENCE ALONG A RIDGE FIVE COURSES AS FOLLOWS: NORTH 41° WEST 1180.0 FEET; THENCE NORTH 11° WEST 377.0 FEET; THENCE NORTH 2° EAST 1079.3 FEET; THENCE NORTH 59° EAST 659.0 FEET; THENCE NORTH 25° EAST 24.0 FEET TO THE QUARTER SECTION LINE; THENCE ALONG SAID LINE NORTH 85°49' EAST 1048.0 FEET TO A POINT MIDWAY ALONG THE EAST BOUNDARY OF SAID SECTION 21 BETWEEN THE NORTHEAST AND SOUTHEAST CORNER STONES; THENCE SOUTH 0°02' WEST 2719.0 FEET TO THE POINT OF BEGINNING.

PARCEL 12: (SUMMIT COUNTY)

FOR INFORMATIONAL PURPOSES ONLY: PARCEL NO. NS-BDY-20

BEGINNING AT THE NORTHEAST CORNER STONE OF SECTION 28, TOWNSHIP 2 NORTH, RANGE 4 EAST, SALT LAKE BASE AND MERIDIAN; RUNNING THENCE SOUTH 0°02' WEST 1666.0 FEET ALONG THE SECTION LINE; THENCE ALONG A RIDGE THREE COURSES AS FOLLOWS: NORTH 26°51' WEST 796.6 FEET; THENCE NORTH 24° WEST 854.00 FEET; THENCE NORTH 41° WEST 155.5 FEET TO THE SECTION LINE; THENCE ALONG SAID LINE NORTH 85°55' EAST 812.3 FEET TO THE POINT OF BEGINNING.

PARCEL 13: (MORGAN COUNTY)

FOR INFORMATIONAL PURPOSES ONLY: PARCEL NO. 00-0005-0375; SERIAL NO. 01-002-125-03

GOVERNMENT LOTS 9, 10, 11, 12, 13, 14, 15 AND 16 OF SECTION 16, TOWNSHIP 2 NORTH, RANGE 4 EAST, SALT LAKE BASE AND MERIDIAN.

LESS ANY PORTION LYING WITHIN SUMMIT COUNTY.

PARCEL 14: (MORGAN COUNTY)

FOR INFORMATIONAL PURPOSES ONLY: PARCEL NO. 00-0000-2731; SERIAL NO. 01-002-134

GOVERNMENT LOTS 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15 AND 16 OF SECTION 20, TOWNSHIP 2 NORTH, RANGE 4 EAST, SALT LAKE BASE AND MERIDIAN.

PARCEL 15: (MORGAN COUNTY)

FOR INFORMATIONAL PURPOSES ONLY: PARCEL NO. 00-0084-9030; SERIAL NO. 01-002-135-01

ALL OF SECTION 27, TOWNSHIP 2 NORTH, RANGE 4 EAST, SALT LAKE BASE AND MERIDIAN.

LESS AND EXCEPTING THAT PORTION LYING WITHIN SUMMIT COUNTY.

ALSO LESS AND EXCEPTING THE FOLLOWING DESCRIBED PROPERTY: PART OF THE SOUTHWEST QUARTER OF SECTION 27, TOWNSHIP 2 NORTH, RANGE 4 EAST, SALT LAKE BASE AND MERIDIAN AND HAVING A BASIS OF BEARING TAKEN AS SOUTH 85°43'59" WEST BETWEEN THE SOUTH 1/4 CORNER AND THE SOUTHWEST CORNER OF SAID SECTION 27 DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT WHICH IS SOUTH 85°43'59" WEST 1506.90 FEET ALONG THE SECTION LINE AND NORTH 72.48 FEET FROM THE SOUTH 1/4 CORNER OF SAID SECTION 27 AND RUNNING THENCE NORTH 54°37'38" WEST 45.00 FEET; THENCE NORTH 35°22'22" EAST 26.31 FEET; THENCE NORTH 08°38'29" WEST 73.81 FEET;

THENCE NORTH 81°21'31" EAST 20.00 FEET; THENCE SOUTH 08°38'29" EAST 53.11 FEET; THENCE NORTH 35°22'22" EAST 20.86 FEET; THENCE NORTH 50°55'52" EAST 38.68 FEET; THENCE NORTH 08°32'24" EAST 42.33 FEET; THENCE NORTH 10°15'47" EAST 56.91 FEET; THENCE NORTH 15°12'11" EAST 21.59 FEET; THENCE NORTH 09°36'58" EAST 47.90 FEET; THENCE NORTH 04°50'59" EAST 56.72 FEET; THENCE NORTH 03°13'30" WEST 48.39 FEET; THENCE NORTH 15°17'17" WEST 78.41 FEET; THENCE NORTH 12°58'55" WEST 75.46 FEET; THENCE NORTH 09°53'13" WEST 47.03 FEET; THENCE NORTH 10°15'27" WEST 66.93 FEET; THENCE NORTH 10°36'25" WEST 66.48 FEET; THENCE NORTH 22°07'54" WEST 63.17 FEET; THENCE NORTH 14°22'48" WEST 40.32 FEET; THENCE NORTH 03°54'11" WEST 51.81 FEET; THENCE NORTH 00°14'18" EAST 57.90 FEET; THENCE NORTH 09°00'37" WEST 120.64 FEET; THENCE NORTH 15°45'11" WEST 9.99 FEET; THENCE SOUTH 60°46'28" WEST 27.80 FEET; THENCE NORTH 29°13'32" WEST 91.23 FEET; THENCE NORTH 60°46'28" EAST 94.65 FEET; THENCE SOUTH 29°13'32" EAST 91.23 FEET; THENCE SOUTH 60°46'28" WEST 56.57 FEET; THENCE SOUTH 15°45'11" EAST 13.02 FEET; THENCE SOUTH 09°00'37" EAST 121.97 FEET; THENCE NORTH 80°44'01" EAST 181.39 FEET; THENCE SOUTH 09°15'59" EAST 342.85 FEET; THENCE SOUTH 80°44'01" WEST 175.42 FEET; THENCE SOUTH 09°53'13" EAST 46.79 FEET; THENCE SOUTH 12°58'55" EAST 74.99 FEET; THENCE SOUTH 15°17'17" EAST 79.26 FEET; THENCE SOUTH 03°13'30" EAST 50.16 FEET; THENCE SOUTH 04°50'59" WEST 57.85 FEET; THENCE SOUTH 09°36'58" WEST 48.80 FEET; THENCE SOUTH 15°12'11" WEST 21.65 FEET; THENCE SOUTH 10°15'47" WEST 56.32 FEET; THENCE SOUTH 08°32'24" WEST 42.18 FEET; THENCE SOUTH 03°46'06" WEST 49.05 FEET; THENCE SOUTH 35°22'22" WEST 75.96 FEET TO THE POINT OF BEGINNING.

PARCEL 16: (MORGAN COUNTY)

FOR INFORMATIONAL PURPOSES ONLY: PARCEL NO. 00-0000-2749; SERIAL NO. 01-002-136

ALL OF SECTION 21, TOWNSHIP 2 NORTH, RANGE 4 EAST, SALT LAKE BASE AND MERIDIAN.

LESS AND EXCEPTING THEREFROM THE FOLLOWING DESCRIBED TWO TRACTS OF LAND:

A TRACT OF LAND BEING PART OF THE NORTHEAST QUARTER OF SECTION 21, TOWNSHIP 2 NORTH, RANGE 4 EAST, SALT LAKE BASE AND MERIDIAN, AND MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHEAST CORNER OF STONE OF THE SAID SECTION 21, AND RUNNING THENCE SOUTH 0°02' WEST 2719.0 FEET TO A POINT MIDWAY TO THE SOUTHEAST CORNER STONE OF SAID SECTION 21; THENCE SOUTH 85°49' WEST 1048.0 FEET ALONG THE QUARTER SECTION LINE; THENCE ALONG A RIDGE THREE COURSES AS FOLLOWS: (1) NORTH 25° EAST 1514.0 FEET; (2) THENCE NORTH 33° EAST 532.6 FEET; (3) THENCE NORTH 5°30' WEST 965.4 FEET TO

A-10

SECTION LINE; THENCE NORTH 85°43' EAST 210.0 FEET TO THE POINT OF BEGINNING.

A TRACT OF LAND BEING PART OF THE SOUTHEAST QUARTER OF SECTION 21, TOWNSHIP 2 NORTH, RANGE 4 EAST, SALT LAKE BASE AND MERIDIAN, AND MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE SOUTHEAST CORNER STONE OF SAID SECTION 21, AND RUNNING THENCE SOUTH 85°55' WEST 812.3 FEET ALONG THE SECTION LINE; THENCE ALONG A RIDGE FIVE COURSES AS FOLLOWS: (1) NORTH 41° WEST 1180.0 FEET; (2) THENCE NORTH 11° WEST 377.0 FEET; (3) THENCE NORTH 2° EAST 1079.3 FEET; (4) THENCE NORTH 59° EAST 659.0 FEET; (5) THENCE NORTH 25° EAST 24.0 FEET TO THE QUARTER SECTION LINE; THENCE ALONG SAID LINE NORTH 85°49' EAST 1048.0 FEET TO A POINT MIDWAY ALONG THE EAST BOUNDARY OF SAID SECTION 21 BETWEEN THE NORTHEAST AND SOUTHEAST CORNER STONES; THENCE SOUTH 0°02' WEST 2719.0 FEET TO THE POINT OF BEGINNING.

PARCEL 17: (MORGAN COUNTY)

FOR INFORMATIONAL PURPOSES ONLY: PARCEL NO. 00-0000-2764; SERIAL NO. 01-002-137

ALL OF SECTION 28, TOWNSHIP 2 NORTH, RANGE 4 EAST, SALT LAKE BASE AND MERIDIAN.

LESS AND EXCEPTING THEREFROM THE FOLLOWING DESCRIBED TRACT OF LAND:

PART OF THE NORTHEAST QUARTER OF SECTION 28, TOWNSHIP 2 NORTH, RANGE 4 EAST, SALT LAKE BASE AND MERIDIAN:

BEGINNING AT THE NORTHEAST CORNER STONE OF THE SAID SECTION 28; AND RUNNING THENCE SOUTH 0°02' WEST 1666.0 FEET ALONG THE SECTION LINE; THENCE ALONG A RIDGE THREE COURSES AS FOLLOWS: (1) NORTH 26°51' WEST 796.6 FEET; (2) THENCE NORTH 24° WEST 854.0 FEET; (3) THENCE NORTH 41° WEST 155.5 FEET TO SECTION LINE; THENCE ALONG SAID LINE NORTH 85°55' EAST 812.3 FEET TO THE POINT OF BEGINNING.

PARCEL 18: (MORGAN COUNTY)

FOR INFORMATIONAL PURPOSES ONLY: PARCEL NO. 00-0000-2780; SERIAL NO. 01-002-138

ALL OF SECTION 29, TOWNSHIP 2 NORTH, RANGE 4 EAST, SALT LAKE BASE AND MERIDIAN.

A-11

PARCEL 19: (SUMMIT COUNTY)

FOR INFORMATIONAL PURPOSES ONLY: PARCEL NOS. WOH-1B-16 THROUGH WOH-1B-21; WOH 1B-23; WOH-1B-24; WOH-1B-52; WOH-1B-53, WOH-1B-55 AND WOH-1B-57 THROUGH WOH-1B-63; WOH-1B-OSA; WOH-1B-OSB

LOTS 16 THROUGH 21, 23, 24, 52, 53, 55 AND 57 THROUGH 63, OPEN SPACE A, AND OPEN SPACE B, WOHALI PHASE 1B SUBDIVISION, ACCORDING TO THE OFFICIAL PLAT THEREOF RECORDED OCTOBER 26, 2023 AS ENTRY NO. 1211487 IN THE OFFICE OF THE SUMMIT COUNTY RECORDER.

PARCEL 20: (SUMMIT COUNTY)

FOR INFORMATIONAL PURPOSES ONLY: PARCEL NO. WOH-2A

ALL OF WOHALI PHASE 2A, A UTAH RESORT UNIT PROJECT, ACCORDING TO THE OFFICIAL PLAT THEREOF RECORDED NOVEMBER 28, 2023 AS ENTRY NO. 1212847 IN THE OFFICE OF THE SUMMIT COUNTY RECORDER.

PARCEL 21: (SUMMIT COUNTY)

FOR INFORMATIONAL PURPOSES ONLY: PARCEL NO. WOH-2B

ALL OF WOHALI PHASE 2B, A UTAH RESORT UNIT PROJECT, ACCORDING TO THE OFFICIAL PLAT THEREOF RECORDED NOVEMBER 28, 2023 AS ENTRY NO. 1212848 IN THE OFFICE OF THE SUMMIT COUNTY RECORDER.

PARCEL 22: (SUMMIT COUNTY)

FOR INFORMATIONAL PURPOSES ONLY: PARCEL NO. WOH-2C

ALL OF WOHALI PHASE 2C, A UTAH RESORT UNIT PROJECT, ACCORDING TO THE OFFICIAL PLAT THEREOF RECORDED NOVEMBER 28, 2023 AS ENTRY NO. 1212849 IN THE OFFICE OF THE SUMMIT COUNTY RECORDER.

4913-8130-8319.1

# EXHIBIT "B"

[TO BE PROVIDED]

4913-8130-8319.1

# EXHIBIT "C"

[TO BE PROVIDED]

# EXHIBIT "D"

## <u>BILL OF SALE</u>

[TO BE PROVIDED]

E-1

**EXHIBIT "E"**

**ASSIGNMENT AND ASSUMPTION OF LEASES**

[TO BE PROVIDED]

E-1

**EXHIBIT "F"**

**ASSIGNMENT OF TRADE NAMES AND TRADEMARKS**

[TO BE PROVIDED]

Schedule 12.1-2

**ASSIGNMENT OF ASSIGNMENT OF CONTRACTS**

[TO BE PROVIDED]

# EXHIBIT "H"

## ASSIGNMENT OF PERMITS, ENTITLEMENTS, INTANGIBLES AND IP

[TO BE PROVIDED]

4913-8130-8319.1

**EXHIBIT "I"**

**ASSUMPTION AND ASSIGNMENT OF WATER RIGHTS AND WATER CONTRACTS**

[TO BE PROVIDED]

Schedule 12.1-5

**EXHIBIT "J"**

**<u>CERTIFICATE OF NON-FOREIGN STATUS</u>**

[TO BE PROVIDED]

Schedule 12.1-6

**EXHIBIT "K"**

**ASSIGNMENT AND ASSIGNMENT OF RIGHTS AND OBLIGATIONS OF DEBTOR
RELATED TO PID**

[TO BE PROVIDED]

Schedule 12.1-7

**SCHEDULE 1.0**

**<u>Excluded Property</u>**

1. Originals of Books and Records.

2. Cash, including without limitation funds to be advanced under the DIP Loan.

3. Causes of Action, including without limitation, Chapter 5 causes of action.

4913-8130-8319.1

## SCHEDULE 2.1(b)

## **Personal Property**

See attached Exhibit A.

4913-8130-8319.1

## SCHEDULE 2.1(c)

## **<u>Leases</u>**

- 2026 Golf Discovery Memberships.

4913-8130-8319.1

## SCHEDULE 2.1(d)

## <u>**Assumed Contracts**</u>

- Wohali Master Planned Development: Development Agreement dated May 25, 2021, as amended.

- 2026 Golf Discovery Memberships.

4913-8130-8319.1

# SCHEDULE 2.1(e)

## Permits

[TO BE PROVIDED]

4913-8130-8319.1

**SCHEDULE 2.1(f)**

**<u>Intangibles</u>**

None.

4913-8130-8319.1

**Entitlements**

As outlined in the Master Development Agreement.

4913-8130-8319.1

**SCHEDULE 2.1(h)**

**Trade Names and Trademarks**

Wohali Land Estates LLC

Schedule 12.1-15

## SCHEDULE 2.1(j)

## Water Rights and Water Contracts

As outlined in the Master Development Agreement.

4913-8130-8319.1

# SCHEDULE 4.0

## Permitted Title Exceptions

[TO BE PROVIDED]

4913-8130-8319.1