Ellen E. Ostrow (14743)
eostrow@foley.com
FOLEY & LARDNER LLP
95 State Street, Suite 2500
Salt Lake City, UT  84111
Telephone:  801.401.8900
*Counsel for the Chapter 11 Trustee*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF UTAH

| In re: | Chapter 11 |
|---|---|
| Wohali Land Estates, LLC, | Bankruptcy No. 25-24610 |
| | Hon. Peggy Hunt |
| Debtor. | |

### CHAPTER 11 TRUSTEE'S OMNIBUS REPLY IN SUPPORT OF HIS MOTION FOR AN ORDER (A) APPROVING THE SALE, FREE AND CLEAR OF ALL CLAIMS, LIENS, AND ENCUMBRANCES; AND (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OR REJECTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (III) GRANTING RELATED RELIEF

Matt McKinlay, in his capacity as the Chapter 11 Trustee (the "***Trustee***") of Wohali Land Estates, LLC (the "***Debtor***"), hereby submits this omnibus reply in support of his motion (this "***Motion***") to (A) approve the sale of the  (the "***Sale***") of substantially all of the Debtor's assets (the "***Assets***") pursuant to that certain Purchase and Sale Agreement (the "***APA***")[1] between Wohali Land Estates, LLC and EB5AN Wohali Utah Fund XV, LP ("***EB5***") [Docket No. 441], (B) approving the assumption and assignment or rejection of executory contracts and unexpired leases; and (C) granting related relief.

---

[1] All capitalized terms not defined herein shall have the meanings ascribed to them in the Motion or the APA.

4901-2358-5192.1

## INTRODUCTION

After completion of the sale process that was approved by the Court in its *Order (A) Approving Bid Procedures for the Sale of Assets; (B) Approving Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases; (C) Scheduling the Sale Hearing; and (D) Granting Related Relief* [Dkt. No. 423] (the "**Bid Procedures Order**"), and the Court's approval of the settlement agreement between the Trustee and EB5 [Dkt. No. 465] (the "**Settlement Agreement**"), the Trustee is seeking the Court's approval of the Sale, as outlined in the APA. The Trustee believes that the Sale, as proposed, is the best result for creditors, and is indeed the only option which will allow this case to be resolved in an orderly manner while providing a meaningful return to creditors. The Debtor's DIP loan matures in 10 days and there is no prospect of further funding. Without approval of the Sale, the Trustee will not have sufficient additional funding to preserve the estate's assets, its championship golf course in particular, or to otherwise administer the estate for any meaningful time. The value of the estate will suffer severe consequences, and the case may need to be converted or dismissed. Despite ample opportunities to submit bids, no other prospective bidder has submitted any bid (other than a low-ball stalking horse proposal that was not seriously considered), let alone made an offer that is higher or better than the APA provides.

Despite these stark realities, two parties have filed objections to the Sale, Boyden Farms, LLC ("**Boyden**") [Dkt. No. 471] (the "**Boyden Objection**"), and the Wohali Concerned Landowners (the "**Owners**") [Dkt. No. 470] (the "**Owners' Objection**"). Boyden and the Owners have clearly established that they do not want EB5 to acquire the Debtor's property but, in the end, they do not provide any basis for the Court to reject the Sale. In addition, the Owners filed an

2

objection to the assumption and assignment or rejection of executory contracts as it relates to certain golf course memberships [Dkt. No. 472] (the "***Owners Contract Objection***"). The golf course memberships are not contracts with the Debtor. And even if they are, the purchaser does not want to take them, so the Trustee would not burden the estate with the administrative cost of assuming them. To the extent they run with the land, the Sale does not affect them. These objections should be overruled and the Sale should be approved.

Finally, the City of Coalville also filed an objection to the cure amount for a contract it has with the Debtor [Dkt No. 466] (the "***Coalville Cure Objection***"). The Trustee understands that EB5 has agreed to pay the cure amounts to Coalville, such that the assumption and assignment of the Assigned Contracts is in the best interest of the Debtor's estate and creditors and should be approved accordingly.

## <u>REPLY IN SUPPORT OF MOTION</u>

### A. The Sale was Conducted in Accordance with the Court's Orders and Should be Approved

1.      The Trustee and his professionals, including his broker, CBRE, undertook a robust marketing process that began shortly after the Trustee's appointment. By December 2025, the Trustee had established a data room for interested purchasers and had 14 active in the data room after signing confidentiality agreements. CBRE and the Trustee conducted their marketing efforts in a manner consistent with, and in anticipation of, the Bid Procedures, including, without limitation, working to identify a stalking horse bidder and solicit interest and Bids that would lead to a Qualified Bid. These marketing efforts included CBRE's broad but targeted outreach to approximately 13,960 potential buyers leading to approximately 100 signed NDAs to access the data room, 75 active parties in the data room and six parties touring the property. As interested

4901-2358-5192.1

parties conducted their due diligence, CBRE and the Trustee's professionals engaged in discussions and answered questions.

2. At the time the Trustee was negotiating the settlement reflected in the Settlement Agreement, CBRE provided the Trustee with the details of the communications CBRE was having with prospective purchasers regarding the challenges with the Debtor's property and the negative impact on value. The Trustee accordingly understood the market's indications of value with respect to the Debtor's assets. Nobody expressed an interest in submitting a bid for $65 million (plus the Assumed Liabilities such as the PID), let alone $89 million.

3. While EB5's credit bid rights were a consideration for prospective buyers, they were not the reason the most likely bidders failed to submit a bid. In the end, the significant uncertainty regarding necessary entitlement changes and utilities made the Debtor's property undesirable to such prospective buyers. In particular, CBRE repeatedly heard that the path to revenue generation was too challenging and risky because of (i) the estimated timeframe of six to nine months to achieve any entitlement amendments with respect to "air rights" on the "Village" units and (ii) the uncertain cost (multiple millions) and likely extended timeframe of at least a year to get power and other utilities to the property. The air rights constrained underwriting assumptions for several prospective buyers. Similarly, the requirement for additional infrastructure to obtain certificates of occupancy created concerns regarding timing and cost for investors and made underwriting too challenging.

4. The Trustee negotiated the settlement and critical APA terms (including cash, credit bid floor and cap, and assumed liabilities) with the market feedback in mind in order to maximize value for the estate and creditors. At no point did the credit bid rights cause the settlement or APA

4

negotiations with EB5 to become anything other than good faith, arm's length negotiations. The Trustee and his team fought hard over the course of weeks for the results set forth in the Settlement Agreement and the APA. The Trustee negotiated the APA over the course of several days after the Trustee entered into the Settlement Agreement. The APA only involves certain aspects of the settlement. In substance, the APA simply sells the Debtor's assets to EB5 for a purchase price that includes a $1.8 million cash component, a credit bid of $65 million, and the assumption of certain liabilities. It does not require any particular plan or path forward for the estate.

5. Notably, the APA also does not include three parcels (the "*WP Parcels*") that are owned by Wohali Partners. Accordingly, the Motion does not request any relief from the Court with respect to the WP Parcels. The inclusion of the WP Parcels in the sale process would somewhat de-risk the purchase of the Debtor's assets for any prospective buyer, but they were not a meaningful impediment for the most likely bidders. No prospective bidder even asked CBRE for details regarding the Trustee's anticipated efforts to acquire the WP Parcels or when or how they might be included in the purchased assets, and neither the Trustee nor CBRE are aware of any prospective bidder that passed on the opportunity to submit a Bid because of the WP Parcels.

6. Similarly, no prospective bidder engaged CBRE in any discussions regarding the backcountry or the disputes between the Trustee, EB5 and Boyden Farms with respect to the ownership of, and liens on, the backcountry. And no prospective bidder raised any questions about the current golf memberships tied to the Debtor's championship golf course. In the circumstances of this case, CBRE concluded that prospective bidders would not ascribe any meaningful value to these memberships.

4901-2358-5192.1

7. The Trustee and CBRE kept prospective bidders informed of the Trustee's negotiations with EB5. As part of the Trustee's and CBRE's ongoing efforts to attract and communicate with potential buyers, after entering into the Settlement Agreement, the Trustee caused CBRE to provide notice to potential buyers of the proposed Stalking Horse Bid. As provided in the Bid Procedures, any potential buyer was able to and required to provide a markup of the APA if it elected to submit a Qualified Bid.

8. The initial Qualified Bid Deadline was April 20, 2026. The Trustee did not receive any Qualified Bids by April 20, nor did any potential buyer ask for additional time to submit a bid. However, the Trustee extended the Qualified Bid Deadline by two days to April 22, 2026, and CBRE reached out to the market regarding the extended deadline. No Qualified Bid was received, nor did any prospective buyers ask for additional time or otherwise inform the Trustee or CBRE that they were awaiting the Court's ruling on the Settlement Agreement or wanted additional time to submit a bid. Because no Qualified Bid was received by the Qualified Bid Deadline, the Trustee cancelled the April 24, 2026 auction pursuant the Bid Procedures.

9. Contrary to the misleading allegations of the Owners that CBRE and the Trustee acted prematurely (Owners Objection, p. 12), after the Court orally approved the Settlement Agreement on April 29, CBRE, at the Trustee's direction, promptly provided notice of the Court's approval of the Settlement Agreement. Neither the Trustee nor CBRE informed interested bidders that the Court approved EB5 as a stalking horse bidder. Rather, CBRE communicated additional information on the ability for interested parties to overbid EB5's stalking horse bid under the Settlement Agreement, which would require an overbid starting at $70 million dollars, to clear the value to be provided to the estate by the bid EB5 agreed to make under the Settlement Agreement.

6

The deadline for such overbids to be submitted was May 5, 2026 at 3:00 p.m. Mountain Time. No additional bids were submitted by this deadline.

10.     The majority of the Owners' Objection is a litany of complaints about the sale process. *See generally* Owners' Objection, p. 9-15. Jeffery Woolson of CBRE and the Trustee have submitted declarations in support of the Sale that further detail their efforts in this matter [Dkt. Nos. 485 (McKinlay); and 486 (Woolson)] (respectively the "***Woolson Declaration***" and the "***McKinlay Declaration***"), and the outcome of the marketing efforts. The sale process was conducted in the manner and in the timeframe the Court authorized and directed in its orders. Unfortunately, despite the best efforts of the Trustee and CBRE, no other bidder came forward with an offer that would return greater value to the estate than the EB5 bid. Therefore, the only viable option available to the Trustee is the sale to EB5 under the APA, which in addition to the benefits provided under the Settlement Agreement, provides several million dollars of additional funding for the estate, including a significant amount to be paid to unsecured creditors. As such, both the Trustee and CBRE concluded that the Sale provides the highest and best value available for the Assets. The proposed Sale to EB5 pursuant to the APA is in the best interest of the Debtor's estate and creditors and should be approved.

**B. The Trustee has Appropriately Exercised his Business Judgement in Pursing the Sale to EB5**

11.     The Owners argue that the Trustee has not demonstrated a sound business purpose for the Sale and that there was a better offer available in mid-April which the Trustee could have accepted but chose not to. Owners Objection, p. 6. However, as with many of the promises of a better offer that have been made throughout the case, and as addressed at the hearings on the approval of the Settlement Agreement, this purported better offer was purely conceptual and did

not ever materialize into anything actionable. Moreover, even if the WP Parcels were available to lien up for a new DIP loan to fight with EB5 and otherwise pursue an unconfirmable plan, the Owners' plan sought to put creditor recoveries at risk for the benefit of the Owners' desire to fight EB5 and do anything and everything to prevent EB5 from acquiring the Debtor's property. The Court rejected that argument in connection with its approval of the Settlement Agreement and should do so again. The Trustee exercised sound business judgment, in the absence of any actionable alternatives, to pursue a path that could ultimately lead to the Sale to EB5 but would also ensure creditor recoveries. The Trustee objectively and without duress chose the bird in hand with EB5 instead of the Owners' hopeful two in the bush.

12.     The Trustee is entitled to "great judicial deference" in its decision to sell assets of the estate, even when the court believes there may be another offer for the estate's assets. *In re Castre, Inc.*, 312 B.R. 428, 430-431 (Bankr. D. Colo. 2004) (approving a sale to the bidder selected by the trustee even though there were some questions about that bidder and there was a second bid because the court found it should not "step in and assume a role and responsibility properly placed by the Code in another's hands.").

13.     The circumstances of this case demonstrate why the Sale is a sound exercise of the Trustee's business judgment. The Trustee is required to comply with the Milestones in the DIP Order and the Bidding Procedures Order, including the dates for this sale process. Furthermore, the DIP Loan is set to mature on May 15, 2026. The estate will run out of funding at that time and will be unable to pay expenses, or maintain facilities like the golf course, which will both harm the current members of the club and also reduce the value of the Debtor's assets over time. *In re Daufuskie Island Properties, LLC*, 431 B.R. 626, 636 (Bankr. D. S.C. 2010) (approving a sale of

4901-2358-5192.1

substantially all of the Debtor's assets before plan confirmation because, among other reasons, the trustee would run out of funding to maintain the facilities if the sale did not go forward). Time is of the essence in this case.

14.     In addition, and as more fully described in the McKinlay Declaration and the Woolson Declaration, the Trustee has obtained the highest and best bid for the assets through the Court-approved sale process, indicating that the sale meets the sound business purpose test. *Daufuskie*, 431 B.R. at 639 (approving the sale under Section 363 where the purchase price was the highest obtained after extensive marketing by professionals).

15.      If a better offer had been available during the sale process, the Trustee would have known it and pursued it. Indeed, the Trustee and his professionals held discussions with the Owners and others throughout the case on a potential plan. However, nothing came to fruition, as noted by the Court at the conclusion of the hearing to approve the Settlement Agreement. (Hrg. Tr., p. 28, lines 23-25, p. 29, lines 1-3). The Sale to EB5 is the Trustee's sole option at this point. In the Trustee's business judgment, the sale to EB5, with the additional cash consideration to be paid for estate expenses, including maintenance of the golf course, and a guaranteed minimum distribution to unsecured creditors, is in the best interests of the estate and the stakeholders.

**C. The Court-Approved Bidding Procedures and Settlement Agreement did not Chill Bidding but Instead Provided all Parties with a Reasonable Valuation for the Debtor's Assets**

16.     In this case, the Court approved the Settlement Agreement, which expressly permitted EB5 to credit bid its debt in connection with the Sale. *See* Settlement Agreement, ¶ 1. Prior to seeking approval of the Settlement Agreement, the Trustee and his professionals thoroughly examined the validity and priority of EB5's liens through the review of thousands of

documents and a number of depositions. As explained in the McKinlay Declaration, the Trustee thoroughly considered CBRE's and the market's feedback with respect to the value of the Debtor's property and negotiated the Settlement Agreement and the terms of the stalking horse bid accordingly.

17. Here, the Owners have listed a variety of complaints about the sales process, EB5's conduct, and the manner in which the Trustee conducted the sale, arguing that the large credit bid could have chilled the bidding of other parties. *See* Owners' Objection, p. 14; Boyden Objection, p. 9-10. However, Mr. Woolson believes that while parties were aware of the credit bid rights and may have taken them into account, there are significant issues with the Debtor's assets that made the sale difficult, including required entitlement changes, utility concerns, and the extended period of time it would take to resolve those issues. Woolson Declaration, ¶ 15. Problems with the Debtor's entitlements and infrastructure and the lack of a clear path and timeframe to revenue generation hindered the value of the Debtor's property, not EB5's credit bid rights or the sale process undertaken by the Trustee and CBRE. Additionally, EB5 would not voluntarily agree to reduce or waive its rights to credit bid. The Trustee carefully evaluated whether to challenge EB5's credit bid rights, but concluded the time, expense and litigation risk were not in the best interests of creditors and the estate.

18. The property has been extensively marketed for several months. In fact, since December of last year, a data room has been available for interested parties to conduct diligence. With the assistance of CBRE, the Trustee and his team have reached out far and wide to get Qualified Bids and have a competitive auction. The underlying issue here is that the Debtor's assets simply are not worth what the Owners and Boyden believe they are or would like them to be.

4901-2358-5192.1

19. The sale process has indicated the Debtor's assets are worth some amount under $70 million. *See* McKinlay Declaration, ¶ 13. After extensive marketing, the Trustee did not receive any other qualified bids. A public, well-advertised sale process indicates the appropriate value of the property. *In re Moreno*, 554 B.R. 504, 510 (Bankr. D. N.M. 2016) (approving a sale of property to an insider relative of the debtor for a lower offer than the debtor wished to accept because the property had been marketed by an experienced broker which had not yielded any offers). In this case, the Trustee with the assistance of CBRE made multiple attempts to secure additional bids on the property, but were not successful. McKinlay Declaration, ¶¶ 10-16.

**D. EB5 and the Trustee have acted in Good Faith in Connection with the Sale Process**

20. As discussed above, the Trustee and his professionals have acted in good faith and in accordance with all of the Court's orders in their conduct of the sale. In parallel with the sale process, the Trustee entered into negotiations with the Owners to determine if there was another potential resolution of this matter, including through an agreed plan. No written proposals were ever submitted by the Owners and the Trustee was bound by the Court's orders and the DIP Milestones to reach a resolution. The Trustee also made diligent efforts to secure other bidders for the Debtor's assets. McKinlay Declaration, ¶¶ 10-16. Such efforts did not lead to any better resolution, but that does not mean that the Trustee failed to act in good faith. Rather, the concerns highlighted above indicate that there were a number of difficult issues surrounding the Project that made potential purchasers wary of submitting a bid.

21. Good faith in the context of Section 363 addresses the good faith of the purchaser in the sale, barring allegations of collusion with the Trustee. *In re Buerge*, 2014 WL 1309694, *13 (10th Cir. B.A.P. 2014). Courts analyze whether a purchaser acted in good faith by determining if

11

there was an arms-length process; the insider status of the purchaser if any, and whether fraud or collusion existed. *Id*.

22. The Trustee, who was personally involved in the negotiations for the Sale and the Settlement Agreement, declared that EB5 also acted in good faith during the negotiations, which were arms-length. McKinlay Declaration, ¶ 21. There are no connections between EB5 and the Trustee other than EB5's status as a lienholder. Finally, there was no fraud or collusion in this case and the objecting parties do not point to any. Rather, they make a collection of misleading assertions designed to smear the reputations of the Trustee and his professionals and EB5 and cast doubt on the legitimacy of the sale process. The Court should not countenance this gamesmanship. The APA provides substantial value to the estate, including the assumption of significant liabilities, a limitation on any potential deficiency claim, and millions of dollars to be paid into the estate for distribution to administrative claim holders and unsecured creditors. It would be an attractive offer in any circumstance, but here, there are no other offers to be considered and the Court should approve the Sale.

### E. **The Sale does not Constitute a Sub Rosa Plan**

23. Both the Owners and Boyden also contend that the Sale is a sub rosa plan of liquidation. This is incorrect, it is simply a sale of substantially all the Debtor's assets. That the sale may result in, or that parties may contemplate, a plan of liquidation or a conversion to Chapter 7 is not dispositive. For the Court to find it is a sub rosa plan, the Court must find that all aspects of the case that would normally be decided in a plan are resolved by the Sale and the APA. *In re 23andMe Holdings Co.*, 674 B.R.487, 521 (Bankr. E.D. Mo. 2025) (denying an objection to a Section 363 sale of substantially all of the debtor's assets as a sub rosa plan where "nothing in the

4901-2358-5192.1

APA, the sale order, or other aspects of the transaction establishes any terms of a forthcoming liquidation plan…"). As in *23andMe*, this is not the case here.

24.     Here, as is common in many bankruptcies, the Trustee seeks to sell substantially all of the Debtor's assets. However, the APA does not deal with the WP Parcels, avoidance actions and other claims that the estate may have. Sales of substantially all a debtor's assets are authorized by the Code, and were specifically authorized here in the Bidding Procedures Order, and the Order approving the Settlement Agreement. Once the Sale is complete, the Trustee will have funds to administer and distribute in a plan, which may be proposed in accordance with the Bankruptcy Code, including distribution according to the priority scheme required, and will be subject to creditor approval. Courts have found that sales which fund later plan distributions to be acceptable where the plan will still require court and creditor approval. *See Id*.; *see also In re CSC, Inc.*, 453 B.R. 132, 180 (Bankr. S.D.N.Y. 2011) (finding a sale was not a sub rosa plan where the proceeds of the sale are distributed according to lien priority); *In re Boston Generating, LLC*, 460 B.R. 302 (Bankr. S.D.N.Y. 2010) (approving a sale of substantially all of the assets and finding it was not a sub rosa plan where most of the proceeds would go to the first lien lender and the rest would be distributed through a plan).

## F. <u>Boyden's Objections Regarding the Sale of the Backcountry Parcel Should be Overruled</u>

25.     Boyden also raised an objection to the sale of the Backcountry Parcel because it contends that the parcel is not property of the estate. The Trustee disagrees with this contention but these issues will be resolved in the pending Adversary Proceeding (Case No. 26-02010) (the "***Boyden Adversary Proceeding***"), regarding the enforceability of an Intercreditor Agreement (the "***ICA***") which was executed by Stephen Boyden in 2022, and pursuant to which the EB5's lien on

the Backcountry Parcel has first priority until its liens are paid off in full. While the Trustee does not believe Boyden Farms will prevail in the Boyden Adversary Proceeding, the Trustee addressed the potential result of the Boyden Adversary Proceeding in the APA, providing that the sale is "As-Is, Where-Is, If-Is." APA, Section 12.1(a). If Boyden prevails in the Boyden Adversary Proceeding, it will maintain its lien on the Backcountry Property and EB5 will not be permitted to obtain it through the Sale, or reduce the consideration it offers for the Sale.

26. Despite Boyden's contentions, the Backcountry Property is property of the estate, though the liens on it are subject to a bona fide dispute (the Boyden Adversary Proceeding). The Bankruptcy Code permits a sale of assets free of interests under Section 363(d)(4) if there is bona fide dispute about the interest. Here, the Boyden Adversary Proceeding rests largely on the assertion that the ICA signed by Boyden's principal and two members of his family was somehow fraudulent and therefore ineffective. The Trustee fully expects to prevail in the Boyden Adversary Proceeding, but if he does not, the property will not be conveyed to EB5 under the APA or will be conveyed subject to Boyden's claims as set forth in the Settlement Agreement. Either way, the Sale does not adversely affect Boyden's rights and leaves the determination of those rights for a later date in connection with the Adversary Proceeding. Therefore, Boyden is fully protected if it is successful in the Boyden Adversary Proceeding.

**G. The Three Parcels Owned by Wohali Partners are not Relevant to the Sale Motion**

27. Both Boyden and the Owners make much of the fact that EB5 has taken certain actions in state court as to three parcels (the "***WP Parcels***") which are owned by Debtor's parent, Wohali Partners. As the Court has previously heard evidence, the WP Parcels have never been owned by the Debtor. The WP Parcels include the roadway known as Wohali Way, a water pump,

14

and a vacant land parcel. The Trustee understands that Wohali Partners purchased these parcels for approximately $1.1 million in 2018 and made approximately $900,000 worth of improvements. The Trustee understands that ownership of the WP Parcels would add value to the estate, but they are not critical to a robust sale process for the Debtor's existing real property. Based on CBRE's marketing efforts, the Trustee understands that the prospective buyers who discussed the matters with CBRE and/or the Trustee understand and believe that the Wohali Project can be developed without their inclusion. The WP Parcels are not included in the APA and were not the reason prospective bidders declined to submit a bid. Their inclusion is not required for access to or the sale of the Debtor's existing real property.

28. As the Court knows, the Trustee will attempt to bring them into the Debtor's estate through substantive consolidation or settlement with Wohali Partners, and the Trustee has now entered into a stipulation with EB5 that is subject to the Court's approval at a future date. That stipulation seeks to ensure, among other things, that the Trustee can pursue the estate's claims with respect to the WP Parcels before EB5. Because the feedback from prospective bidders rendered the WP Parcels nice to have but not need to have, the WP Parcels were rendered a secondary issue to be dealt with after the Sale process had concluded. Therefore, the actions EB5 undertook in state court as to property owned by another entity are not relevant to the Sale before the Court.

## H. The Owners' Contract Objection Should be Overruled as Moot

29. The Owners object to the rejection of certain golf course memberships that pre-dated the bankruptcy. However in a hearing on the same issue on May 5, 2026, the Court determined that the Owners did not have any claims based on the memberships. Therefore, the Court should overrule the objection as moot.

15

### I.  The Coalville Cure Objection Should be Overruled

30.     As discussed above, the Trustee has indicated that EB5 will pay the amounts owed to Coalville under the Master Development Agreement in connection with its assumption and assignment to EB5. McKinlay Declaration, ¶ 24. Therefore, this Objection should be overruled if it is not withdrawn by the City of Coalville.

### CONCLUSION

31.     The Sale to EB5 was conducted properly and in all ways complied with the Court's orders and the Bankruptcy Code. There were ample opportunities for any other interested party to submit a bid and participate in the sale process. None did so. Therefore, the Sale is the only option that the Trustee has to resolve this case and begin the wind down of the Debtor in an orderly fashion, while making meaningful distributions to unsecured creditors. While certain parties continue their attacks on the Trustee, EB5, and the process approved by the Court, the fact remains that there are no other bidders for the Debtor's assets or proposals for an alternative exit. Without approval of the Sale, the case will descend into an uncoordinated liquidation, which will harm all creditors and stakeholders in this case.

32.     Based on the foregoing and the Motion, the Trustee respectfully requests that the Court approve the Sale, and grant such other relief as the Court deems appropriate under the circumstances.

DATED: May 5, 2026                          Respectfully submitted,


                                            /s/ *Ellen E. Ostrow*
                                            Ellen E. Ostrow
                                            Foley & Lardner LLP
                                            *Counsel for Chapter 11 Trustee*

16

**CERTIFICATE OF SERVICE**

I hereby certify that on the 5th day of May, 2026, a true and correct copy of the foregoing TRUSTEE'S OMNIBUS REPLY IN SUPPORT OF HIS MOTION FOR AN ORDER (A) APPROVING THE SALE, FREE AND CLEAR OF ALL CLAIMS, LIENS, AND ENCUMBRANCES; AND (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OR REJECTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (III) GRANTING RELATED RELIEF was electronically filed and therefore served via ECF on the following:

- **David P. Billings**   dbillings@fabianvancott.com, khaynes@fabianvancott.com
- **Bryan H Booth**   bryan@mountainwestlaw.com, lisa@mountainwestlaw.com
- **Scott S Bridge**   sbridge@keslerrust.com
- **Matthew James Burne**   matthew.burne@usdoj.gov, Lindsey.Huston@usdoj.gov;Rinehart.Peshell@usdoj.gov;Rachelle.D.Hughes@usdoj.gov;Brittany.Dewitt@usdoj.gov
- **Ryan C. Cadwallader**   rcadwallader@kmclaw.com, twhite@kmclaw.com
- **P. Matthew Cox**   mcox@spencerfane.com, ecall@spencerfane.com;mwatson@spencerfane.com
- **Michael Allen Gehret**   mike.gehret@dentons.com, kim.altamirano@dentons.com
- **Patricia Geary Glenn**   pgearyglenn@gmail.com
- **Jason W. Hardin**   jhardin@fabianvancott.com, sirvin@fabianvancott.com
- **Carson Heninger**   heningerc@gtlaw.com, carson-heninger-5642@ecf.pacerpro.com,Candy.Long@gtlaw.com
- **George B. Hofmann**   ghofmann@ck.law, mparks@ck.law;enilson@ck.law

4901-2358-5192.1

- **Annette W. Jarvis**  jarvisa@gtlaw.com, longca@gtlaw.com
- **Michael R. Johnson**  mjohnson@rqn.com, docket@rqn.com;ASanchez@rqn.com;RQN@ecfalerts.com
- **Penrod W. Keith**  penrod.keith@dentons.com, kristin.hughes@dentons.com
- **Justin J. Keys**  justin@hlhparkcity.com, nancy@hlhparkcity.com
- **Bryce L. Krieger**  bryce.krieger@dentons.com
- **Trevor C Lang**  tclang@agutah.gov, staff@mohtrial.com
- **Matt McKinlay**  mmckinlay@ampleo.com
- **Elijah L. Milne**  eli.milne@dentons.com, deb.calegory@dentons.com,jaime.gargano@dentons.com,kristen.ivory@dentons.com
- **Matt C. Osborne**  matt@oblawpc.com
- **Ellen E. Ostrow**  eostrow@foley.com, ellen-ostrow-4512@ecf.pacerpro.com;docketflow@foley.com;geysa.peeler@foley.com
- **Douglas J. Payne**  dpayne@fabianvancott.com, lwilson@fabianvancott.com;dadamson@fabianvancott.com
- **Charles Louis Pearlman**  charles@hlh.law
- **Mark C. Rose**  mrose@rqn.com, docket@rqn.com;asanchez@rqn.com
- **Jeffrey Weston Shields**  jshields@rqn.com, 5962725420@filings.docketbird.com;docket@rqn.com;ecasaday@rqn.com
- **Jeremy C. Sink**  jsink@kmclaw.com, mcarlson@kmclaw.com
- **Abigail Jennifer Stone**  abigail.stone@gtlaw.com
- **Jeffrey L. Trousdale**  jtrousdale@cohnekinghorn.com, mparks@ck.law;enilson@ck.law
- **United States Trustee**  USTPRegion19.SK.ECF@usdoj.gov

/s/ *Ellen Ostrow*

4901-2358-5192.1